**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| UNDER SEAL | § | |
| | § | |
| Plaintiff | § | **FILED UNDER SEAL** |
| | § | |
| | § | **CIVIL ACTION NO._____** |
| | § | |
| | § | **PLAINTIFF'S COMPLAINT** |
| vs. | § | **PURSUANT TO 31 U.S.C.** |
| | § | **§§ 3729-3732, FEDERAL** |
| | § | **FALSE CLAIMS ACT** |
| | § | |
| UNDER SEAL | § | |
| | § | **JURY TRIAL DEMANDED** |
| Defendant | § | |

**QUI TAM PLAINTIFF/RELATOR'S COMPLAINT**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| *Ex rel.* Michael J. Fisher, and Michael Fisher | § | |
| Individually, | § | CIVIL ACTION NO._____ |
| | § | |
| Plaintiff, | § | <u>FILED UNDER SEAL</u> |
| | § | |
| vs. | § | COMPLAINT |
| | § | (31 U.S.C §§ 3729-3732) |
| Ocwen Loan Servicing, LLC | § | (FEDERAL FALSE CLAIMS ACT) |
| | § | |
| Defendants. | § | |
| | § | |
| | § | JURY TRIAL DEMANDED |
| | § | |

## <u>QUI TAM PLAINTIFF/RELATOR MICHAEL J. FISHER'S COMPLAINT PURSUANT TO 31 U.S.C. §§ 3729-3732, FEDERAL FALSE CLAIMS ACT</u>

The United States of America, by and through *qui tam* Plaintiff/Relator, Michael J. Fisher ("Fisher" or "Relator"), brings this action under 31 U.S.C. §§ 3729-3732 ("False Claims Act" or "FCA") against Ocwen Loan Servicing, LLC ("OLS" or "Defendant") to recover all damages, penalties and other remedies available under the False Claims Act on behalf of the United States and Fisher, and would show the following:

### I. PARTIES

1.      Relator is a citizen of the United States and a resident of Southlake, Texas. Relator was employed in the area of loan modification contracts from 2008 until early 2012. During that time, Relator served as an assistant to attorneys at law firms in  Industry, California and Southlake, Texas, which assisted clients with obtaining modifications of their residential property mortgage loans from OLS and other lenders.  He reviewed loan modification contracts

**Relator's Original Complaint**                                                                                    **Page 2**

for each law firm.   Additionally, he has received and reviewed hundreds of modification contracts from other law firms and companies who represented Clients for modifications from multiple servicers including OLS.

2.     Ocwen Loan Servicing, LLC is a Delaware limited liability company with its principal place of business in West Palm Beach, Florida.  OLS can be served with process by making service upon its registered agent, Corporation Service Company dba CSC – Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, TX 78701-3218.

3.     OLS is wholly owned by and appears to be an alter ego of Ocwen Financial Corporation ("Ocwen Financial"), a Florida corporation with its principal place of business in Atlanta, Georgia.  William C. Erbey is OLS's Chief Executive Officer and Manager; Ronald M. Faris is its President and Manager.  Erbey is Ocwen Financial's Executive Chairman of the Board of Directors (since September 1996) and former Chief Executive Officer (January 1988 to October 2010), and has been part of the company since its founding in 1987.  Erbey owns or controls approximately 14% of the common shares of Ocwen Financial.  Ocwen Financial Corp. Form 10-K Annual Report filed 02/29/12 for the period ending 12/31/11 ("Ocwen 10-K") at pp. 4, 18; http://shareholders.ocwen.com/management.cfm (last accessed 08/14/12).  Faris is Ocwen Financial's President (since March 2001), Chief Executive Officer (since October 2010), and a Director (since 2003), and joined the company in 1991.  10-K at 18; http://shareholders.ocwen.com/management.cfm (last accessed 08/14/12).  Ocwen Financial, through its subsidiaries, is a leading provider of residential and commercial mortgage loan servicing, special servicing and asset management services.  In addition to its Atlanta headquarters, Ocwen Financial has offices in West Palm Beach and Orlando, Florida, Houston,

Texas, McDonough, Georgia, and Washington, DC and support operations in India and Uruguay. OLS is licensed to service mortgage loans in all 50 states, the District of Columbia and two U.S. territories. As of December 31, 2011, Ocwen Financial and its subsidiaries serviced 671,623 residential loans with an aggregate unpaid principal balance (UPB) of $102.2 billion. Ocwen Financial, formed in 1988, and its predecessors have been servicing residential mortgage loans since 1988 and subprime mortgage loans since 1994. As of December 31, 2011, Ocwen Financial and its subsidiaries also serviced 91 commercial assets totaling $290.9 million.  Ocwen 10-K at pp. 3, 4.  Between 2008 and 2011 Ocwen Financial and its subsidiaries modified 200,000 home loan modifications.  Ocwen 10-K at 4.  Ocwen Financial is publicly traded on the New York Stock Exchange under the symbol OCN.  Relator has not joined Ocwen Financial at this time, but will do so should it become apparent that such joinder is appropriate.

## II. JURISDICTION AND VENUE

4.     This matter is within the Court's federal question jurisdiction, as Relator brings this action under 31 U.S.C. § 3730(b)(1).  Venue is proper in the Eastern District of Texas, where OLS transacts business and where violations of the False Claims Act occurred in part, pursuant to the False Claims Act, 31 U.S.C. § 3732(a).  This action seeks remedies on behalf of the United States for Defendant's multiple violations of 31 U.S.C. § 3729.

## III. TRUTH IN LENDING ACT AND REGULATION Z

5.     The federal Truth in Lending Act ("TILA" or "the Act") is contained in Title I of the Consumer Credit Protection Act, as amended, at 15 U.S.C. § 1601 *et seq.*  TILA was enacted "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit,

and to protect the consumer against inaccurate and unfair credit billing and credit card practices," as well as to assure meaningful disclosures of the terms of leases of personal property and limit certain consumer leasing practices.  15 U.S.C. § 1601(a), (b).

6.     12 U.S.C. § 1604 authorizes the Consumer Financial Protection Bureau ("CFPB" or "Bureau")[1] to promulgate regulations to carry out the purposes of the Act, which may contain "additional requirements, classifications, differentiations, or other provisions, and may provide for such adjustments and exceptions for all or any class of transactions, as in the judgment of the Bureau are necessary or proper to effectuate the purposes of [the Act], to prevent circumvention or evasion thereof, or to facilitate compliance therewith.  15 U.S.C. § 1604(a).  The Bureau's rulemaking and interpretive authority are thus expansive and entitled to substantial deference.  In addition, the Bureau is required to publish a single integrated disclosure for mortgage loan transactions which includes the disclosure requirements of TILA and the Real Estate Settlement Procedures Act of 1974 ("RESPA").  15 U.S.C. § 1604(b).

7.     Regulation Z, 12 C.F.R. 1026.1 *et seq.* was promulgated by the Board of Governors of the Federal Reserve System ("Board") to implement TILA and other federal consumer protection statutes pursuant to authority granted in several sections, including, primarily, section 105 of TILA, 15 U.S.C. § 1604.  *See* 12 C.F.R. 1026.1(a).[2]

---

[1] This rulemaking authority was originally vested in the Board of Governors of the Federal Reserve System ("Board"). Effective July 21, 2011, the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank"), P.L. 111-203, 124 Stat. 1376, shifted the TILA rulemaking and interpretive authority from the Board to the new CFPB. Dodd-Frank § 1100A.

