**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| *Ex rel.* Michael J. Fisher, and Michael Fisher | § | QUI TAM PLAINTIFF/RELATOR'S |
| Individually, | § | FIRST AMENDED COMPLAINT |
| | § | PURSUANT TO |
| Plaintiff, | § | 31 U.S.C §§ 3729-3732 |
| | § | (FEDERAL FALSE CLAIMS ACT) |
| vs. | § | |
| | § | **Case No. 4:12-cv-543** |
| Ocwen Loan Servicing, LLC | § | |
| | § | JURY TRIAL DEMANDED |
| Defendant. | § | |

**QUI TAM PLAINTIFF/RELATOR'S FIRST AMENDED COMPLAINT
PURSUANT TO 31 USC §§ 3729-3732, FALSE CLAIMS ACT**

**UNITED STATES OF AMERICA, ex rel. Michael J. Fisher**

/s/ Samuel L. Boyd
Samuel L. Boyd
Texas SBN: 02777500
Catherine C. Jobe Texas
Texas SBN: 10668280
BOYD & ASSOCIATES, PC
6440 North Central Expressway, Suite 600
Dallas, Texas 75206-4101
Tel (214) 696-2300
Fax (214) 363-6856
sboyd@boydfirm.com

*Counsel for Qui Tam Plaintiff/Relator*

## Table of Contents

I. SUMMARY ....................................................................................................... 1

II. PARTIES........................................................................................................... 6

III. JURISDICTION AND VENUE ........................................................................ 8

IV. HOME AFFORDABLE MODIFICATION PROGRAM ..................................... 8

V. FACTS ............................................................................................................12

VI. OLS HAMP AND NON-HAMP LOAN MODIFICATIONS ...........................18

VII. FEDERAL HOUSING ADMINISTRATION ("FHA") VIOLATIONS.........................23

VIII. UNFAIR, DECEPTIVE OR ABUSIVE ACTS OR PRACTICES ...................................26

    A. UDAAP and UDAP .................................................................................27

    B. DODD-FRANK ACT ...............................................................................29

      1. Unfair .................................................................................................29

      2. Deceptive ...........................................................................................31

      3. Abusive ..............................................................................................32

    C. "In-Flight" Modifications.......................................................................33

    D. Loss Mitigation – Modification Delays and Denials ...............................33

IX. REAL ESTATE SETTLEMENT PROCEDURES ACT (RESPA) ...............................37

X. TRUTH IN LENDING ACT AND REGULATION Z.........................................39

XI. STATE LAWS AND REGULATIONS .............................................................45

    A. Texas Constitutional and Administrative Law ........................................48

      1. Constitutional Law .............................................................................48

      2. Sims "Extensions of Credit" triggering Section 50(a)(6) applications .....................51

      3. The Relevant Situation........................................................................53

      4. Pervasive Violations by Purchase Money Mortgage Modifications in Texas ............55

      5. Loan-to-value Ratio............................................................................56

      6. Closing Location ................................................................................56

      7. Texas Notice of Right of Rescission....................................................57

      8. Full Amortization ..............................................................................58

      9. Examples of OLS Texas Modification Contracts .................................58

      10. Homesteaders, In Effect, Become "Renters".........................................61

    B. New York State Law................................................................................61

1.     OLS Examples of NY Modification Contracts .......................................................64

C.     Massachusetts Law .........................................................................................68

1.     Mass. Right of Rescission ...............................................................................70

2.     OLS Examples of Massachusetts Modification Contracts.......................................71

XII.     ACQUISITION OF HOMEWARD RESIDENTIAL HOLDINGS, INC. .........................73

XIII. FALSE CLAIMS ACT .............................................................................................78

XIV. CAUSES OF ACTION ............................................................................................80

A. First Cause of Action -False Claims 31 U.S.C. § 3729(a)(1)(A) ....................................80

B. Second Cause of Action - False Claims 31 U.S.C. § 3729(a)(1)(B) ...............................80

PRAYER AND REQUEST FOR RELIEF..............................................................................81

The United States of America, by and through *qui tam* Plaintiff/Relator Michael J. Fisher ("Fisher" or "Relator"), brings this action under 31 U.S.C. §§ 3729-3732 ("False Claims Act" or "FCA") against Ocwen Loan Servicing, LLC ("OLS" or "Defendant") to recover all damages, penalties, and other remedies available under the False Claims Act on behalf of the United States and Fisher, and would show the following:

## I. SUMMARY

1.      OLS is a participant in the Government's Home Affordable Modification Program ("HAMP"), through which the United States incentivizes borrowers, note owners and servicers of residential home mortgages to modify the borrower's home loans by lowering interest rates and payments, extending terms, and possibly forgiving principal, to help American homeowners avoid foreclosure and to attempt to stabilize financial markets supported by home mortgages in various formats. OLS violated the False Claims Act by fraudulently inducing Fannie Mae, agent for the United States, to execute the OLS Servicer Participation Agreement by falsely stating therein, at Exhibit B, Form of Financial Instrument at ¶5.b and Exhibit C, Form of [Annual] Certification at ¶2 that it was (1) initially in compliance and annually represented and certified that all Services "**will be performed in compliance with, all** applicable Federal, state and local laws, regulations, regulatory guidance, statutes ordinances, codes and requirements, including, but not limited to, the Truth in Lending Act, 15 USC 1601 § et seq., the Home Ownership and Equity Protection Act, 15 USC § 1639, the Federal Trade Commission Act, 15 USC § 41 et seq., the Equal Credit Opportunity Act, 15 USC § 701 et seq., the Fair Credit Reporting Act, 15 USC § 1681 et seq., the Fair Housing Act and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices and all applicable laws governing tenant rights"; (2) it obtained or made, or will obtain or make, all governmental approvals or registrations

required under law and has obtained or will obtain all consents necessary to authorize the performance of its obligations under the Programs and the Agreement; (3) the performance of Services under the Agreement will not conflict with, or be prohibited in any way by, any other agreement or statutory restriction by which Servicer is bound, provided, however, that Fannie Mae acknowledges and agrees that this representation and warranty is qualified solely by and to the extent of any contractual limitations established under applicable servicing contracts to which Servicer is subject; (4) it is not aware of any other legal or financial impediments to performing its obligations under the Program or the Agreement and shall promptly notify Fannie Mae of any financial and/or operational impediments which may impair its ability to perform its obligations under the Program or the Agreement; and (5) it is not delinquent on any Federal tax obligation or any other debt owed to the United States or collected by the United States for the benefit of others, excluding any debt or obligation that is being contested in good faith. OLS certified compliance in its Servicer Participation Agreement (SPA) with the United States and in subsequent mandatory annual recertification, all of which were and are express conditions of payment under the HAMP SPA.[1]

2.      OLS has also continuously failed to meet the basic and fundamental federal requirements related to the servicing of delinquent conventional **FHA** loans under the **mandated loss mitigation programs.[4]** For example, OLS did not have an FHA-compliant loss mitigation program. Notwithstanding that FHA laws and regulations **mandated** that OLS immediately institute a qualified compliant loss mitigation program, OLS **did not** have compliant **loss mitigation program** for its FHA borrowers. Management was on **repeated, express notice**

---

[1] *OLS Servicer Participation Agreement* is attached hereto at **Exhibit 1;** OLS *Amended and Restated Servicer Participation Agreement is attached as* **Exhibit 2**.

**from employees** of the resulting hardship and losses of FHA borrowers, but executive management was **unmoved** to stem the personal suffering of **these mostly middle class families**. OLS made false representations that it did have such a program (1) to HUD representatives and (2) to hundreds, if not thousands, of innocent, sometimes delinquent, FHA borrowers seeking loss mitigation options to save their homes from foreclosure. **Hundreds if not thousands of families** lost their homes because of OLS's **knowing refusal to staff and train representatives who could have offered** loss mitigation options to **save homes** and **minimize the government's FHA insurance losses.** As it certified in the SPA, **"(4) it is not aware of any other legal or financial impediments to performing its obligations under the Program or the Agreement** and **shall promptly notify Fannie Mae of any financial and/or operational impediments** which may impair its ability to perform its obligations under the Program or the Agreement.**  Yet Defendant never properly made the expenditures to properly staff, train or execute the HAMP loan modifications, and further it never notified Fannie Mae of its financial impediments.** The Defendant's numerous, false representations, regarding compliance with **HAMP certifications and all federal, state and local consumer lending laws, regulations and rules, including GSE, FHA and Ginnie Mae** loss mitigation requirements, rendered the **initial and sequential** certifications provided by OLS in the SPA, and each annual certification thereafter, a **false certification/statement. These false representations caused the unnecessary loss of borrowers' homes to foreclosure, at the exact time that the affected borrowers were falsely and repeatedly told by OLS that modification relief was being "reviewed and in process" on the borrower's modification package.  The government's losses on insurance fraud, stemming from OLS fraudulent conduct, are likely very material after the trebling under the FCA.**

3.      The Truth in Lending Act ("TILA"), 15 U.S.C. §1601 et seq,  and several Federal statutes have a prominent identification in this certification, (no more important, however, than other Federal, state and local laws regulations, regulatory guidance, statutes, ordinances, codes and requirements) and create the national landscape of all laws designed to prevent unfair, discriminatory or predatory lending practices.   The notice of the right to rescind is required, of course, in the first instance, by TILA and its implementing rules, known as Regulation Z (Reg. Z, §  1026.23(a)-(b) (additionally, required by Massachusetts, Texas and New York state laws) . OLS further violated the False Claims Act by falsely stating, again, in its annual recertification to the United States that it was in compliance with and certified that all Services had been performed in compliance with the same Federal and state laws in all of its business, including but not limited to its HAMP modifications. The statements regarding compliance in the annual recertification were false and its certifications were false records used by OLS to continue to participate in the HAMP program and receive large incentive payments from the United States. OLS continued to knowingly fail to provide consumers with notices of the right to rescind HAMP and non-HAMP loan modification agreements entered between the borrowers and OLS, as objectively required by TILA, Texas, New York and Massachusetts laws designed to prevent unfair, discriminatory or predatory lending practices.[2] The modifications **virtually always *increased*** the borrowers' principal balances by capitalizing past due interest, and past due property taxes and, at times, amounts for prospective  property taxes and insurance premiums not yet due, the latter of which began accruing interest for the **first time**, on all of these capitalized past due and prospective sums, as well as for some, undefined modification fees or costs which did not arise out of the (i) original note or (ii) deed of trust. The modifications frequently

---

2 12 C.F.R. 1026 (Regulation  Z); Tex. Const. Art. XVI, § 50. (a)(6)(Q)(viii); Mass. Gen. Laws Ch. 140D § 10(b)..

included step rate adjustments, pursuant to which the interest rate, and thus the payment, increased at predetermined dates and increments. Without the statutorily required notice that the borrower had three days after consummation of the agreement to rescind, the borrower lacked the important information that there was still time to back out of what the borrower might realize was neither in his or her best interest nor that of his or her family. The borrower was entitled to consider his or her modification ramifications with "Eyes Wide Open," the very essence of the Notice of the Right of Rescission in Reg. Z.[3]  This material omission was to the detriment of the borrower, generally, while OLS enjoyed unlawful benefits of receiving many millions of dollars of incentive payments on the basis of its false statements and false certifications to the United States.

4.      Several of OLS statements in its SPA regarding present and future compliance were false and the SPA is thus a false statement and false record used by OLS to fraudulently induce the United States and thereby obtain the full range of incentive payments from the United States. OLS knowingly continued to fail to (i) provide consumers with notices of the right to rescind its proprietary loan modification agreements entered between borrowers and prior to its participation in HAMP (which OLS certified compliance in its SPA), and (ii) comply with state laws (including at least Texas, New York and Massachusetts) designed to prevent unfair, discriminatory or predatory lending practices; including, but not limited to state Unfair and Deceptive Acts and Practices ("UDAP") laws, and state consumer lending laws (Texas, New York and Massachusetts). For example, here in Texas, the Texas Constitution, when an extension of credit "involves [1] the satisfaction or replacement of the original note, [2] an advancement of new funds, or [3] an increase in the obligations created by the original note," it

_____

3 12 C.F.R. 1026.1 *et seq*

is subject to the home equity provisions set for at Section 50(a)(6).  In such an event, Section 50(6) <u>requires</u>, inter alia, (1) providing notices to borrowers of the right to rescind, (2) that the resulting mortgage loan debt not exceed 80% of the value of the property, (3) that the loan not generate resulting balloon payments, that the principal debt be amortized, monthly, (4) that the closing of the loan modification occur, only, in an (a) attorney's office, (b) title company office or (c) the lender's office, and more. Many Texas loan modifications that Relator has reviewed have objectively violated this well established Texas law.

## II. PARTIES

5.      Relator is a citizen of the United States and a resident of Southlake, Texas. Relator was employed in the area of loan modification contracts from 2008 until early 2012. During that time, Relator served as an assistant to attorneys at law firms in Brea, California (now located in Industry, California) and Southlake, Texas, which assisted clients with obtaining modifications of their residential property mortgage loans from OLS and other lenders or loan servicers. He reviewed loan modification contracts for each law firm. Additionally, he has received and reviewed thousands of modification contracts from other law firms and companies who represented clients for modifications from multiple servicers including OLS.

6.      Ocwen Loan Servicing, LLC is a Delaware limited liability company with its principal place of business in West Palm Beach, Florida.  OLS can be served with process by making service upon its registered agent, Corporation Service Company dba CSC – Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, TX 78701-3218.

7.      OLS is wholly owned by and appears to be an alter ego of Ocwen Financial Corporation ("Ocwen Financial"), a Florida corporation with its principal place of business in Atlanta, GA. William C. Erbey is OLS's Executive Chairman; Ronald M. Faris is its President

and Chief Executive Officer of OLS. Erbey is Ocwen Financial's Executive Chairman of the Board of Directors (since September 1996) and former Chief Executive Officer (January 1988 to October 2010), and has been part of the company since its founding in 1987; Faris is Ocwen Financial's President (since March 2001), Chief Executive Officer (since October 2010), and a Director (since 2003), and joined the company in 1991. Ocwen Financial, through its subsidiaries, is a leading provider of residential and commercial mortgage loan servicing, special servicing and asset management services. In addition to its Atlanta headquarters, Ocwen Financial has offices in West Palm Beach and Orlando, Florida, Houston, Texas, McDonough, Georgia, and Washington, DC and support operations in India and Uruguay. OLS is licensed to service mortgage loans in all 50 states, the District of Columbia and two U.S. territories. As of December 31, 2013, Ocwen Financial and its subsidiaries serviced 2,861,918 residential loans with an aggregate unpaid principal balance (UPB) of $464.7 billion. **See Exhibit 16, *Ocwen Financial Corp. Form 10-K Annual Report*, filed 03/03/14 for the period ending 12/31/13 ("Ocwen 10-K") at pp. 4, 17, 26.** Ocwen Financial, formed in 1988, and its predecessors have been servicing residential mortgage loans since 1988 and subprime mortgage loans since 1994. As of December 31, 2013, Ocwen Financial and its subsidiaries also serviced commercial assets totaling $2.6 billion.  Ocwen 10-K at pp. F-37.  Ocwen Financial and its subsidiaries modified have completed 450,000 home loan modifications since 2008. Ocwen 10-K at 3.  Ocwen Financial is publicly traded on the New York Stock Exchange under the symbol OCN.  Relator has not joined Ocwen Financial at this time, but will do so should it become apparent that such joinder is appropriate.

8.     On December 27, 2012, Homeward Residential Holdings, Inc. f/k/a American Mortgage Servicing, Inc. ("AHMSI" or "Homeward") was purchased by Ocwen Financial. *See*

**Exhibit 17** and Ocwen 10-K, **Exhibit 16**, at p. 6. AHMSI is a Delaware corporation with its principal place of business in Coppell, Texas. Although AHMSI is not a party to this action, Relator has filed a similar, separate suit against AHMSI in the Eastern District of Texas and intends to seek leave, ultimately, for consolidation to this case.

### III. JURISDICTION AND VENUE

9.     This matter is within the Court's federal question jurisdiction, as Relator brings this action under 31 U.S.C. § 3730(b)(1). Venue is proper in the Eastern District of Texas, where OLS transacts substantial business and where violations of the False Claims Act occurred in part, pursuant to the False Claims Act, 31 U.S.C. § 3732(a). This action seeks remedies on behalf of the United States for Defendant's multiple violations of 31 U.S.C. § 3729.

### IV. HOME AFFORDABLE MODIFICATION PROGRAM

10.     In approximately mid-to late 2008, an industry sprang up to help financially troubled homeowners save their homes by negotiating loan modifications with the servicers[4] of the loans. In the third quarter of 2009, the U.S. Treasury Department rolled out the Home Affordable Modification Program ("HAMP")[5] to encourage lenders to modify home-secured loans. Under HAMP, loan servicers, investor/owners of loans, and borrowers receive incentive payments from the Government in connection with granting the modification and keeping the

---

[4] A loan servicer is an entity that may or may not be the original lender or the owner of a loan. It need not be a bank but may be. Servicers that are not the owners are paid by the owners of the loans to collect monthly payments and generally manage the borrowers' accounts on a day-to-day basis. Servicers sometimes buy the right to service groups of loans.

[5] In addition to the Treasury Department's HAMP program for non-GSE loans—loans not owned by Government-Sponsored Entities, the Federal National Mortgage Association (Fannie Mae) or Federal Home Loan Mortgage Corporation (Freddie Mac)—Fannie Mae, Freddie Mac, the VA, and the FHA administer their own versions of HAMP pursuant to the Government's Making Home Affordable initiative.

modified payments current (borrowers' incentives are paid to the servicer to be applied as principal reduction paid to the owner/investor). On August 19, 2010, pursuant to its Supplemental Directive 10-09,[6] **Exhibit 4,** the Treasury Department issued the Making Home Affordable Program Handbook for Servicers of Non-GSE Mortgages[7] ("MHA Handbook"), which governs the procedures for HAMP loan modifications.

