IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA § <br> *Ex rel.* Michael J. Fisher and Brian Bullock, § <br> and Michael Fisher Individually, and Brian § <br> Bullock Individually, § <br> § <br> Qui Tam Plaintiffs/Relators, § <br> § <br> vs. § <br> § <br> Ocwen Loan Servicing, LLC § <br> § <br> Defendant. § | **Case No. 4:12-cv-543** <br><br> JURY TRIAL DEMANDED |

### RELATORS' OPPOSITION TO STONETURN GROUP'S MOTION TO QUASH NON-PARTY SUBPOENA

Relators/*Qui Tam* Plaintiffs Michael J. Fisher, Brian Bullock and Michael Fisher, Individually and Brian Bullock, Individually, ("Relators") hereby submit their Response to StoneTurn Group LLP's ("StoneTurn") Motion to Quash Plaintiffs' Non-Party Subpoena ("Motion") and respectfully show the Court as follows:

#### I.   INTRODUCTION

StoneTurn is a nonparty that possesses highly relevant documents, because New York regulators (the New York Department of Financial Services, "NYDFS") hired it to audit (Defendant) Ocwen Loan Servicing, LLC's ("OLS") (and its parent company, Ocwen Financial Corp., "OFC") (together "Ocwen") compliance with regulations designed to protect borrowers. StoneTurn's audit resulted in Ocwen's admissions of guilt that directly support Relators' False Claims Act ("FCA") causes of action. StoneTurn seeks to resist the subpoena on two grounds.

First, it argues that the requests are unduly burdensome. But far from unduly burdensome, the requests primarily seek the documents that Ocwen already gathered and

provided to StoneTurn in conjunction with a discrete event—StoneTurn's audit of Ocwen pursuant to a 2012 Consent Order between Ocwen and NYDFS. Ocwen has already gathered the great bulk of the documents in a discrete set, and StoneTurn has no need to conduct further culling or search processes. Furthermore, because Ocwen is an adjudicated, serial discovery violator, Relators need the documents to confirm the completeness and accuracy of what OLS produces in response to Relators' requests. Relators also seek StoneTurn's related internal reports and summaries, which are also likely already segregated to provide to the NYDFS and/or Ocwen. Together, these documents evince (a) Ocwen's admitted violations that render false its certifications to the government, and (b) Ocwen's knowledge of the certifications' falsity.

Second, StoneTurn argues that the documents are protected by the work product privilege. The great bulk of documents requested by Relators, however, are simply factual documents evidencing specific, loan level transactions that were prepared by OLS, not StoneTurn. Furthermore, the work product privilege does not apply because the documents were not prepared in anticipation of litigation. In fact, NYDFS never instituted litigation against Ocwen, and StoneTurn has not even attempted to show litigation was contemplated or imminent. It is clear that StoneTurn created the documents related to Ocwen in its ordinary course of business as the monitor. Therefore, StoneTurn has far from met its burden of showing that work-product protection applies. Finally, to the extent the protection applies to a small number of responsive documents, Relators have a substantial need for the materials and cannot obtain their substantial equivalent from other means. Accordingly, StoneTurn must produce even these supposed work product documents under Federal Rule of Civil Procedure 26(b)(3)(A)(ii).

## II.   FACTUAL BACKGROUND

### A.   New York Regulators Hired StoneTurn to Conduct an Audit that Led to Ocwen Admitting Numerous Violations.

In recent years Defendant OLS has been one of the largest mortgage servicing companies in the United States. According to NYDFS, from the end of 2009 to the end of 2013, OLS's servicing portfolio grew from 351,595 residential loans with an aggregate unpaid principal balance of $50 billion to 2,861,918 residential loans with an aggregate unpaid principal balance of $464.7 billion. (2014 New York Consent Order, attached hereto as Ex. A, at 2).