[2] Since the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank"), P.L. 111-203, 124 Stat. 1376, shifted the TILA rulemaking and interpretative authority from the Board to the new Consumer Financial Protection Bureau ("CFPB" or "Bureau") effective July 21, 2011, Dodd-Frank § 1100A, Regulation Z, previously published at 12 C.F.R. 226, has been republished at 12 C.F.R 1026.

The Act is subdivided into five main sections devoted to:

"General Provisions,"
"Credit Transactions,"
"Credit Advertising and Limits of Credit Card Fees,"
"Credit Billing" and
"Consumer Leases."

The provisions relevant to this action are contained in the first two sections of TILA.

8.      The scope of the Act is so broad that TILA does not contain a general statement of what transactions are covered, but instead specifies what transactions are excluded from coverage.  See 15 U.S.C. § 1603, titled "Exempted transactions**."**  The Court of Appeals for the Fifth Circuit has held that "'exceptions' not mentioned in the Act should not lightly be read into it."  *Thomas v. Myers-Dickson Furniture Co*., 479 F.2d 740, 745 (5th Cir. 1973).  The Act also affirmatively specifies coverage as to some transactions, including, *inter alia*, exceptions to exceptions from coverage.  Although the original bill passed by the Senate did not cover mortgage lending, the final version of the Act passed by Congress included all real property transactions, unless specifically exempted.  4-37A Powell on Real Property § 37A.01[1][a].

## A.      TILA Definitions and Disclosure Requirements

9.      The Act delineates its broad scope by specifying *who* must comply with its provisions.  Specifically, TILA provides that "creditors" are required to make disclosures and provides that **"Creditor"**

refers only to a person who both (1) regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge[3] is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness or, if there is no such evidence of indebtedness, by

---

[3] Regulation Z defines "finance charge" at 12 C.F.R. § 1026.4.

**Relator's Original Complaint**                                                                                      **Page 6**

agreement. . . . person who originates 2 or more mortgages referred to in subsection (aa) [current subsection (bb)] in any 12-month period or any person who originates 1 or more such mortgages through a mortgage broker shall be considered to be a creditor for purposes of this title . . . .

15 U.S.C. § 1602(g).  Under the Act,

(f) The term **"credit"** means the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment.

15 U.S.C. § 1602(f).

   10.    A **"mortgage[ ] referred to in Subsection (aa) [current subsection (bb)]"**

refers to certain high-cost mortgages; the phrase

means a consumer credit transaction that is secured by the consumer's principal dwelling, *other than a residential mortgage transaction*, a reverse mortgage transaction, or a transaction under an open end credit plan, if--
   (A) the annual percentage rate at consummation of the transaction will exceed by more than 10 percentage points the yield on Treasury securities having comparable periods of maturity on the fifteenth day of the month immediately preceding the month in which the application for the extension of credit is received by the creditor; or
   (B) the total points and fees payable by the consumer at or before closing will exceed the greater of--
      (i) 8 percent of the total loan amount; or
      (ii) $400.

15 U.S.C. § 1602(bb)(1).  The 8% figure may be and the $400 figure is required to be

adjusted regularly by the Bureau.  15 U.S.C. 1602(bb)(2), (3).  **Fees and points** include

(A) all items included in the finance charge, except interest or the time-price differential;
(B) all compensation paid to mortgage brokers;
(C) each of the charges listed in section 106(e) [15 U.S.C. § 1605(e)] (except an escrow for future payment of taxes), unless--
      (i) the charge is reasonable;
      (ii) the creditor receives no direct or indirect compensation; and
      (iii) the charge is paid to a third party unaffiliated with the creditor; and
 (D) such other charges as the Bureau determines to be appropriate.

**Relator's Original Complaint**                                                    **Page 7**

15 U.S.C. § 1602(4).  A **"residential mortgage transaction"** is, in general, a purchase money loan or construction loan for the initial acquisition of *the borrower's dwelling*.  15 U.S.C. § 1602(x).[4]

11.     TILA requires specific disclosures for, *inter alia*, **"closed-end credit,"** which is defined as credit **other than "open-end credit,"** which includes primarily revolving credit or charge accounts and lines of credit without a specific end date.

> (j) The terms "open end credit plan" and "open end consumer credit plan" mean a plan under which the creditor reasonably contemplates repeated transactions, which prescribes the terms of such transactions, and which provides for a finance charge which may be computed from time to time on the outstanding unpaid balance. A credit plan or open end consumer credit plan which is an open end credit plan or open end consumer credit plan within the meaning of the preceding

---

[4]     (w) The term **"dwelling"** means a residential structure or mobile home which contains one to four family housing units, or individual units of condominiums or cooperatives.

> (x) The term **"residential mortgage transaction"** means a transaction in which a mortgage, deed of trust, purchase money security interest arising under an installment sales contract, or equivalent consensual security interest is created or retained against the consumer's dwelling to finance the acquisition or initial construction of such dwelling.

15 U.S.C. § 1602; see also 12 C.F.R § 1026.2(a)(19), (24).  **"*Residential mortgage loan*"** however, ***differs*** in some respects and is not limited to an initial construction or acquisition loan:

> (5) Residential mortgage loan. The term **"residential mortgage loan"** means any consumer credit transaction that is secured by a mortgage, deed of trust, or other equivalent consensual security interest on a dwelling or on residential real property that includes a dwelling, other than a consumer credit transaction under an open end credit plan or, for purposes of sections 129B and 129C [15 USCS §§ 1639b and 1639c] and section 128(a) (16), (17), (18), and (19) [15 USCS § 1638(a)(16)-(19)], and sections 128(f) and 130(k) [15 USCS §§ 1638(f) and 1640(k)], and any regulations promulgated thereunder, an extension of credit relating to a plan described in section 101(53D) of title 11, United States Code.

15 U.S.C. § 1602[(dd)] (cc).

**Relator's Original Complaint**                                                          **Page 8**

sentence is an open end credit plan or open end consumer credit plan even if credit information is verified from time to time.

15 U.S.C. § 1602(j).

12.     The *form* of the disclosures required by TILA, generally, is provided by 15 U.S.C. § 1632. 15 U.S.C. § 1638 governs transactions other than under an open end credit plan and *specifies the required disclosures* including the identity of the creditor, the amount financed, the finance charge, the annual percentage rate, the sum total of all payments, the number, amount and due dates of payments, and other disclosures, including specific disclosures where the transaction is secured by the consumer's principal dwelling. Section 1638 also specifies the *form and timing of disclosures for closed-end transactions*. Additional disclosures are required by section 1639 for high cost mortgages as defined in section 1602(bb). Modification fees are prohibited in connection with such loans pursuant to July 21, 2010 amendments, effective July 21, 2011. 15 U.S.C. § 1639(s).