11.     The MHA Handbook states "[t]his Handbook constitutes Program Documentation under the Servicer Participation Agreement and is incorporated by reference into the Servicer Participation Agreement." **Exhibit 4,** *MHA Handbook v. 4.3,* **at p. 14,** **https://www.hmpadmin.com/portal/programs/guidance.jsp (last accessed February 25, 2014).**[8]   The Servicer Participation Agreement is part of the uniform agreement between a servicer and the Government's financial agent Fannie Mae as designated by the Treasury Department ("Commitment to Purchase Financial Instrument and Servicer Participation Agreement"), pursuant to which the servicer may participate in HAMP, 2MP (Treasury and HUD's Second Lien Modification Program), Treasury FHA-HAMP, RD-HAMP (Department of Agriculture's Rural Housing Service HAMP program), or FHA2LP (FHA refinance program for underwater loans) for loans that are not owned, securitized, or guaranteed by Fannie Mae or Freddie Mac, and the Government compensates the servicer, loan owner(s), and borrower(s). The form of the Servicer Participation Agreement can be accessed at **http://www.hmpadmin.com//portal/programs/servicer.jsp** (last accessed February 25, 2014).

6 On March 1, 2013, Supplemental Directive 13-01 issued, effective May 1, 2013.

[7] Non-GSE mortgages are mortgages not owned by government-sponsored entities ("GSEs") such as the Federal National Mortgage Association (Fannie Mae) or Federal Home Loan Mortgage Corporation (Freddie Mac).

[8] On March 3, 2014 the Treasury Department issued Version 4.4 Making Home Affordable Program Handbook for Servicers of Non-GSE Mortgages.

12.     In the MHA Handbook v. 4.3, (September 16, 2013), every servicer is put on notice of the following requirement:

**1.6 Compliance with Applicable Laws**

Each servicer and any sub-servicer that the servicer uses will be subject to and must fully comply with all federal, state, and local laws, including statutes, regulations, ordinances, administrative rules and orders that have the effect of law, and judicial rulings and opinions…

**Exhibit 4, *MHA Handbook v. 4.3*, at p. 32 ¶ 1.6.**

13.     Under HAMP, incentive fees paid to the servicer by the Government, which currently can equal up to $4,600 per HAMP modification, and similar, separate fees paid by the Government to the lender/investor owners of the loans, are designed to fully compensate the servicer and investor owners for all costs associated with granting the HAMP modification.

14.     The United States also pays up to $83.33 per month for the benefit of borrowers, to be applied to the borrowers' loan balance as principal reduction, accruing monthly and paid annually for the first five years as long as the loan is in good standing where the modification reduces the monthly housing expense by 6% or more and the property is owner occupied. These payments are made by the Government to the servicer for payment to the owner/investor as credits to the borrower's loan balance**. Exhibit 4, MHA Handbook v. 4.3, at pp. 141 ¶ 13.2; Exhibit 5, *MHA Compensation Matrix*, at p. 2, § 5.** Thus the United States pays for the benefit of the borrower (and the owner of the loan, which receives payment on the loan) up to a maximum of $5,000.

15.     Pursuant to the *current* HAMP servicer Compensation Matrix, last updated January 24, 2014, attached as **Exhibit 6**, a servicer receives a one-time payment of $400-1600 from the Government for each completed permanent HAMP modification with an effective date of the trial period plan on or after October 1, 2011 and before March 1, 2014; the amount of this

incentive payment depends on the number of days the specific loan was delinquent. The Compensation Matrix was previously updated several times (including an update effective October 1, 2011 to reflect changes to servicer incentives detailed in Treasury Supplemental Directive 11-06 Making Home Affordable Program—Updates to Servicer Incentives). Under the incentive schedules prior to these changes, the servicer received $1,000 for each completed modification under HAMP with a trial period plan effective date before October 1, 2011, without regard to whether the borrower was delinquent; however, for permanent HAMP modifications with a trial period plan effective date before October 1, 2011, the servicer received an additional $500 if the borrower was not delinquent at the time of the modification[9] for a maximum one-time, initial payment of $1,500 under pre-October 1, 2011 incentive schedules. **Exhibit 6, *MHA Compensation Matrix*, last updated January 24, 2014 at p. 1-2,**

**https://www.hmpadmin.com/portal/programs/hamp.jsp#8** (last accessed

February 25, 2014); **Exhibit 4, MHA Handbook, v 4.3, p. 139 at ¶ 13 – p. 141 at ¶ 13.1.3**.

16.     In addition to the <u>initial</u> modification completion incentive payment, servicers are paid "Pay for Success" incentives of up to $83.33 per month, which are accrued monthly and paid annually on the anniversary date of the permanent HAMP loan modification for a period of thirty-six (36) months for modified loans that remain in good standing. Thus, servicers may, post-October 1, 2011 plan, be paid up to $4,600 for a permanent HAMP loan modification that continues in good standing for thirty-six (36) consecutive months ($1,600 for modification plus $3,000 maximum total good standing payments). Prior to October 1, 2011, the servicer could be paid up to $4,500 for a permanent HAMP loan modification where the borrower was not delinquent at the time of the trial period effective date and continued in good standing for thirty-

---

[9] This payment is no longer applicable, for modifications with a post-October 1, 2011 effective date.

six (36) consecutive months ($1,000 for modification plus $500 bonus plus $3,000 maximum total good standing payments); for a borrower who was delinquent at the time of the trial period effective date, the servicer could be paid up to $4,000 ($1,000 for modification plus $3,000 maximum total good standing payments). **Exhibit 4, MHA Handbook, v 4.3, p. 139 at ¶ 13 – p. 141 at ¶ 13.1.3; Exhibit 5,** *MHA Compensation Matrix* **dated July 31, 2012, at pp. 1-3.**

17.    Investors/owners of the loans are paid an initial, one-time modification fee of $1,500 for modifications that lower the monthly housing expense by 6% or more and the property is owner occupied. Investors are paid by the United States (via payment to the servicer for the investor) good standing incentives accruing monthly and paid annually for up to five years pursuant to more complex formulas. Investors can also receive Investor Home Price Decline (HPDP) Incentive Payments for two years or Principal Reduction Alternative Payments for up to three years, pursuant to similar formulas based in part on amount of principal reduced. **Exhibit 4, MHA Handbook v. 4.3, at pp. 142-144 ¶ 13.3.4.2 (formulas for investor incentives); Exhibit 5,** *MHA Compensation Matrix***, dated July 31, 2012 at pp. 1-3, §§ 3 -7.**

## V. FACTS

18.    Ronald Farris, President of OLS, executed on behalf of OLS on September 9, 2010, an Amended and Modified Commitment to Purchase Financial Instrument and Servicer Participation Agreement with Fannie Mae as financial agent for the United States (accepted by Fannie Mae on September 15, 2010). **Exhibit 2**, *OLS Amended and Restated Servicer Participation Agreement***.**   OLS continues as a HAMP participant and the obligations, representations, warranties and covenants of OLS under its agreement survive the expiration or termination of its agreement effective September 9, 2010. **Exhibit 2 at p. 1.** *See* also **Exhibit 18**, *Non-GSE Servicer Participants*,

http://www.makinghomeaffordable.gov/get-started/contact-mortgage/Pages/default.aspx

(click the letter "O" under "Mortgage Servicers" (last accessed January 2, 2014). OLS *original* Servicer Participation Agreements were executed on or around April 16, 2009. **Exhibit 1**, ***Commitment to Purchase Financial Instrument and Servicer Participation Agreement for the Home Affordable Modification Program under the Emergency Economic Stabilization Act of 2008***.

19.     The OLS Servicer Participation Agreements (Exhibits 1 and 2) provide for required representations, warranties, and certifications by OLS, the Servicer, within the Servicer Participation Agreement itself and in subsequent annual certifications:

> **Servicer's representations and warranties, and acknowledgement** of an agreement to fulfill or satisfy certain duties and obligations, with respect to its participation in the Programs and under the Agreement **are set forth in the Financial Instrument.** Servicer's **certification as to its continuing compliance** with, and the truth and accuracy of, the representations and warranties set forth in the Financial Instrument will be provided **annually** in the form attached hereto as Exhibit C (the "Certification"), beginning on June 1, 2010 and again on June 1 of each year thereafter during the Term (as defined below) and upon the execution and delivery by Servicer of any Additional Service Schedule during the Term.

**Exhibit 1, OLS *Servicer Participation Agreement*, at p. 2 ¶ B; Exhibit 2, OLS *Amended Servicer Participation Agreement*, at p. 2 ¶ C.**

20.     In paragraph 5(b) of the "Representations, Warranties and Covenants" of the Financial Instrument, which is a part of the Servicer Participation Agreements, at the time of executing its agreement, OLS represented, warranted, and covenanted that:

> (b)     Servicer **is in compliance** with, and **covenants** that all **Services will be performed in compliance with, all applicable Federal, state and local laws, regulations, regulatory guidance, statutes, ordinances, codes and requirements, including, but not limited to, the Truth in Lending Act, 15 USC 1601 § et seq.** [sic], the Home Ownership and Equity Protection Act, 15 USC § 1639, the Federal Trade Commission Act, 15 USC § 41 et seq., the Equal Credit Opportunity Act, 15 USC § 701 et seq., the Fair

Credit Reporting Act, 15 USC § 1681 et seq., the Fair Housing Act **and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices** and all applicable laws governing tenant rights. Subject to the following sentence, Servicer has obtained or made, or will obtain or make, all governmental approvals or registrations required under law and has obtained or will obtain all consents necessary to authorize the performance of its obligations under the Program and the Agreement.

**Exhibit 1, OLS** *Servicer Participation Agreement***, at Exhibit A Financial Instrument, p. 2 ¶ 5(b); Exhibit 2, OLS** *Amended Servicer Participation Agreement***, at p. B-3 ¶ 5(b).**

21.     The following certification is included in the Certificates to be executed and delivered to the Government by OLS, like every Servicer, annually beginning on June 1, 2010, and again on June 1 of each year during the Term of the Agreements, pursuant to Section 1.C of OLS Servicer Participation Agreements, as well as paragraph 5(l) of their Financial Instruments, which are each incorporated in and part of each of the Servicer Participation Agreements.

## CERTIFICATION

2.     **Servicer is in compliance with, and certifies that all Services have been performed in compliance with, all applicable Federal, state and local laws, regulations, regulatory guidance, statutes, ordinances, codes and requirements, including, but not limited to, the Truth in Lending Act, 15 USC 1601 § et seq.** [sic], the Home Ownership and Equity Protection Act, 15 USC § 1639, the Federal Trade Commission Act, 15 USC § 41 et seq., the Equal Credit Opportunity Act, 15 USC § 701 et seq., the Fair Credit Reporting Act, 15 USC § 1681 et seq., the Fair Housing **Act and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices** and all applicable laws governing tenant rights.

Exhibit 1, OLS *Servicer Participation Agreement*, Exhibit A Financial Instrument, p. 2 ¶ 5(b) and Exhibit B Annual Certification, p. 2 ¶ 2; Exhibit 2, OLS *Amended Servicer Participation Agreement*, at Exhibit B Financial Instrument, p. B-3 ¶ 5(b) and Exhibit C Form of Certification p. C-1 ¶ 2; *see also* form for annual certification accessible at

**Qui Tam Plaintiff/Relator's First Amended Complaint**                                            14

https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/servicerparticipationagreement.pdf (last accessed January 2, 2014).

22.     OLS falsely represented that it was in full compliance with the above requirements with the execution of the *original* Servicer Participation Agreement and the Certification within that Agreement (Exhibit 1) on April 16, 2009, as well as in its Amended and Restated Servicer Participation Agreement on September 9, 2010, (Exhibit 2) which pursuant to the HAMP program were substantially similar, and in each annual re-certification.

23.     The representations of compliance with federal and state law made by OLS were conditions of payment, and material to payment by the United States. Paragraphs 4.A. to 4.D. of OLS's Servicer Participation Agreements provide as follows:

> **4.     Agreement to Purchase Financial Instrument; Payment of Purchase Price**
>
> **A.     Fannie Mae, in its capacity as a financial agent of the United States, agrees to purchase**, and Servicer agrees to sell to Fannie Mae, in such capacity, the Financial Instrument that is executed and delivered by Servicer to Fannie Mae in the form attached hereto as <u>Exhibit B</u>, in consideration for the payment by Fannie Mae, as agent, of the Purchase Price.
>
> **B.     The <u>conditions precedent</u> to the payment by Fannie Mae of the Purchase Price with respect to the Services described on the Initial Service Schedules are: (a) the execution and delivery of the Commitment, the Initial Service Schedules, and the Financial Instrument by Servicer to Fannie Mae;** (b) the execution and delivery of the Commitment and the Initial Service Schedules by Fannie Mae to Servicer; (c) the delivery of copies of the fully executed Commitment, Initial Service Schedules and Financial Instrument to Treasury on the Effective Date of the Agreement; **(d) the performance by Servicer of the Services described in the Agreement, in accordance with the terms and conditions thereof, to the reasonable satisfaction of Fannie Mae and Freddie Mac; and (e) the satisfaction by Servicer of such other obligations as are set forth in the Agreement.**

C.     The conditions precedent to the payment by Fannie Mae of the Purchase Price with respect to the Services described on the Additional Service Schedules (if any) are: (a) the **execution** and delivery of the Additional Service Schedules **and the Certification by Servicer to Fannie Mae**; (b) the execution and delivery of the Additional Service Schedules by Fannie Mae to Servicer; (c) the delivery of copies of the fully executed Additional Service Schedules to Treasury; (d) **the performance** by Servicer of the Services described in the Agreement, in accordance with the terms and conditions thereof, to the reasonable satisfaction of Fannie Mae and Freddie Mac; and (e) the **satisfaction** by Servicer of such other obligations as are set forth in the Agreement.

D.     Solely in its capacity as the financial agent of the United States, and subject to subsection E. below, Fannie Mae shall remit all payments described in the Program Documentation to Servicer for the account or credit of Servicer, Investors and borrowers, in each case in accordance with the Program Documentation (all such payments, collectively, the "Purchase Price"); all payments remitted to Servicer for the credit or account of third parties under the Program Documentation shall be applied by Servicer as required by the Program Documentation. Fannie Mae shall have no liability to Servicer with respect to the payment of the Purchase Price, unless and until: (a) Servicer and all other interested parties have satisfied all pre-requisites set forth herein and in the Program Documentation relating to the applicable Program payment structure, including, but not limited to, the delivery of all data elements required by Section 3 of this Commitment; and (b) the Treasury has provided funds to Fannie Mae for remittance to Servicer, together with written direction to remit the funds to Servicer in accordance with the Program Documentation.

**Exhibit 1, OLS *Servicer Participation Agreement*, at p. 3 (emphasis added) and Exhibit 2,**

**OLS *Amended Servicer Participation Agreement*, at pp. 3-4.**

24.     OLS acknowledged in the **Financial Instruments** purchased by Fannie Mae pursuant to the Commitment to Purchase Financial Instrument and Servicer Participation Agreements between Fannie Mae and OLS that **providing false or misleading information** to Fannie Mae or Freddie Mac in the HAMP Program may constitute violations of (1) federal

criminal laws found in Title 18 of the U. S. Code or of the **civil False Claims Act (31 U.S.C. §§ 3729-33)**:

> (f)  **Servicer acknowledges that the provision of false or misleading information to Fannie Mae or Freddie Mac in connection with the Program or pursuant to the Agreement may constitute a violation of: (a) Federal criminal law involving fraud,** conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code; or **(b) the civil False Claims Act (31 U.S.C. §§ 3729-3733).** Servicer covenants to disclose to Fannie Mae and Freddie Mac any credible evidence, in connection with the Services, that a management official, employee, or contractor of Servicer has committed, or may have committed, a violation of the referenced statutes.

**Exhibit 1, OLS *Servicer Participation Agreement*, at Exhibit A Financial Instrument at p. 3 ¶ 5(f); Exhibit 2, OLS Amended Servicer Participation Agreement, at Exhibit B Financial Instrument at p. B-4 ¶ 5(f).** Given the scope of the representations, warranties, and covenants and the Servicer's continuing obligations of truthfulness and accuracy as set forth in the introduction to paragraph 5, OLS was on notice of the obligations of truthfulness and accuracy and acknowledged that failures to fulfill these obligations could lead to criminal and False Claims Act prosecution:

> 5.  **Representations, Warranties and Covenants**. Servicer makes the following **representations, warranties and covenants** to Fannie Mae, Freddie Mac and the Treasury, **the truth and accuracy of which are continuing obligations of Servicer**. In the event that any of the representations, warranties, or covenants made herein ceases to be true and correct, Servicer agrees to notify Fannie Mae and Freddie Mac immediately.

**Exhibit 1, OLS *Servicer Participation Agreement*, at Exhibit A Financial Instrument, at p. 2 ¶ 5; Exhibit 2, OLS *Amended Servicer Participation Agreement,* at Exhibit B Financial Instrument p. B-2 ¶ 5.** OLS has knowingly failed to notify the government as required when it certifications and representations of compliance have been false.

25.     In 2008, Relator, who was an employee of a Brea, California law firm, began assisting attorneys there in helping homeowners obtain home loan modifications. Relator continued this line of work with a Southlake, Texas, law firm upon moving to Texas in November of 2010 until his partial retirement in March 2012. Relator's tasks involved primary responsibility for much of the processing of loan modification applications for the firms' clients. Relator assisted a number of attorneys in successfully completing hundreds of loan modifications for clients of the two law firms and personally reviewed every one of the modification contracts and applications. Relator coordinated the modification process with twenty or more different servicers. Additionally, he received and reviewed thousands  of modification contracts from other law firms and companies who represented clients for modifications from multiple servicers including OLS.

26.     Relator worked with his law firm employers to complete successful OLS loan modifications for the firms' clients. Relator reviewed and consulted on the details of each OLS modification agreement with the clients. As a result, Relator is aware of all of the OLS modification agreements between the firms' clients and OLS, as well as the contents of the files. This includes some modifications submitted under HAMP and non-HAMP modifications. Relator has also requested and received copies of additional OLS HAMP and non-HAMP modification contracts from other firms and has closely examined them all.

## VI. OLS HAMP AND NON-HAMP LOAN MODIFICATIONS

27.     OLS, in connection with modification agreements, operates essentially the same as virtually all servicers who participate in the Government's Making Home Affordable (MHA) – HAMP program. OLS facilitates and grants modifications under two general kinds of circumstances, as do virtually all servicers. One circumstance involves making modifications

under guidelines that are established by the Treasury Department for the Government's HAMP program,[10] and then submitting a claim for payment of incentive fees by the U.S. Government pursuant to HAMP policies. The second area of modifications involves modification of loans that are outside of HAMP wherein the servicer and investors or lenders owning the loans determine the guidelines On the Non-HAMP-submitted modifications, a servicer does <u>not</u> submit a request for Government payment, but may look to the borrower to compensate the servicer instead.