In 2010 and 2011, NYDFS participated in an examination of Ocwen's mortgage servicing practices that identified numerous deficiencies and that ultimately led to the necessity of StoneTurn's audit of Ocwen. (*Id.* at 3). On September 1, 2011, NYDFS and Ocwen entered into an Agreement on Mortgage Servicing Practices that required Ocwen to take steps to ensure it could comply with the government's Home Affordable Modification Program ("HAMP"), designed to help struggling borrowers, and to maintain proper records and implement robust internal controls and oversight. (*Id.*).

In June 2012, NYDFS conducted a targeted examination of Ocwen to assess its compliance with the 2011 Agreement. The examination identified several deficiencies similar to those identified in 2011 and widespread non-compliance with the 2011 Agreement. (*Id.* at 4). Consequently, on December 5, 2012, Ocwen entered into a Consent Order with NYDFS, which required Ocwen to retain an independent compliance monitor for two years. (*Id.*)

As part of the targeted examination, NYDFS hired StoneTurn to review Ocwen's loan servicing documents. StoneTurn is a consulting firm that provides a variety of forensic accounting and other services for large corporations and government entities throughout the world. (*See* StoneTurn website, available at http://www.stoneturn.com). Pursuant to its mandate,

StoneTurn (and another nonparty named Boston Portfolio) determined Ocwen was continuing to commit violations of the 2011 Agreement, and New York state laws and regulations. (Ex. A, 2014 New York Consent Order). As a result of StoneTurn's audit, NYDFS and Ocwen entered into a Consent Order in December 2014. (*Id.*). In the 2014 Consent Order, Ocwen admitted to numerous violations of laws intended to protect borrowers. (*Id.*) It also agreed to pay $150 million to various recipients, to submit to certain additional monitoring and reporting requirements, and to require the resignation of its CEO William Erbey. (*Id.* at 10–19).

B.   **Ocwen Is an Adjudicated Discovery Violator.**

Prior to the serving of Relators' subpoena on StoneTurn, Ocwen was already adjudicated a serial discovery violator. (California Discovery Order, attached hereto as Ex. C). In January 2013, the California Commissioner of Business Oversight ("the Department") commenced a regulatory examination of Ocwen's loan servicing practices, investigating violations similar to some of those Relators allege. Ocwen successfully delayed the Department's investigation because of its "repeated failure to timely produce all the information and documents requested by the Department." (*Id.*) After multiple fines resulting from Ocwen's refusal to provide the information, Ocwen agreed to pay a $2,500,000 fine, and to cease acquiring additional mortgage servicing rights on California real estate. (*Id.* at 4). Far from a slap on the wrist, Ocwen was foreclosed from acquiring servicing rights in California, where in 2013 "OLS serviced more than $90 billion in mortgage loans, for more than 350,000 borrowers." (*Id*. at 2). Thus, Ocwen had been willing to risk revenue from the most lucrative mortgage servicing state in the country merely to avoid its discovery obligations. Ocwen has proven it will resist legitimate discovery efforts without a threat of extremely serious reprisal.

C.  **Relators Seek Highly Relevant Documents and Related Reports and Summaries.**

On March 11, 2015, Relators served a subpoena requesting eight categories of documents from StoneTurn. (Subpoena, attached hereto as Ex. B). The requested categories include documents Ocwen provided in conjunction with StoneTurn's audit (Request Nos. 1 and 3) and StoneTurn's related reports and summaries (Request Nos. 2 and 7). The Requests also seek documents concerning Relators (Request Nos. 5 and 6), and Ocwen's key decision makers William Erbey and Ron Faris (Request No. 8). After several discussions with StoneTurn's counsel, it became clear that StoneTurn would resist providing any responsive documents absent Court intervention. On March 30, StoneTurn filed its Motion to quash the subpoena, which was transferred to this Court. For the following reasons, the Motion should be denied.