13.     Section 1635 of the Act requires an additional disclosure of the borrower's right to rescind consumer credit transactions in which a security interest is retained or acquired in property that will be the borrower's principal dwelling until midnight of the third business day after consummation of the transaction or delivery of the TILA disclosures and rescission forms, whichever is later. 12 U.S.C. § 1635(a). Written acknowledgement of required TILA disclosures creates only a rebuttable presumption of delivery. 15 U.S.C. § 1635(c). Refinancings with no new advances and certain other transactions are exempted from the rescission provisions. 15 U.S.C. § 1635(e).

14.     The Home Ownership and Equity Protection Act of 1994 (HOEPA), Pub. Law 103-325, 108 Stat. 2190, Sept. 23, 1994, part of the Riegle Community Development and

Regulatory Improvement Act of 1994, Pub. Law 103-325, 108 Stat. 2160, Sept. 23, 1994, requires additional disclosures in connection with high-cost, non-purchase money loans ("high-cost mortgage loans" or "HOEPA loans").  Senate Report 103-169, Pub. Law 103-325, Sept. 23, 1994.  Regulation Z addresses these additional disclosure requirements as well.

15.    Knowing and willful violations of the Act are subject to criminal penalties including fines and imprisonment.  15 U.S.C. § 1611.

**B.    Regulation Z Definitions, Disclosure Requirements, and Commentary Guidance**

16.    Regulation Z specifies that its scope extends:

To each individual or business that offers or extends credit . . . when four conditions are met:
      (i)     The credit is offered or extended to consumers;
      (ii)    The offering or extension of credit is done regularly; . . .
      (iii)   The credit is subject to a finance charge or is payable by a
            written agreement in more than four installments; and
      (iv)   The credit is primarily for personal, family, or household
            purposes.

12 C.F.R. 1026.1(c)(1).

17.    Regulation Z provides five independent tests for determining whether one is a

**"Creditor,"** including in relevant part:

(17) Creditor means:

(i) A person who regularly extends consumer credit that is subject to a finance charge or is payable by written agreement in more than four installments (not including a down payment), and to whom the obligation is initially payable, either on the face of the note or contract, or by agreement when there is no note or contract.
. . .

(v) **A person regularly extends consumer credit only if it extended credit** (other than credit subject to the requirements of § 1026.32) more than 25 times (or **more than 5 times for transactions secured by a dwelling)** in the preceding calendar year. If a person did not meet these numerical standards in the preceding

**Relator's Original Complaint**                                                              **Page 10**

calendar year, the numerical standards shall be applied to the current calendar year. A person regularly extends consumer credit if, in any 12-month period, the person originates more than one credit extension that is subject to the requirements of § 1026.32 or one or more such credit extensions through a mortgage broker.

12 C.F.R. 1026.2(a)(17).  If the obligation is initially payable to one person, that person is the creditor.  12 C.F.R. § 1026, Supp. I, Comment 2(a)(17)(i)2.

18.     **Credit** means the right to defer payment of debt or to incur debt and defer its payment.  12 C.F.R. 1026.2(a)(14).

19.     **"Consumer credit** means credit offered or extended to a consumer primarily for personal, family, or household purposes."  12 C.F.R. 1026.2(a)(12).

20.     **Consummation** means the time that a consumer becomes contractually obligated on a credit transaction.  12 C.F.R. 1026.2(a)(13).

21.     Regulation Z specifies that a **"residential mortgage transaction"**

means a transaction in which a mortgage, deed of trust, purchase money security interest arising under an installment sales contract, or equivalent consensual security interest is created or retained in the consumer's principal dwelling to finance the acquisition or initial construction of that dwelling.

12 C.F.R.  1026.2(a)(24).  According to the Commentary to the § 1026.2(a)(24) definition of "Residential mortgage transaction," a transaction is not "to finance the acquisition" of the consumer's principal dwelling if the consumer has previously purchased and acquired some title to the dwelling, even if not full legal title.  12 C.F.R. § 1026, Supp. I, Comment 2(a)(24)5.

22.     Regulation Z defines **closed-end credit** in the same manner as the Act—credit other than open-end credit, 12 C.F.R. § 1026.2(a)(10), and defines **"open-end credit"** as "consumer credit extended by a creditor under a plan in which:  (i) The creditor reasonably contemplates repeated transactions; (ii) The creditor may impose a finance charge from time to

time on an outstanding unpaid balance; and (iii) The amount of credit that may be extended to the consumer during the term of the plan (up to any limit set by the creditor) is generally made available to the extent that any outstanding balance is repaid."  12 C.F.R. § 1026.2(a)(20).

23.    Closed-end credit disclosures are governed by Regulation Z's Subpart C, 12 C.F.R. §§ 1026.17-1026.24.  The required disclosures must be made clearly and conspicuously, in writing, be grouped together apart from other information, and presented in a reasonably understandable form that does not obscure the disclosures' relationship to each other.  12 C.F.R. §§ 1026.17 & Supp. I, Comment 17(a)(1)1, 2, 3.  Subsection 1026.18 provides 20 specific disclosures required for closed-end credit transactions; all applicable disclosures must be made, including:

1) The identity of the creditor;

(2) The amount financed (determined in accordance with Section 1026.18(b));

(3) A separate written itemization of the amount financed including (i) any amount distributed to the consumer, (ii) any amount credited to the consumer's account with the creditor, (iii) any amount paid by the creditor to other persons on the consumer's behalf, and (iv) any prepaid finance charge;

(4) The finance charge (using the term "finance charge" and a clear statement such as "**the dollar amount the credit will cost you**"), 12 C.F.R. § 1026.18(d);

(5) The annual percentage rate (using that term), 12 C.F.R. § 1026.18(e);

(6) Any variable rate terms, 12 C.F.R. § 1026.18(f);

(7) The payment schedule, 12 C.F.R. § 1026.18(g);

(8) The total of payments, 12 C.F.R. § 1026.18(h);

(9) Any demand feature;

(10) The total sale price, 12 C.F.R. § 1026.18(j);

(11) Any prepayment penalty, 12 C.F.R. § 1026.18(k);

(12) Any late payment charge;

(13) The security interest acquired, 12 C.F.R. § 1026.18(m);

(14) Insurance and debt cancellation;

(15) Certain security interest charges as required by Section 1026.4(e), 12 C.F.R. § 1026.18(o);

(16) A reference to the appropriate contract for further information about the loan terms, 12 C.F.R. § 1026.18(p);

(17) In a residential mortgage transaction, a statement of whether the loan is assumable;

(18) In the event the creditor requires that the consumer maintain a deposit with the lender, a statement that the annual percentage rate does not reflect the effect of the deposit;

(19) In a transaction secured by real property or a dwelling, information in the form of a table about the interest rate and payments; and

(20) In a closed-end transaction secured by real property or a dwelling, a prescribed form of notice that there is no guarantee the consumer can refinance to lower the interest rate or periodic payments. 12 C.F.R. § 1026.18(t).

12 C.F.R. § 1026.18(a)-(t).  **See Exhibit 3, sample TILA disclosure form.**

24.     These disclosures generally must be made before the consummation of the transaction, except in certain mortgage transactions for which special timing is set forth in section 1026.19(a)-(c), and other exceptions not relevant here.  12 C.F.R. § 1026.17(b).  For mortgage transactions subject to the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 *et seq.*, secured by the consumer's dwelling, other than home equity lines of credit and timeshare mortgages, the creditor must deliver good faith estimates of the disclosures by the third business day after its receipt of the consumer's written application.  12 C.F.R. § 1026.19(a).