28.     The two types of modification contracts are usually similar in form and substance. The HAMP modifications generally are more restrictive in requirements for an approval of a permanent modification, and subsequent payment by the U.S. Government. The non-HAMP modifications have more flexibility for approval, and do not have the requirement to be completed within the strict boundaries of the MHA Handbook.  Like virtually every servicer who is a participant in the HAMP program, OLS generally uses one of two standard contract formats for modifications to borrowers. One contract format is used for HAMP-submitted modifications, and another format is used for non-HAMP modifications. Here, OLS HAMP and non-HAMP modification contracts are similar in form and substance, although its HAMP modifications must meet the HAMP requirements for approval, while its non-HAMP modifications may be more flexible.

29.     In the numerous HAMP and non-HAMP OLS loan modifications reviewed by Relator, OLS virtually always loaned new amounts of principal to the borrower by adding them to the original loan principal balance. The amount of the new, additional loan advances made to borrowers in modifications reviewed by Relator, above and beyond the principal balance owed prior to the modification, typically amounted to tens of thousands of dollars. The capitalized

amount included delinquent interest, property taxes, and various, undefined and undisclosed modification fees and costs, **not** arising out of (i) the original note or (ii) deed of trust, OLS often capitalized a lump sum without any itemization of the amount financed, making it impossible for the borrower to discern what charges comprised the added principal. On the amounts added to the principal balance, OLS charges interest to be repaid over approximately 25-40 years. **OLS does not, however, provide the required notice of the right of rescission notwithstanding the resulting first lien mortgage retained or acquired in the borrower's principal residence for the deferred debt payment or the additional amount advanced and secured.**

30.    The HAMP modification agreements typically state:

> *The modified principal balance of my Note **will include** all amounts and arrearages that will be past due as of the Modification Effective Date (including unpaid and deferred interest, fees, escrow advances and other costs, but excluding unpaid late charges, collectively, "Unpaid Amounts") less any amounts paid to the Lender but not previously credited to my Loan.*

All of these modification contracts with increased capitalized debt, including past due obligations and modification fees and costs **not** arising under the (i) original note or (ii) deed of trust, and the deferral of a large principal payment were secured and finalized without providing the borrowers the legally required notice of the right to rescind. The OLS HAMP loan modifications reflected new debt balances that were always substantially more than the pre-modification outstanding principal balances on the HAMP modifications reviewed by Relator.

31.    Each OLS modification contract contains the following or substantially similar language:

> If under the Servicer's procedures a title endorsement or subordination agreements are required to ensure that the modified mortgage Loan **retains** its **first lien position** and is fully enforceable, I understand and agree that the Servicer will not be obligated or bound to make any modification of the Loan

> Documents or to execute the Modification Agreement if the Servicer has not received an acceptable title endorsement and/or subordination agreements from other lien holders, as Servicer determines necessary.

*See, e.g.,* **Exhibit 12 at p. 4, para. J.**

32.     Pursuant to the language quoted in the previous paragraph in OLS loan modification contracts, OLS, as the Servicer, *acquired* a new, first-lien security interest in the residential real property for its HAMP modification advance. The original first lien securing the original loan obligation was *retained* by the Investor/Note owner. This **new security interest** secures an obligation to a new lender (Servicer), and the first-lien security interest now covers a larger loan obligation than the previous loan obligation.[11] Thus, this factually satisfies Section 1026.23, as a security interest is both retained (Investor/Note owner) and acquired (Servicer advance). 15 U.S.C. § 1635; 12 C.F.R § 1026.23(a).  The new security interest appears to cover the new change of interest on the newly capitalized advances.

33.     OLS never provided TILA/Regulation Z Right of Rescission notices when making HAMP or proprietary modifications, despite the fact that OLS's sophisticated real-estate lending lawyers prepared each of the files, and Section 1026.23(a) objectively requires that the notice be provided. 12 C.F.R. § 1026.23(a)-(b).

34.     Through July 2014, the United States has paid a total of **$1,264,459,115.58** in incentives for OLS HAMP modifications, which includes **$285,758,800.95** for the servicer, OLS.[12] The balance of the funds was paid for the benefit of the relevant borrowers and investors.

---

[11] In some modifications, OLS adds amounts to existing principal balances, and forgives part of the original principal. In these cases, the new loan amount is owed to and a new security interest acquired or retained by a new lender, OLS. The amount of principal forgiven is forgiven by the owner/investor; the newly advanced amount loaned by OLS is not forgiven and a new security interest in the property is acquired or retained by OLS.

[12] The Government's incentives for the benefit of the investor/lenders and borrowers, the other

**Exhibit 7,** *TARP Housing Transactions Report for Period Ending July 31, 2014,* **at p.41,** Supplemental Information [Not Required by EESA §114(a)] Making Home Affordable Program Non-GSE Incentive Payments (through June 2014).

http://www.treasury.gov/initiatives/financial-stability/reports/Pages/default.aspx

Under "All Reports by Frequency," "As Indicated," click on TARP Housing Transaction Reports" and select report by date. Therefore, the approximate amount of the Government's False Claims Act single damages incurred through July 2014 is **$1,264,459,115.58**.

35.     The cap on incentives for OLS modifications, which is subject to periodic adjustments, is **$4,968,381,523.00** in potential incentive payments by the United States to the Servicer, OLS. **Exhibit 7** *TARP Housing Transactions Report for Period Ending July 31, 2014,* **at p. 22.**

36.     The procedure by which OLS has received the Government-paid incentives for OLS's loan modifications  is as follows:

## MHA Compensation Process

1.     Servicer establishes bank account.

- Bank accounts are designated by the servicer on the HAMP Registration Form, Sections 3 and 4.

- Servicers may designate up to four accounts to allocate compensation appropriately:  default, servicer, investor, and borrower accounts.

2.     Servicer submits Official Loan Setup record once trial period is complete.

---

two express beneficiaries, are paid to OLS to be distributed or credited promptly  to the appropriate recipient.

      ●   Refer to the chart above for compensation timing considerations and requirements.

3.   Fannie Mae, as administrator for the Making Home Affordable Program, provides Cash Payment Summary Report to servicer.

      ●   Report includes compensation amount on a loan-level basis and indicates the associated payer: U.S. Treasury Department, Fannie Mae, or Freddie Mac.

      ●   Report is accessible via the HAMP Reporting Tool one business day before compensation is deposited into accounts. Deposit occurs on the 27th calendar day or first business day prior to the 27th if the 27th falls on a weekend or a holiday.

4.   Deposit is made.

      ●   Deposit is transferred via the Automated Clearing House (ACH) Network on 27th of the month or on the business day prior to the 27th.

**Exhibit 5,** *MHA Compensation Matrix*, dated July 31, 2012 at p. 7. OLS followed this procedure and generated $1,112,071,752.25 in Government incentive payments for the benefit of OLS, its investor/owners, and its borrowers through July 2014. **Exhibit 7,** *TARP Housing Transactions Report for Period Ending July 31, 2014*, at p.41.

### VII.   FEDERAL HOUSING ADMINISTRATION ("FHA") VIOLATIONS

37.   The FHA was created by Congress in 1934 and became part of the Department of Housing and Urban Development (HUD) in 1965. The FHA provides mortgage insurance for single-family housing loans to approved lenders to protect them against losses resulting from defaulting borrowers. *See* 12 U.S.C. § 1709; *See generally* 24 C.F.R Part 203. FHA-approved servicers are obligated to comply with all applicable laws and regulations.[13] Those servicers that fail to comply with HUD statutes, regulations, handbook requirements or mortgagee letters may

---

[13] FHA Commissioner Letter Oct. 8, 2010

**Qui Tam Plaintiff/Relator's First Amended Complaint**                            23

be required to repay incentives received or indemnify HUD for any losses incurred.[14] After April 25, 1996, FHA ceased accepting applications for the assignment of FHA loans which had gone into default, and instead initiated a comprehensive loss mitigation program to provide relief to borrowers in default.[15] The loss mitigation program returned the responsibility for managing loan defaults to the servicer and provided financial incentives to recognize them for this effort. Pursuant to HUD regulations and guidance, FHA-approved lenders and their servicers are *required* to engage in loss mitigation to avoid the foreclosure of HUD-insured residential mortgages.[16] OLS has continuously failed to meet the basic and fundamental requirements related to the servicing of delinquent FHA loans under the mandated loss mitigation program. The primary goal of the FHA program is to reduce the risk to lenders and encourage lending to borrowers, all the while increasing homeownership.

**FHA Loss Mitigation**

38.     To service FHA loans, a servicer must have a fully functioning Quality Control (QC) Program in place to ensure that FHA-compliance procedures are observed and that personnel working for the lender understand how to meet the strict FHA requirements. FHA-compliant QC programs and plans provide for the correction and reporting of problems and violations  to HUD once the lender becomes aware of them.

---

[14] *Id.*

[15] *See generally* 24 C.F.R. § 203.605;  **Exhibit 19**, Mortgagee Letter ("ML") 2000-05 ("Loss Mitigation Program-Comprehensive Clarification of Policy and Notice of Procedural Changes") (Jan. 19, 2000).

[16] 24 C.F.R. § 203.500 et seq.; **Exhibit 19**, ML 2000-05 at p. 6; *see also* **Exhibit 20**, ML 2008-27 ("Treble Damages for Failure to Engage in Loss Mitigation") (Sept. 26, 2008) to avoid treble damages, "First, mortgagees must ensure that the loss mitigation evaluations are completed for all delinquent mortgages before four full monthly installments are due and unpaid.  Second, mortgagees must ensure that the appropriate action is taken based on these evaluations. Third, mortgagees must maintain documentation of all initial and subsequent loss mitigation evaluations and actions taken."

39.     OLS knowingly failed to establish a compliant QC program for the FHA portfolio. The employees servicing the FHA portfolio did not have a check list, reference guide or instruction manual to assist them in their determination of compliance with current FHA requirements, nor were they provided adequate instruction by management. The servicer's knowing failure to implement an FHA compliant QC program was a direct violation of HUD requirements and rendered each of OLS's requests for payment, from the FHA insurance fund, a false claim/certification.  Thus, OLS's SPA certifications were false for this additional reason.

40.     Likewise, OLS knowingly and continuously failed to engage in  any form of FHA loss mitigation, as required under HUD. OLS's practice has long been to treat **all** loan default processes, including FHA loss mitigation, as if they were conventional loans; however, HUD has developed particular processes and procedures to be used in relation to FHA loans. Therefore, OLS's standard practice, of applying the same loan default processes across the board, is was unlawful and it violated HUD requirements. OLS failed to act in good faith and refrain from taking advantage of the FHA. 48 Fed. Rag. 11928, 11932 (Mar. 22, 1983). Thus, OLS's SPA certifications were false for this additional reason.

41.     In regard to FHA loss mitigation, the FHA Home Affordable Modification Program (FHA HAMP) provides defaulting borrowers a loss mitigation solution that combines a Loan Modification with a Partial Claim. The specific guidelines for FHA HAMP are found in a document released by HUD titled, "Making Home Affordable Program: FHA's Home Affordable Modification Loss Mitigation Option." (Attached hereto as **Exhibit 8**). The guidelines therein specifically require that the FHA loan modification must be re-amortized to a 30-year fixed rate mortgage in order to qualify for FHA HAMP. Upon information and belief, OLS was modifying FHA loans and amortizing the loan for more than 30 years, which was

prohibited by HUD and resulted in the borrower's disqualification from eligibility in the FHA HAMP program.   In addition, the review of FHA loan modification packages were outsourced overseas to India along with modification applications for conventional loans. The FHA modification applications were not distinguished from conventional loan packages and the India company applied the same review criteria to all loans. As a result, a borrower would be wrongfully denied a FHA-HAMP modification and the loan ultimately proceeded to foreclosure status. Thus, OLS's SPA certifications were false for this additional reason.

**OLS's False Certifications**

42.     The FHA has paid insurance claims for insured mortgages based on OLS's false certifications that it was in compliance with all FHA and HUD regulations and had a properly functioning QC program. The FHA would not have paid mortgage insurance to OLS if it had known about OLS's failures to maintain quality control within the FHA portfolio.   The cumulative FHA loss mitigation violations make evident OLS's SPA false certifications of compliance with federal lending laws, regulations, etc. made by OLS in its Servicer Participation Agreement used to induce the United States to approve the SPA agreement and to further influence the United States to agree to pay OLS in accordance with the Financial Instrument sold by OLS to the United States.

## VIII. UNFAIR, DECEPTIVE OR ABUSIVE ACTS OR PRACTICES

43.     The Home Affordable Modification Program's instructions to servicers explicitly and prominently state that "Lenders MUST revise the [Home Affordable Modification Agreement] . . . as necessary to comply with applicable federal, state and local law."[17] OLS failed to make such required revisions, all of which is outlined hereinbelow.

---

[17] Home Affordable Modification Agreement—Document Summary for non-GSE Loans (for use

## A. UDAAP and UDAP

44.     The Dodd-Frank Act prohibits unfair, deceptive, or abusive acts or practices (UDAAP). In addition, some state laws contain broad prohibitions on unfair and deceptive acts and practices (UDAP). Others contain only specific prohibitions on clearly specified activities. And, some state laws exclude creditors from coverage.[18] Thus, the extent to which OLS violated state UDAP laws will vary based on the peculiarities of each state's law, but OLS did violate federal (UDAAP) and state (UDAP) laws, thus triggering FCA violations by falsely certifying compliance with those statutes.

45.     A number of the terms (and omitted terms) in the loan modification agreements raise potential UDAAP and UDAP violations:

1.  OLS failed to make clear that borrowers had to pay the deferred principal at maturity. In modifications that deferred some of the principal, OLS included a clause stating the borrower agrees to pay any amount still due at the term of the loan, but failed to state the exact amount that would remain.  This included any balloon payment resulting from (1) the deferral of principal or (2) an extended amortization schedule creating a monthly shortage of fully paying down the principal each month. ; nor did OLS ever state any specific combined amount of the two (if more than one was created) that would be due in a balloon payment at the term of the loan.

    Although there are  two references to the deferred principal, OLS did not include the deferred principal amount due in the payment schedules box it provided borrowers. Instead, the payment schedules show how much borrowers will pay in principal and interest during different time periods, but not the final Balloon payment that will be due as required by law. Any Balloon payments due at maturity are neither included in the box payment

---

with Form 3157) (available at https://www.hmpadmin.com/portal/programs/hamp.jsp). This language reveals that the model HAMP forms establish a floor not a ceiling. In other words, OLS is not immunized from liability because it used the model forms. Rather, the HAMP instructions make clear that OLS was required to go beyond the requirements of the model forms if necessary to comply with federal, state and local law.

[18] *See generally,* Carolyn L. Carter, Consumer Protection in the States (National Consumer Law Center, February 2009).

schedule  chart nor  noted with an exact amount due in  any paragraph in the contract.

OLS  failed to disclose to borrowers the  specific additional dollar amount the  borrower  would have to pay in  the  form of a  balloon payment at maturity.

2.  In the HAMP Loan Modification Agreements <u>OLS failed to provide the borrowers with the current principle balance of their loans</u>, which impeded their  ability to make  meaningful comparisons  among their  principal balance, their adjusted principal balances, and the payments they would have to make at maturity. This information could have been valuable in their evaluation whether to go through with the loan modifications. In addition, without this information, the borrowers could not determine whether OLS's representations of their principal balance were correct.

3.  <u>OLS often failed to break down the amounts it had advanced for taxes, insurance  and  interest</u>.  These  omissions  prevented  borrowers  from ascertaining whether OLS's numbers were correct.

4.  Many of the modifications had <u>interest rates that increased over time</u>. It is a  fair assumption that the lower initial interest rates were necessary for the loans  to be affordable. If borrowers could not afford the loans at higher interest rates at the time of the modification, there is no reason to believe that they would be able to afford the higher interest rates in a few years.

5.  The modifications that OLS provided borrowers <u>depended on home values rising</u>. This is the same misguided assumption that banks like OLS made a few years back and that led to the financial crisis that resulted in many people defaulting on their loans.

6.  <u>OLS provided only</u> <u>temporary relief</u> to borrowers, the effect of which was to postpone foreclosures, not to facilitate people keeping their homes. The loan modifications, with their deferred principle and balloon payments were not affordable in the  long-term. By the maturity date of the loans, some of the borrowers will be too old to be eligible to obtain a loan to refinance their homes to pay off the balloon and deferred principle payments. And, even if they are not too old, they might not have enough equity or sufficient income to refinance.

See *infra* at ¶¶  93, 104, 111. Thus, OLS's SPA certifications were false for these additional reasons.

## B.  DODD-FRANK ACT

46.    The CFPB is still shaping the contours of Dodd-Frank's prohibitions on unfair, deceptive and abusive acts or practices, relying in large part on interpretations the FTC and the courts have given to prohibitions on unfair or deceptive acts or practices under the FTC Act.[19]

The Dodd-Frank Act[20] makes it:

unlawful for (1) any covered person or service provider--

(A) to offer or provide to a consumer any financial product or service not in conformity with Federal consumer financial law, or otherwise commit any act or omission in violation of a Federal consumer financial law; or

(B) to engage in any unfair, deceptive, or abusive act or practice."[21]

47.    A covered person is "any person that engages in offering or providing a consumer financial product or service."[22] A consumer financial product or service includes extending credit.[23] OLS meets the definition of a covered person and the loan modification agreements are consumer financial products for the reasons previously discussed.

### 1.  Unfair

48.    Unfairness is defined as an act or practice that:

(A)       . . . causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers; and

(B)       such substantial injury is not outweighed by countervailing benefits to consumers or to competition."[24]

---

[19] 15 U.S.C.A. § 45(a)(1) (2006).
[20]  The Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203, 124 Stat., 1376-2223 (July 21, 2010).
[21] 12 U.S.C.A. § 5536(a)(1) (2010).
[22] 12 U.S.C.A. § 5481(6) (2010).
[23] 12 U.S.C.A. § 5481(5) and (15)(A)(1) (2010).
[24] 12 U.S.C.A. § § 5531(c)(1) (2010).