### III.  ARGUMENT AND AUTHORITIES

A.  **Relators' Requests Are Not Unduly Burdensome.**

Relators' requests seek a highly relevant and discrete set of documents from StoneTurn, the great majority of which Ocwen already collected and turned over to StoneTurn, and some of which may be solely in StoneTurn's possession. StoneTurn's brief acknowledges the following factors as relevant to whether a subpoena is unduly burdensome:

    (1)    The relevance of the information requested;
    (2)    the need of the party for the documents;
    (3)    the breadth of the documents request;
    (4)    the time period covered by the request;
    (5)    the particularity with which the party describes the requested documents;
    (6)    the burden imposed;
    (7)    whether the request is cumulative or duplicative;
    (8)    the time and expense required to comply with the subpoena (relative to the responder's resources); and
    (9)    the importance of the issues at stake in the litigation."[1]

Although StoneTurn's brief ignores most of these factors, each factor militates in favor of

---

[1] (Mot. at 4).

requiring StoneTurn to produce the requested, responsive documents.

### 1. The Relevance of the Information Requested

StoneTurn does not contest the relevance of the requested documents. The documents are in fact highly relevant for multiple reasons. First, the underlying loan documents provided to StoneTurn (Request Nos. 1, 3) evidence the violations of laws and regulations that rendered Ocwen's certifications of compliance false. It is these false certifications (and related misrepresentations) that form the basis of Relators' causes of action.

StoneTurn's resulting reports and summaries (Request No. 2) are also highly relevant because they demonstrate both the violations and OLS's knowledge of its wrongdoing. "Knowledge" (as the FCA defines it) is an essential element of Relators' causes of action. The loan level documents actually provided to StoneTurn resulted in Ocwen's admissions to NYDFS that it committed numerous violations. These admissions, and the underlying violations, show that Ocwen's certifications of compliance were false, and thus are highly relevant to Relators' causes of action.

### 2. The Need of the Party for the Documents

For StoneTurn's requested internal reports (Request No. 2), there is simply no other source for these documents. For the loan level documents and other documents Ocwen provided to StoneTurn, StoneTurn argues the documents are not needed because Ocwen possesses them. Relators, however, need the documents from StoneTurn for several reasons.

First, OLS does not come into this litigation with a clean discovery record. Ocwen has admitted that it resisted similar discovery requested by regulators in California for more than a year and a half, resulting in severe fines and other sanctions. (Ex. C, California Discovery Violations). In light of the fact Ocwen is an adjudicated discovery violator in a similar matter,

Relators need the documents provided to StoneTurn to confirm the completeness and accuracy of the documents OLS provides. Furthermore, OLS is once again resisting discovery in this action. Relators served requests for production on January 15, 2015, and again on February 15, 2015, requesting, among other things, the documents sent to StoneTurn. (Walker Aff., attached hereto as Ex. D, ¶ 2). OLS has so far failed to produce the documents, and it continues to assert numerous meritless objections. (*Id.*). The deadline for the completion of discovery is currently August 17, 2015, so there is simply not enough time to compel OLS to produce documents and analyze the deficiencies before requesting the documents from StoneTurn, which can confirm completeness and accuracy of the documents provided.

Second, even if OLS also has some of the requested documents, it is independently relevant what documents StoneTurn actually received from Ocwen, because those documents form the basis of StoneTurn's conclusions regarding the violations, which ultimately led to Ocwen's admission of violations in the New York Consent Order. (Ex. A, Consent Order).

### 3. The Breadth and the Time Period Covered by the Request

StoneTurn argues with little explanation that the requests are "overbroad on their face." In fact, the requests are all related to a specific, discrete transaction, StoneTurn's auditing of Ocwen pursuant to the December 5, 2012 Consent Order, as the subpoena clearly defines. (Ex. B, Subpoena). In all likelihood, Ocwen turned over the documents in one (or a very small number) of discrete batches, and it would have a duty to maintain them separately for its audit on behalf of NYDFS. StoneTurn has not requested that Relators limit the breadth or time period of the requests, nor is there any logical way to further limit the requests in light of the relevant documents required.

### 4. The Particularity of the Requests

StoneTurn does not argue that it does not understand the scope of the requests, which are clearly limited to the documents Ocwen provided to StoneTurn and any related documents StoneTurn prepared. StoneTurn has not sought clarification regarding the scope of any requests.