New disclosures are expressly required by Regulation Z on all closed-end credit transactions upon the occurrence of a refinancing or assumption. 12 C.F.R. § 226.20. A refinancing, requiring new disclosures, occurs when the original obligation is satisfied or extinguished and replaced. 12 C.F.R. § 1026.20, & Supp. I, Comment 1026.20(a)-1. When this occurs, new disclosures are required even if the prior credit terms were not substantially altered. *Id.* Some refinancings not applicable here are excepted from the new disclosure requirement. 12 C.F.R. § 1026.20(a)(1)-(5).

25.     Subpart E of Regulation Z, 12 C.F.R. §§ 1026.31-1026.36, implements the provisions of HOEPA and, with certain exceptions, generally applies to

> **a consumer credit transaction that is secured by the consumer's principal dwelling, and in which . . . The total points and fees payable by the consumer at or before loan closing will exceed the greater of 8 percent of the total loan amount, or $400; the $400 figure shall be adjusted annually on January 1 by the annual percentage change in the Consumer Price Index that was reported on the preceding June 1.**

12 C.F.R. § 1026.32(a)(1); see also 15 U.S.C. § 1639(a), (b). **"Points and fees"** include amounts paid at closing for optional credit life, accident, health, or loss-of-income insurance, and other debt-protection products written in connection with the loan. Moreover, if such amounts are financed by the creditor, they must be deducted from the amount financed in calculating the **"total loan amount."** 12 C.F.R. § 1026.32(b)(1). 12 C.F.R. 1026.31 identifies the form and timing—at least three days before consummation—of disclosures to be made in closed-end mortgages identified in section 1026.32.

26.     In most credit transactions in which a security interest is acquired in a consumer's principal dwelling (other than "residential mortgage transactions"), each consumer whose ownership interest is or will be subject to a security interest has a right to rescind the transaction.

15 U.S.C. § 1635; 12 C.F.R. § 1026.23(a). (A **"Residential mortgage transaction,"** defined at 12 C.F.R. § 1026.2(a)(24), is a transaction to finance the initial acquisition or construction of a dwelling, whether the dwelling is real or personal property. 12 C.F.R. § 1026, Supp. I, Comment 1026.23(f)-1. See also 122 C.F.R. 1026, Supp. I, Comment 1026.23(a)).   Refinancing or consolidation by the same creditor of an extension of credit already secured by the consumer's principal dwelling is exempt from the right to rescind.   *See Arnold v. W.D.L. Investments, Inc*., 703 F.2d 848 (5th Cir. 1983).   This exemption, in Section 1026.23(f)(2), applies only to refinancings or consolidations by the original creditor; if new money is advanced, however, the amount of the new money is rescindable. For purposes of rescission, a new advance does not include amounts attributed solely to the costs of refinancing. 12 C.F.R. § 1026, Supp. I, Comment 1026.23(f)-4.

27.     In any transaction subject to rescission, the creditor must give the consumer two copies of a notice of right to rescind, which must be a separate document clearly and conspicuously disclosing the rights and process of rescission. 12 C.F.R. § 1026.23(b).  Unless the consumer waives the right to rescind, permitted only in limited circumstances, no money shall be disbursed, other than in escrow, no services shall be performed and no materials shall be delivered unless and until the three-day period passes without the right of rescission being exercised. 12 C.F.R. § 1026.23(c).

28.     In Regulation Z's Official Comments, the Bureau acknowledges that subsequent events such as wrap-around extensions of credit are credit transactions requiring disclosures:

> 6. *Wrap-around financing.*  Wrap-around transactions, usually loans, involve the creditor's wrapping the outstanding balance on an existing loan and advancing additional funds to the consumer.  The pre-existing loan, which is wrapped, may be to the same consumer or to a different consumer.  In either case, the consumer

**Relator's Original Complaint**                                                                 **Page 15**

makes a single payment to the new creditor, who makes the payments on the pre-existing loan to the original creditor.  Wrap-around loans or sales are considered new single-advance transactions, with an amount financed equaling the sum or the new funds advanced by the wrap creditor and the remaining principal owed to the original creditor on the pre-existing loan.  In disclosing the itemization of the amount financed, the creditor may use a label such as "the amount that will be paid to creditor X" to describe the remaining principal balance on the pre-existing loan.  This approach to Truth in Lending calculations has no effect on calculations required by other statutes, such as state usury laws.

7. *Wrap-around financing with balloon payments.*  For wrap-around transactions involving a large final payment of the new funds before the maturity of the pre-existing loan, the amount financed is the sum of the new funds and the remaining principal on the pre-existing loan.  The disclosures should be based on the shorter term of the wrap loan, with a large final payment of both the new funds and the total remaining principal on the pre-existing loan (although only the wrap loan will actually be paid off at that time).

12 C.F.R. § 1026 Supp. I, Official Staff Commentary, § 226.17(c)(1) -6, 7.

## IV. HOME AFFORDABLE MODIFICATION PROGRAM

29.    In approximately mid-to late 2008, an industry sprung up to help financially troubled homeowners save their homes by negotiating loan modifications with the servicers[5] of the loans.  In the third quarter of 2009, the U.S. Treasury Department rolled out the Home Affordable Modification Program (HAMP)[6] to encourage lenders to modify home-secured loans.  Under HAMP, loan servicers, investor/owners of loans, and borrowers receive incentive payments from the Government in connection with granting the modification and keeping the

---

[5] A loan servicer need not be a bank but may be.  It is an entity that may or may not be the original lender or the owner of a loan.  Servicers that are not the owners are paid to collect monthly payments and generally manage the borrowers' accounts on a day-to-day basis on behalf of the owners of the loans.  Servicers sometimes buy the right to service groups of loans.

[6] In addition to the Treasury Department's HAMP program for non-GSE loans—loans not owned by Government-Sponsored Entities, the Federal National Mortgage Association (Fannie Mae) or Federal Home Loan Mortgage Corporation (Freddie Mac), Fannie Mae, Freddie Mac, the VA, and the FHA administer their own versions of HAMP pursuant to the Government's Making Home Affordable initiative.

**Relator's Original Complaint**                                                    **Page 16**

modified payments current.  (Borrower's incentives are paid to the servicer to be applied as principal reduction.)  On August 19, 2010, pursuant to its Supplemental Directive 10-09, **Exhibit 1,** the Treasury Department issued the Making Home Affordable Program Handbook for Servicers of Non-GSE Mortgages,[7] Version 1.0, ("MHA Handbook")**, Exhibit 10,** which governs the procedures for HAMP loan modifications.