The unfairness provision further states that "in determining whether an act or practice is unfair, the Bureau may consider established public policies as evidence to be considered with all other evidence. Such public policy considerations may not serve as a primary basis for such determination."[25]

49.     Applying these elements to the OLS loan modifications, the likelihood that borrowers will lose their homes at the end of the maturity periods or when their interest rates go up is a **substantial injury**.

50.     In its Supervision and Examination Manual, the CFPB has put some flesh on the second element-- that consumers are not reasonably able to avoid the injury. The critical inquiry is whether "material information about a product, such as pricing . . . is withheld until after the consumer has committed to purchasing the product. . . . The question is whether an act or practice hinders a consumer's decision-making. For example, not having access to important information could prevent consumers from comparing available alternatives, choosing those that are most desirable to them, and avoiding those that are inadequate or unsatisfactory."[26]

51.     The OLS modifications obscured and excluded material information about the loan modifications by excluding the amount of the deferred principal from the payment schedules, by not including the principal balance so the borrowers could meaningfully compare their options, by not providing borrowers with information from which they could assess the accuracy of OLS's figures, and by not making clear that OLS was under no obligation to refinance their balloon and deferred principal payments. These omissions impeded borrowers' ability to weigh their options with full information. *Supra.* ¶ 28.

---

[25] 12 U.S.C.A. § § 5531(c)(2) (2010).

[26] CFPB Supervision and Examination Manual, version 2 (October 2012), p. UDAAP 2, citing the FTC Policy Statement on Deception (available at http://www.ftc.gov/bcp/policystmt/ad-decept.htm).

52.     Obscuring the terms of the modifications does not benefit competition or consumers. To the extent that public policy is a consideration, numerous laws and judicial decisions have established that informed consumer choice is a value that the law should support.

## 2. Deceptive

53.     Although the Dodd-Frank Act does not define the term deceptive, the CFPB Supervision and Examination Manual states that a representation or omission is deceptive if:

(1) the representation, omission, act, or practice misleads or is likely to mislead the consumer;

(2) the consumer's interpretation of the representation, omission, act, or practice is reasonable under the circumstances; and

(3) the misleading representation, omission, act, or practice is material.[27]

54.     The feature of the loan modifications that falls most squarely under the deception prong is the omission of the deferred principle amounts from the payment schedules. Again, the CFPB Manual provides guidance: "Oral or fine print disclosures or contract disclosures may be insufficient to cure a misleading headline or a prominent written representation . . . . Acts or practices that may be deceptive include: making misleading cost or price claims."[28] The payment schedules are prominent in the loan modification agreements and give the impression that they reflect the true cost of the loan modifications even though the fine print indicates otherwise.

55.     The CFPB cites to the FTC's "four Ps" test for determining whether a statement is or is likely to be misleading. The test focuses on the prominence of the statement, whether the statement is presented in a format consumers can understand, whether the information is in a place consumers would look, and "whether the information is in close proximity to the claim it

---

[27] *Id.* at p. UDAAP 5.
[28] *Id.*

qualifies."[29]  The critical language about the date for paying the deferred principle is not prominent nor is it in close proximity to the payment schedule, which it, in effect, qualifies.

56.     The focus of the second element takes into account the target audience. The question is: how would reasonable people who are financially distressed interpret the payment schedule? If "a significant minority" of such people would find the schedule misleading, this element is satisfied.[30]

57.     Finally, the last element is satisfied because the ambiguous deferred principal payments of tens and even hundreds of thousands of dollars is material to every consumers' choice.

### 3.  Abusive

58.     An abusive act or practice is one that:

(1) materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service; or

(2) takes unreasonable advantage of--

    (A) a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service;

    (B) the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service; or

    (C) the reasonable reliance by the consumer on a covered person to act in the interests of the consumer.[31]

59.     Abusive acts and practices are not well-defined because abusive is a new addition to the traditional UDAP coverage. The CFPB has not yet provided any explicit guidance on the parameters of the prohibition. With that in mind, the same provisions and omissions that would

---

[29] *Id*. at p. UDAAP 5-6.
[30] *Id* at 6.
[31] 12 U.S.C.A. § § 5531(d) (2010).

**Qui Tam Plaintiff/Relator's First Amended Complaint**                                    32

support an unfairness claim would satisfy the first of the two categories of abusive acts and practices. *Supra*, ¶¶ 55-56.

### C.   "In-Flight" Modifications

60.   Commonly known in the industry as "In-Flight" modifications, these are loan modifications that are already in progress, and perhaps have even been approved, when the servicing rights of the loan are sold to another financial institution.  Often, when OLS was the recipient of in-flight modifications, OLS would receive only a portion of a borrower's loan file (i.e. the transferee failed to send some of the documents to OLS) resulting in an incomplete modification package. When borrower, who believed he or she had been approved for modification by the transferee bank, would begin making the adjusted payments to OLS, the borrower's payment would be short, because the transferred file was incomplete and OLS had no record of the modification. Despite identifying the issue, OLS knowingly failed to offer alternative modification options to these borrowers, resulting in many borrowers being wrongfully forced into foreclosure.

61.   Upon information and belief, borrower's in-flight modifications were not being honored by OLS, even though it was determined that the borrower was eligible for modification and relief should have been extended to the borrower to avoid adverse credit reports and even foreclosure. OLS's intentional course of conduct caused "substantial injury to consumers" violated the Dodd-Frank Act and the UDAAP/UDAP provisions. These additional federal legal violations are additional reasons that OLS' SPA **representations/certifications of compliance were false** each time they were provided to the United States.

### D.   Loss Mitigation – Modification Delays and Denials

62.     In addition to violations contained in the terms (and omitted terms) of the modification agreements, **OLS's handling of the modification agreements, themselves, amounted to unfair, deceptive and abusive acts and practices**. It was a common practice of OLS, after borrowers sought loss mitigation assistance, **to delay implementation** of the borrower's modification agreement by causing the borrower (or their legal counsel) to **repeatedly have to submit the same documentation several times**. The practice was **intended by OLS to frustrate the loss mitigation process**. Some borrowers suffered as many as five to six submissions over a period as long as nine to twelve months, and at times, longer. Virtually every client Relator assisted in seeking a modification had experience with OLS's demands for **multiple submissions** of documents *previously provided* to the servicer.

63.     In Relator's attempt to coordinate modifications with OLS**, the servicer made redundant demands for loan documents** Relator, personally, had already provided. Typically, OLS either claimed that the entire package was not received, that certain pages of the package were missing, or that the delay of a decision had now taken so long that it required all new financial records in order to render a final decision on the modification. **It was not uncommon for this scenario to play out more than once in a single borrower's modification process (or attempted modification process), and each time OLS requested new documentation the entire process had to begin anew.** Often, the delay for a borrower to receive a final decision was as long as 12 months or more, with a 9-12 months wait considered average. The indifference demonstrated by OLS could not be the result of oversight, as Relator and the law firm he was assisting followed the document trail each time for the borrowers and often failed to receive a sensible response from OLS as to the delay.

64. For those borrowers who were **enrolled in a trial period plan** for HAMP or non-HAMP modifications, this process, of making redundant demands for loan documentation already submitted, **was especially detrimental**. When the final decision on whether to offer a loan modification was eventually rendered, and the decision was a denial, wherein the process **had taken six to twelve months** and the borrower had sent each month the agreed-to, lesser trial payment, **once the denial was received OLS then demanded the immediate payment of** *all amounts past due* – meaning the difference between the lesser, modified trial payment amount and the full payment amount contained in the original contract. This amount, **often equaling thousands of dollars**, was required by OLS to be made up **within thirty days** or the borrower was forced into **foreclosure**, which occurred with regularity, as the borrowers were ususaly under severe personal and financial distress, unable to pay the "denial penalty."

65. Aside from engaging in tactical delays designed to force delinquent borrowers into foreclosure, OLS regularly engaged in the following harmful and unlawful behavior, **violating loss mitigation standards**:

  a) **Inadequate staffing to accomplish goals of all the departments involved in the modification process forcing delays and incompetence at every level of the process. The inadequate staffing was compouned by the lack of training, education and experience of those hired, all of which was objectively known by the highest management.**

  b) **Improper performance of modification underwriting;**

  c) **Inadequate establishment of loan modification procedures;**

  d) **Misplace and fail to properly store loan modification documents;**

  e) **Wrongful denial of modification applications;**

  f) **Impart false/misleading information to borrowers regarding the status of loss mitigation review;**

  g) **Not responding timely to borrower inquiries;**

      **h)  Improper calculations of borrowers' eligibility for loan modifications;**

      **i)  Wrongful denial of loan modifications;**

      **j)  Improper processing of modification applications, leading to denial; and**

      **k)  Off-shore loan reviews.**

Virtually all of the above can be found included in **Fannie's Annual LARC Audit** and the Final Report issued by the Auditors. More violations will likely be discovered during the discovery process during which the Final Reports must be produced.  These additional violations will be added to the pleadings by an amendment to conform to the evidence.

66.     When a loan is more than forty-five days delinquent a Servicer, since 2014, must assign a single point of contact to assist the borrower. OLS developed an appointment system whereby a borrower was assigned a "relationship manager" to contact, but by appointment only. The relationship manager was allotted a restricted amount of time, approximately thirty minutes, for each appointment with a borrower. The restriction on time and appointment requirement did not allow ample time to address the borrowers' situation, it was unfair and frustrated the process. Despite these unfair restrictions, although OLS had represented, falsely, that it had the financial commitment and ability to properly staff the process.

67.     OLS's employees complained to management about default process issues and on-going violations of loss mitigation standards, but management disregarded the warnings and did nothing to remediate pervasive violatons.

68.     The Vice President of GSE loans expressly raised loss mitigation deficiency and default servicing violations to management; his warnings were disregarded,  he was held in disfavor and nothing was done to even attempt to bring OLS into compliance. This made it clear to other OLS employees and management that **known violations or deficiencies regarding loan laws and regulations** were not on the table for discussion.

## IX.     REAL ESTATE SETTLEMENT PROCEDURES ACT (RESPA)

69.     RESPA is a consumer protection statute that provides certain rights regarding the servicing of mortgage loans and escrow accounts.[32] Section 2605 states that prior to a loan transfer, it is the responsibility of the transferor servicer to notify the borrower in writing, fifteen (15) days before the effective date of the transfer.[33] The transferee receiving servicing rights to a loan must notify the borrower within fifteen (15) days after the effective date of the transfer of the servicing of the mortgage loan. [34]

70.     In addition, RESPA requires that a servicer of a federally related mortgage may not:

A.   obtain force-placed hazard insurance to maintain property insurance;

B.   charge fees for responding to valid qualified written requests under this section;

C.   fail to take timely action to respond to a borrower's requests to correct errors relating to allocation of payments, final balances for purposes of paying off the loan, or avoiding foreclosure, or other standard servicer's duties;

D.   fail to respond within 10 business days to a request from a borrower to provide the identity, address, and other relevant contact information about the owner or assignee of the loan; or

E.   fail to comply with any other obligation found by the Bureau of Consumer Financial Protection, by regulation, to be appropriate to carry out the consumer protection purposes of this chapter.[35]

71.     OLS retained servicing rights in connection with certain mergers and/or purchases of a competitor's loan portfolio. In turn, OLS was responsible for the timely notification of these transfers to the respective borrowers.   Additionally, OLS was required by RESPA to honor all

---

[32] 12 U.S.C. §§ 2601-2617.
[33] 12 U.S.C. § 2605(a) and § 2605(b)(1)-(2)(A).
[34] 12 U.S.C. § 2605(c)(1)-(2)(A)
[35] 12 U.S.C. § 2605(k)(1)(A)-(E)

modifications approved by the prior servicer.   OLS violated the above legal requirements, and for these **additional reasons** made the representations/certifications to the United States **false**.

72.     Despite this requirement, OLS would remit transferor/transferee letters to borrowers well past the statutorily required 15 days, thereby causing the borrower to become "wrongfully" late on a payment,[36] and generating a bad credit report to the CRAs at a time when the borrower was current and paying as agreed!  The transfers were also carried out in such a way that many incomplete files were sent to the transferee and were missing important documents, such as the original mortgage contract and often a recently approved modification. OLS failed to timely respond to complaints regarding the misappropriation of mortgage payment funds due to the failure to properly notify the borrower of a transfer in a timely manner and confirmation of the modified terms.

### A.     Untimely Transferee/Transferor Letters to Borrowers

73.     According to RESPA, borrowers must receive notice of the transfer of their loan to a new servicer within fifteen (15) days. OLS knowingly failed to timely transmit notices commonly known as "hello" letters to the borrowers in violation of RESPA.[37]  This confused the borrower who then sent payment to the wrong servicer **and thereby became delinquent <u>at no fault of the borrowers.</u>**

> If the transferor (rather than the transferee servicer that should properly receive payment on the loan) receives payment on or before the applicable due date (including any grace period allowed under the loan documents), a late fee may not be imposed on the borrower with respect to that payment.  Moreover, the payment may not be treated as late for any other purposes. 12 C.F.R. § 1024.21(d)(5)

74.     In these instances, the borrower would send payment to the wrong servicer, due to the untimely transferee letter, and OLS would improperly charge the unwitting borrower a late

---

[36] 12 U.S.C. § 2605(a)
[37] 12 U.S.C. § 2605(a)

fee and send a negative report to the CRAs at a time when the borrowers were **current on their loan**. This all occurred within the first 60 days of the transfer. This knowing and reckless conduct resulted to the detriment of the borrower as described above.

### B.   Additional Violations of RESPA

75.   OLS's course of conduct with regard to (1) "In-Flight Modifications" as described at ¶¶ 60-61, is a violation of RESPA. 12 U.S.C. § 1024.38.[38]

76.   A transferee servicer [OLS] must have policies and procedures reasonably designed to ensure, in connection with a servicing transfer, that the transferee servicer receives information regarding any loss mitigation discussions with a borrower, including any copies of loss mitigation agreements. Further, the transferee servicer's [OLS] policies and procedures must address obtaining any such missing information or documents from a transferor servicer before attempting to obtain such information from a borrower.[39]   OLS knowingly failed to implement policies to assist borrowers in connection with a servicing transfer. This knowing and reckless conduct resulted to the detriment of the borrower as described above.

### X. TRUTH IN LENDING ACT AND REGULATION Z

77.   The federal Truth in Lending Act ("TILA") is contained in Title I of the Consumer Credit Protection Act, as amended, 15 U.S.C. § 1601 *et seq*. TILA was enacted "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit." 15 U.S.C. § 1601(a).

---

[38] 12 USC § 2605(k)(1)(C)
[39] 12 U.S.C. § 1024.38(b)(4). See also Official Bureau Interpretations ¶ 38(b)(4)(ii) Compliance with the commentary issued by the BCFP affords protection from liability under § 19(b) of RESPA, 12 U.S.C. 2617(b)

78.     15 U.S.C. § 1604 authorizes the Consumer Financial Protection Bureau ("CFPB" or "Bureau")[40] to promulgate regulations to carry out the purposes of TILA, which may contain "additional requirements, classifications, differentiations, or other provisions, and may provide for such adjustments and exceptions for all or any class of transactions, as in the judgment of the Bureau are necessary or proper to effectuate the purposes of [TILA], to prevent circumvention or evasion thereof, or to facilitate compliance therewith." 15 U.S.C. § 1604(a). The Bureau's rulemaking and interpretive authority are thus expansive and entitled to substantial deference.

79.     Regulation Z, 12 C.F.R. 1026.1 *et seq.* was promulgated by the Board of Governors of the Federal Reserve System ("Board") to implement TILA and other federal consumer protection statutes pursuant to authority granted in several sections, including, primarily, section 105 of TILA, 15 U.S.C. § 1604. *See* 12 C.F.R. 1026.1(a).[41] The provisions relevant to this action are contained in the first two of TILA's five sections, captioned "General Provisions," and "Credit Transactions."

80.     The scope of TILA is so broad that it does not contain a general statement of what transactions are covered but instead specifies what transactions are <u>excluded from coverage.</u> See 15 U.S.C. § 1603, titled "Exempted transactions." Federal courts have held that "'exceptions' not mentioned in TILA should not lightly be read into it." *E.g., Thomas v. Myers-Dickson Furniture Co.*, 479 F.2d 740, 745 (5th Cir. 1973). TILA also affirmatively specifies coverage as to some

---

[40] This rulemaking authority was originally vested in the Board of Governors of the Federal Reserve System ("Board"). Effective July 21, 2011, the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank"), P.L. 111-203, 124 Stat. 1376, shifted the TILA rulemaking and interpretative authority from the Board to the new Consumer Financial Protection Bureau ("CFPB" or "Bureau"). Dodd-Frank § 1100A.

[41] Since Dodd-Frank, P.L. 111-203, 124 Stat. 1376, shifted the TILA rulemaking and interpretative authority from the Board to the new CFPB, effective July 21, 2011, Dodd-Frank § 1100A, Regulation Z, previously published at 12 C.F.R. 226, has been republished at 12 C.F.R 1026.

transactions, including, *inter alia*, exceptions to exceptions from coverage. Although the original

bill passed by the Senate did not cover mortgage lending, the final version of TILA passed by

Congress included <u>all real property transactions</u>, unless specifically exempted. 4-37A Powell on

Real Property § 37A.01[1][a].

81.     TILA delineates its broad scope by specifying *who* must comply with its

provisions. Specifically, TILA provides that "creditors" are required to comply and provides that

**"Creditor"**

> refers only to **a person who both (1) regularly extends, whether in connection
> with loans,** sales of property or services, or otherwise, **consumer credit which is
> payable by agreement in more than four installments or for which the
> payment of a finance charge[42] is or may be required, and (2) is the person
> to whom the debt arising from the consumer credit transaction is initially
> payable on the face of the evidence of indebtedness** or, if there is no such
> evidence of indebtedness, by agreement. . . . Any person who originates 2 or more
> mortgages referred to in subsection (aa) [current subsection (bb)][43] in any 12-
> month period or any person who originates 1 or more such mortgages through a
> mortgage broker shall be considered to be a creditor for purposes of this title . . . .

15 U.S.C. § 1602(g). Under TILA,

> (f) The term **"credit"** means **the right granted by a creditor to a debtor [1] to
> defer payment of debt or [2] to incur debt and defer its payment**.

15 U.S.C. § 1602(f) (emphasis added). Both events constitute an extension of credit. Virtually

100% of the HAMP modifications deferred the payment of debt, and most involved the

incurrence of additional debt and the deferral of payment.

---

[42] Regulation Z defines "finance charge" at 12 C.F.R. § 1026.4.