### 5. The Burden Imposed

The Ocwen documents are undoubtedly already segregated, so no electronic searching or culling should be required. Nor does StoneTurn argue that any expensive measures are necessary to segregate, retrieve, or copy the documents—most likely on disk or hard drive—for production.

StoneTurn fallaciously argues that "to respond, StoneTurn will have to undertake an exhaustive review of millions of pages of documents to parse what is, and is not, non-privileged and responsive to Plaintiff's vague requests." (Resp. at 5). These arguments have no basis in fact. First, StoneTurn simply needs to turn over all the documents provided by Ocwen, so there is no "parsing" or searching necessary. Regarding the purported privilege, any privilege for Ocwen documents would have been Ocwen's. If Ocwen turned over privileged documents to StoneTurn, the privilege would have been waived. StoneTurn has no basis to support the need for a page-by-page privilege search (which is in any case very rare in modern complex litigation). Additionally, Relators address below why none of the requested documents would fall under the work-product privilege. Furthermore, even if privileged documents somehow exist, Relators agree to return them in accordance with the robust Clawback Order entered in this case and to which OLS agreed. (Agreed Clawback Order, Dkt. No. 120).

### 6. Whether the Request Is Cumulative or Duplicative

StoneTurn does not argue that the eight requests are cumulative or duplicative. Additionally, Relators currently do not have any of the documents they request from StoneTurn,

and many of the documents are exclusively in StoneTurn's possession. (*E.g.,* Request No. 2).

7. **Time and Cost of Compliance (Relative to Responder's Resources)**

Because the Ocwen documents are (in large part) already segregated and no further culling or searching is required, the time and expense to comply with this request should be minimal. Because the documents are electronic, the cost of transmission should likewise be negligible.

According to public records, StoneTurn has approximately 65 employees and more than $7 million in annual revenue. (*See* Hoover's report, attached hereto as Ex. E). Requiring the production of a discrete set of documents that were (in large part) already gathered by Ocwen and presented to it, along with a small number of related documents, is not unduly burdensome for a company of StoneTurn's size and means.

8. **The Importance of the Issues at Stake in the Litigation**

This case seeks to recoup more than a billion dollars paid by the federal government as a result of Ocwen's false statements. (*See* Third Am. Compl., Dkt. No. 59). Ocwen obtained these massive funds (for its own benefit, that of mortgage owner/investors, and in small part, indirectly, for borrowers) by harming the distressed borrowers that it promised it would treat fairly and lawfully. As a result of OLS's violations, many struggling borrowers, including some veterans, lost their homes. The importance of this case is significant, both to recoup the massive funds wrongfully taken from the government, and to deter mortgage servicers like Ocwen from defrauding the government and harming struggling borrowers.

B. **The Requested Documents Are Not Protected or Privileged Work Product.**

The documents requested by Relators are not protected by the work product privilege. StoneTurn, the party that is seeking the protection of the work-product doctrine, has the burden

of proving that its documents were prepared in anticipation of litigation. *Hodges, Grant & Kaufmann v. U.S. Government, Dept. of the Treasury, I.R.S.*, 768 F.2d 719, 721 (5th Cir. 1985). StoneTurn has utterly failed to meet this burden for any documents it is withholding.

First, as StoneTurn implicitly admits, many of the documents Relators request are not documents that were prepared by StoneTurn. Rather, many of the documents are loan files and reports provided by Ocwen to StoneTurn. Federal Rule of Civil Procedure 26(b)(3)(A) states that documents are protected if they are "*prepared* in anticipation of litigation or for trial by or for another party or its representative." Clearly, the documents *Ocwen* prepared in the ordinary course of its business such as loan level documents were not prepared in anticipation of litigation and are not documents for which StoneTurn can assert work-product privilege.