30.     The MHA Handbook states "This Handbook constitutes Program Documentation under the Servicer Participation Agreement and is incorporated by reference into the Servicer Participation Agreement."  **MHA Handbook version 3.4, Exhibit 5 at p. 12, version 1.0, Exhibit 10 at p. 6.**  The Servicer Participation Agreement is part of the uniform agreement between a servicer and the Government's financial agent Fannie Mae as designated by the Treasury Department ("Commitment to Purchase Financial Instrument and Servicer Participation Agreement"), pursuant to which the servicer may participate in HAMP, 2MP (Treasury and HUD's Second Lien Modification Program), Treasury FHA-HAMP, RD-HAMP (Department of Agriculture's Rural Housing Service HAMP program) or FHA2LP (FHA refinance program for underwater loans) for loans that are not owned, securitized or guaranteed by Fannie Mae or Freddie Mac, and the Government compensates the servicer, loan owner(s), and borrower(s). The form of the Servicer Participation Agreement can be accessed at https://www.hmpadmin.com//portal/programs/servicer.jsp (last accessed August 17, 2012).  All servicer participant agreements were executed by December 31, 2009, at which time no additional servicers could participate.

---

[7] Non-GSE mortgages are mortgages not owned by government-sponsored entities ("GSEs") such as the Federal National Mortgage Association (Fannie Mae) or Federal Home Loan Mortgage Corporation (Freddie Mac).

**Relator's Original Complaint**                                                        **Page 17**

31.     Under HAMP, servicers may not charge any fees to grant a modification and must

waive all late fees and similar charges upon entering a permanent modification.  The incentive

fees paid to the servicer by the Government, which can equal up to $4,500 per HAMP

modification, and similar fees paid by the Government to the lender/investor owners of the loans

are designed to fully compensate the servicer and owners for all costs associated with granting

the HAMP modification.

32.     Specifically the MHA Handbook provides:

**9.3.2 Late Fees**
**All late charges, penalties, stop-payment fees, or similar fees must be waived** upon
the borrower receiving a permanent modification.  Late charges may accrue while the
servicer is determining borrower eligibility for an FDD forbearance plan and during the
forbearance period. However, a servicer must not collect late charges from the borrower
during the forbearance period.

**9.3.3 Administrative Costs**
**Servicers may not charge the borrower to cover the administrative processing costs
incurred in connection with HAMP. The servicer pays and will not be reimbursed
for any actual out-of-pocket expenses,** including, but not limited to, any required notary
fees, recordation fees, title costs, property valuation fees, credit report fees, or other
allowable and documented expenses.

**MHA Handbook, Exhibit 5 at p. 95;**

**https://www.hmpadmin.com//portal/programs/servicer.jsp (click on MHA Handbook and**

**SD Guidance).**

33.     In the MHA Handbook, v. 3.4, (December 15, 2011) every servicer is put on

notice of the following requirement:

**1.6 Compliance with Applicable Laws**

Each servicer and any sub-servicer that the servicer uses will be subject to and
must fully comply with all federal, state, and local laws, including statutes,
regulations, ordinances, administrative rules and orders that have the effect of

law, and judicial rulings and opinions including, but not limited to, the following
laws that apply to any of its practices related to MHA.

**Exhibit 5, MHA Handbook v. 3.4, at p. 25 ¶ 1.6;**

https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/mhahandbook_34.pdf        (last
accessed August 7, 2012)

34.     Pursuant to the HAMP servicer Compensation Schedule, a servicer receives a
one-time minimum payment fee of $1,000 from the Government for each completed permanent
HAMP modification for which the borrower was delinquent at the time of the modification and
$1,500 for each permanent HAMP loan modification for which the borrower was not delinquent
at the time of the modification.  **See Exhibit 4 at pp. 1-2 (available at
https://hmpadmin.com/portal/programs/docs/hamp_servicer/mhacompensationmatrix.pdf,
last accessed August 7, 2012); Exhibit 5 MHA Handbook, v 3.4, pp. 105 ¶13- 107 ¶ 13.1.**

35.     In addition, servicers are paid up to $83.33 per month, which is accrued monthly
and paid annually on the anniversary date of the permanent HAMP loan modification for a
period of thirty–six (36) months for modified loans that remain in good standing.  Thus, servicers
may be paid up to $4,000 for a permanent HAMP loan modification where the Borrower was
delinquent at the time of modification and continued in good standing for thirty-six (36)
consecutive months and up to $4,500 for a permanent HAMP loan modification where the
Borrower was not delinquent at the time of modification and continued in good standing for
thirty-six (36) consecutive months. **See Exhibit 4 at pp. 1-2 (available at
https://hmpadmin.com/portal/programs/docs/hamp_servicer/mhacompensationmatrix.pdf,
last accessed August 7, 2012); Exhibit 5 Amendment MHA Handbook, v 3.4, pp. 105 ¶13-
107 ¶ 13.1.**

36.     The United States also pays up to $83.33 per month for the benefit of borrowers, to be applied to the borrower's loan balance as principal reduction, accruing monthly and paid annually for the first five years as long as the loan is in good standing.  These payments are made by the Government to the servicer for payment to the borrower.  **Exhibit 5 Amendment, MHA Handbook, v 3.4, p. 107 ¶ 13.2**.  Investors/owners of the loans are paid additional incentives by the United States.  **Exhibit 5 Amendment, MHA Handbook, v 3.4, p. 107-110 ¶¶ 13.3 (formulas for investor incentives); see also, https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/mhahandbook_34.pdf (MHA Handbook);  Exhibit 4, §§ 3, 4, 7, 8 at pp. 1-4; https://hmpadmin.com/portal/programs/docs/hamp_servicer/mhacompensationmatrix.pdf (last accessed August 7, 2012) (servicer compensation matrix).**

## V. FACTS

37.     Ronald Farris, President of OLS, executed on behalf of OLS on September 9, 2010 an amended and modified Servicer Participation Agreement with Fannie Mae as financial agent for the United States (accepted by Fannie Mae on September 15, 2010).  **See Exhibit 7, OLS Servicer Participation Agreement.**  OLS continues as a HAMP participant.  **See Exhibit 2 list of all Non-GSE servicer participants.**

38.     This agreement references a prior agreement that is being amended and restated, which was effective on or around April 16, 2009.  **Exhibit 7 at 13, A-16.**  OLS continues as a HAMP participant, as evidenced by the attached **Exhibit 2** showing a list of all non-GSE servicer participants, including "Ocwen Financial Corporation."  See http://www.makinghomeaffordable.gov/get-started/contact-mortgage/Pages/default.aspx.  Click

**Relator's Original Complaint**                                                                 **Page 20**

the letter "O" under "Mortgage Servicers (last accessed August 6, 2012). The listing hyperlinks the user to the Ocwen Financial Corporation/Ocwen Loan Servicing, LLC shared website.

39.     OLS's Amended and Restated Commitment to Purchase Financial Instrument and Servicer Participation Agreement **("OLS Servicer Participation Agreement"), Exhibit 7,** provides for representations, warranties, and certifications by OLS, the Servicer, both within the Servicer Participation Agreement itself and in subsequent annual certifications:

> **C. Servicer's representations and warranties, and acknowledgement** of and agreement to fulfill or satisfy certain duties and obligations, with respect to its participation in the Programs and under the Agreement **are set forth in the Financial Instrument.** Servicer's certification as to its continuing compliance with, and the truth and accuracy of, the representations and warranties set forth in the Financial Instrument will be provided annually in the form attached hereto as Exhibit C (the "Certification"), beginning on June 1, 2010 and again on June 1 of each year thereafter during the Term (as defined below) and upon the execution and delivery by Servicer of any Additional Service Schedule during the Term.