[43] A "mortgage[ ] referred to in Subsection (aa) [current subsection (bb)]" refers to certain high-
cost mortgages with high interest rates in comparison with the yield on Treasury securities, or
high points and fees payable at or before closing, 15 U.S.C. §§ 1602(bb)(1), 1602(4), (2), (3),
1605(e), secured by the consumer's principal dwelling, other than purchase money or
construction financing loans ("residential mortgage transactions," 15 U.S.C. § 1602(x), (w); 12
C.F.R § 1026.2(a)(19), (24); *cf.,* 15 U.S.C. § 1602[(dd)] (cc) (**"*Residential mortgage loan*"**
*refers to credit transactions secured by mortgage on a dwelling other than purchase money or
construction financing loans*.)).

82.     Section 1635 of TILA, 15 U.S.C. § 1635, requires notice of the borrower's right to rescind consumer credit transactions in which a <u>security interest is retained or acquired</u> in property that will be the borrower's principal dwelling, until midnight of the third business day after consummation of the transaction or delivery of the TILA rescission forms, whichever is later. 12 U.S.C. § 1635(a). In 100% of OLS's HAMP or proprietary modifications, a "security interest is retained." In virtually 100% of the HAMP modifications, OLS advances to the borrower were expressly conditioned on the advance being covered by a first lien security interest that OLS acquired through the credit extension under the HAMP modification. Thus, a security interest was both (1) retained (Note Owner) and (2) acquired (Servicer). Written acknowledgement of *any* required TILA disclosure creates only a rebuttable presumption of delivery. 15 U.S.C. § 1635(c). <u>Refinancings</u> *with no new advances, by the <u>same</u> creditor and secured by the same property*, and certain other transactions are exempted from the rescission provisions. 15 U.S.C. § 1635(e). The actionable conduct alleged herein involves transactions which were <u>not refinancings and not otherwise exempted</u> from the rescission provisions.

83.     Knowing and willful violations of TILA are subject to criminal penalties including fines and imprisonment. 15 U.S.C. § 1611.

84.     Consistent with the Act, Regulation Z specifies that its scope extends in general:

> To each individual or business that offers or extends credit . . . when four conditions are met:
>
> (i)      The credit is offered or extended to consumers;
> (ii)     The offering or extension of credit is done regularly;…
> (iii)    The credit is subject to a finance charge or is payable by a written agreement in more than four installments; and
> (iv)     The credit is primarily for personal, family, or household purposes.

12 C.F.R. 1026.1(c)(1).

85.     Regulation Z provides tests for determining whether one is a **"Creditor,"** including in relevant part:

> (17) Creditor means:
>
> (i) **A person who regularly extends consumer credit that is subject to a finance charge or is payable by written agreement in more than four installments (not including a down payment), and to whom the obligation is initially payable, either on the face of the note or contract,** or by agreement when there is no note or contract.
> . . .
>
> (v) **A person regularly extends consumer credit only if it extended credit** (other than credit subject to the requirements of § 1026.32) more than 25 times (or **more than 5 times for transactions secured by a dwelling) in the preceding calendar year.** If a person did not meet these numerical standards in the preceding calendar year, the numerical standards shall be applied to the current calendar year. A person regularly extends consumer credit if, in any 12-month period, the person originates more than one credit extension that is subject to the requirements of § 1026.32 or one or more such credit extensions through a mortgage broker.

12 C.F.R. 1026.2(a)(17). If the obligation is initially payable to one person, that person is the creditor. 12 C.F.R. § 1026, Supp. I, Comment 2(a)(17)(i)2.

86.     **Credit** means the right to defer payment of debt or to incur debt and defer its payment. 12 C.F.R. 1026.2(a)(14).

87.     **Consumer credit** means credit offered or extended to a consumer primarily for personal, family, or household purposes. 12 C.F.R. 1026.2(a)(12). The statute does not define "**transaction,**" "**credit transaction,**" or "**consumer credit transaction,**" although it defines "consumer" and "credit." In a fairly recent case of "first impression," the Court of Appeals for the Fourth Circuit held that for purposes of the right to rescind under TILA—notice of which is the focal point of this action—a course of dealing between parties must be consummated—must be a "consummated event"—to constitute a transaction giving rise to the right to rescind.

*Weintraub v. Quicken Loans, Inc.,* 594 F.3d 270 (4th Cir. 2010). Relying on cases regarding the definition of "credit transaction" in automobile sales, the definitions of "residential mortgage transaction," 15 U.S.C. § 1602(w), and "reverse mortgage transaction," 15 U.S.C. § 1602(bb), a *Black's Law Dictionary* definition of "transaction" in the business context, and "a common sense reading of the text of § 1635(a)," the court of appeals concluded that a "credit transaction" occurs when (and that it cannot occur until) "credit is in fact extended"—nothing more is required. 594 F.3d at 274-76. The court of appeals further pointed out that under the regulation implementing the right of rescission, a transaction arises when a security interest has been retained. *Id.* at 276. The court further concluded that the plaintiffs' **deposit agreement with the lender pursuant to which the plaintiff paid a $500 fee "<u>was undoubtedly a 'transaction,'</u>"** although not a *credit* transaction. *Id.*

88.     **Consummation** means the time that a consumer becomes contractually obligated on a credit transaction. 12 C.F.R. 1026.2(a)(13).

89.     Regulation Z specifies that a **"residential mortgage transaction"**

means a transaction in which a mortgage, deed of trust, purchase money security interest arising under an installment sales contract, or equivalent consensual security interest is created or retained in the consumer's principal dwelling to finance *the acquisition* or *initial construction* of that dwelling.

12 C.F.R. § 1026.2(a)(24) (emphasis added). According to the Commentary to the § 1026.2(a)(24) definition of "Residential mortgage transaction," a transaction is *not "to finance the acquisition"* of the consumer's principal dwelling if the consumer has previously purchased and acquired some title to the dwelling, even if not full legal title. 12 C.F.R. § 1026, Supp. I, Comment 2(a)(24)5.

90.     In most credit transactions in which a security interest is acquired in a consumer's principal dwelling, each consumer whose ownership interest is or will be subject to a security

interest has a **right to rescind the transaction**. 15 U.S.C. § 1635; 12 C.F.R. § 1026.23(a) (other

than "residential mortgage transactions," defined at 12 C.F.R. § 1026.2(a)(24) as a transaction to

finance the initial acquisition or construction of a dwelling, whether the dwelling is real or

personal property, 12 C.F.R. § 1026, Supp. I, Comment 1026.23(f)-1; *see also* 122 C.F.R. 1026,

Supp. I, Comment 1026.23(a)). ***Refinancing or consolidation by the same creditor of an***

***extension of credit already secured by the consumer's principal dwelling is exempt from the***

***right to rescind.*** *See Arnold v. W.D.L. Investments, Inc.*, 703 F.2d 848 (5th Cir. 1983). A

**refinancing** occurs when the original obligation is satisfied or extinguished and replaced. 12

C.F.R. § 1026.20, & Supp. I, Comment 1026.20(a)-1. ***This exemption, in Section 1026.23(f)(2),***

***applies only to refinancings or a consolidation by the original creditor; if new money is***

***advanced, however, the amount of the new money is rescindable.*** For purposes of rescission, a

new advance does not include amounts attributed solely to the costs of refinancing. 12 C.F.R. §

1026, Supp. I, Comment 1026.23(f)-4. None of the HAMP modifications were refinancings or

consolidations under Section 1026.23(f), which requires that the previous debt be paid and

replaced by a new debt to constitute a refinancing.

91.     In any transaction subject to rescission, the creditor must give the consumer two

copies of a notice of right to rescind, which must be a separate document clearly and

conspicuously disclosing the rights and process of rescission. 12 C.F.R. § 1026.23(b). Unless the

consumer waives the right to rescind, which is permitted only in limited circumstances, no

money shall be disbursed, other than in escrow, no services shall be performed, and no materials

shall be delivered unless and until the three-day period passes without the right of rescission

being exercised. 12 C.F.R § 1026.23(c).

## XI. STATE LAWS AND REGULATIONS

92.     Since OLS certified that it is in compliance with "all applicable Federal, state and local laws, regulations, regulatory guidance, statutes, ordinances, codes and requirements, including, but not limited to, the Truth in Lending Act, . . . and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices," Exhibit 1, OLS *Servicer Participation Agreement*, the following state laws are relevant to the falsity of OLS's initial certification to sell the financial instrument to Fannie Mae and each anniversary thereafter when re-certification was required.

93.     OLS has modified Texas home equity loans and purchase money mortgages without, when required, complying with Tex. Const. Art. XVI, § 50(a)(6). OLS has sometimes added tens of thousands of dollars to the principal balance, far in excess of the original notes and of constitutional reasonable closing costs. 7 Tex. Admin. Code § 153.14(2)(B). Similarly, OLS imposed new obligations of charging the borrowers interest on interest through the modification process, a burden not imposed based upon the borrowers from the terms of the original note or deed of trust. The evidence proves, objectively, that OLS pervasively violated many Texas constitutional legal requirement that protect homesteads in Texas, thus making its certification of compliance with state [Texas] laws and regulations in the initial SPA, and each year thereafter, a false certification to the U.S. of a condition of payment and was a fraudulent inducement of the U.S. to approve the SPA.

94.     New York Regulation 3 NYCRR § 419.11 states that Servicers must make "reasonable and good faith" efforts when offering loan modifications to borrowers. Loan modifications should have payments that are "**affordable and sustainable**" for borrowers, and prevent foreclosure. Second, Servicers are required to provide borrowers with **<u>written</u> <u>disclosures</u>** that clearly state the **"material terms, costs and risks**." 3 NYCRR 419.11(b) and

(d). The evidence proves, objectively, that OLS pervasively violated both New York provisions, thus making its certification of compliance with state [New York] laws and regulations in the initial SPA, and each year thereafter, a false certification to the U.S. of a condition of payment and a fraudulent inducement of the United States to approve the SPA.

95.      The state of Massachusetts also has stringent requirements for Servicers. The Code of Massachusetts' Regulations mandates that a third-party loan servicer may not use "**unfair or unconscionable means**" when servicing a loan. 209 CMR § 18.21(1). The Code also prohibits "misrepresenting any material information [including] the amount, nature or terms of any fee or payment due…and conditions of the servicing contract." 209 CMR § 18.21(1)(i). Massachusetts' law and regulations also require that lenders provide borrowers with a Notice of the Right of Rescission which provides the "obligor" a right to rescind a consumer credit transaction that involves an added security interest in the principal dwelling of the person. Mass. Gen. Laws Ch. 140D § 10(b). The evidence proves, objectively, OLS pervasively violated the duty under Massachusetts law to provide borrowers the Notice of the Right of Rescission at the time of loan modifications. For this additional reason the annual OLS Certifications of Compliance with federal and state [Massachusetts] consumer lending laws under the SPA were false. The evidence further proves, objectively, that OLS pervasively violated these Massachusetts laws protecting consumers. Those violations make OLS's certification of compliance with state [Massachusetts] laws and regulations in the initial SPA, and each year thereafter, a false certification and false statement to the United States made or used to fraudulently induce the United States to approve the SPA.

96.      Pervasive violations by OLS make its Certifications of Compliance to Fannie Mae false, thus fraudulently inducing Fannie Mae to approve the SPA with OLS, approve the

payment of huge incentives all while OLS stood in violation of, at least, the following provisions:

A.   **Texas Constitutional and Administrative Law**

1.   Constitutional Law

97.     OLS has modified Texas home equity loans and purchase money mortgage loans by making "an advancement of new funds, or by increasing the obligations beyond those created by the original note and deed of trust" without complying with Tex. Const. Art. XVI, § 50(a)(6). OLS has at times, "when making extensions of credit," added tens of thousands of dollars to the principal balance, far in excess of (i) of the sums due and (ii) the obligations arising out of the original note or deed of trust which abridged the limits  of constitutionally reasonable closing costs. 7. Tex. Admin. Code § 153.14(2)(B). According to well established Texas law, if mortgage servicers increase, beyond an amount of reasonable and necessary closing costs, the principal balance of existing loans, whether purchase money loans or home equity loans, the transaction constitutes a home equity loan under section 50(a)(6) as a matter of law, whether intended or not, and triggers a number of constitutional requirements and disclosures that protect the borrower's homestead.  OLS often failed to abide by its duties to provide the protections of Section 50(a)(6) for Texas modifications when making borrowers "new extensions of credit" as defined by the Texas Supreme Court in the recent *Sims* case.44

98.     Loan modifications that increase the principal balance by collateralizing accrued interest, property taxes, or insurance seek to secure additional home equity and are thus home equity loans under Texas law. Further, Tex. Const. Art. XVI, § 50(e) states that when a lender advances "additional sums" (any sum over and above "reasonable and necessary closing costs")

---

44 *Sims, et al.  v. Carrington Mortgage Services, LLC*, No. 13-068  Tex. Sup. Ct., (Tex. May 16, 2014).

to an existing purchase money loan, the lender has actually made a—perhaps unintended—home equity loan. In addition, Texas law unequivocally requires, if there are "**new extensions of credit**" as outlined by the Texas Supreme Court in the *Sims* case in 2014, that when a lender advances additional sums to an existing home equity loan it must satisfy **all the requirements** of Section 50(a)(6)(A) – (Q)—*i.e.*, all the requirements applicable to a home equity loan. If the "modification" does not comply with the long, demanding list of requirements at 50(a)(6)(A) – (Q), **no lien attaches** to the homestead. The lender has an unsecured, non-recourse loan unless and until it cures the loan within sixty (60) days of being notified by the borrower of the lender's failure to comply. *See* Tex. Const. Art. XVI, § 50(a)(6)(Q)(x). There is no other *safe harbor* for Texas home loan modifications which involve a *Sims* "**new extensions of credit.**" OLS has violated most of the provisions of the Texas constitution Section 50(a)(6)-(Q).

99.     The evidence proves, objectively, that OLS *increased,* unlawfully, the Texas borrowers' principal balances by making *Sims* **new extensions of credi**t, including the new financial burden of charging interest on interest (**not allowed** under the original note or deed of trust) capitalizing new debt principal consisting of such items as (1) past due interest, which began accruing interest for the first time; (2) past due property taxes; (3) escrow prepayments; and (4) some undefined fees or costs. According to Texas constitutional law, the lender who has made new *Sims* "**extensions of credit**" is restricted by Section 50(a)(6) and is allowed to add debt in the amount of reasonable closing costs only; each home equity loan refinance has a reasonable allowance of 3% for closing costs against the sums advanced. Adding new debt, by way of new extensions of credit, to the principal is strictly prohibited. A 2001 Interpretation Letter drafted by banking regulators, and laying the groundwork for 7 Tex. Admin. Code **§** 153.14(2)(B) states:

A modification to increase the principal amount advanced would be prohibited because it would have the effect of turning the home equity loan into a line of credit, which is expressly prohibited.

**Exhibit 9,** Tex. Jt. Fin. Reg. Agencies, "Home Equity Modification Interpretation Letter," (Dec. 20, 2001). Subject to the *Sims* decision, the regulations state that "[t]he advance of additional funds to a borrower is not permitted by modification of an equity loan." 7 Tex. Admin. Code § 153.14(2)(B). Equally important is the requirement that payments be an invariable monthly amount for the life of the loan. Principal was increased so much, however, that even with a lower interest rate, borrower payments increased and constituted an additional state law violation.. To counteract this problem, OLS instituted modification terms involving interest-only payments and balloons, which created dramatic payment increases as the loan matured. Tex. Const. Art. XVI, § 50(a)(6)(L)(i). These laws clearly apply to the "**new extensions of credit**" clarified by *Sims*.

100.    Furthermore, OLS failed to conform to Texas state law requirements pertaining to the modification of mortgage loans involving "new extensions of credit." Specifically, in its Purchase Money Mortgage ("PMM") modifications, OLS, although required by Texas law, **did not**:

- Schedule loan modifications for repayment in substantially equal successive periodic installments, not more often than every 14 days and not less often than monthly, beginning no later than two months from the date the extension of credit is made, each of which equals or exceeds the amount of accrued interest as of the date of the scheduled installment. **Tex. Const. Art. XVI, § 50(a)(6)(L)(i).**

- Close loan modifications at the office of the lender, an attorney at law, or a title company. **Tex. Const. Art. XVI, § 50(a)(6)(N).**

- Provide a disclosure in the security instrument that the extension of credit is the type of credit defined by Section **50(a)(6). Tex. Const. Art. XVI, § 50(a)(6)(Q)(vi).**

- Provide the owner of the homestead that he or she may, within three days after the extension of credit is made, rescind the extension of credit without penalty or charge. **Tex. Const. Art. XVI, § 50(a)(6)(Q)(viii).**

- Include a written acknowledgement as to the fair market value of the homestead property on the date the extension of credit is made, signed by the owner of the homestead and the lender. **Tex. Const. Art. XVI, § 50(a)(6)(Q)(ix).**

- Ensure that the maximum principal amount extended, when added to all other debts secured by the home, did not exceed 80 percent of the fair market value of the home on the date the line of credit is established. **Tex. Const. Art. XVI, § 50(a)(6)(R)(5).**

    2.    <u>Sims "Extensions of Credit" triggering Section 50(a)(6) applications</u>

101.    In a recent decision,[45] the Texas Supreme Court held that as long as there is no additional "extension of credit" in the modification of a home equity loan, the modification, or "restructuring," is valid and need not comply with the requirements of Tex. Const. Art. XVI, § 50(a)(6). The Court identified three situations, however, which constitute an "**extension of credit**" and make the loan modifications subject to the home equity provisions in Section 50(a)(6) of the Texas Constitution. The *Sims* case defined an "extension of credit" as follows for purposes of home equity loan modifications:

---

45 *Sims, et al. v. Carrington Mortgage Services, LLC*, No. 13-068 Tex. Sup. Ct., (Tex. May 16, 2014). There is no reason to believe that the Supreme Court would rule differently in regards to purchase money mortgage modifications.

1.  A **re-financing** or "satisfaction or replacement" of the **original** note;"

2.  An **advancement of new funds** which were not due and owing under the terms of the **original** note or deed of trust; and

3.  The borrower has **new/increased obligations**, as a result of the modification, which were not created by the terms of the **original** note or deed of trust.