Second, in regard to any reports or summaries prepared by StoneTurn, StoneTurn has not demonstrated that any of the documents it created were prepared in anticipation of litigation, nor has StoneTurn demonstrated that the "primary motivating purpose behind the creation of the document was to aid in possible future litigation." *United States v. Davis*, 636 F.2d 1028, 1040 (5th Cir. 1981). StoneTurn contends that, "in the course of [its] work, StoneTurn prepared various reports and communications *in the shadow of the prospect* that NYDFS could take further action against Ocwen should the problems go unresolved." (Mot. at 6) (emphasis added). StoneTurn provides no factual support for this assertion, nor can it do so. In fact, NYDFS never filed a lawsuit, nor does StoneTurn provide any support that the prospect of litigation motivated the creation of any documents. Preparing documents "in the shadow of the prospect" is not the standard, and this vague assertion is far from sufficient to meet the standard of proving documents were prepared in anticipation of litigation. The Fifth Circuit has described the standard for determining whether a document has been prepared in anticipation of litigation as

follows:

> It is admittedly difficult to reduce to a neat general formula the relationship between preparation of a document and possible litigation necessary to trigger the protection of the work product doctrine. We conclude that litigation need not necessarily be imminent, as some courts have suggested, as long as the *primary motivating purpose* behind the creation of the document was to aid in possible future litigation.

*Elec. Data Sys. Corp. v. Steingraber*, No. 4:02 CV 225, 2003 WL 21653414, at *4 (E.D. Tex. July 9, 2003) (citing *United States v. Davis*, 636 F.2d 1028, 1039 (5th Cir. 1981)). StoneTurn has not provided the Court with any evidence that the primary motivating purpose behind any of its summaries or reports was to aid in possible future litigation; rather, the purpose behind StoneTurn's efforts, was, in its own words "to assist NYDFS in understanding and assessing the extent of compliance, or non-compliance, of one of its regulated entities." (Mot. at 7).

StoneTurn further argues that it "worked closely with NYDFS in this process and *presumably* formed part of NYDFS' assessment of whether a second action would be necessary to remedy the problems that were identified—an assessment that has led to an additional monitorship of Ocwen." (Mot., at 7) (emphasis added). As StoneTurn acknowledges, it simply *presumes* that any of its supplied information was used in any of NYDFS's assessments. Further, and more importantly, StoneTurn not once mentions *litigation*; rather, it acknowledges that *litigation* did not result from any of the information it supplied NYDFS (nor does it identify litigation as the "second action" that might "be necessary to remedy the problems that were identified"). In fact, the "second action" that in fact *was* found necessary was *an additional monitorship*, not litigation. Thus, StoneTurn has not met its burden of showing any documents were created in anticipation of litigation.

It is clear that StoneTurn created all of its documents related to Ocwen in its ordinary course of business given that NYDFS selected it to serve as the monitor, and this business is not

per se pursuant to litigation. StoneTurn would in fact have undertaken the same investigation regardless of whether litigation was anticipated. "If the document would have been created regardless of whether litigation was expected to ensue, the document is deemed to have been created in the ordinary course of business and not in anticipation of litigation." *Steingraber*, 2003 WL 21653414, at *5. "If a party or its attorney prepares a document in the ordinary course of business, it will not be protected from discovery even if the party is aware that the document may also be useful in the event of litigation." *Id*. (citation and internal quotations omitted) (finding that EDS would have conducted the same investigation into a possible expense account fraud by one of its employees regardless of whether litigation was anticipated; determining that the primary purpose of the investigation was to "fairly and impartially determine whether or not an employee [was] stealing or otherwise misusing EDS assets" and "make a business decision – whether or not to terminate [an employee's] employment").[2] Further, even if StoneTurn's documents were prepared with an eye toward litigation, it is indisputable that the documents also contain information which it was expected to obtain or compile in the ordinary course of its business of monitoring and investigating Ocwen's violations.

The three cases cited by StoneTurn in support of its argument that its documents are protected by the work-product privilege are distinguishable from the facts currently presented to the Court. First, when citing *In re LTV Securities Litigation*, 89 F.R.D. 595, 616 (N.D. Tex.