**OLS Servicer Participation Agreement, Exhibit 7 at p. 2 ¶ C.**

40.     In paragraph 5(b), Representations, Warranties and Covenants, of the Financial Instrument, which is a part of the Servicer Participation Agreement, at the time of executing its agreement, OLS represented, warranted and covenanted that:

> (b)     Servicer **is in compliance with, and covenants that all Services will be performed in compliance with, all applicable Federal, state and local laws, regulations, regulatory guidance, statutes, ordinances, codes and requirements, including, but not limited to, the Truth in Lending Act, 15 USC 1601 § et seq.** [sic], the Home Ownership and Equity Protection Act, IS USC § 1639, the Federal Trade Commission Act, 15 USC § 41 et seq., the Equal Credit Opportunity Act, IS USC § 701 et seq., the Fair Credit Reporting Act, IS USC § 1681 et seq., the Fair Housing Act and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices and all applicable laws governing tenant rights. Subject to the following sentence, Servicer has obtained or made, or will obtain or make, all governmental approvals or registrations required under law and has obtained or will obtain all consents necessary to authorize the performance of its obligations under the Program and the Agreement.

**Relator's Original Complaint**                                                                 **Page 21**

**OLS Servicer Participation Agreement, Exhibit 7 at p. B-4 ¶ 5(b).**

41.    The following certification is included in the Certificate to be executed and delivered to the Government by OLS, like every Servicer, annually beginning on June 1, 2010 and again on June 1 of each year during the Term of the Agreement, pursuant to Section 1.C of OLS's Servicer Participation Agreement, as well as paragraph 5(l) of the Financial Instrument, which is incorporated in and part of the Servicer Participation Agreement.   **OLS Servicer Participation Agreement, Exhibit 7 at p. B-4 ¶ 5(l):**

<u>**CERTIFICATION**</u>

**"This Certification is delivered as provided in Section 1.C. of the Amended and Restated Commitment to Purchase Financial Instrument and Servicer Participation Agreement (the "Commitment"),** effective as of [INSERT], by and between Federal National Mortgage Association ("<u>Fannie Mae</u>"), a federally chartered corporation, *acting as financial agent of the United States*, and the undersigned party ("<u>Servicer</u>"). All terms used, but not defined herein, shall have the meanings ascribed to them in the Commitment.

**Servicer hereby <u>certifies,</u>** as of [INSERT DATE ON WHICH INITIAL CERTIFICATION IS GIVEN]**, that:**
. . .

2.    <u>**Servicer is in compliance with,**</u> **and <u>certifies </u>that all Services have been<u> performed</u> in compliance with, all applicable Federal, state and local laws, regulations, regulatory guidance, statutes, ordinances, codes and requirements, including, but not limited to<u>, the Truth in Lending Act, 15 USC 1601 § et seq.</u>,** the Home Ownership and Equity Protection Act, 15 USC § 1639, the Federal Trade Commission Act, 15 USC § 41 et seq., the Equal Credit Opportunity Act, 15 USC § 701 et seq., the Fair Credit Reporting Act, 15 USC § 1681 et seq., the Fair Housing Act and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices and all applicable laws governing tenant rights.

**See Exhibit 7, OLS Servicer Participation Agreement at pp. 2, C-1 ¶ 2; see also form for annual certification accessible at**

**Relator's Original Complaint**                                                               **Page 22**

https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/servicerparticipationagreement.pdf **(last accessed August 16, 2010).**

42.    OLS falsely certified its full compliance with the above requirements initially with the execution of the Servicer Participation Agreement and the Certification within that Agreement, on September 9, 2010, as well as in its original agreement, which pursuant to the HAMP program was substantially similar, and in each annual re-certification.

## A.    MATERIALITY OF OLS'S CERTIFICATIONS

43.    The certifications made by OLS were material to payment by the United States. Paragraph 4.A. &4.B. of Ocwen's Servicer Participation Agreement provide as follows:

> **4.    Agreement to Purchase Financial Instrument; Payment of Purchase Price**
>
> **A.    Fannie Mae, in its capacity as a financial agent of the United States, agrees to purchase**, and Servicer agrees to sell to Fannie Mae, in such capacity, the Financial Instrument that is executed and delivered by Servicer to Fannie Mae in the form attached hereto as Exhibit B, in consideration for the payment by Fannie Mae, as agent, of the Purchase Price.
>
> **B.    The conditions precedent to the payment by Fannie Mae of the Purchase Price with respect to the Services described on the Initial Service Schedules are: (a) the execution and delivery of the Commitment, the Initial Service Schedules, and the Financial Instrument by Servicer to Fannie Mae;** (b) the execution and delivery of the Commitment and the Initial Service Schedules by Fannie Mae to Servicer; (c) the delivery of copies of the fully executed Commitment, Initial Service Schedules and Financial Instrument to Treasury on the Effective Date of the Agreement; **(d) the performance by Servicer of the Services described in the Agreement, in accordance with the terms and conditions thereof, to the reasonable satisfaction of Fannie Mae and Freddie Mac; and (e) the satisfaction by Servicer of such other obligations as are set forth in the Agreement.**
>
> C.    The conditions precedent to the payment by Fannie Mae of the Purchase Price with respect to the Services described on the Additional

Service Schedules (if any) are: (a) the execution and delivery of the Additional Service Schedules and the Certification by Servicer to Fannie Mae; (b) the execution and delivery of the Additional Service Schedules by Fannie Mae to Servicer; (c) the delivery of copies of the fully executed Additional Service Schedules to Treasury; (d) the performance by Servicer of the Services described in the Agreement, in accordance with the terms and conditions thereof, to the reasonable satisfaction of Fannie Mae and Freddie Mac; and (e) the satisfaction by Servicer of such other obligations as are set forth in the Agreement.

D.      Solely in its capacity as the financial agent of the United States, and subject to subsection E. below, Fannie Mae shall remit all payments described in the Program Documentation to Servicer for the account or credit of Servicer, Investors and borrowers, in each case in accordance with the Program Documentation (all such payments, collectively, the "Purchase Price"); all payments remitted to Servicer for the credit or account of third parties under the Program Documentation shall be applied by Servicer as required by the Program Documentation. Fannie Mae shall have no liability to Servicer with respect to the payment of the Purchase Price, unless and until: (a) Servicer and all other interested parties have satisfied all pre-requisites set forth herein and in the Program Documentation relating to the applicable Program payment structure, including, but not limited to, the delivery of all data elements required by Section 3 of this Commitment; and (b) the Treasury has provided funds to Fannie Mae for remittance to Servicer, together with written direction to remit the funds to Servicer in accordance with the Program Documentation.