102.    The *Sims* opinion made evident that capitalizing any funds on the principal balance in a home equity loan modification, for obligations that grew out of the original mortgage contract/Deed of Trust, may be done without regard to Texas Section 50(a)(6) home equity provisions. However, if within the modification contract, any new funds are advanced for an obligation that **did not arise** from rights granted to the lender/servicer under the **original note/Deed of Trust those advances of new funds implicated** Section 50(a)(6). Similarly, the same is true if the lender imposes **increased or new obligations** which do not arise out of (i) the original note or (ii) deed of trust. Both of the foregoing events are considered "extensions of credit" and are subject to the home equity provisions of Section 50(a)(6), which **includes** providing the borrower the Notice of the Right of Rescission, which was **never provided, although required,** under TILA/Reg Z, Texas law or Massachusetts laws, respectively, when appropriate.

103.    Upon information and belief, Ocwen has increased Texas borrower obligations by:

- Adding modification fees and costs including but not limited to ancillary costs (e.g. charges for Broker Price Opinions, property inspections, appraisals, etc.) not arising out of the **original** note or deed of trust.

- Imposing interest on interest not allowed under the **original** note or deed of trust;

- Requiring the establishment of an escrow account that was not required by the terms of the **original** note/deed of trust; and

- Extending the repayment period with only partial amortization creating large balloon payments due at the maturity of the modified note.

104.    The situation, outlined below, occurs in many modifications and would not be restricted to Texas, but would also have an effect on  the TILA/Reg Z Right of Rescission under Federal law, as well as the  Right of Rescission duties  which arise pursuant to state laws (Massachusetts and Texas).

### 3.  The Relevant Situation

105.    When a borrower enters into a Note/Deed of Trust for a residential mortgage loan there are two methods by which to pay their property taxes and insurance premiums.  Insurance premiums are always paid in advance, monthly, quarterly or annually.  The escrow provisions for insurance or taxes are fact specific to the each particular note and/or deed of trust. There are no generalizations that apply broadly to all mortgage contracts/security agreements.  With this in mind, the  following transactions  would constitute  a new  obligation  imposed by OLS on the borrower which  would require  OLS's compliance  with  Texas Constitution  Section 50(a)(6) home equity provisions.

1. Borrower enters into an original purchase money note/deed of trust and the contract often **does not** expressly require that the borrower must maintain an impound/escrow account with the lender, and the borrower may elect to pay their insurance premiums and/or property taxes directly to the county/insurance company; and

2. Borrower then later enters into a modification contract wherein a condition of approval of the modification **requires the borrower to establish an escrow** account with the servicer/lender for the escrow of funds to pay annual taxes and insurance premiums.

Because the imposition by the OLS of an escrow account was not required by the terms of the original note/deed of trust, the imposition of the escrow arrangement in the modification of the

loan constituted a **new obligation** thus triggering lender compliance with Texas' Section 50(a)(6) home equity provisions.

106.    Additionally, on some modifications, both HAMP and non-HAMP, the servicer is advancing/loaning new funds for Modification fees, expenses and costs that do not arise out of the original note or deed of trust.  While *Sims,* allows the capitalization of past due items arising from the original note and/or deed of trust, the prospective, post-modification imposition for the charging of interest on interest on any (i) capitalized past due interest, (ii) capitalized property taxes and insurance premiums; (iii) prospective, not yet due escrow items and (iv) reserve amount required by the servicer were new obligations that **would not have been allowed** without the borrower's approval in writing of the loan modification agreement.  The HAMP agreements expressly provide:

> [Borrowers] understand that interest will now accrue on the unpaid interest that is added to the outstanding principal balance, which would not happen without this Agreement.

107.    It is only by the express wording of the <u>modification contract</u> that interest is charged by the lender on these newly capitalized amounts;  the original note and/or deed of trust did not allow this on capitalized interest on interest charge.  Therefore, the charging of interest against the new capital advanced is a **new obligation** imposed on the borrower by the modification,  thus triggering Texas Section 50(a)(6) home equity requirements

108.    Additionally, OLS in its modifications of Home Equity Loans and  Purchase Money Mortgages ,although required by Texas law, made new extensions of credit and **<u>did not</u>**:

- Schedule loan modifications for repayment in substantially equal successive periodic installments, not more often than every 14 days and not less often than monthly, beginning no later than two months from the date the extension

of credit is made, each of which equals or exceeds the amount of accrued interest as of the date of the scheduled installment. **Tex. Const. Art. XVI, § 50(a)(6)(L)(i).**

- Close loan modifications at the office of the lender, an attorney at law, or a title company**. Tex. Const. Art. XVI, § 50(a)(6)(N).**

- Provide a disclosure in the security instrument that the extension of credit is the type of credit defined by Section **50(a)(6). Tex. Const. Art. XVI, § 50(a)(6)(Q)(vi).**

- Provide the owner of the homestead that he or she may, within three days after the extension of credit is made, rescind the extension of credit without penalty or charge. **Tex. Const. Art. XVI, § 50(a)(6)(Q)(viii).**

- Include a written acknowledgement as to the fair market value of the homestead property on the date the extension of credit is made, signed by the owner of the homestead and the lender. **Tex. Const. Art. XVI, § 50(a)(6)(Q)(ix).**

- Ensure that the maximum principal amount extended, when added to all other debts secured by the home, did not exceed 80 percent of the fair market value of the home on the date the line of credit is established. **Tex. Const. Art. XVI, § 50(a)(6)(R)(5).**

4.  Pervasive Violations by Purchase Money Mortgage Modifications in Texas

109.    The evidence proves, objectively, that from and after Defendant's finalization of the SPA under the HAMP program, Defendant's loan modifications of purchase money mortgages in the State of Texas virtually always involved adding the *Sims* **"new extensions of**

credit," not arising from the **original** note or deed of trust. As such, the transactions constituted, as a matter of law, a home equity loans.  According to Texas law post-Sims, Texas permitted modifications of a purchase money mortgage except for those involving "new extensions of credit;" otherwise, the modified loans were converted to a home equity loan involking the protections of section 50(a)(6) of the Texas Constitution.

110.    Since virtually all purchase money mortgage modifications by the Defendant involved the *Sims* **"new extension of credit**," the modifications were home equity loans under Texas law, and OLS was required to comply with all of the provisions of Section 50(a)(6)A-Q which OLS knowingly failed to do. The evidence proves, objectively, that Defendant violated virtually all of the Texas Constitutional provisions as set out here and below on its attempted purchase money mortgage modifications.

### 5.    Loan-to-value Ratio

111.    In addition, OLS violates the Texas Constitution by collateralizing the new extensions of credit in contravention of Tex. Const. Art. XVI, § 50(a)(6). To comply with Section 50(a)(6), a new loan/modification which involves a new extension of credit must be completed without violating the strict 80% loan-to-value restriction. Tex. Const. Art. XVI, § 50(a)(6)(B). The evidence proves that virtually all of OLS's Texas loan modifications violated Texas' 80% loan-to-value restriction as a result of the severe drop in Texas property values during the 2008 national financial crisis and the amounts advanced by OLS.

### 6.    Closing Location

112.    In addition, the Texas constitution requires home equity loans, involving **new extensions of credit**, to close in person **only at the office of a lender, attorney or title company**. Tex. Const. Article XVI § 50a(6)(N). All of OLS's mortgage modifications

**unlawfully closed** by the borrower executing the documents and sending them to OLS by mail, Federal Express, or other carrier for finalization. The Texas Supreme Court has definitively ruled that the borrower, himself/herself, must attend all closing activities in the constitutionally permitted venues of an office of the lender, an attorney or title company, only. *The Financial Committee Of Texas, et al. v. Valerie Norwood, et al.*, No. 10-0121, (Tex. Sup. Ct. Jan. 24, 2014). OLS did not comply with this recently confirmed Texas Constitutional requirement, nor many of the other Section 50 requirements.

### 7.    Texas Notice of Right of Rescission

113.    One of the requirements for home equity loans, involving new extensions of credit, under the Texas Constitution, like Section 1026.23(a) of Regulation Z, is that the servicer/lender must provide the borrower(s) with the mandated **Notice of the three (3) day Right of Rescission**. Tex. Const. Art. XVI, § 50(a)(6)(Q)(viii).  As evident in **Exhibit 10 and 11**, there is no evidence that the mandated Notices were provided under either the federal or state laws. The owner of a homestead in Texas may, within three days after an extension of credit secured by his or her homestead is made, rescind the transaction without penalty or charge. Tex. Const. Art. XVI, § 50(a)(6)(Q)(viii). The Texas law is, therefore, similar to TILA's Regulation Z, which states that, in any transaction subject to rescission, the creditor must give the consumer the required written Notice of Right to Rescind. 12 C.F.R. § 1026.23(a)-(b). There is no evidence of compliance with the federal or state legal requirement by OLS, so upon information and belief, virtually all of OLS's Texas modification contracts do not include either the required federal or Texas three day Notice of the Right of Rescission. The concealment of the absence of these Notices of the Right of Rescission where additional violations of state law, thus for these additional reasons rendering OLS's SPA false.

8.     Full Amortization

114.    The Texas Constitution, interpreted by *Sims*, states that home equity loans involving the ***Sims* "new extensions of credit**" must be fully amortizing at inception and must remain that way. Home equity loans must provide for equal payments over the course of the loan, must pay down principal with each installment, and must be fully amortizing (i.e. a steadily downward sloping principal curve that is zero at maturity). Tex. Const. Art. XVI, § 50(a)(6)(L) and 7 Tex. Admin. Code § 153.11. As the evidence demonstrates, OLS loan modifications violated these provisions.

115.    In short, § 50(a)(6)(L) requires that affected loans:

1.  Have a definite **non-balloon** pay-off date;

2.  Are **fully** amortizing;  and

3.  Pay down principal with every installment (7 Tex. Admin. Code Sec. 153.11).

The Texas Department of Banking and other state regulatory agencies stated that:

> Section 50(a)(6) does not specifically allow or even mention modifications of home equity loans. Elsewhere, the constitution provides that a refinance secured by the homestead, any portion of which is a home equity loan, may not be secured by a valid lien against the homestead **unless the refinance of the debt is a home equity loan.** (citing Tex. Const. art. XVI, §50(f)).

Tex. Jt. Fin. Reg. Agencies, "Home Equity Modification Interpretation Letter," (Dec. 20, 2001).

9.     Examples of OLS Texas Modification Contracts

116.    Attached hereto as **Exhibits 10 – 11** are Texas contract examples. The following examples are included:

**Exhibit 10     Servicer: - OLS**
**Loan No.  71871321; Borrower - Redacted**
City, State: Dallas, TX 75248
New Advance of funds: Not disclosed

New Principal Balance AFTER modification: $222,497.13
Start Date of Modification:  March 2011
New Interest on Interest Charges: Interest charged on capitalized,  past due interest, any reserve amounts for property taxes and insurance premiums not allowed  under the original  note or deed of trust, nor by State and Federal banking rules, regulations,  and/or laws.
Violates 80% LTV:      A) Property Value on Modification  Date - $249,000
                      B) 80% LTV on Modification  date - $199,200
                      C) $ amount over 80% LTV - $23,297.13
Credit Extension  Type: New Obligations  not included  in Original  Note

This contract  fails  to provide  the borrower  with  the termination  date, nor the amount  of  the previous  loan balance,  or the specific  amount  being  added  to create the new  principal  balance.  In addition,  the servicer  advanced  new sums to the borrower  by   adding  to the principal  balance,  amounts  not due or allowed under  the original  Note/Deed  of  Trust.  These amounts  included;  1) fees/costs associated  with  the modification,  2) obligating  the borrower  for interest  over the next some 25 to 40 years on the delinquent  interest  added  to the principal  balance, 3) new  interest  on the past due property  taxes/escrow,  4) and the now  accruing interest  on the advanced  amount  not yet due of funds  to be placed  in the escrow account  for future  escrow  expenses  and paid  over the next some 25 to 40 years. The Servicer  increased  the borrowers  obligation  by causing  interest  to now be required  to be paid on the delinquent  interest,  the past due property  taxes/escrow, the advanced  but not yet due funds  to be placed  in the escrow  account  for future expenses,  and any fees /costs associated  with  the modification  and the interest now  accruing  on those  fees/costs  advanced.     These  new  advanced amounts/obligations  carried  the  duty  to  meet  the  requirement  of  Texas Constitution  Section  50.

**New  obligations**,  triggering  the duties  under  Texas  Constitution  Section 50(a)(6), are created  for the borrower  if the **original**  Note/Deed  of Trust did **not require**  the establishment  of an escrow  account,  but the establishment  of an escrow  account  was a condition  of  approval  for the modification,  as was required for in every  modification  I have  reviewed.  It would  also be a **new  obligation**  to the borrower  when  any extension  of the original  amortization  schedule,  as called for in the original  Note/Deed  of Trust, by virtue  of the modification  contract  was extended.  This is a **new,  additional  obligation**  due to causing  the borrower  an increased  amount  of interest  to be paid,  greater  than that called  for in the original Note/Deed  of Trust over the term of the loan.

Further,  the extension  of the amortization  schedule  wherein  the modified loan is not a fully  amortizing  loan within  the term of the loan,  as set forth in the **original**  Note/Deed  of Trust,  whereby  it causes  the monthly  payment  to not fully pay down  the principal  within  the loan term,  and thereby  creates  a monthly  short fall  on paying  down  the principal  each month  that results  in the creation  of  a Balloon  Payment  at the end of the loan term,  that was not part of the original

Note/Deed of Trust, constitues a new credit transaction under Texas Section 50(a)(6), and requires that the servicer/lender comply with the requirements of Texas Constitution Section 50(a)(6).

**Texas State Violations within Section 50(a)(6), Article XVI, Texas Constitution and Tex. Admin Code 153 on this contract:**

1. Section 50(a)(6)(B) & Tex. Admin. Code 153.3 – Involves an advance of funds that creates a home equity loan exceeding 80% LTV.
2. Section 50(a)(6)(Q)(vi) – Appropriate language not provided in contract, required disclosures not made to borrower.
3. Section 50(a)(6)(Q)(viii) – No notice of right of Rescission form provided with contract.
4. Section 50(a)(6)(Q)(ix) – No written acknowledgement as to fair market value of homestead on date extension of credit is provided.
5. Section 50(a)(R)(5) – Principal amount exceeds 80% LTV.
6. Section 50(a)(6)(N) -- Was not closed at the office of a lender, attorney or title company.

**Exhibit 11**     **Servicer: - OLS**
Loan No. 707350062; Borrower – Brian
City, State: Missouri City, TX 75227
New Advance of funds: Not disclosed in Modification Contract
New Principal Balance AFTER modification: $205,722.44
Start Date of Modification: October 2010
New Interest on Interest Charges: Interest charged on capitalized, past due interest, any reserve amounts for property taxes and insurance premiums not allowed under the original note or deed of trust, nor by State and Federal banking rules, regulations, and/or laws.

This modification contract fails to provide the borrower with the amount of the previous loan balance, or the specific amount being added to create the NEW loan balance. It has a monthly shortage of principal that creates a Balloon Payment of approximately $900.00 at the term of the loan, which is not disclosed. This is a violation of Texas Section 50(a)(6), Article XVI.

In this modification, the servicer advanced and capitalized new sums of money to the borrower by adding to the principal balance amounts not due or allowed under the original Note/Deed of Trust. These amounts included: 1) modification fees, 2) interest over the next 25 to 40 years on the delinquent interest added to the principal balance, 3) new interest on the past due property taxes/insurance, 4) and interest on the advanced amount of funds placed in the escrow account for future escrow expenses and paid over the next some 24 years. These new advanced amounts/obligations triggered the requirement for OLS to adhere to the Texas Constitution Section 50.

Further, the extension of the amortization schedule creates  a modification that is not a fully amortizing loan within the term of the loan, as set forth in the original Note/Deed of Trust, whereby it causes the monthly payment to not fully pay down the principal within the loan term, and thereby creates a monthly short fall on paying down the principal each month that results in the creation of a Balloon Payment at the end of the loan term, that was not part of the original Note/Deed of Trust, creates a new credit transaction  under Texas Section 50, and causes the servicer/lender the duty to meet the requirements of Texas Constitution  Section 50.

**Texas State Violations within Section 50(a)(6), Article XVI, Texas Constitution and Tex. Admin Code 153 on this contract:**

1. Section 50(a)(6)(B) & Tex. Admin. Code 153.3 – Involves an advance of funds that creates a home equity loan exceeding 80% LTV.
2. Section 50(a)(6)(Q)(vi) – Appropriate language not provided in contract, required disclosures not made to borrower.
3. Section 50(a)(6)(Q)(viii) – No notice of right of Rescission form provided with contract.
4. Section 50(a)(6)(Q)(ix) – No written acknowledgement as to fair market value of homestead on date extension of credit is provided.
5. Section 50(a)(R)(5) – Principal amount may exceed 80% LTV.
6. Section 50(a)(6)(N) -- Was not closed at the office of a lender, attorney or title company.

10.    Homesteaders, In Effect, Become "Renters"

117.    When servicers add tens to hundreds of thousands of dollars of principal balance to the original note, while making "new extensions of credit" they make it virtually impossible for the borrower to ever have any hope of paying the loan off. As a result of the monetary increase in the principal balance, the new loan principal begins accruing its own interest.

118.    To make the payments affordable, many loans have stepped interest rates, deferred principal, partial amortization, and balloon payments, which result in a mortgage note that is not paid down in accordance with the **mandatory**, fully-amortizing requirement of § 50(a)(6)(L).

**B.    New York State Law**

119.   New York Regulation 3 NYCRR § 419.11 states that servicers must make "reasonable and good faith" efforts when offering loan modifications to borrowers. Loan modifications should have payments that are "**affordable and sustainable**" for borrowers, and prevent foreclosure. Second, servicers are required to provide borrowers with written disclosures that clearly state the "**material terms, costs and risks**." 3 NYCRR 419.11(b) and (d). The evidence proves, objectively, that Bank of America pervasively violated both New York provisions, thus making its certification of compliance [a condition of payment] with state [New York] laws in the initial SPA a fraudulent inducement of the United States to approve the SPA and purchase the Financial Instrument, and each year thereafter, a material false statement to the United States as a condition of payment.