---

[2] *See also Miller v. Federal Express Corp.*, 186 F.R.D. 376, 386, 387 (W.D. Tenn. 1999) (finding that documents generated during an investigation before the filing of a formal EEOC complaint were prepared in ordinary course of adjusting employee complaints and were not work product simply because corporate counsel directed the investigation); *Occidental Chem. Corp. v. OHM Remediation Servs. Corp.*, 175 F.R.D. 431, 435 (W.D.N.Y. 1997) ("Even if these documents were prepared with an eye toward litigation, it is indisputable that the documents also contain information which plaintiff would be expected to obtain or compile in the ordinary course of its business of overseeing the performance of environmental remediation work under its contract with defendant."); *Guzzino v. Felterman*, 174 F.R.D. 59, 63 (W.D. La. 1997) (holding that "the evidence does not establish that the primary motivating purpose behind the investigation and the creation of the withheld documents was to aid in possible future litigation. Instead, the evidence presented by Dean Witter indicates that the investigation was conducted in the ordinary course of business ***and/or to prepare for potential investigations by [securities regulators]***.") (emphasis added).

1981), StoneTurn does not cite any of the court's analysis addressing work-product privilege; rather, StoneTurn cites to the court's analysis of Special Officer privileges. Further, when addressing work-product privilege, the court in *LTV Securities* emphasizes that counsel's efforts on LTV's behalf "were motivated by the anticipation of future litigation." *In re LTV Securities Litigation*, 89 F.R.D. 595 at 612. As discussed above, StoneTurn has not met its burden of demonstrating that any of its documents were motivated by the anticipation of future litigation. Rather, it is clear that StoneTurn's purpose in drafting any of its summaries or correspondence was to assist NYDFS in understanding and assessing the extent of Ocwen's noncompliance.

Further, in *In re Cardinal Health, Inc. Securities Litigation*, an unpublished case in the Southern District of New York, Cardinal Health, Inc., was being investigated by the Securities Exchange Commission ("SEC"). *In re Cardinal Health*, No. C2-04-575-ALM, 2007 WL 495150, at *1 (S.D.N.Y. 2007). After learning that it was being investigated by the SEC, the company discovered documents suggesting that certain employees might have engaged in improper practices, and *it* therefore hired outside counsel to conduct an investigation. It is clear that Cardinal Health anticipated litigation as the company itself identified potential wrongful conduct and wanted to prepare for any subsequent litigation that the SEC may pursue. As the court explains, "[t]he Audit Committee [of Cardinal] recognized that the SEC was investigating Cardinal's accounting practices and, after review of certain Cardinal documents, that these practices might not have been 'in accordance with applicable law and regulations.' Thus, the likelihood of civil or criminal litigation was anticipated *before* hiring Kramer Levin." *Id*. at *5. Ocwen, on the other hand, did not hire StoneTurn to investigate its internal conduct in anticipation of litigation (nor did Ocwen create an internal committee to do so). Instead, *NYDFS* asked StoneTurn to serve as a monitor and assist in assessing the extent of Ocwen's

noncompliance. StoneTurn has not demonstrated that it prepared its documents in anticipation of litigation. It would have been a completely different situation (and one in line with *Cardinal*) if Ocwen had hired outside counsel to investigate its own compliance *after* NYDFS and StoneTurn completed their investigation; however, that was not the case.

Finally, similar to *Cardinal*, in *In re Vioxx*, Merck & Co. decided to establish a Special Committee to conduct an internal investigation in the wake of investigations by the Department of Justice and the SEC. *In re Vioxx Products Liability Litigation*, No. MDL 1657, 2007 WL 854251, at *1 (E.D. La. 2007). As the court stated, Merck's board of directors established the Special Committee "[i]n the wake of various criticisms, shareholder demands, existing and anticipated shareholder litigation, and pending regulatory investigations by the Department of Justice and the Securities Exchange Commission." *Id*. The court, citing *Cardinal*, stated that "[c]ourts have held that materials created by *a committee investigating corporate wrongdoing in response to shareholder demands* are entitled to work-product protection." *Id*. at *4 (emphasis added). The court further stated that "in this case the 'prospect of litigation was identifiable and not remote because specific claims had arisen and action had been demanded' of Merck." *Id*. Again, Ocwen did not create a Special Committee to investigate its internal conduct in anticipation of litigation. Instead, NYDFS simply asked StoneTurn to serve as a monitor and assist in assessing the extent of Ocwen's compliance or noncompliance. StoneTurn has not demonstrated that it prepared its documents in anticipation of litigation, as there were no specific claims that had arisen or specific action that had been demanded; rather, the investigation requested by NYDFS was pursued for the *purpose* of identifying whether Ocwen had violated any regulations or agreements at issue. Accordingly, StoneTurn has not met its burden, and any of its summaries and drafts relating to Ocwen were created in its ordinary course of business as

the selected monitor.