**Exhibit 7, Ocwen Servicer Participation Agreement, at p.3-4.**

44.     OLS acknowledged in the **Financial Instrument** purchased by Fannie Mae pursuant to the Commitment to Purchase Financial Instrument and Servicer Participation Agreement between Fannie Mae and OLS that providing false or misleading information to Fannie Mae or Freddie Mac in the HAMP Program may constitute violations of: (1) Federal criminal laws found in Title 18 of the U. S. Code; or violations of the civil False Claims Act (31 U.S.C. §§ 3729-3733):

(f)     **Servicer acknowledges that the provision of false or misleading information to Fannie Mae or Freddie Mac in connection with the**

**Relator's Original Complaint**                                                       **Page 24**

> **Program or pursuant to the Agreement may constitute a violation of:**
> **(a) Federal criminal law involving fraud,** conflict of interest, bribery, or
> gratuity violations found in Title 18 of the United States Code; or **(b) the**
> **civil False Claims Act (31 U.S.C. §§ 3729-3733).** Servicer covenants to
> disclose to Fannie Mae and Freddie Mac any credible evidence, in
> connection with the Services, that a management official, employee, or
> contractor of Servicer has committed, or may have committed, a violation
> of the referenced statutes.

**Exhibit 7 at p. B-4 ¶ 5(f).**  Given the scope of the Representations, Warranties and Covenants

and the Servicer's continuing obligations of truthfulness and accuracy  as set forth in the

introduction to paragraph 5, OLS was on notice of the obligations of truthfulness and accuracy

and acknowledged that failures to fulfill these obligations could lead to criminal and False

Claims Act prosecution:

> **5.  <u>Representations, Warranties and Covenants</u>.** Servicer makes the following
> representations, warranties and covenants to Fannie Mae, Freddie Mac and the
> Treasury, the truth and accuracy of which are continuing obligations of Servicer.
> In the event that any of the representations, warranties, or covenants made herein
> ceases to be true and correct, Servicer agrees to notify Fannie Mae and Freddie
> Mac immediately.

**Exhibit 7 at p._B-2 ¶ 5.**

45.     In 2008, Relator, who was an employee of a Brea, California law firm, began

assisting attorneys there in assisting homeowners in obtaining home loan modifications.  Relator

continued this work with a Southlake, Texas law firm upon moving to Texas in November of

2010 until his partial retirement in March, 2012.  Relator's tasks included primary responsibility

for much of the processing of loan modification applications for the firms' clients.  Relator

assisted a number of attorneys in successfully completing hundreds of loan modifications for

clients of the two law firms and personally reviewed every one of the modification contracts and

applications.   Relator coordinated the modification process with twenty or more different

servicers.  Additionally, he has received and reviewed hundreds of modification contracts from other law firms and companies who represented Clients for modifications from multiple servicers including OLS.

46.     Relator worked with his law firm employers to complete successful OLS loan modifications for the firms' clients.  Relator reviewed, and consulted on the details of each OLS Modification agreement with the clients.  As a result, Relator is completely aware of all of the OLS modification agreements between the firms' clients and OLS, as well as the contents of the files.  This includes some modifications submitted under HAMP and non-HAMP modifications. Relator has also requested and received copies of numerous OLS modification contracts from other firms, both HAMP and Non-HAMP modifications and has closely examined them all.

47.     OLS's HAMP and Non-HAMP modification contracts are similar in form and substance, although HAMP loans must meet the HAMP requirements for approval and Non-HAMP loans may be more flexible

48.      In the numerous HAMP and non-HAMP OLS loan modifications reviewed by Relator, OLS virtually always loaned new amounts of principal to the borrower by adding it to the original loan principal balance.  The amount of the new, additional loan advances made to these borrowers, above and beyond the principal balance owed prior to the modification, ranged from approximately $20,000 to $30,000 .  That amount included delinquent interest, property tax loans, and various fees and costs of OLS.  Attached as **Exhibit 6** are exemplar copies of a typical OLS HAMP and non-HAMP modification contracts.  On the amounts added to the principal balance, OLS charges interest to be repaid over as long as the next 25-30 years.  **OLS does not, however, provide all of the disclosures required by TILA and Regulation Z with its HAMP**

**or Non-HAMP modifications.   OLS typically failed to disclose anywhere in the modification agreements: the finance charge, the annual percentage rate, the total amount of payments, whether the agreement had a demand feature, prepayment policy, late payment policy, assumption policy, interest rate and payment summary, no guaranty to refinance statement, and notice of right of rescission.   OLS also failed to fulfill the requirements that disclosures be conspicuous, segregated, that certain terms be made more conspicuously, a five-column tabular format for certain disclosures, that the itemization of amounts financed be made separately, and the use of certain required terms in the tables.**

49.   On a HAMP modification, however, the servicer is not permitted to charge any fees or costs to the borrower for the granting of a modification.   OLS added monies to the principal of the HAMP modifications in a lump sum without any itemization of the amount financed, and with no TILA disclosures, making it impossible to discern what the added principal is comprised, and whether or not it includes amounts not allowed under the HAMP program.   The HAMP agreement states:

> *The modified principal balance of my Note **will include** all amounts and arrearages that will be past due as of the Modification Effective Date (including unpaid and deferred interest, fees, escrow advances, and other costs, but excluding unpaid late charges, collectively, "unpaid Amount") less any amounts paid to the Lender but not previously credited to my loan.*

All of these contracts with increased indebtedness were finalized without providing the borrowers the benefits of the required federal TILA Disclosures.   The OLS HAMP loans were, however, always substantially more than the pre-modification outstanding principal balances on the HAMP modifications reviewed by Relator.

50.     OLS never, however, provided TILA/Regulation Z disclosures or Right of Rescission notices, despite the fact that OLS's sophisticated real-estate lending lawyers prepared each of the files.

51.     The Department of the Treasury June 2012 Making Home Affordable Program Performance Report, available at http://www.treasury.gov/initiatives/financial-stability/reports/Documents/June%202012%20MHA%20Report%20Final.pdf (last accessed August 6, 2012), attached hereto as **Exhibit 8**, indicates that OLS had by the end of June of 2012 73,019 active modifications including 13,826 GSE-owned, 57,579 private investor-owned, and 1,614 portfolio modifications.  **See Exhibit 8 at p. 8.**  OLS has submitted, and had approved by HAMP, 90,642 Permanent HAMP modifications. **See Exhibit 8 at pp. 12, 13, http://www.treasury.gov/initiatives/financial-stability/reports/Documents/June%202012%20MHA%20Report%20Final.pdf (last accessed August 7, 2012).**

52.     To date, the United States has paid **$250,071,455.83** in incentives for OLS's HAMP modifications, including **$88,674,734.19** for OLS, the servicer.  The balance of the funds was paid to the relevant borrowers and investors.  **See Exhibit 9, U.S. Treasury Department Office of Financial Stability, Troubled Asset Relief Program, Transactions Report-Housing Programs for Period Ending July 27, 2012, Making Home Affordable Program at p.35,** http://www.treasury.gov/initiatives/financial-stability/reports/Pages/default.aspx Under, "All Reports by Frequency," "As Indicated," click on TARP Housing Transaction Reports" and select report by date. (last accessed August 6, 2012).  The cap on incentives for Ocwen modifications, which is subject to periodic adjustments, is $1,827,234,254.00 in potential

incentive payments by the United States.  **See Exhibit 9 at p. 4.**

53.    The procedure by which OLS has received the Government-paid incentives for

OLS's loan modifications is as follows:

### MHA Compensation Process

1.    Servicer establishes bank account.

- Bank accounts are designated by the servicer on the HAMP Registration Form, Sections 3 and 4.

- Servicers may designate up to four accounts to allocate compensation appropriately: default, servicer, investor, and borrower accounts.