120.   According to 3 NYCRR § 419.11, Servicers must take steps to ensure that borrowers are treated fairly in accordance with HAMP guidelines and rules established by the United States Department of Treasury. The Servicer is required to inform the borrower of the details of the loan, including the status of the default and all "loss mitigation" procedures and services that can be considered. 3 NYCRR § 419.11(a)(1). If requested, they are also required to "negotiate with the borrower in good faith, subject to the Servicer's duties and obligations under the mortgage servicing contract, if any, to attempt a resolution or workout of the delinquency or to prevent the borrower's default, including a loan modification." 3 NYCRR § 419.11(a)(2).

121.   In addition, § 419.11(b) of the regulation requires that:

> Loan modifications should be structured to result in payments that are _**affordable**_ and _**sustainable**_ for the borrower. Servicers that are participating in HAMP shall offer loan modifications in compliance with the HAMP guidelines or directives, including using reasonable efforts to remove prohibitions or impediments to their authority and to obtain third party consents and waivers that are required, by contract or law, in order to effectuate a loan modification under HAMP. (_emphasis added_).

122.    Based on the evidence, the Servicer did not adhere to these guidelines and, instead, provided modifications that were <u>not</u> affordable or sustainable resulting in many borrower failures to perform the terms and conditions of the modified note.

123.    Moreover, OLS did not provide borrowers with required written disclosures that clearly state the "material terms, costs and risks." 3 NYCRR 419.11(d) specifically requires that:

> Within 30 days of receiving all required documentation from the borrower and third parties, unless a shorter time is required under regulations or guidelines implementing HAMP, a Servicer shall complete its evaluation of the borrower's eligibility for a loan modification or other loss mitigation option requested by the borrower and advise the borrower, and if applicable, the borrower's authorized representative, in writing of its determination. Where the Servicer approves the borrower for a loan modification, <u>including</u> a trial modification, or other loss mitigation option, the written notice <u>must provide</u> the borrower with ***clear and understandable written information explaining the material terms, costs and risks*** of the option offered. (*emphasis added*).

OLS's failure to provide these required disclosures were pervasive throughout New York.

124.    Finally, there is a presumption of good faith "if the Servicer offers loan modifications and other loss mitigation options in accordance with the HAMP guidelines…" 3 NYCRR § 419.11(i). OLS did not act in good faith, however, when it provided terms that were not conducive to the borrower avoiding foreclosure and saving the home on a long term basis. Similarly, the Servicer's pervasive **failures**, upon information and belief, to provide the mandated, written disclosures clearly disclosing the "**material terms, costs and risks**," constituted the second major prong for New York modification violations. *See* 3 NYCRR § 419.11(d). These New York state law violations, again, **rendered false** the Servicer's certification of compliance with federal and state laws in the initial SPA which fraudulently induced the U.S. to approve the SPA and purchase the Financial Instrument, and was a false

record which OLS used to obtain huge incentive payments each year thereafter, when OLS falsely re-certified legal compliance with federal and state laws to Fannie Mae.

125.    In *U.S. Bank Nat. Ass'n v. Padilla*, the bank was involved in "bad faith" loss mitigation negotiations with the borrower, "plunging her deeper and deeper into arrears, raising the very real probability that she will never be able extricate herself from this debt and work out an affordable loan modification." 31 Misc. 3d 1208(A) at *3 (N.Y. Sup. Ct. 2011). After more than a year of negotiations and settlement conferences, U.S. Bank and its representatives gave contradictory information and made "piecemeal requests" for documents that caused a delay in a decision on a HAMP or in-house modification. *Id*. This delay resulted in an increase in fees, interest, and penalties to the bank's benefit and "the homeowner's detriment." *Id*. The Court found that the bank also violated many of the subsections of NYCRR § 419.11 by not meeting the Servicer obligations regarding loss mitigation negotiations. The court stated that "in the wake of new legislation, decisions are beginning to emerge in which the courts are finding that the banks have engaged in discriminatory, unconscionable, and onerous lending practices and are now negotiating settlements of these oppressive loans in bad faith." *Id*. *See* also *Aurora Loan Services, LLC v. Dunning*, 2012 N.Y. Misc. LEXIS 2636 (N.Y. Sup. Ct. May 25, 2012). The *Padilla* Court recognized that these unlawful practices are common among mortgage loan servicers/banks. The *Dunning* Court similarly found a lack of good faith by the lender/servicer.

1.    OLS Examples of NY Modification Contracts

126.    Attached hereto as **Exhibit 12-13** are New York contract examples. The following examples are included:

**Exhibit 12          Servicer: OLS**
                       **Loan No. 7100435291 – Borrower Name– Redacted**
                       City/State/Zip:  Mount Vernon, NY 10553

New Advance of funds:  Not disclosed in contract
New Principal Balance AFTER modification: $577,983.85
Deferred Principal:  $344,833.85
Deferred Principal eligible  for forgiveness: $305,333.85
Interest Bearing Principal Amount:  $233,150
Balloon Payment on Deferred Payment:  $39,500
Start Date of Modification  September 2013;  Term: 268 months
New Interest on Interest Charges: Interest charged on capitalized,  past due
interest, any reserve amounts for property taxes and insurance  premiums
not allowed under the original  note or deed of trust, nor by State and
Federal banking rules, regulations,  and/or laws.
Monthly payment in modification  contract for Principal & Interest:
$706.04
Monthly Payment if fully amortized over 268 Months: $1,079.38
Amortization  schedule in contract extended 212 extra months
Monthly shortage on payment over fully amortized: $373.34
Contract Not Fully Amortized creating a Balloon  Payment: YES
Balloon  Payment due to not full amortization:  $126,006.75
Total Balloon  Payment due: $165,505.75

**New York State violations within 3 NYCRR § 419.11 on this contract**:

1. Section 419.11(b) – Requires that modifications  be affordable and sustainable.
- The minimum total Balloon Payment due at the end of the loan term is
  $165,505.75. This amount, due after 22 years of borrower's payments, is 71% of
  the initial  Interest Bearing Principal the borrower started with.
- The monthly payment is short of paying the full principal if fully amortized by
  $357.66 per month for 268 months.

2. Section  419.11(d) – Requires that borrowers receiving a modification must receive
clear and understandable  written information explaining the material terms, costs and
risks of the option offered. The contract does not ever use the term "Balloon Payment" in
any language throughout  the contract.

- The contract does not provide for the previous principal balance before any
  advanced funds are added.
- The contract does not disclose to the borrower the amount of new funds being
  advanced and added to create the new principal balance after the modification.
- The contract does not explain that the borrower shall pay a monthly Principal &
  Interest payment wherein the principal is short by $373.34 per month for 268
  payments. The contract does not disclose that this monthly shortage shall result in
  a Balloon Payment of $126,006.75 due at the end of the loan term by the
  borrower.
- Additionally, while the loan terms in the contract reflects 268 months, the
  amortization schedules is extended to 480 months (nearly 18 additional years)

beyond the loan term creating the monthly shortage amount on principal and Balloon Payment – a clear and understandable explanation of this is not reflected in the contract for the borrower.

- The contract does not have any language that informs the Borrower that a Balloon Payment in the amount of $165,505.75 will be due at the term of the loan.
- The contracts fails to provide a line item in the "Payment Schedule" section informing the borrower of a final payment due, the date due and the amount due, as required by TILA.
- The contracts fails to list the Balloon Payment as a final payment due in the "Payment Schedule", with an exact amount due and the date it is due as required by TILA.
- The contract does not have the proper federal and New York State required notice to borrowers that the Balloon Payment may not be refinanced by the Lender

3. Section 419.11(i) – There is the presumption of good faith "if the servicers offer borrowers a modification."

- The violations above demonstrate that there was a lack of "good faith" in the modification offered to the borrower.
- This contract fails to provide the borrower the Federally mandated, and any New York State required, TILA, Regulation Z, Right of Rescission form on the newly advanced funds added to the original principal balance creating a new increased principal balance.

**Exhibit 13**          **Servicer: OLS**
                        **Loan No. 706108818 – Borrower Name – Redacted**
                        City, State, Zip Code:  Brooklyn, New York 11236
                        New Advance of funds: Not disclosed in contract
                        New Principal Balance AFTER modification: $277,513.82
                        Deferred Principal:   None
                        Interest Bearing Principal Amount:  $277,513.82
                        Start Date of Modification  February 2012; Term: 301 Months
                        New Interest on Interest Charges: Interest charged on capitalized, past due interest, any reserve amounts for property taxes and insurance premiums not allowed under the original note or deed of trust, nor by State and Federal banking rules, regulations, and/or laws.
                        Monthly payment in modification contract for Principal & Interest: $971.85
                        Monthly Payment if fully amortized over 301 Months:  $1,270.15
                        Amortization schedule in contract extended 157 extra months (13 years)
                        Monthly shortage on payment over fully amortized: $298.30
                        Contract <u>Not</u> Fully Amortized creating a Balloon Payment: YES

**New York State violations within 3 NYCRR § 419.11 on this contract:**

1. Section 419.11(b) – Requires that modifications be affordable and sustainable.

- The modification contract is not amortized over the term of the loan. The monthly payment is short of paying the full principal if fully amortized of $298.30 per month for 301 months. This monthly shortage creates a Balloon Payment due at the end of the loan term of $128,784.16.  This amount, due after 25 years of borrower's payments, is 46.41% of the initial interest bearing Principal the borrower started with.

2. Section 419.11(d) – Requires that borrowers receiving a modification must receive clear and understandable written information explaining the material terms, costs and risks of the option offered.

- The contract does not provide for the previous principal balance before any advanced funds are added.
- The contract does not disclose to the borrower the amount of new funds being advanced and added to create the new principal balance after the modification.
- The contract does not explain that the borrower shall pay a monthly Principal & Interest payment wherein the principal is short by $298.30 per month for 301 payments. Nowhere in the contract does it provide to the borrower that this monthly shortage shall result in a Balloon Payment of $128,174.16 due at the end of the loan term by the borrower.
- Additionally, while the loan terms in the contract reflects 301 months, the amortization schedules is extended to 458 months (an additional 13 years) beyond the loan term creating the monthly shortage amount on principal and Balloon Payment – a clear and understandable explanation of this is not reflected in the contract to the borrower.
- The contract does not ever provide the exact dollar amount of Balloon Payment due on January 1, 2037. Because this amount is unclear, it requires the average borrower to know the undisclosed monthly payment shortage and use a compound interest calculator in order to determine on their own the amount of the Balloon Payment.
- The contracts fails to provide a line item in the "Payment Schedule" section informing the borrower of the amount due, as required by TILA.
- The contract does not have the proper federal and New York State required notice to borrowers that the Balloon Payment may not be refinanced by the Lender.

3. Section 419.11(i) – There is the presumption of good faith "if the servicers offer borrowers a modification."

- The violations above demonstrate that there was a lack of "good faith" in the modification offered to the borrower.
- This contract fails to provide the borrower the Federally mandated, and any New York State required, TILA, Regulation Z, Right of Rescission form on the newly

advanced funds added to the original principal balance creating a NEW increased principal balance

### C.    Massachusetts Law

127.    Massachusetts also has stringent requirements for servicers. In its discussion of mortgage loan servicing practice, the Code of Massachusetts' Regulations mandates that a third-party loan servicer may not use **"unfair or unconscionable means"** when servicing a loan. 209 CMR § 18.21(1). The Code also prohibits "misrepresenting any material information [including] the amount, nature or terms of any fee or payment due…and conditions of the servicing contract." 209 CMR § 18.21(1)(i). Massachusetts' law and regulations also require that lenders provide borrowers with Notice of the Right of Rescission which provides the "obligor" a right to rescind a consumer credit transaction that involves an added security interest in the principal dwelling of the person. Mass. Gen. Laws Ch. 140D § 10(b). OLS pervasively violated the duty under Massachusetts law to provide borrowers the Notice of the Right of Rescission at the time of loan modifications. For this additional reason the original and annual OLS Certifications of Compliance with federal and state consumer lending laws under the SPA were material false statements, false certifications and false records used to obtain huge incentive payments from the United States.

128.    In its discussion of mortgage loan servicing practices, the Code of Massachusetts Regulations mandates that a third-party loan servicer may not use **"unfair or unconscionable means"** when servicing a loan. 209 CMR § 18.21(1).

129.    The following conduct is specifically prohibited:

> (a) Knowingly misapplying or recklessly applying loan payments to the outstanding balance of a loan.
> …
> (i) **Misrepresenting any material information** in connection with the servicing of the loan, including, but not limited to,

> **misrepresenting the amount, nature or terms of any fee or payment due or claimed to be due on a loan, the terms and conditions of the servicing contract or the borrower's obligations under the loan.**

Upon information and belief, OLS violated this law as outlined by the Massachusetts' high court below.

130.    Under Massachusetts' UDAP law,[46] loans that are "doomed to foreclosure" are unfair. In *Commonwealth of Massachusetts v. Fremont Investment & Loan*, the highest court in Massachusetts affirmed a lower court's ruling that loans with a specific set of features were presumptively unfair, because the only way borrowers could avoid foreclosure was if housing values rose. 897 N.E.2d 548 (Mass. 2008) ("General Laws c. 93A, § 2(a), makes unlawful any "unfair or deceptive acts or practices in the **conduct of any trade or commerce**.")

> More to the point, at the core of the judge's decision is a determination that when Fremont chose to combine in a subprime loan the four characteristics the judge identified, Fremont knew or should have known that they would operate in concert essentially to guarantee that the borrower would be unable to pay and default would follow unless residential real estate values continued to rise indefinitely -an assumption that, in the judge's view, logic and experience had already shown as of January, 2004, to be unreasonable.
>
> \*\*\*
>
> Fremont correctly points out that as a bank in the business of mortgage lending, it is subject to State and Federal regulation by a variety of agencies. Well before 2004, State and Federal regulatory guidance **explicitly warned** lending institutions making subprime loans that, even if they were in compliance with banking-specific laws and regulations and were "underwrit[ing] loans on a safe and sound basis, [their] policies could still be considered unfair and deceptive practices" under G.L. c. 93A. Consumer Affairs and Business Regulation, Massachusetts Division of Banks, Subprime Lending (Dec. 10, 1997). More particularly, the principle had been clearly stated before 2004 that loans made to borrowers on terms

46 Mass. G.L. c. 93A, § 2.

that showed they **would be unable to pay and therefore were likely to lead to default were unsafe and unsound, and probably unfair**. Thus, an interagency Federal guidance published January 31, 2001, jointly by the Office of the Comptroller of the Currency (OCC), the Board of Governors of the Federal Reserve System, the FDIC, and the Office of Thrift Supervision, stated: "Loans to borrowers who do not demonstrate the capacity to repay the loan, as structured, from sources other than the collateral pledged are generally **considered unsafe and unsound**" (emphasis supplied). Expanded Guidance for Subprime Lending Programs at 11 (Jan. 31, 2001). On February 21, 2003, one year before the first of Fremont's loans at issue, the OCC warned that certain loans could be unfair to consumers:

When a loan has been made based on the foreclosure value of the collateral, rather than on a determination that the borrower has the capacity to make the scheduled payments under the terms of the loan, based on the borrower's current and expected income, current obligations, employment status, and other relevant financial resources, the lender is effectively counting on its ability to seize the borrower's equity in the collateral to satisfy the obligation and to recover the typically high fees associated with such credit. Not surprisingly, such credits experience foreclosure rates higher than the norm. "[S]uch disregard of basic principles of loan underwriting lies at the **heart of predatory lending** ."OCC Advisory Letter, Guidelines for National Banks to Guard Against Predatory and Abusive Lending Practices, AL 2003-2 at 2 (Feb. 21, 2003).

*Id.* at 556-557;

1.   Mass. Right of Rescission

131.   The Massachusetts Consumer Credit Cost Disclosure Act (MCCCDA) determines the rights and liabilities of "consumer credit transactions." **Mass. Gen. Laws Ch. 140D § 10**. The Massachusetts legislature closely modeled the MCCCDA after TILA, making them materially the same.

132.   Massachusetts' **right of rescission** gives an "obligor" a right to rescind a consumer credit transaction that involves an added security interest in the principal dwelling of

the person. Once an obligor rescinds the transaction, he is not liable for finance or other charge, and any security interest given by the obligor becomes void upon such rescission. **Mass. Gen. Laws Ch. 140D § 10(b).  OLS did not provide Massachusetts borrowers the require Notice thus rendering false for this additional reason the original certification and annual re-certifications of compliance with state law under the HAMP requirements.**

2. <u>OLS Examples of Massachusetts Modification  Contracts</u>

133. Attached hereto as **Exhibits 14-15** are Massachusetts contract examples. The following  examples are included:

**Exhibit 14  Servicer: OLS**

**Loan No.  7143874753 – HAMP Modification; Borrower - Redacted City, State: Attleboro, MA 02703**
New Advance of funds: Amount not disclosed  in Contract
New Principal Balance AFTER modification: $372,429.82
Deferred Principal:  $23,422.17
Interest Bearing Principal Amount:  $349,007.65
Start Date of Modification:  May 2013; Term: 283 months
New Interest on Interest Charges: Interest charged on capitalized,  past due interest, any reserve amounts for property taxes and insurance premiums not allowed under the original  note or deed of trust, nor by State and Federal banking rules, regulations,  and/or laws.
Monthly payment in modification  contract for Principal & Interest: $1,064.15
Monthly Payment if fully amortized over 283 Months:  $1,547.87
Amortization  schedule in contract extended by 192 months – 16 years
Monthly shortage on payment over fully amortized: $483.72
Contract <u>Not</u> Fully Amortized creating a Balloon  Payment: $179,800.00
Balloon  Payment due to not full amortization:  $179,800.00
Balloon  Payment from Deferred Principal:  $23,422.17
Total Balloon  Payment due at term of loan: $203,222.17

**Massachusetts State Violations within 209 CMR § 18.21 and Mass. Gen. Laws Ch. 140D § 10(b) on this contract:**

1. Mass. Gen. Laws Ch. 140D § 10(b) -
   - OLS fails to provide  the borrower the federally mandated, and the Massachusetts required Right of Rescission form on the newly advanced funds added to the original  principal  balance.
2. 209 CMR § 18.21(1)(i) -

- The contract includes a monthly shortage of $483.72 per month and the borrower is not informed that this shortage accrues compound interest for the next 283 months.
- As a result of the amortization, the contract creates a Balloon Payment. At loan maturity, $179,800.00  will be due after nearly 24 years of payments.
- Additionally, there is a separate Balloon Payment due of $23,422.17 on the Deferred Principal. This creates a total <u>Balloon Payment due of $203,222.</u>17 after nearly 24 years of payments. The servicer fails to provide this correct Balloon Payment amount in the payment schedule box as a last line of payment due as required by Federal TILA and Massachusetts law

3. 209 CMR § 18.21(1) -
- The failure to inform the borrower of the extended amortization schedule, and that it will cause an increased amount of interest to be paid over the term of the loan, coupled with the omission of the exact amount of funds added to the principal balance, misrepresents "material information" and represents "unfair or deceptive acts or practices in the conduct of any trade or commerce" pursuant to Massachusetts law.