C.  **Relators Have a Substantial Need for Protected Documents, if any Exist.**

StoneTurn has not met its burden of showing that work product protection applies to any responsive documents. Even if the Court determines a small subset of responsive documents constitute work product, the Court should nevertheless require their production.

Under Federal Rule of Civil Procedure 26(b)(3)(A)(ii), materials may be discovered if "the party shows that it has a substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." To the extent StoneTurn prepared internal reports or summaries discussing the violations to which Ocwen admitted in the 2014 New York Consent Order, they are highly relevant and compelling documents concisely evidencing Ocwen's violations. Furthermore, Relators cannot obtain these documents from any other source. To the extent the summaries and reports condense findings from numerous loan level documents, they can also likely save the parties from considerable expense in attempting to discern from loan level documents what violations occurred.[3] Furthermore, to the extent the summaries or reports were sent to Ocwen, they show irrefutable evidence of Ocwen's knowledge of the violations referenced in the report, an essential element of Relators' causes of action.

## IV.  CONCLUSION

For the aforementioned reasons, Relators respectfully request that the Court deny StoneTurn's Motion and require compliance with Relators' document request subpoena.

---

[3] "Rule 26(b)(3) recognizes a distinction between 'ordinary' and 'opinion' work product." "Opinion" work product, that which conveys the "mental impressions, conclusions, opinions, or legal theories of an attorney or other representative," has been accorded almost absolute protection from discovery by some courts. *See Thomas v. General Motors Corp.*, 174 F.R.D. 386, 388 (E.D. Tex. 1997). StoneTurn, however, has not argued that any documents constitute opinion work product, so any purported documents should be analyzed as at most "ordinary work product."

Dated: April 13, 2015          Respectfully submitted,

By:   */s/ Thomas M. Melsheimer*
Thomas M. Melsheimer
melsheimer@fr.com
Texas Bar No. 13922550
Chad B. Walker
cbwalker@fr.com
Texas Bar No. 24056484
**FISH & RICHARDSON P.C.**
1717 Main Street, Suite 5000
Dallas, TX 75201
(214) 747-5070 (Telephone)
(214) 747-2091 (Facsimile)

William T. "Tommy" Jacks
Texas Bar No. 10452000
jacks@fr.com
David S. Morris
Texas Bar No. 24032877
dmorris@fr.com
One Congress Plaza, Suite 810
111 Congress Avenue
Austin, TX 78701
(512) 472-5070 (Telephone)
(512) 320-8935 (Facsimile)

Samuel L. Boyd
sboyd@boydfirm.com
Texas State Bar No. 02777500
Catherine C. Jobe
cjobe@boydfirm.com
Texas State Bar No. 10668280
**BOYD & ASSOCIATES, PC**
6440 North Central Expressway
Suite 600
Dallas, Texas 75206-4101
(214) 696-2300 (Telephone)
(214) 363-6856 (Facsimile)

>Roger D. Sanders
>Texas State Bar No. 17604700
>roger.sanders@somlaw.net
>J. Michael Young
>Texas State Bar No. 00786465
>michael.young@somlaw.net
>**SANDERS, O'HANLONG, MOTLEY & YOUNG, PLLC**
>III South Travis
>Sherman, Texas 75090
>(903) 892-9133 (Telephone)
>(903) 892-4300 (Facsimile)

**Counsel for Relators/*Qui Tam* Plaintiffs**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on April 13, 2015 to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Local Rule CV-5(a)(3).

>*/s/ Thomas M. Melsheimer*
>Thomas M. Melsheimer