2.    Servicer submits Official Loan Setup record once trial period is complete.

- Refer to the chart above for compensation timing considerations and requirements.

3.    Fannie Mae, as administrator for the Making Home Affordable Program, provides Cash Payment Summary Report to servicer.

- Report includes compensation amount on a loan-level basis and indicates the associated payor: U.S. Treasury Department, Fannie Mae, or Freddie Mac.

  Report is accessible via the HAMP Reporting Tool one business day before compensation is deposited into accounts. Deposit occurs on the 27th calendar day or first business day prior to the 27th if the 27th falls on a weekend or a holiday.

4.    Deposit is made.

- Deposit is transferred via the Automated Clearing House (ACH) Network on 27th of the month or on the business day prior to the 27th.

**Exhibit 4, p. 7;**

**https://hmpadmin.com/portal/programs/docs/hamp_servicer/mhacompensationmatrix.pdf**

**Relator's Original Complaint**                                                                 **Page 29**

**(last accessed August 7, 2012).**  OLS has followed this procedure and generated more than $250 Million in Government incentive payments for the benefit of OLS, its investor/owners, and its borrowers.

## VI. FALSE CLAIMS ACT

54.    This is an action alleging violations of the federal False Claims Act, 31 U.S.C. §§ 3729-3732 and seeking damages and civil penalties on behalf of the United States and Relator as a result of the Defendant's false records, statements, and claims.

55.    The False Claims Act generally provides, *inter alia*, that any person who knowingly presents or causes to be presented to the United States for payment or approval a false or fraudulent claim, knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim, or conspires to do these things, is liable to the Government for a civil penalty of not less than $5,500 and not more than $11,000 for each such claim, plus three (3) times the amount of damages sustained by the Government because of the false claim.  31 U.S.C. §§ 3729(a)(1)(G).

56.    The False Claims Act allows any person having knowledge of a false or fraudulent claim against the Government to bring an action in Federal District Court for himself and for the United States Government and to share in any recovery as authorized by 31 U.S.C. § 3730(d).  Relator claims entitlement to a portion of any recovery obtained by the United States as he is, on information and belief, the first to file, and is an original source for the information on which the allegations or transactions in the claims herein are based.

57.    Based on these provisions, Relator on behalf of the United States Government seeks through this action to recover damages and civil penalties arising from the Defendant's

submission of false and/or fraudulent claims for approval and/or payment and OLS's use of false records or statements that would be material to a decision of the United States to pay OLS's requests under its contract.  The United States has suffered significant actual damages as a result of the Defendants' false and fraudulent claims, and its use of false records or statements material to false or fraudulent claims.

58.     As required under the False Claims Act, Relator has provided the offices of the Attorney General of the United States and the United States Attorney for the Eastern District of Texas a disclosure statement of material evidence and information related to and supporting the allegations in this complaint.

59.     OLS <u>falsely certified</u> on or around April 16, 2009 and on September 9, 2010_that it was in full compliance with all relevant laws, including but not limited to the Truth in Lending Act, with the execution of the Servicer Participation Agreement and Financial Instrument.  By this material false certification, OLS fraudulently induced the United States, through its Financial Agent, to enter the Agreement with OLS and <u>to purchase</u> the overarching Financial Instrument. OLS made false Subsequent Certifications to the United States annually, on or about June 1, 2010, 2011 and 2012, in the form set forth in the Servicer Participation Agreement, that it had and would comply with all Federal, State, and Local laws, including specifically, the Truth in Lending Act.  OLS has, however, knowingly failed to provide TILA/Regulation Z Disclosures to borrowers, both in and out of the HAMP program.

## VII. CAUSES OF ACTION

### First Cause of Action - False Claims 31 U.S.C. § 3729(a)(1)(A)

60.     Relator realleges and hereby incorporates by reference each and every allegation contained in the preceding paragraphs numbered 1 through 59 of this complaint.  Therefore, OLS has knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval in violation of **31 U.S.C. 3729(a)(1)(A).**

### Second Cause of Action - False Claims 31 U.S.C. § 3729(a)(1)(B)

61.     Relator realleges and hereby incorporates by reference each and every allegation contained in the preceding paragraphs numbered 1 through 60 of this complaint.  Therefore, OLS has knowingly made, used or caused to be made or used a false record or statement material to a false or fraudulent claims in violation of **31 U.S.C. § 3729(a)(1)(B).**

### VII. RELIEF

62.     On behalf of the United States, Relator seeks to recover all relief available under the False Claims Act, as amended.  He seeks monetary damages equal to three (3) times the damages suffered by the United States.  In addition, Relator seeks to recover all civil penalties and other relief on behalf of the United States Government and the Relator in accordance with the False Claims Act.

63.     Relator should, for his contribution to the Government's investigation and recovery, be awarded a fair and reasonable Relator's share pursuant to 31 U.S.C. § 3730(d) of the False Claims Act;

64.     Relator seeks to be awarded all costs and expenses for this action, including statutory attorneys' fees, expenses, court costs and any available pre-judgment or post-judgment interest at the highest rate allowed by law.

**Relator's Original Complaint**                                                                    **Page 32**

# VIII. PRAYER

WHEREFORE, premises considered, Relator prays that this District Court enter judgment on behalf of the United States and against the Defendants for the following:

a.   Damages in the amount of three (3) times the actual damages suffered by the United States and all statutory penalties arising from the Defendant's unlawful conduct which violated the False Claims Act;

b.   A Relator's Share from the recoveries in a statutory amount which is fair and reasonable under the circumstances.

c.   Relator's statutory attorneys' fees, expenses and costs of court;

d.   Pre-judgment and post-judgment interest, at the highest rate allowed by law;

e.   All other relief to which Relator and/or the United States may be justly entitled, whether at law or inequity, and which the District Court deems just and proper.

Dated: August 20, 2012

**UNITED STATES OF AMERICA, ex rel. Michael J. Fisher**

Respectfully submitted:

By: _____

Samuel L. Boyd
SBN: 02777500
Catherine C. Jobe
SBN: 10668280
Boyd & Associates
6440 North Central Expressway
Suite 600
Dallas, Texas 75206-4101
Telephone (214) 696-2300
Facsimile (214) 363-6856
sboyd@boydfirm.com
**Attorneys for Relator/Qui Tam Plaintiff**

## CERTIFICATE OF SERVICE AND DISCLOSURE

On August 9, 2012 Relator served a copy of his Disclosure Statement to US Attorneys Shamoil Shipchandler and Kevin McClendon for the United States District Court for the Eastern District of Texas, Sherman Division, and to United States Attorney General Eric Holder.

On August 20, 2012 Relator served a copy of his Disclosure Statement and proposed Original Complaint to US. Attorney William Edgar, US Attorney Kevin McClendon for USDC for the Eastern District of Texas and Scott Hogan, US Attorney for the Northern District of Texas, Dallas Division.

On this date, August 20, 2012, a copy of Relator's Complaint was formally served pursuant to FRCP 4(i)(1)(b), via Certified Mail, Return Receipt Requested, upon:

Eric Holder
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530-0001

_____

Samuel L. Boyd

**Relator's Original Complaint**                                    **Page 34**