**Exhibit 15**     **Servicer: OLS**
**Loan No. 77091605456; Borrower - Redacted**
**City, State:  Dorchester, MA 02124**
New Advance of funds: Contract does not disclose
New Principal Balance AFTER modification: $337,549.30
Deferred Principal:   None
Interest Bearing Principal Amount:  $337,549.30
Start Date of Modification:  November 2013;  273 Months
New Interest on Interest Charges: Interest charged on capitalized,  past due interest, any reserve amounts  for property taxes and insurance  premiums not allowed under the original note or deed of trust, nor by State and Federal banking rules, regulations,  and/or laws.
Monthly payment in modification  contract for Principal & Interest: $1,049.32
Monthly Payment if fully amortized over 283 Months:  $1,543.89
Amortization  schedule in contract extended by 276 months − 23 years
Monthly shortage on payment over fully amortized: $494.57
Contract <u>Not</u> Fully Amortized creating a Balloon  Payment: $176,600.00
(52.32% of Principal Balance at start of modification)

**Massachusetts State Violations within 209 CMR § 18.21 and Mass. Gen. Laws Ch. 140D § 10(b) on this contract:**

1. Mass. Gen. Laws Ch. 140D § 10(b) -
- OLS fails to provide the borrower the federally mandated, and the Massachusetts required Right of Rescission form on the newly advanced funds added to the original  principal  balance.

2. 209 CMR § 18.21(1)(i) -
- OLS fails to provide the borrower the exact, itemized amount of funds being added to create the NEW principal balance.
- The contract includes a monthly shortage of $494.57 per month not disclosed to the borrower, nor is the borrower informed that this shortage accrues compound interest for the next 276 months.
- As a result of the amortization, the contract creates a Balloon Payment. At loan maturity, $176,600.00 will be due after nearly 23 years of payments. The servicer fails to use the term Balloon Payment to identify the total amount due by the borrower at loan maturity.

3. 209 CMR § 18.21(1) -
- The failure to inform the borrower of the extended amortization schedule, and that it will cause an increased amount of interest to be paid over the term of the loan, coupled with the omission of the exact amount of funds added to the principal balance, misrepresents "material information" and represents "unfair or deceptive acts or practices in the conduct of any trade or commerce" pursuant to Massachusetts law.

## XII.   ACQUISITION OF HOMEWARD RESIDENTIAL HOLDINGS, INC.

134.    MHA Handbook v. 4.3 expressly addresses the obligations of servicers when a transfer of servicing occurs:

> *When a participating servicer transfers or assigns mortgage loans, or servicing rights relating to mortgage loans, that constitute Eligible Loans pursuant to the SPA, **the transferee servicer must assume the transferor's obligations under the SPA** with respect to the transferred Eligible Loans. A transferring servicer may not use a transfer to circumvent its existing obligations under the SPA. If the transferee servicer has signed its own SPA, the Eligible Loans involved in the transfer become subject to the transferee servicer's SPA. If a transferee servicer has not signed its own SPA, it will be required to execute an assignment and assumption agreement, the form of which is attached as Exhibit D to the SPA (AAA). **See MHA Handbook v. 4.3, at p. 24 ¶ 1.4.1.**

135.    On December 27, 2012, Homeward Residential Holdings, Inc. f/k/a American

Mortgage Servicing, Inc. ("AHMSI" or "Homeward") was purchased by Ocwen Financial. *See* Ocwen 10-K, **Exhibit 16**, at p. 6. At the time of purchase, Homeward had a servicing portfolio of more than 422,000 loans with an unpaid principal balance of $77 billion. *See* **Exhibit 17.** Effective March 11, 2013, the Ocwen Board of Directors appointed Wilbur L. Ross, Jr., the founder of Ross & Co., as one of its members. AHMSI is a Delaware corporation with its principal place of business in Coppell, Texas. AHMSI is a participant in HAMP. Like the above servicers, AHMSI violated the False Claims Act by fraudulently inducing Fannie Mae, agent for the United States to execute its initial Servicer Participation Agreement with the United States Government on July 10, 2009 (which was accepted by the Government on July 22, 2009). AHMSI falsely certified its compliance with the requirements in the SPA and the Certification within the SPA, and each annual re-certification thereafter. Relator has filed a separate suit against AHMSI in the USDC for the Eastern District of Texas and intends to seek leave to transfer that cause of action and for consolidation  to this  instant suit.

136.    AHMSI violated the False Claims Act by fraudulently inducing Fannie Mae, agent for the United States, to execute its Servicer Participation Agreements by falsely stating therein, at Exhibit B, Financial Instrument at ¶5.b and Exhibit C, Form of Certification at ¶2 that it was (1) in compliance with, and covenanted that all Services will be performed in compliance with, all applicable Federal, state and local laws, regulations, regulatory guidance, statutes ordinances, codes and requirements, including, but not limited to, the Truth in Lending Act, 15 USC 1601 § et seq., the Home Ownership and Equity Protection Act, 15 USC § 1639, the Federal Trade Commission Act, 15 USC § 41 et seq., the Equal Credit Opportunity Act, 15 USC § 701 et seq., the Fair Credit Reporting Act, 15 USC § 1681 et seq., the Fair Housing Act and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending

practices and all applicable laws governing tenant rights; (2) it obtained or made, or will obtain or make, all governmental approvals or registrations required under law and has obtained or will obtain all consents necessary to authorize the performance of its obligations under the Programs and the Agreement; (3) the performance of Services under the Agreement will not conflict with, or be prohibited in any way by, any other agreement or statutory restriction by which Servicer is bound, provided, however, that Fannie Mae acknowledges and agrees that this representation and warranty is qualified solely by and to the extent of any contractual limitations established under applicable servicing contracts to which Servicer is subject; (4) it is not aware of any other legal or financial impediments to performing its obligations under the Program or the Agreement and shall promptly notify Fannie Mae of any financial and/or operational impediments which may impair its ability to perform its obligations under the Program or the Agreement; and (5) it is not delinquent on any Federal tax obligation or any other debt owed to the United States or collected by the United States for the benefit of others, excluding any debt or obligation that is being contested in good faith. AHMSI certified compliance in its Servicer Participation Agreement (SPA) with the United States and in subsequent mandatory annual recertification, all of which were and are express conditions of payment under the HAMP SPA. The Truth in Lending Act ("TILA"), 15 U.S.C. §1601 et seq,  and several Federal statutes have a prominent identification in this certification, (no more important, however, than other Federal, state and local laws regulations, regulatory guidance, statutes, ordinances, codes and requirements) and create the national landscape of all laws designed to prevent unfair, discriminatory or predatory lending practices.

137.    The evidence proves, substantially, that AHMSI violated Federal and State laws, including UDAAP/UDAP laws and the Dodd Frank Act.   AHMSI regularly engaged in the following harmful and unlawful behavior, **violating loss mitigation standards**:

a)  Inadequate staffing to accomplish goals of the programs (lack of training);

b)  Improper performance of modification underwriting;

c)  Inadequate establishment of loan modification procedures;

d)  Misplace and fail to properly store loan modification documents;

e)  Wrongful denial of modification applications;

f)  Impart false/misleading information to borrowers regarding the status of loss mitigation review;

g)  Not responding timely to borrower inquiries;

h)  Improper calculations of borrowers' eligibility for loan modifications;

i)  Wrongful denial of loan modifications; and

j)  Improper processing of modification applications, leading to denial.

138.    AHMSI obscured and excluded material information from the contracts about the loan modifications that would allow the borrowers to meaningfully compare their options. These omissions impeded borrowers' ability to weigh their options with full information. Additionally, AHMSI knowingly failed to (i) provide consumers with notices of the right to rescind its proprietary loan modification agreements entered between borrowers and prior to its participation in HAMP (which AHMSI certified compliance in its SPA), and (ii) comply with state laws (including at least Texas, New York and Massachusetts) designed to prevent unfair, discriminatory or predatory lending practices; including, but not limited to state Unfair and Deceptive Acts and Practices ("UDAP") laws, and state consumer lending laws (Texas, New York and Massachusetts). Many Texas loan modifications that Relator has reviewed have objectively violated this well established Texas law. AHMSI modified Texas home equity loans

and purchase money mortgages without, when required, complying with Tex. Const. Art. XVI, §
50(a)(6). AHMSI, like OLS, has sometimes added tens of thousands of dollars to the principal
balance, far in excess of the original notes and of constitutional reasonable closing costs. 7 Tex.
Admin. Code § 153.14(2)(B). Additionally, AHMSI imposed new obligations of charging the
borrowers interest on interest through the modification process, a burden not imposed based
upon the borrowers from the terms of the original note or deed of trust. The evidence proves,
objectively, that AHMSI, like OLS, pervasively violated many Texas constitutional legal
requirements that protect homesteads in Texas, thus making its certification of compliance with
state [Texas] laws and regulations in the initial SPA, and each year thereafter, a false
certification to the U.S. of a condition of payment and was a fraudulent inducement of the U.S.
to approve the SPA.

139.    Further, AHMSI pervasively violated New York Regulation 3 NYCRR § 419.11
and its duty under Massachusetts law to provide borrowers the Notice of the Right of Rescission
at the time of loan modifications, thus making its certification of compliance with state [New
York / Massachusetts] laws and regulations in the initial SPA, and each year thereafter, a false
certification to the U.S. of a condition of payment and a fraudulent inducement of the United
States to approve the SPA, and approve the payment of huge incentives all while these servicers
each stood in violation of federal and state laws.

140.    In corporate law there exists a general rule of successor non-liability. "It is a
'well-settled rule…[that] where one company sells or transfers all of its assets to another, the
second entity does not become liable for the debts and liabilities, including torts, of the
transferor.'" *Maine St. Retirement Sys. v. Countrywide Financial Corp.* (quoting *Polius v. Clark
Equip. Co.*, 802 F.2d 75, 77 (3d Cir. 1986). However, there are four recognized exceptions to the

rule of successor non-liability. A buyer of a corporation's assets will be liable as its successor if: (1) there is an express or implied agreement of assumption, (2) the transaction amounts to a consolidation or merger of the two corporations, (3) the purchasing corporation is a mere continuation of the seller, or (4)  the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller's debts. *Maine St. Retirement Sys. v. Countrywide Financial Corp.; New York v. Nat'l Serv. Indus*., 460 F.3d 201, 207 (2d Cir. 2006).  In this case, Ocwen Financial expressly agreed to assume certain liabilities of the selling organizations. In the mortgage servicing purchase transaction, Ocwen Financial, as the parent organization of AHMSI made unspecified indemnification agreements in connection with its acquisition of AHMSI. Moreover, the transaction amounted to a consolidation or merger of the two corporations. Finally, Ocwen is liable for AHMSI violations under the federal successor liability doctrine.

## XIII. FALSE CLAIMS ACT

141.    This is an action alleging violations of the federal False Claims Act, 31 U.S.C. §§ 3729-32 and seeking damages, civil penalties and other statutory relief on behalf of the United States and the Relator as a result of the Defendant's false records, statements, and claims.

142.    The False Claims Act generally provides, *inter alia*, that any person who (i) knowingly presents or causes to be presented to the United States for payment or approval a false or fraudulent claim, *(ii) knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim,* **and (iii)** is liable to the Government for a civil penalty of not less than $5,500 and not more than $11,000 for each such claim, plus three (3) times the amount of damages sustained by the Government because of the false claim. 31 U.S.C. §§ 3729(a)(1)(G).

143.    The False Claims Act allows any person having knowledge of a false or fraudulent claim against the Government to bring an action in Federal District Court for himself and for the United States Government and to share in any recovery as authorized by 31 U.S.C. § 3730(d). Relator claims entitlement to a portion of any recovery obtained by the United States as he is, on information and belief, the first to file, and is an original source for the information on which the allegations or transactions in the claims herein are based.

144.    Based on these provisions, Relator, on behalf of the United States Government, seeks, through this action, to recover damages, civil penalties and other statutory relief arising from the Defendant's submission of false and/or fraudulent claims for approval and/or payment and OLS's use of false records or statements that would be material to a decision of the United States to pay OLS requests under its contract. The United States has suffered significant actual damages as a result of the Defendant's false and fraudulent claims and its use of false records or statements material to false or fraudulent claims.

145.    As required under the False Claims Act, Relator has provided the offices of the Attorney General of the United States and the United States Attorney for the Eastern District of Texas a disclosure statement of material evidence and information related to and supporting the allegations in this complaint before the filing of the Complaint.

146.    OLS falsely certified in their original, standard form Servicer Participation Agreements on or around April 16, 2009, Exhibit 8 at p. 1, that they were in full compliance with all relevant laws, including but not limited to TILA, at the time of their execution of the Servicer Participation Agreement and Financial Instruments. OLS *falsely certified, again,* on or about September 9, 2010 that they were in full compliance with all relevant laws, including but not limited to TILA, at the time of their execution of the Amended and Restated Commitment to

Purchase Financial Instrument and Servicer Participation Agreements. Exhibit 1, OLS *Servicer Participation Agreement*. By these individual material false certifications and false statements, OLS **fraudulently induced** the United States, through its Financial Agent, to enter the Agreement with OLS and **to purchase** the overarching Financial Instrument. OLS made false Subsequent Certifications to the United States annually, on or about June 1, 2010, June 1, 2011, June 1, 2012, and June 1, 2013 in the form set forth in the Servicer Participation Agreement, that it had and would comply with all relevant laws, including but not limited to TILA and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices, when it had not done so. OLS has however, knowingly failed to provide required TILA/Regulation Z notices of right of rescission to borrowers for the secured additional advances, both in and out of the HAMP program, and failed to comply with the state laws set forth above.

## XIV. CAUSES OF ACTION

### A. First Cause of Action -False Claims 31 U.S.C. § 3729(a)(1)(A)

147.    Relator re-alleges and hereby incorporates by reference each and every allegation contained in the preceding paragraphs numbered 1 through 117 of this complaint. Therefore, OLS has knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval in violation  of **31 U.S.C. 3729(a)(1)(A).**

### B. Second Cause of Action - False Claims 31 U.S.C. § 3729(a)(1)(B)

148.    Relator re-alleges and hereby incorporates by reference each and every allegation contained in the preceding paragraphs numbered 1 through 118 of this complaint. Therefore, OLS has knowingly made, used or caused to be made or used a false record or statement material to a false or fraudulent claim in violation of **31 U.S.C. § 3729(a)(1)(B). The false statements**

also included false statements and certifications made to <u>fraudulently induce</u> the U.S. to approve OLS's SPA and to induce the U.S. to purchase OLS's Financial Instrument.

## PRAYER AND REQUEST FOR RELIEF

149.    On behalf of the United States, Relator seeks to recover all relief available under the False Claims Act, as amended. He seeks monetary damages equal to three (3) times the damages suffered by the United States. In addition, Relator seeks to recover all civil penalties and other relief on behalf of the United States Government and the Relator in accordance with the False Claims Act.

150.    Relator should, for his contribution to the Government's investigation and recovery, be awarded a fair and reasonable Relator's share pursuant to 31 U.S.C. § 3730(d) of the False Claims Act;

151.    Relator seeks to be awarded all costs and expenses for this action, including statutory attorneys' fees, expenses, court costs and any available pre-judgment or post-judgment interest at the highest rate allowed by law.

WHEREFORE, premises considered, Relator prays that this District Court enter judgment on behalf of the United States and against the Defendant for the following:

a.    damages in the amount of three (3) times the actual damages suffered by the United States and all statutory penalties arising from the Defendant's unlawful conduct which violated the False Claims Act;

b.    a Relator's Share from the recoveries in a statutory amount which is fair and reasonable under the circumstances;

c.    Relator's statutory attorneys' fees, expenses, and costs of court;

d.    pre-judgment and post-judgment interest, at the highest rate allowed by law; and

e.     all other relief to which Relator and/or the United States may be justly entitled, whether at law or inequity,  and which the District Court deems just and proper.

Dated: August 1, 2014

**UNITED STATES OF AMERICA, ex rel. Michael J. Fisher**

Respectfully  submitted:

By: /s/ Samuel L. Boyd
Samuel L. Boyd
Texas SBN: 02777500
Catherine C. Jobe
Texas SBN: 10668280
BOYD & ASSOCIATES, PC
6440 North Central Expressway, Suite  600
Dallas, Texas 75206-4101
Telephone  (214) 696-2300
Facsimile  (214) 363-6856
sboyd@boydfirm.com

**Counsel for Relator/Qui Tam Plaintiff**

## CERTIFICATE OF SERVICE AND DISCLOSURE

On August 9, 2012, Relator served a copy of his Disclosure Statement to US Attorneys Shamoil Shipchandler and Kevin McClendon for the United States District Court for the Eastern District of Texas, Sherman Division,  and to United States Attorney General Eric Holder.

On August 20, 2012, Relator served a copy of his Disclosure Statement and proposed Original Complaint to US Attorney Kevin McClendon for USDC for the Eastern District of Texas, Scott Hogan, US Attorney for the Northern District of Texas, Dallas Division and to US. Attorney William  Edgar, Senior Trial Counsel, Department of Justice, Washington D.C.

On August 20, 2012, a copy of Relator's Complaint filed under seal was formally served pursuant to FRCP 4(i)(1)(b), via Certified Mail, Return Receipt Requested, upon:

Eric Holder
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington,  DC 20530-0001

On August 1, 2014 a copy of Relator's First Amended Complaint was provided to AUSA Kevin McClendon for the United States District Court for the Eastern District of Texas, Sherman Division and to US. Attorney William Edgar, Senior Trial Counsel, Department of Justice, Washington D.C.

On August 1, 2014, a copy of the First Amended Complaint filed under seal was formally served pursuant to FRCP 4(i)(1)(b), via Certified Mail, Return Receipt Requested, upon:

Eric Holder
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington,  DC 20530-0001

/s/Samuel Boyd
Samuel L. Boyd