**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| *Ex rel.* Michael J. Fisher, Brian Bullock and | § | **Case No. 4:12-cv-543** |
| Michael Fisher, Individually,  and  Brian | § | |
| Bullock, Individually, | § | |
| | § | RELATORS' FOURTH AMENDED |
| Plaintiffs, | § | COMPLAINT PURSUANT TO |
| | § | 31 U.S.C §§ 3729-3732 |
| vs. | § | (FEDERAL FALSE CLAIMS ACT) |
| | § | |
| Ocwen  Loan  Servicing,  LLC  and  Ocwen | § | JURY TRIAL DEMANDED |
| Financial Corporation, | § | |
| | § | |
| Defendants. | § | |
| | § | |

**RELATORS' FOURTH AMENDED COMPLAINT
PURSUANT TO 31 USC §§ 3729-3732 (FEDERAL FALSE CLAIMS ACT)**

**UNITED STATES OF AMERICA, ex rel. Michael J. Fisher and Brian Bullock**

By: */s/ Samuel L. Boyd*
Samuel L. Boyd
Texas SBN: 02777500
Catherine C. Jobe
Texas SBN: 10668280
**BOYD & ASSOCIATES**
6440 North Central Expressway, Suite 600
Dallas, Texas 75206-4101
Tel (214) 696-2300
Fax (214) 363-6856
sboyd@boydfirm.com

By: */s/ Chad B. Walker*
Thomas M. Melsheimer
txm@fr.com
Texas Bar No. 13922550
Chad B. Walker
cbwalker@fr.com
Texas Bar No. 24056484
**FISH & RICHARDSON P.C.**
1717 Main Street, Suite 5000
Dallas, TX 75201

William T. "Tommy" Jacks
jacks@fr.com
Texas Bar No. 10452000
**FISH & RICHARDSON P.C.**
One Congress Plaza, Suite 810
111 Congress Avenue
Austin, TX 78701
(512) 472-5070 (Telephone)
(512) 320-8935 (Facsimile)

*Counsel for Qui Tam Plaintiffs/Relators*

By: */s/Roger D. Sanders*
Roger D. Sanders
TX SBN 17604700
J. Michael Young
TX SBN 00786465
Sanders, O'Hanlon, Motley & Young, PLLC
III South Travis
Sherman, TX 75090
(903) 892-9133 (Tel.)
(903 892-4300 (Fax)
**Local Counsel for Relators**

(214) 747-5070 (Telephone)
(214) 747-2091 (Facsimile*)*

## TABLE OF CONTENTS

I. SUMMARY ............................................................................................................ 2

II. PARTIES ............................................................................................................... 5

III. JURISDICTION AND VENUE ........................................................................... 7

IV. HOME AFFORDABLE MODIFICATION PROGRAM ................................... 7

V. FACTS ................................................................................................................. 11

VI. OLS HAMP AND NON-HAMP LOAN MODIFICATIONS ........................... 18

VII. FEDERAL HOUSING ADMINISTRATION ("FHA") VIOLATIONS ....... 23

    A. OLS Violations of FHA Loss Mitigation Requirements ........................... 24

        1.    Failure to engage in loss mitigation in a timely manner ..................... 24

        2.    Failure to engage in FHA-specific loss mitigation procedures ........... 24

        3.    Failure to properly implement FHA-HAMP ....................................... 26

    B. OLS Violations of FHA Quality Control Requirements ........................... 27

        1.    Failure to implement a FHA-compliant quality control program ..... 26

        2.    Improperly servicing FHA loans offshore ........................................... 29

    C. OCWEN's False Certifications ................................................................... 31

VIII. UNFAIR, DECEPTIVE OR ABUSIVE ACTS OR PRACTICES ............... 34

    A. UDAAP and UDAP ...................................................................................... 34

    B. DODD-FRANK ACT ................................................................................... 36

        1.    Unfair ..................................................................................................... 37

        2.    Deceptive ................................................................................................ 39

        3.    Abusive ................................................................................................... 40

    C. OLS's Unfair, Deceptive or Abusive Acts and Practices ........................ 41

        1.    Loss Mitigation – OLS's Modification Delays and Denials ................ 41

        2.    Incorrect Income Calculation Detrimental for HAMP Borrowers ....47

        3.    OLS's Violations of Loss Mitigation Requirements ........................... 48

        4.    Unlawful Failure to Suspend Foreclosure ........................................... 50

        5.    Unlawful Capitalization of Unloaned Principal .................................. 51

        6.    Unlawful, Forced Advance of Escrow ................................................. 53

7. **"In-Flight" Modifications** ........................................................ 55

8. **False, Unlawful Affidavits, Assignments and Attestations** ................ 56

9. **Manipulation of Modification Process by OLS Employees** ............... 57

10. **Manipulation of Modification Documents** ............................................ 58

11. **Violations of the CFPB's Continuity of Contact Requirement** .......... 61

12. **Imparting False, Misleading Information to Borrowers** .................... 64

13. **Offshore Loan Review Resulting in Misunderstanding and Confusion** ...................................................................................67

14. **Forced In-House Modifications** ............................................... 69

**IX. REAL ESTATE SETTLEMENT PROCEDURES ACT (RESPA) ................................ 70**

A. **Untimely Transferee/Transferor Letters to Borrowers** ..................... 72

B. **Additional Violations of RESPA** ....................................................... 73

**X. TRUTH IN LENDING ACT AND REGULATION Z ....................................................... 74**

**XI. STATE LAWS AND REGULATIONS .......................................................................... 81**

A. **Texas Constitutional and Administrative Law** ................................. 83

1. **Constitutional Law** ............................................................. 83

2. **Sims "Extensions of Credit" triggering Section 50(a)(6) applications** 85

3. **The Relevant Situation** ...................................................... 90

4. **Pervasive Violations by Purchase Money Mortgage Modifications** ... 93

5. **Loan-to-value Ratio** ........................................................... 93

6. **Closing Location** ................................................................ 94

7. **Texas Notice of Right of Rescission** .................................... 95

8. **Full Amortization** ............................................................... 96

9. **Examples of OLS Texas Modification Contracts** ................... 97

10. **Homesteaders, In Effect, Become "Renters"** ...................... 98

B. **New York State Law** ......................................................................... 99

1. **OLS Examples of NY Modification Contracts** .................... 101

C. **Massachusetts Law** .......................................................................... 105

1. **Mass. Right of Rescission** ................................................ 107

2. **OLS Examples of Massachusetts Modification Contracts** .............. 108

**XII. FAILURE BY OLS TO SELF-REPORT .................................................................. 111**

**XIII. FALSE CLAIMS ACT ............................................................................................. 112**

**XIV.   ADMISSIONS: 2014 CONSENT ORDER NEW YORK BANKING LAW**...…....**114**

**XV.    CAUSES OF ACTION** ................................................................................ **122**

    **A.     First Cause of Action -False Claims 31 U.S.C. § 3729(a)(1)(A)** .................... 122

    **B.     Second Cause of Action - False Claims 31 U.S.C. § 3729(a)(1)(B)** ............... 122

**XVI. PRAYER AND REQUEST FOR RELIEF** .................................................. **122**

**CERTIFICATE OF SERVICE AND DISCLOSURE**…………………………….....**125**

Defendant Ocwen Financial Corporation ("OFC") and its alter ego Ocwen Loan Servicing, LLC ("OLS") (collectively "Ocwen" or "Defendants") wrongfully procured for themselves and the owner/investors of mortgages serviced by OLS nearly two billion dollars in incentive payments from the Government (a relatively small percentage of which indirectly benefitted distressed homeowners in the form of modest principal reductions) by fraudulently inducing the U.S. to execute a mortgage servicer incentives contract allowing Ocwen to participate and recover incentives in the Treasury Department's Home Affordable Modification Program ("HAMP") program. As a result of the fraudulent inducement of the United States to enter that contract, all of Ocwen's requests for incentive payments thereunder were false claims. Ocwen continued its fraudulent course of conduct by submitting to Fannie Mae, the financial agent for the United States under the HAMP program, false Annual Certifications and representations of past, present and future compliance with federal and state laws, regulations, rules and requirements. Based on these and other false representations, Ocwen continues to submit false claims for incentive payments under the HAMP program.[1]

HAMP was designed to help struggling homeowners; Relators uncovered inside information showing wide-spread and serious federal and state law violations by OLS that harmed those same borrowers. In many instances, these violations resulted in borrowers, including many families, unlawfully being deprived of their homes through unlawful foreclosure proceedings. Because Ocwen falsely certified and represented to the Government, as a **condition** of the payment of HAMP funds, that it was (1) in the past, (2) in the present and (3) in the future would continue to be in compliance with federal and state laws designed to protect borrowers, OLS's incentive payments received from the U.S. were wrongfully obtained by the making or

---

[1] On information and belief as disclosed by Relators' investigations and direct witness of evidence, none of the violations disclosed in this complaint have been rectified and all are ongoing.

use of false or fraudulent claims, statements, records or certifications. Based on similar false statements, records or certifications, Ocwen wrongfully received payments from Veterans Administration ("VA") and Federal Housing Administration ("FHA") programs as well.

Therefore, the United States of America, by and through *qui tam* Plaintiffs/Relators, Michael J. Fisher ("Fisher"), Brian Bullock ("Bullock"), (collectively "Relators") brings this action under 31 U.S.C. §§ 3729-3732 ("False Claims Act" or "FCA") against OLS and OFC to recover all damages, penalties, and other remedies available under the FCA on behalf of the United States and Relators. Relators file this Fourth Amended Complaint in order to (1) join additional parties to this action and (2) conform the pleadings to the evidence. Relators' Fourth Amended Complaint joins OFC as a Defendant.

## I. SUMMARY

1.     Ocwen was and is a participant in the Government's Home Affordable Modification Program ("HAMP"), through which the United States incentivizes borrowers, note owners and servicers of residential home mortgages to modify the borrowers' troubled home loans by lowering interest rates and payments, extending terms, and possibly forgiving principal, to help American homeowners avoid foreclosure and to attempt to stabilize financial markets supported by home mortgages in various formats. Ocwen violated the FCA by fraudulently inducing Fannie Mae, agent for the United States, to execute two (2) Ocwen Servicer Participation Agreements ("SPA") by falsely representing, warranting and covenanting therein that Ocwen (1) **was at that time [present] "in compliance with, and . . . that all Services will be performed [future] in compliance with, and later that all Services has been performed [past] in compliance with, all** applicable Federal, state and local laws, regulations, regulatory guidance, statutes, ordinances, codes and requirements, including, but not limited to, the Truth in

Lending Act, 15 USC 1601 § [sic] et seq., the Home Ownership and Equity Protection Act, 15 USC § 1639, the Federal Trade Commission Act, 15 USC § 41 et seq., the Equal Credit Opportunity Act, 15 USC § 701 et seq., the Fair Credit Reporting Act, 15 USC § 1681 et seq., the Fair Housing Act and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices;" (2) it obtained approvals, registrations or consents necessary for the performance of its obligations;. . . (3) the performance of Services under the Agreement will not conflict with, or be prohibited in any way by, any other agreement or statutory restriction by which Servicer is bound . . . ; [and] (4) it is **not** aware of any other **legal or financial impediments** to performing its obligations under the Program or the Agreement and shall promptly notify Fannie Mae of **any** financial and/or operational impediments which **may impair** its ability to perform its obligations under the Program or the Agreement . . . .[2] Each annual recertification repeated the same or substantially similar false certifications and/or representations.[3]

2.      OLS has continuously, from the beginning of the HAMP program, failed to meet the basic and fundamental federal requirements related to the servicing of delinquent conventional and FHA loans under the "default servicing" and/or "loss mitigation" requirements—procedures designed to prevent delinquent borrowers from losing their homes, protect lenders from losing the income stream from the loan, and protect the insurer, FHA, from

---

[2] *Ocwen Servicer Participation Agreement ("SPA") (executed by OFC)* at Exhibit A, Financial Instrument at ¶5(b), attached hereto at **Exhibit 1;** Ocwen *Amended and Restated Servicer Participation Agreement (executed by OLS) ("Amended SPA")* at Exhibit B, Financial Instrument at ¶5(b), attached hereto as **Exhibit 2.**

[3] *See* Exhibit 1 at Exhibit B, Form of Annual Certification ¶ 2; Exhibit 2 at Exhibit C, Form of Certification, ¶ 2. Beginning with its September 22, 2011 Annual Certification, OLS certified that it was "in material compliance with and certifie[d] that its services ha[d] been performed in material compliance with" the same laws and regulations. Exhibit 11 at 2. Ocwen's conduct never approached "materially in compliance" with the relevant laws and regulations.

unnecessarily paying such lenders' claims under the FHA loan insurance programs. OLS knowingly failed to comply with federal and state laws (including at least Texas, New York and Massachusetts) designed to prevent unfair, discriminatory or predatory lending practices; including, but not limited to UDAAP and UDAP, and state consumer lending laws. OLS further failed to provide consumers with notices of the right to rescind HAMP and non-HAMP loan modification agreements entered between the borrowers and OLS, as objectively required by TILA and by, Texas, New York and Massachusetts laws. Moreover, OLS has engaged in practices designed to force delinquent borrowers into foreclosure, (and on information and belief, continues to engage) in harmful and unlawful behavior, violating loss mitigation requirements, including those identified hereinbelow with specificity and particularity by Relators. OLS's fraudulent conduct and material omissions were to detriment of the borrowers, generally, while OLS enjoyed unlawful benefits of receiving many millions of dollars of incentive payments and increased servicing fees based on higher principal balances.

3.       The Defendants' numerous, false representations, regarding certifications, warranties, and covenants of compliance with HAMP requirements and obligations and with all the other applicable federal, state and local consumer lending laws, regulations and rules, including GSE (Fannie Mae, Freddie Mac), FHA and Ginnie Mae loss mitigation requirements, rendered the initial and sequential certifications provided by Ocwen in the SPAs, and in each annual certification thereafter, material and false certification/statements. All of Ocwen's statements in its SPAs regarding present, past and future compliance with federal and state consumer and other lending laws were false statements and/or false records used by Ocwen to fraudulently induce the United States and thereby obtain the full range of incentive payments from the United States.

**Relators' Fourth Amended Complaint**                                                                                  4

## II. PARTIES

4.      Relator Michael Fisher is a citizen of the United States and a resident of Southlake, Texas. Relator Fisher was employed in the area of loan modification contracts from 2008 until early 2012. During that time, Fisher served as an assistant to attorneys at law firms in Brea, California (now located in Industry, California) and Southlake, Texas, which assisted clients with obtaining modifications of their residential property mortgage loans from OLS and other lenders or loan servicers. He reviewed loan modification contracts for each law firm. Additionally, he has received and reviewed thousands of modification contracts from other law firms and companies that represented clients seeking modifications from multiple servicers, including OLS.

5.      Relator Brian Bullock is a citizen of the United States and a resident of Plano, Texas. Relator Bullock was formerly employed at OLS in the company's home retention department. Relator Bullock has fifteen years of experience in the financial services industry, including experience in default servicing and foreclosure.

6.      Defendant Ocwen Loan Servicing, LLC is a Delaware limited liability company with its principal place of business in West Palm Beach, Florida. OLS is licensed to service mortgage loans in all 50 states, the District of Columbia and two U.S. territories. OLS executed a Waiver of the Service of Summons on August 4, 2013, which has been filed with the Court. OLS is wholly owned by and is an alter ego of Defendant Ocwen Financial Corporation.

7.      Defendant Ocwen Financial Corporation is a Florida corporation with its principal place of business in Atlanta, GA. OFC can be served with process by making service upon its registered agent, Corporation Service Company dba CSC – Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, TX 78701-3218. OFC, through its subsidiaries, is

a leading provider of residential and commercial mortgage loan servicing, special servicing and asset management services. In addition to its Atlanta headquarters, OFC has offices in West Palm Beach and Orlando, Florida, Houston, Texas, McDonough, Georgia, and Washington, DC and support operations in India and Uruguay. As of December 31, 2013, OFC and its subsidiaries serviced 2,861,918 residential loans with an aggregate unpaid principal balance (UPB) of $464.7 billion.[4] OFC, formed in 1988, and its predecessors have been servicing residential mortgage loans since 1988 and subprime mortgage loans since 1994. OFC and its subsidiaries have completed 450,000 home loan modifications since 2008.[5] OFC is publicly traded on the New York Stock Exchange under the symbol OCN.

8.      OLS and OFC have a great deal of overlap in terms of leadership and control. Ronald M. Faris is the President and Chief Executive Officer of OLS and also serves as OFC's President (since March 2001), Chief Executive Officer (since October 2010) and a Director (since 2003). Prior to January 16, 2015 William C. Erbey served as OLS's Executive Chairman, as well as OFC's Executive Chairman of the Board of Directors (since September 1996) and former Chief Executive Officer (January 1988 to October 2010). William C. Erbey was forced to resign from his position as Executive Chairman of OFC, OLS, and several other related entities on January 16, 2015, pursuant to the Consent Order entered between OFC and OLS, on the one hand, and the New York State Department of Financial Services ("NYDFS"), on the other hand, on or about December 19-22, 2014.

### III. JURISDICTION AND VENUE

---

[4] See Exhibit 9, *Ocwen Financial Corp. Form 10-K Annual Report*, filed 03/03/14 for the period ending 12/31/13 ("OFC 10-K") at pp. 4, 17, 26.

[5] OFC 10-K at 3.

9.     This matter is within the Court's federal question jurisdiction, as Relators bring this action under 31 U.S.C. § 3730(b)(1). Venue is proper, pursuant to the FCA, 31 U.S.C. § 3732(a), in the Eastern District of Texas, where Ocwen transacts substantial business and where violations of the FCA occurred in part.

### IV. HOME AFFORDABLE MODIFICATION PROGRAM

10.     In approximately mid-to late 2008, an industry sprang up to help financially troubled homeowners save their homes by negotiating loan modifications with the servicers[6] of the loans. In the third quarter of 2009, the U.S. Treasury Department rolled out the Home Affordable Modification Program ("HAMP")[7] to encourage lenders to modify home-secured loans. Under HAMP, loan servicers, investor/owners of loans, and borrowers receive incentive payments from the Government in connection with granting the modification and keeping the modified payments current (borrowers' incentives are paid to the servicer to be applied as principal reduction paid to the owner/investor). On August 19, 2010, pursuant to its Supplemental Directive 10-09,[8] the Treasury Department issued the Making Home Affordable Program Handbook for Servicers of Non-GSE Mortgages[9] ("MHA Handbook"), which governs

---

[6] A loan servicer is an entity that may or may not be the original lender or the owner of a loan. It need not be a bank but may be. Servicers that are not the owners are paid by the owners of the loans to collect monthly payments and generally manage the borrowers' accounts on a day-to-day basis. Servicers sometimes buy the right to service groups of loans.

[7] In addition to the Treasury Department's HAMP program for non-GSE loans—loans not owned by Government-Sponsored Entities, the Federal National Mortgage Association (Fannie Mae) or Federal Home Loan Mortgage Corporation (Freddie Mac)—Fannie Mae, Freddie Mac, the VA, and the FHA administer their own versions of HAMP pursuant to the Government's Making Home Affordable initiative.

[8] Supplemental Directive 10-09, available at
https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/sd1009.pdf (last accessed Nov. 7, 2014). On March 1, 2013, Supplemental Directive 13-01 issued, effective May 1, 2013.

[9] Non-GSE mortgages are mortgages not owned by government-sponsored entities ("GSEs") such as the Federal National Mortgage Association (Fannie Mae) or Federal Home Loan Mortgage Corporation (Freddie Mac).

the procedures for HAMP loan modifications.

11.     The MHA Handbook states "[t]his Handbook constitutes Program Documentation under the Servicer Participation Agreement and is incorporated by reference into the Servicer Participation Agreement."[10] The SPA is part of the uniform agreement between a servicer and the Government's financial agent Fannie Mae as designated by the Treasury Department ("Commitment to Purchase Financial Instrument and Servicer Participation Agreement"), pursuant to which the servicer may participate in HAMP, 2MP (Treasury and HUD's Second Lien Modification Program), Treasury FHA-HAMP, RD-HAMP (Department of Agriculture's Rural Housing Service HAMP program), or FHA2LP (FHA refinance program for underwater loans) for loans that are not owned, securitized, or guaranteed by Fannie Mae or Freddie Mac, and the Government compensates the servicer, loan owner(s), and borrower(s).

12.     In the MHA Handbook v. 4.3, every servicer is put on notice of the following requirement:

### 1.6 Compliance with Applicable Laws

Each servicer and any sub-servicer that the servicer uses will be subject to and must fully comply with all federal, state, and local laws, including statutes, regulations, ordinances, administrative rules and orders that have the effect of law, and judicial rulings and opinions…

*MHA Handbook v. 4.3*, at p. 32 ¶ 1.6.

13.     Under HAMP, incentive fees paid to the servicer by the Government, which currently can equal up to $4,600 per HAMP modification, and similar, separate fees paid by the

---

[10] *MHA Handbook v. 4.3*, at p. 14,
https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/mhahandbook_43.pdf (last accessed November 7, 2014). On March 3, 2014 the Treasury Department issued Version 4.4 Making Home Affordable Program Handbook for Servicers of Non-GSE Mortgages.

Government to the lender/investor owners of the loans, are designed to fully compensate the servicer and investor owners for all costs associated with granting the HAMP modification.

14.     The United States also pays up to $83.33 per month for the benefit of borrowers, to be applied to the borrowers' loan balance as principal reduction, accruing monthly and paid annually for the first five years as long as the loan is in good standing where the modification reduces the monthly housing expense by 6% or more and the property is owner occupied. These payments are made by the Government to the servicer for payment to the owner/investor as credits to the borrower's loan balance.[11] Thus the United States pays for the benefit of the borrower (and the owner of the loan, which receives payment on the loan) up to a maximum of $5,000.

15.     Pursuant to the *current* HAMP servicer Compensation Matrix, last updated November 3, 2014, a servicer receives a one-time payment of $400-1600 from the Government for each completed permanent HAMP modification with an effective date of the trial period plan on or after October 1, 2011 and before March 1, 2014; the amount of this incentive payment depends on the number of days the specific loan was delinquent.[12] The Compensation Matrix was previously updated several times (including an update effective October 1, 2011 to reflect changes to servicer incentives detailed in Treasury Supplemental Directive 11-06 Making Home Affordable Program—Updates to Servicer Incentives). Under the incentive schedules prior to these changes, the servicer received $1,000 for each completed modification under HAMP with a trial period plan effective date before October 1, 2011, without regard to whether the borrower

---

[11] Exhibit 3, *MHA Compensation Matrix*, at p. 2, § 5; MHA Handbook v. 4.3, at pp. 141 ¶ 13.2.

[12] *MHA Compensation Matrix*, last updated January 24, 2014, available at https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/mhacompensationmatrix110314.pdf.

**Relators' Fourth Amended Complaint**                                                                9

was delinquent; however, for permanent HAMP modifications with a trial period plan effective date before October 1, 2011, the servicer received an additional $500 if the borrower was not delinquent at the time of the modification[13] for a maximum one-time, initial payment of $1,500 under pre-October 1, 2011 incentive schedules.[14]

16.     In addition to the _initial_ modification completion incentive payment, servicers are paid "Pay for Success" incentives of up to $83.33 per month, which are accrued monthly and paid annually on the anniversary date of the permanent HAMP loan modification for a period of thirty-six (36) months for modified loans that remain in good standing. Thus, servicers may, post-October 1, 2011 plan, be paid up to $4,600 for a permanent HAMP loan modification that continues in good standing for thirty-six (36) consecutive months ($1,600 for modification plus $3,000 maximum total good standing payments). Prior to October 1, 2011, the servicer could be paid up to $4,500 for a permanent HAMP loan modification where the borrower was not delinquent at the time of the trial period effective date and continued in good standing for thirty-six (36) consecutive months ($1,000 for modification plus $500 bonus plus $3,000 maximum total good standing payments); for a borrower who was delinquent at the time of the trial period effective date, the servicer could be paid up to $4,000 ($1,000 for modification plus $3,000 maximum total good standing payments).[15]

17.     Investors/owners of the loans are paid an initial, one-time modification fee of $1,500 for modifications that lower the monthly housing expense by 6% or more and the

---

[13] This payment is no longer applicable, for modifications with a post-October 1, 2011 effective date.

[14] _MHA Compensation Matrix_, last updated January 24, 2014 at p. 1-2; _see also_ MHA Handbook, v 4.3, p. 139 at ¶ 13 – p. 141 at ¶ 13.1.3.

[15] Exhibit 3, _MHA Compensation Matrix_ dated July 31, 2012, at pp. 1-3; MHA Handbook, v 4.3, p. 139 at ¶ 13 – p. 141 at ¶ 13.1.3.

**Relators' Fourth Amended Complaint**                                                                        10

property is owner occupied. Investors are paid by the United States (via payment to the servicer for the investor) good standing incentives accruing monthly and paid annually for up to five years pursuant to more complex formulas. Investors can also receive Investor Home Price Decline (HPDP) Incentive Payments for two years or Principal Reduction Alternative Payments for up to three years, pursuant to similar formulas based in part on amount of principal reduced.[16]

## V. FACTS

18.   Ronald Faris, as President of OFC, executed on behalf of **OFC** on April 16, 2009 a Commitment to Purchase Financial Instrument and Servicer Participation Agreement ("SPA") with Fannie Mae as financial agent for the United States.[17] On or about September 9, 2010, Faris executed as President of **OLS** and on its behalf an Amended and Restated Commitment to Purchase Financial Instrument and SPA with Fannie Mae as financial agent for the United States (accepted by Fannie Mae on September 15, 2010).[18] Ocwen continues as a HAMP participant, and the obligations, representations, warranties and covenants of Ocwen under its agreement survive the expiration or termination of its agreement, effective September 9, 2010.[19]

19.   The Ocwen SPAs (Exhibits 1 and 2) provide for required representations, warranties, and certifications by Ocwen, the Servicer, within the SPA itself and in subsequent annual certifications:

---

[16] *MHA Compensation Matrix*, dated July 31, 2012 at pp. 1-3, §§ 3 -7 (Exhibit 3); MHA Handbook v. 4.3, at pp. 142-144 ¶ 13.3.4.2 (formulas for investor incentives).

[17] Exhibit 1, *Ocwen Original SPA*.

[18] Exhibit 2, *Ocwen Amended and Restated SPA*.

[19] Exhibit 2 at p. 1; *see* also *Non-GSE Servicer Participants*, http://www.makinghomeaffordable.gov/get-started/contact-mortgage/Pages/default.aspx (click the letter "O" under "Mortgage Servicers" (last accessed November 7, 2014).

**Relators' Fourth Amended Complaint**                                                           11

**Servicer's representations and warranties, and acknowledgement** of an agreement to fulfill or satisfy certain duties and obligations, with respect to its participation in the Programs and under the Agreement **are set forth in the Financial Instrument.** Servicer's **certification as to its continuing compliance** with, and the truth and accuracy of, the representations and warranties set forth in the Financial Instrument will be provided **annually** in the form attached hereto as Exhibit C (the "Certification"), beginning on June 1, 2010 and again on June 1 of each year thereafter during the Term (as defined below) and upon the execution and delivery by Servicer of any Additional Service Schedule during the Term.

**Exhibit 1, Ocwen *SPA*, at p. 2 ¶ B; Exhibit 2, Ocwen *Amended and Restated SPA*, at p. 2 ¶C.**

20.     In paragraph 5(b) of the "Representations, Warranties and Covenants" of the Financial Instrument, which is a part of the SPAs,[20] at the time of executing its agreement, OFC represented, warranted, and covenanted that:

> (b)     Servicer **is in compliance** with, and **covenants** that all **Services will be performed** in compliance with, all applicable **Federal, state and local laws, regulations, regulatory guidance, statutes, ordinances, codes and requirements, including, but not limited to, the Truth in Lending Act, 15 USC 1601 § et seq.** [sic], the Home Ownership and Equity Protection Act, 15 USC § 1639, the Federal Trade Commission Act, 15 USC § 41 et seq., the Equal Credit Opportunity Act, 15 USC § 701 et seq., the Fair Credit Reporting Act, 15 USC § 1681 et seq., the Fair Housing Act **and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices** and all applicable laws governing tenant rights. Subject to the following sentence, Servicer has obtained or made, or will obtain or make, all governmental approvals or registrations required under law and has obtained or will obtain all consents necessary to authorize the performance of its obligations under the Program and the Agreement.

Exhibit 1, Ocwen *SPA*, at Exhibit A Financial Instrument, p. 2 ¶ 5(b); Exhibit 2, Ocwen *Amended and Restated SPA*, at p. B-3 ¶ 5(b).[21]

---

[20]*See* Ocwen SPA, Exhibit 1, at p. 10 ¶ 11.G ("The Commitment, together with the Financial Instrument, the Annual Certifications, the Assignment and Assumption Agreement (if applicable) and the Program Documentation, constitute the entire agreement of the parties with respect to the subject matter hereof."); Ocwen Amended and Restated SPA, Exhibit 2, at p. 12 ¶ 11G. (same).

**Relators' Fourth Amended Complaint**                                                                12

21.     The following certification is included in the Certificates to be executed and delivered annually to the Government by OLS, like every Servicer, beginning on June 1, 2010, and again on June 1 of each year during the Term of the Agreements, pursuant to Section 1.C of Ocwen SPAs, as well as paragraph 5(l) of their Financial Instruments, which are each incorporated in and part of each of the SPAs.

### CERTIFICATION

**2.     <u>Servicer is [currently] in compliance with</u>, and <u>certifies</u> that all Services <u>have been</u> <u>performed [past]</u> in compliance with, all applicable Federal, state and local laws, regulations, regulatory guidance, statutes, ordinances, codes and requirements, including, but not limited to, <u>the Truth in Lending Act, 15 USC 1601 § et seq.</u>** [sic], the Home Ownership and Equity Protection Act, 15 USC § 1639, the Federal Trade Commission Act, 15 USC § 41 et seq., the Equal Credit Opportunity Act, 15 USC § 701 et seq., the Fair Credit Reporting Act, 15 USC § 1681 et seq., the Fair Housing **Act and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices** and all applicable laws governing tenant rights.

Exhibit 1, Ocwen *SPA*, Exhibit A Financial Instrument, p. 2 ¶ 5(b) and Exhibit B Annual Certification, p. 2 ¶ 2; Exhibit 2, Ocwen *Amended and Restated SPA*, at Exhibit B Financial Instrument, p. B-3 ¶ 5(b) and Exhibit C Form of Certification p. C-1 ¶ 2; *see also* form for annual certification accessible at https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/servicerparticipationagreemen t.pdf (last accessed January 2, 2014).

---

[21] *See also* Exhibit 1, Ocwen SPA at Exhibit B Form of Annual Certification, p. 1 ¶2 and Exhibit 2, Ocwen Amended and Restated SPA at Exhibit C Form of Certification, p. 1 ¶2. **"Servicer is in compliance with, and <u>certifies</u> that all Services <u>have been performed</u> in <u>compliance</u> with, all applicable Federal, state and** local laws, **regulations, regulatory guidance, statutes, ordinances, codes and requirements, including, but not limited to, the Truth in Lending Act, 15 USC 1601 § et seq. . . . "**

22.     The subsequent certifications were made, attested to, executed and delivered annually to the Government by OLS each year during the Term of the Agreements, pursuant to Section 1.C of Ocwen SPAs, as well as paragraph 5(l) of their Financial Instruments, which are each incorporated in and part of each of the SPAs.  In addition to the certifications, OLS's cover letter enclosing each annual certification made the same false representations and certifications:

> **As of the date of this letter, there are no instances of noncompliance; either through internal or external reviews, which would have a material effect on Ocwen's ability to comply with the Program requirements.**
> **…**
> **Ocwen has a comprehensive Internal Audit process implemented to ensure compliance with all aspects of HAMP and the scope of this certifications falls within this process.**

**Exhibit 10,** Subsequent Certification dated September 25, 2014.

23.     OFC falsely represented that it was in full compliance with the above requirements with the execution of the Original SPA and the Certifications/Representations within that Agreement (Exhibit 1) on April 16, 2009, as well as in its Amended and Restated SPA on September 9, 2010, (Exhibit 2), which pursuant to the HAMP program, was substantially similar in each annual re-certification.

24.     The representations of compliance with federal and state law made by OFC were **conditions of payment**, and thus material to payment by the United States. Paragraphs 4.A. to 4.D. of Ocwen's Original SPA Agreement provides as follows:

> A.     **Fannie Mae, in its capacity as a financial agent of the United States, agrees to purchase,** and Servicer agrees to sell to Fannie Mae, in such capacity, the Financial Instrument that is executed and delivered by Servicer to Fannie Mae in the form attached hereto as Exhibit A, **in consideration for the payment by Fannie Mae, as agent, of the Purchase Price** (defined below). **The conditions precedent to the payment by Fannie Mae of the Purchase Price are: (a) the execution and delivery of the**

**Commitment and the Financial Instrument by Servicer to Fannie Mae;** (b) the execution and delivery by Fannie Mae of the Commitment to Servicer; (c) the delivery of copies of the fully executed Commitment and Financial Instrument to Treasury on the Effective Date; **(d) the performance by Servicer of the Services described in the Agreement, in accordance with the terms and conditions thereof, to the reasonable satisfaction of Fannie Mae and Freddie Mac; and (e) the satisfaction by Servicer of such other obligations as are set forth in the Agreement.**

...

C.      **The Purchase Price will be paid** to Servicer by Fannie Mae as the financial agent of the United States as and when described herein and in the Program Documentation **in consideration for the execution and delivery of the Financial Instrument by Servicer** on or before the Effective Date of the Agreement, upon the **satisfaction of the conditions precedent to payment** described in subsections A. and B. above.

**Exhibit 1, OLS *Original Servicer Participation Agreement*, at p. 3 (emphasis added).**

25.      OLS's Amended and Restated Servicer Participation Agreement also confirms that the execution and delivery of the "**Certification by Servicer** to Fannie Mae" is a **condition precedent to payment**:

The *conditions precedent to the payment by Fannie Mae of the Purchase Price* with respect to the Services described on the Additional Service Schedules (if any) are: (a) the execution and delivery of the Additional Service Schedules and the ***Certification by Servicer to Fannie Mae***; ... and (e) **such other obligations** *as are set forth* in the **Agreement**.

**Exhibit 2, OLS Amended and Restated Servicer Participation Agreement at p. 4**

26.      Ocwen acknowledged in the **Financial Instruments** <u>purchased</u> by Fannie Mae pursuant to the Commitment to Purchase Financial Instrument and SPAs between Fannie Mae and Ocwen that **providing false or misleading information** to <u>Fannie Mae or Freddie Mac in the HAMP Program</u> may constitute violations of (1) **federal criminal laws** found in Title 18 of the U. S. Code or of the **civil FCA (31 U.S.C. §§ 3729-33)**:

(f)     **Servicer acknowledges that the provision of false or misleading information to Fannie Mae or Freddie Mac in connection with the Program or pursuant to the Agreement may constitute a violation of: (a) Federal criminal law involving fraud,** conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code; or **b) the civil False Claims Act (31 U.S.C. §§ 3729-3733).** Servicer covenants to disclose to Fannie Mae and Freddie Mac any credible evidence, in connection with the Services, that a management official, employee, or contractor of Servicer has committed, or may have committed, a violation of the referenced statutes.

**Exhibit 1, Ocwen *SPA*, at Exhibit A Financial Instrument at p. 3 ¶ 5(f); Exhibit 2, *Ocwen Amended and Restated SPA*, at Exhibit B Financial Instrument at p. B-4 ¶ 5(f).** Given the scope of the certifications, representations, warranties, and covenants and the Servicer's continuing obligations of truthfulness and accuracy as set forth in the introduction to paragraph 5, Ocwen was on notice of the obligations of truthfulness and accuracy and acknowledged that failures to fulfill these obligations could lead to criminal and civil FCA prosecution:

**5. Representations, Warranties and Covenants.** Servicer makes the following **representations, warranties and covenants** to Fannie Mae, Freddie Mac and the Treasury, **the truth and accuracy of which are underlined** continuing obligations of Servicer. In the event that **any** of the representations, warranties, or covenants made herein **ceases to be true and correct**, Servicer agrees to notify Fannie Mae and Freddie Mac **immediately**.

**Exhibit 1, Ocwen *SPA*, at Exhibit A Financial Instrument, at p. 2 ¶ 5; Exhibit 2, Ocwen Amended and Restated SPA, at Exhibit B Financial Instrument p. B-2 ¶ 5.** Ocwen has **knowingly** failed to notify the government as required when its certifications and representations of compliance have been false. OLS's violations of its many duties, as well as the concealment of those violations, as set forth herein, made false, ubiquitously, the **expressly defined conditions precedent** to payment in the SPA.

**Relators' Fourth Amended Complaint**                                                           16

27.     In 2008, Relator Fisher, who was an employee of a Brea, California law firm, began assisting attorneys there in helping homeowners obtain home loan modifications. Relator continued this line of work with a Southlake, Texas law firm upon moving to Texas in November of 2010 until his partial retirement in March 2012. Relator's tasks involved primary responsibility for much of the processing of loan modification applications for the firms' clients. Relator assisted a number of attorneys in successfully completing hundreds of loan modifications for clients of the two law firms and personally reviewed every one of the modification contracts and applications. Relator coordinated the modification process with twenty or more different servicers. Additionally, he received and reviewed thousands of modification contracts from other law firms and companies who represented clients for modifications from multiple servicers including OLS.

28.     Relator Fisher worked with his law firm employers to complete successful OLS loan modifications for the firms' clients. Relator reviewed and consulted on the details of each OLS modification agreement with the clients. As a result, Relator Fisher is aware of all of the OLS modification agreements between the firms' clients and OLS, as well as the contents of the files. This includes some modifications submitted under HAMP and non-HAMP modifications. Relator Fisher has also requested and received copies of additional OLS HAMP and non-HAMP modification contracts from other firms and has closely examined them all. Fisher continued investigating Ocwen lending, modification and serving practices.

## VI. OLS HAMP AND NON-HAMP LOAN MODIFICATIONS

29.     In connection with modification agreements, OLS operates essentially the same as most servicers who participate in the Government's Making Home Affordable (MHA) – HAMP program. OLS facilitates and grants modifications in two general instances. One instance

involves making modifications pursuant to guidelines that are established by the Treasury Department for the Government's HAMP program and then submitting a claim for payment of incentive fees by the U.S. Government pursuant to HAMP policies. The second instance involves modification of loans that are outside of HAMP, wherein the servicer and investor or lender owning the loan determine the relevant guidelines. On the non-HAMP modifications, a servicer does <u>not</u> submit a request for Government payment, but may look to the borrower to compensate the servicer instead.

30.     The two types of modification contracts are usually similar in form and substance. The HAMP modifications generally include more restrictive requirements for an approval of a permanent modification and subsequent incentive payments by the U.S. Government. The non-HAMP modifications have more flexibility for approval and do not have the requirement to be completed within the strict boundaries of the MHA Handbook. Like virtually every servicer who is a participant in the HAMP program, OLS generally uses one of two standard contract formats for borrower modifications. One contract format is used for HAMP-submitted modifications and another format is used for non-HAMP modifications.

31.     In the numerous HAMP and non-HAMP OLS loan modifications reviewed by Relators, OLS virtually always loaned new amounts of principal to the borrower in the form of amounts (1) past due, (2) not yet due, and (3) of advances **never** actually made, which were then added to the loan's unpaid principal balance. The amount of the new, additional loan advances made to borrowers in modifications reviewed by Relators, above and beyond the principal balance owed prior to the modification, typically amounted to tens of thousands of dollars. The capitalized amount included delinquent interest, property taxes, and various, undefined and undisclosed modification fees and costs **not** arising out of (i) the **original** note or (ii) deed of

trust. OLS often capitalized a lump sum without any itemization of the amount financed, making it impossible for the borrower to discern what charges comprised the added principal. On the amounts added to the principal balance, OLS charged interest to be repaid over approximately 25-40 years. **OLS did not, however, provide the required notice of the right of rescission, notwithstanding the resulting first lien mortgage retained or acquired in the borrower's principal residence for the deferred debt payment, or the additional amount (new extension of credit) advanced and secured.**

32.     The HAMP modification agreements typically state:

> *The modified principal balance of my Note <u>**will include**</u> all amounts and arrearages that will be past due as of the Modification Effective Date (<u>including</u> unpaid and deferred interest, <u>fees, escrow advances and other costs</u>, but excluding unpaid late charges, collectively, "Unpaid Amounts") less any amounts paid to the Lender but not previously credited to my Loan.*

In many of these modification contracts with increased capitalized debt, including past due obligations, **<u>unloaned</u> principal** and costs **not** arising under the **original** (i) note or (ii) deed of trust, also included the deferral of a large principal payment and were secured and finalized without providing borrowers the legally required notice of the right to rescind. The OLS HAMP loan modifications reflected new debt balances that were always substantially more than the pre-modification outstanding principal balances on the HAMP modifications reviewed by Relators.

33.     Each OLS modification contract contains the following or substantially similar language:

> If under the Servicer's procedures a title endorsement or subordination agreements are required to ensure that the modified mortgage Loan **retains** its **first lien position** and is fully enforceable, I understand and agree that the Servicer will not be obligated or bound to make any modification of the Loan Documents or to execute the Modification Agreement if the

> Servicer has not received an acceptable title endorsement and/or subordination agreements from other lien holders, as Servicer determines necessary.

*See, e.g.,* **Exhibit 5 at p. 4, para. J.**

34.     Pursuant to the language quoted in the previous paragraph, in OLS loan modification contracts, OLS, as the Servicer, *acquired* a new, first-lien security interest in the residential real property for its HAMP modification advance. The original first lien securing the original loan obligation was *retained* by the Investor/Note owner. This **new security interest secured** an obligation to a new lender (Servicer), and the first-lien security interest after modification covered a larger loan obligation than the previous loan obligation.[22] Thus, this satisfies 12 C.F.R. § 1026.23, as the new extension of credit was secured by a first-lien security interest that was both **retained** (Investor/Note owner) and **acquired** (Servicer advance).[23] The new first lien security interest covered the newly capitalized advances.

35.     OLS knowingly failed to provide TILA/Regulation Z Right of Rescission notices when making HAMP or proprietary modifications, despite the fact that OLS's sophisticated real-estate lending lawyers prepared each of the files, and Section 1026.23(a) requires that the notice be provided.[24]

36.     Through March 2015, the United States has paid a total of **$1,776,578,992.03** in incentives for OLS HAMP modifications, which includes **$365,772,381.39** for the servicer,

---

[22] In some modifications, OLS adds amounts to existing principal balances, and forgives part of the original principal. In these cases, the new loan amount is owed to and a new security interest acquired or retained by a new lender, OLS. The amount of principal forgiven is forgiven by the owner/investor; the newly advanced amount loaned by OLS is not forgiven and a new security interest in the property is acquired or retained by OLS.

[23] 15 U.S.C. § 1635; 12 C.F.R§ 1026.23(a).

[24] 12 C.F.R. § 1026.23(a)-(b).

**Relators' Fourth Amended Complaint**                                                    20

OLS.[25] The balance of the funds was paid for the benefit of the relevant borrowers and investors.[26] Therefore, the approximate amount of the Government's FCA damages (before applying the trebling requirement) incurred through March 2015 is **$1,776,578,992.03**.

37.     The cap on incentives for OLS modifications, which is subject to periodic adjustments, is **$5,427,667,399 in** potential incentive payments by the United States to the Servicer, OLS.[27]

38.     The procedure by which OLS has received the Government-paid incentives for OLS's loan modifications is as follows:

### MHA Compensation Process

1.     Servicer establishes bank account.

- Bank accounts are designated by the servicer on the HAMP Registration Form, Sections 3 and 4.

- Servicers may designate up to four accounts to allocate compensation appropriately: default, servicer, investor, and borrower accounts.

2.     Servicer submits Official Loan Setup record once trial period is complete.

- Refer to the chart above for compensation timing considerations and requirements.

---

[25] The Government's incentives for the benefit of the investor/lenders and borrowers, the other two express beneficiaries, are paid to OLS to be distributed or credited promptly to the appropriate recipient.

[26] *TARP Housing Transactions Report for Period Ending March 26, 2015*, at p.49, Supplemental Information [Not Required by EESA §114(a)] Making Home Affordable Program Non-GSE Incentive Payments (through March 2015). http://www.treasury.gov/initiatives/financial-stability/reports/Pages/TARP-Housing-Transaction-Reports.aspx. Under "All Reports by Frequency," "As Indicated," click on TARP Housing Transaction Reports" and select report by date.

[27] *TARP Housing Transactions Report for Period Ending March 26, 2015*, at p. 29.

3.      Fannie Mae, as administrator for the Making Home Affordable Program, provides Cash Payment Summary Report to servicer.

- ●      Report includes compensation amount on a loan-level basis and indicates the associated payer: U.S. Treasury Department, Fannie Mae, or Freddie Mac.

- •      Report is accessible via the HAMP Reporting Tool one business day before compensation is deposited into accounts. Deposit occurs on the 27th calendar day or first business day prior to the 27th if the 27th falls on a weekend or a holiday.

4.      Deposit is made.

- ●      Deposit is transferred via the Automated Clearing House (ACH) Network on 27th of the month or on the business day prior to the 27th.

**Exhibit 3,** *MHA Compensation Matrix*, dated July 31, 2012 at p. 7. OLS followed this procedure and generated $**1,776,578,992.03** in Government incentive payments for the benefit of OLS, its investor/owners, and its borrowers through March 2015.[28]

## VII.    FEDERAL HOUSING ADMINISTRATION ("FHA") VIOLATIONS

39.      The FHA was created by Congress in 1934 and became part of the Department of Housing and Urban Development (HUD) in 1965. The FHA provides mortgage insurance for single-family housing loans to approved lenders to protect them against losses resulting from defaulting borrowers.[29] FHA-approved servicers are obligated to comply with all applicable laws and regulations.[30] Those servicers that fail to comply with HUD statutes, regulations, handbook requirements or mortgagee letters may be required to repay incentives received or indemnify

---

[28] *TARP Housing Transactions Report for Period Ending March 26, 2015*, at p.49.

[29] *See* 12 U.S.C. § 1709; *See generally* 24 C.F.R § 203.

[30] Letter from David H. Stevens, Ass't Secretary of Housing – Federal Housing Commissioner (Oct. 8, 2010), available at http://portal.hud.gov/hudportal/documents/huddoc?id=OCT201008.pdf .

HUD for any losses incurred.[31]

40.     After April 25, 1996, FHA ceased accepting applications for the assignment of FHA loans which had gone into default, and instead initiated a comprehensive loss mitigation program to provide relief to borrowers in default.[32] The loss mitigation program returned the responsibility for managing loan defaults to the servicer and provided financial incentives for this effort. Pursuant to HUD regulations and guidance, FHA-approved lenders and their servicers are *required* to engage in loss mitigation to avoid the foreclosure of HUD-insured residential mortgages.[33] OLS has continuously failed to meet the basic and fundamental requirements related to the servicing of delinquent FHA loans under the mandated loss mitigation program. The primary goal of the FHA program is to reduce the risk to lenders and encourage lending to borrowers, all the while increasing homeownership.

**A.      OLS Violations of FHA Loss Mitigation Requirements**

**1.      <u>Failure to engage in loss mitigation in a timely manner</u>**

41.     The foundation of HUD's loss mitigation program is based upon the requirement that mortgage servicers engage in "early delinquency servicing."[34] Specifically, servicers must

---

[31] *Id.*

[32] *See generally* 24 C.F.R. § 203.605; Mortgagee Letter ("ML") 2000-05 ("Loss Mitigation Program-Comprehensive Clarification of Policy and Notice of Procedural Changes") (Jan. 19, 2000), available at <u>http://portal.hud.gov/hudportal/HUD?src=/program_offices/housing/sfh/nsc/lmmltrs</u> (last visited September 2, 2014)

[33] 24 C.F.R. § 203.500 et seq.; ML 2000-05 at p. 6; *see also* ML 2008-27 ("Treble Damages for Failure to Engage in Loss Mitigation") (Sept. 26, 2008) to avoid treble damages, "First, mortgagees must ensure that the loss mitigation evaluations are completed for all delinquent mortgages before four full monthly installments are due and unpaid. Second, mortgagees must ensure that the appropriate action is taken based on these evaluations. Third, mortgagees must maintain documentation of all initial and subsequent loss mitigation evaluations and actions taken" (available at <u>http://portal.hud.gov/hudportal/HUD?src=/program_offices/housing/sfh/nsc/lmmltrs</u> (last visited September 2, 2014).

[34] ML 2000-05 at pp. 4-5.

review a delinquent loan for FHA retention options, in order to determine appropriate loss

mitigation techniques, prior to the loan becoming four monthly payments past due or within 90

days of delinquency. [35]

> 24 CFR § 203.605
>
> (a) Duty to mitigate. Before **four full monthly installments due** on the mortgage have become unpaid, the mortgagee shall **evaluate on a monthly basis** all of the loss mitigation techniques provided at § 203.501 to determine which is appropriate. Based upon such evaluations, **the mortgagee shall take the appropriate loss mitigation action**.

The loss mitigation policies and guidelines related to the foreclosure of FHA loans assume that

the servicer will comply with this fundamental rule. However, that OLS rarely, if ever, managed

to complete a proper review of FHA loans in default prior to the 90th day of delinquency and

sometimes missed this mandatory deadline by several months, while FHA files sat **unlawfully**

unattended and un-reviewed. Thus, the SPA certifications/representations executed by Ocwen

that it was "in compliance with all applicable Federal, state and local laws,

regulations…requirements…and other Federal and state laws designed to prevent unfair,

discriminatory or predatory lending practices…" were **knowingly false** for these additional

reasons. These certifications were express conditions of payment and material to the

government's decision to make HAMP incentive payments.

### 2. Failure to engage in FHA-specific loss mitigation procedures

42.    OLS knowingly and continuously failed to engage in any required form of FHA-

specific loss mitigation practices, as required by HUD. OLS's practice has been to treat **all** loan

default processes, including FHA loss mitigation, as if the loans were **conventional** loans;

---

[35] *See* 24 CFR § 203.605(a); See also ML 2000-05 at pp. 9-10 and ML 2008-27.

however, HUD has developed and required particularized processes and procedures to be strictly applied in relation to loss mitigation for FHA/VA loans. Therefore, OLS's standard practice of applying the same [**conventional**] loan default processes across the board was unlawful and violated HUD's FHA requirements. OLS failed to act in good faith and refrain from taking advantage of the FHA.[36] See 24 C.F.R. §203.5(c) (requiring an underwriter to exercise due diligence at "the same level of care which it would exercise in obtaining and verifying information for a loan in which the mortgagee would be entirely dependent on the property as security to protect its investment."); 48 Fed. Reg. 11928, 11932 (Mar. 22, 1983 ) (Supplementary Information, asserting in connection with promulgation of substantially identical provisions of former 24 C.F.R. §200.163(b) that due diligence and good faith are owed the insurer not only by regulation but civil law, citing *United States* v. *Bernstein*, 533 F.2d 775, 797 (2nd Cir.), *cert. denied*, 429 U.S. 998, 97 S. Ct. 523; 50 L. Ed. 2d 608 (1976) (holding that a mortgagee has <u>an affirmative duty to use due care," and that the scheme of FHA mortgage guaranties presupposes "an honest mortgagee performing the initial credit investigation with due diligence and making the initial judgment to lend in **good faith** after due consideration of the facts found."))</u>. Thus, the initial and annual SPA certifications/representations executed by Ocwen, stating that it was "in compliance with all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices…" were **knowingly false** for these additional reasons. These **false** certifications and representations were **express conditions of payment** and material to the government's decision to make HAMP incentive payments.

---

[36] 48 Fed. Reg. 11928, 11932 (Mar. 22, 1983).

### 3.    Failure to properly implement FHA-HAMP

43.    In regard to FHA loss mitigation, the FHA Home Affordable Modification Program (FHA HAMP) provides defaulting borrowers a loss mitigation solution that combines a loan modification with a "partial claim."[37] The specific guidelines for FHA HAMP are found in a document released by HUD titled, "Making Home Affordable Program: FHA's Home Affordable Modification Loss Mitigation Option."[38] The guidelines therein specifically require that the FHA loan modification must be re-amortized to a 30-year fixed rate mortgage in order to qualify for FHA HAMP. *Id.* In some instances, OLS was modifying FHA loans and amortizing the loan for more than 30 years. This was expressly prohibited by HUD and resulted in some borrowers' disqualification from eligibility in the FHA HAMP program. Thus, the initial and annual SPA certifications/representations executed by Ocwen, that it was "in compliance with all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices…" were **knowingly false** for all of these additional reasons. These false certifications and representations were **express conditions of payment** and material to the government's decision to make HAMP incentive payments.

### B.    OLS Violations of FHA Quality Control Requirements

### 1.    Failure to implement an FHA-compliant quality control program

44.    To service FHA loans, a servicer must have a fully functioning Quality Control

---

[37] Legal authority for the program: Section 230(b) of the National Housing Act (12 U.S.C. 1715u (b)), as amended by the Helping Families Save Their Homes Act of 2009, Division A of Public Law 111-22. *See also* "Making Home Affordable Program: FHA's Home Affordable Modification Loss Mitigation Option," attachment thereto, and ML 2009-23, "Making Home Affordable Program: FHA's Home Affordable Modification Loss Mitigation Option" available at http://www.hud.gov/offices/adm/hudclips/letters/mortgagee/2009ml.cfm (last accessed Nov. 2014).

[38] *Id.*

(QC) Program in place to ensure that FHA-compliance procedures are observed and that personnel working for the lender understand how to meet the strict FHA requirements.[39] FHA-compliant QC programs and plans provide for the correction and reporting of problems and violations to HUD once the lender becomes aware of them.

45.    OLS knowingly failed to establish a compliant QC program for the FHA portfolio. OLS failed to (ii) assure compliance with FHAs and the mortgagees servicing requirement throughout its operations, (iii) protect the mortgagee and FHA from unacceptable risks, (iv) guard against errors, omissions and fraud, (v) assure swift and appropriate corrective action and (vi) notify finding of fraud or other serious violations to the HUD Homeownership Center.[40] OLS **knowingly** failed to meet even the basic elements of a QC program.  The employees servicing the FHA portfolio did not have a check list, reference guide or instruction

---

[39] *See* HUD Handbook No. 4060.1 Ch. 7: Quality Control Plan, available at http://www.hud.gov/offices/adm/hudclips/handbooks/hsgh/4060.1/40601c7HSGH.pdf . *e.g., inter alia:*

- § 7-1. FHA approved mortgagees must implement and continuously have in place a quality control plan for originating and/or servicing insured mortgages

- § 7-3, A. All quality control plans must be in writing and fully  functional from date of mortgagee's initial FHA approval

- § 7-3,B. Quality Control must be independent of originating and servicing functions; mortgagee is responsible for ensuring outside source performing quality control meets HUD requirements

- § 7-3,C. Mortgagees must properly train quality control staff, and provide them access to current guidelines in electronic or hard format

- § 7-3,D. Mortgagees must ensure quality control reviews are regular and timely, and completed within 90 days of closing loan.

- § 7-3,J. Quality control must ensure findings by employees or quality control staff are reported to HUD within 60 days of discovery.

- § 7-8,E. Quality control must verify escrow funds received are not used for other purposes and are maintained in separate account.

- § 7-11,C, D. Quality control must review for compliance with fair lending laws and transfer of servicing provisions in section 6 of RESPA.

[40] See HUD Handbook, Quality Control Plan No. 4060.1 Ch. 7

manual to assist them in their determination of compliance with current FHA requirements, nor were they provided adequate instruction by management. The servicer's knowing failure to implement an FHA compliant QC program was a direct violation of HUD requirements and rendered each of Ocwen's requests for payment from the FHA insurance fund a false claim. Thus, the initial and annual SPA certifications/representations executed by Ocwen, that it was "in compliance with all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices…" were **knowingly false** for these additional reasons. These false certifications and representations were **express conditions of payment** and material to the government's decision to make HAMP incentive payments.

### 2.      Improperly Servicing FHA Loans Offshore

46.      In addition, the review and underwriting of FHA loan modification packages were outsourced overseas to third party contractors, reportedly in India, along with modification applications for conventional loans, and treated as conventional loans in violation of HUD regulations and guidelines.[41] HUD Handbook 4060.1 allows for the outsourcing of certain administrative and clerical functions "that do **not** materially affect underwriting decisions or increase the risk to FHA," but explicitly prohibits the outsourcing of management, underwriting, and loan origination functions.[42]   Ocwen knowingly violated that restriction.   The FHA modification applications were not distinguished from conventional loan packages, and the Indian company applied the same review criteria to all loans. As a result of the FHA loan being

---

[41] HUD Handbook No. 4060.1 REV-2, Ch. 2-13: Outsourcing, available at http://www.hud.gov/offices/adm/hudclips/handbooks/hsgh/4060.1/40601c2HSGH.pdf.

[42] *Id.*

reviewed under the wrong criteria, some borrowers were wrongfully denied an FHA-HAMP modification, and their loans ultimately proceeded to foreclosure.

47.     OLS **knew** that it was directly responsible for these serious violations committed by the Indian and/or other third party contractors, by virtue of the Financial Instrument contained in Ocwen's Original and Amended SPAs. Specifically, the Financial Instrument provides as follows:

> Use of Contractors. **Servicer is responsible for the supervision and management of any contractor that assists in the performance of Services in connection with the Programs in which Servicer participates**. Servicer shall remove and replace any contractor that fails to perform. Servicer shall ensure that all of its contractors comply with the terms and provisions of the Agreement. **Servicer shall be responsible for the acts or omissions of its contractors as if the acts or omissions were by the Servicer** (emphasis added).
>
> Ocwen's Original and Amended SPAs, Exhibits 1 and 2, at Financial Instrument ¶ 6.

Thus, the initial and annual SPA certifications/representations made by Ocwen, that it was "in compliance with "all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices…" were **knowingly false** for these additional reasons relating to knowing violations of non-delegable duties committed by, at least, the third party, overseas [Indian] sub-contractor. These false certifications and representations were **express conditions of payment** and material to the government's decision to make HAMP incentive payments.

48.     The round-robin process for assigning FHA modification packages to employees, implemented by OLS, also resulted in FHA loans being sent offshore for review and underwriting in violation of FHA regulations and guidelines.[43] Specifically, OLS's computer

---

[43] *See* HUD Handbook, No. 40.61.1 Rev-2

**Relators' Fourth Amended Complaint**                                                        29

system assigned modification packages based upon employee workload, without regard to whether the loan involved was FHA, conventional or otherwise, and operated with an eye toward leveling out workloads across the entire OLS system. If an employee in the United States had approximately 1,100 modification packages in his or her queue, and a third-party contractor employee in India had only 800 modification packages, the incoming packages would be assigned to the overseas agent for review and underwriting, with an eye toward balancing workloads, **without regard** to the type of loan involved and mandatory servicing requirements for the specific loans. This was a direct violation by OLS of FHA regulations and guidelines.

49.    What's more, there was no system in place to catch these serious violations. Instead, it was solely up to the untrained individual overseas employee to recognize and notify their supervisor of the violation; namely, that they should not be reviewing and underwriting an FHA modification, because they are not located in the United States as required by HUD.[44] If the employee did not notify their supervisor and correct the improper and unauthorized transmittal of FHA loans for underwriting, the borrower and employees in the United States had no way of knowing that the FHA loan was improperly sent offshore for servicing. There was no safety net for FHA loans.

50.    Indeed, when such a problem was identified, managers were forced to use a loophole in order to get the FHA loan assigned stateside, where it should have been initially assigned. To ensure that the FHA loan was returned stateside for review, a "United States Associate Only" or USAO flag had to be raised on the account and it is marked "Spanish speaking" to indicate a Spanish speaking employee is needed to work with the borrower –

---

44 *Id.*

whether or not this is actually true. By indicating that a Spanish speaker is needed, the file was steered to an OLS location such as West Palm Beach, Florida or Houston, Texas, where Spanish speaking employees are located. The improper transmittal of FHA modification packages overseas violated HUD guidelines and requirements. Thus, the initial and annual SPA certifications/representations executed by Ocwen, that it was "in compliance [or "material compliance"] with all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices…" were **knowingly false** for these additional reasons relating to knowing violations of non-delegable duties committed by the third party, overseas [Indian] sub-contractor.

### C.    Ocwen's False Certifications

51.    The FHA has paid insurance claims for insured mortgages based on Ocwen's false certifications that it was in compliance with all FHA and HUD regulations. These certifications were material to the government's decision to pay FHA mortgage insurance proceeds, and FHA would not have paid OLS if it had known about OLS's knowing failures to comply with FHA requirements.

52.    Specifically, in order to qualify as an FHA-insured lender, Ocwen was required to submit an annual certification to HUD.[45] Ocwen certified in its annual certification to HUD as follows (in sum and substance):

> I know or am in the position to know, whether the operations of the above named mortgagee conform to HUD-FHA regulations, handbooks, and policies. I certify that to the best of my knowledge, the above named mortgagee conforms to all HUD-FHA regulations necessary to maintain its HUD-FHA approval, and that the

---

[45] *See* 24 CFR § 202.5; *see also* ML 2009-42 ("Sub-Servicing of FHA-insured Mortgages") (Oct. 19, 2009), available at http://www.hud.gov/offices/adm/hudclips/letters/mortgagee/2009ml.cfm (last accessed November 12, 2014) ("As a reminder, the servicing of FHA-insured loans must be performed by a mortgagee that is approved by FHA pursuant to FHA guidelines. See 24 CFR §§202.5 and 203.502.").

above-named mortgagee is fully responsible for all actions of its employees including those of its HUD-FHA approved branch offices.

More specifically, the relevant, annual certification has been made by Ocwen annually from and after August 16, 2004, the date Ocwen was first approved to participate in HUD's Title I and Title II Programs and able to submit FHA mortgages for FHA insurance endorsement.[46]

53.     OLS is a participant in both the FHA Title I and Title II Programs, and therefore must submit the annual certification in question in order to maintain its approval.[47] In each annual certification, OLS certified that it had "complied with and agrees to continue to comply with HUD-FHA regulations, handbooks, Mortgagee Letters, Title I Letters, policies, and terms of any agreements entered into with the Department.[48] Absent such a certification, a lender cannot submit a mortgage for FHA insurance endorsement. The FHA has paid Ocwen insurance claims related to mortgages insured by the FHA based on the false certification that Ocwen had complied with all HUD-FHA regulations, including any servicing requirements. FHA would not have paid Ocwen for such mortgage insurance claims if it had known of Ocwen's non-compliance with HUD-FHA rules and regulations.

54.     Ocwen's cumulative FHA loss mitigation violations were material to the United States payment decisions. Thus, the initial and annual SPA certifications/representations executed by Ocwen, that it was "in compliance with all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair,

---

[46] *See http://www.hud.gov/ll/code/getllst.cfm?startseq=-1&called_by=llslcrit&ldrtp=05&lndrnme=Ocwen&lndrcity=&lndstate=all_states&lndrcounty=&lndrcountyCode=none&lndrzip=&ldrad=1&aafb=all_areas&groupsize=10&pbox1=on&pbox2=on&sobox1=on&sobox2=on&sobox3=on&sobox4=on&sobox5=on&sobox6=on.*

[48] *See* HUD Mortgagee Letter 2009-25 and the sample Annual Certification attached thereto, available at http://portal.hud.gov/hudportal/HUD?src=/program_offices/administration/hudclips/letters/mortgagee/2009ml.

discriminatory or predatory lending practices…" were **knowingly false** for all of these additional reasons.  Ocwen knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval in violation of 31 U.S.C. 3729(a)(1)(A). Furthermore, Ocwen knowingly made, used or caused to be **made or used** a false record or statement material to a false or fraudulent claim that was material to the United States' decision to pay insurance claims for insured mortgages in violation of 31 U.S.C. § 3729(a)(1)(B). These false statements/certifications fraudulently induced the United States to make insurance claim payments from the FHA insurance fund, based upon the belief that Ocwen's certifications/representations of compliance with all FHA and HUD regulations were true when they were, in fact, not true. Therefore, Ocwen is liable to the Government for a civil penalty of not less than $5,500 and not more than $11,000 for each such claim, plus three (3) times the amount of damages sustained by the Government because of the false claim under 31 U.S.C. §§ 3729(a)(1)(G).

## VIII. UNFAIR, DECEPTIVE OR ABUSIVE ACTS OR PRACTICES

55.     The Home Affordable Modification Program's instructions to servicers explicitly and prominently state that "Lenders MUST revise the [Home Affordable Modification Agreement] . . . as necessary to comply with applicable federal, state and local law."[49] Ocwen failed to make such required revisions, as outlined herein below.

### A.     UDAAP and UDAP

---

[49] Home Affordable Modification Agreement—Document Summary for non-GSE Loans (for use with Form 3157) (available at https://www.hmpadmin.com/portal/programs/hamp.jsp). This language reveals that the model HAMP forms establish a floor not a ceiling. In other words, Ocwen is not immunized from liability because it used the model forms. Rather, the HAMP instructions make clear that Ocwen was required to go beyond the requirements of the model forms if necessary to comply with federal, state and local law.

56.     The Dodd-Frank Act prohibits unfair, deceptive, or abusive acts or practices (UDAAP). In addition, some state laws contain broad prohibitions on unfair and deceptive acts and practices (UDAP). Others contain only specific prohibitions on clearly specified activities.[50] Thus, the extent to which Ocwen knowingly violated state UDAP laws will vary based on the peculiarities of each state's law, but Ocwen did violate federal (UDAAP) and state (UDAP) laws from the beginning of the HAMP program and does so through the present.

57.     A number of the terms (and omitted terms) in OLS's loan modification agreements raise UDAAP and UDAP violations:

1.  <u>OLS often failed to make clear that borrowers had to pay the deferred principal at maturity</u>. In modifications that deferred some of the principal, OLS included a clause stating the borrower agrees to pay any amount still due at the term of the loan, but failed to state the exact amount that would remain. This included any balloon payment resulting from (1) the deferral of principal or (2) payment amounts calculated on the basis of an extended amortization schedule longer than the term of the loan, creating a monthly shortage of fully paying down the principal each month. Often, OLS failed to ever state any specific combined amount of the two (if more than one was created) that would be due in a balloon payment at the term of the loan.

Although there are two references to the deferred principal, OLS did not include the deferred principal amount due in the payment schedules box it provided borrowers. Instead, the payment schedules showed how much borrowers will pay in principal and interest during different time periods, but not the final Balloon payment that will be due as required by law. Any Balloon payments due at maturity were not included in the box payment schedule chart.

OLS failed to disclose to borrowers the specific additional dollar amount the borrower would have to pay in the form of a balloon payment at maturity.

---

[50] Some state laws exclude creditors from coverage.     *See generally,* Carolyn L. Carter, <u>Consumer Protection in the States</u> (National Consumer Law Center, February 2009).

2. In the HAMP Loan Modification Agreements, <u>OLS failed to provide the borrowers with the current principle balance of their loans,</u> which impeded their ability to make meaningful comparisons among their principal balance, their adjusted principal balances, and the payments they would have to make at maturity. This information could have been valuable in their evaluation of whether to go through with the loan modifications. In addition, without this information, the borrowers could not determine whether OLS's representations of their principal balance were correct.

3. <u>OLS often failed to break down the amounts it had advanced for taxes, insurance and interest.</u> These omissions prevented borrowers from ascertaining whether OLS's numbers were correct.

4. Many of the modifications had <u>interest rates that increased over time</u>. In many cases the lower initial interest rates were necessary to allow the borrowers to afford the loans. If borrowers could not afford the loans at higher interest rates at the time of the modification, it is in most cases unreasonable to assume they would be able to afford the higher interest rates in a few years.

58.     The modifications that OLS provided borrowers <u>depended on home values rising</u>. This is the same misguided assumption that banks, like OLS, made a few years back and that led to the financial crisis that resulted in many people defaulting on their loans.

59.     OLS provided only temporary relief to borrowers, the effect of which was to postpone foreclosures, not to facilitate people keeping their homes. The loan modifications, with their deferred principle and balloon payments were not affordable in the long-term. By the maturity date of the modified loans, many borrowers will be elderly, having paid on their mortgages 30 years or more-and living on reduced, fixed retirement incomes, and thus be unable to obtain a loan to refinance their homes to pay off the balloon payments.  Even if they are not too old for lender services, many will likely have insufficient equity or income to refinance. See *infra* at ¶¶ 155, 165, 172. Thus, the initial and annual SPA certifications/representations executed by Ocwen, that it was "in compliance with all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair,

discriminatory or predatory lending practices…" were **knowingly false** for all of these additional reasons.  These certifications were express conditions of payment and material to the government's decision to (1) approve the SPAs and (2)  make huge HAMP incentive payments.

### B.    DODD-FRANK ACT

60.    The CFPB is still shaping the contours of Dodd-Frank's prohibitions on unfair, deceptive and abusive acts or practices, relying in large part on interpretations the FTC and the courts have given to prohibitions on unfair or deceptive acts or practices under the FTC Act.[51]

The Dodd-Frank Act[52] makes it:

unlawful for (1) any covered person or service provider--

(A) to offer or provide to a consumer any financial product or service not in conformity with Federal consumer financial law, or otherwise commit any act or omission in violation of a Federal consumer financial law; or

(B) to engage in any unfair, deceptive, or abusive act or practice."[53]

61.    A covered person is "any person that engages in offering or providing a consumer financial product or service."[54] A consumer financial product or service includes extending credit.[55] OLS meets the definition of a covered person, and the loan modification agreements are consumer financial products, for the reasons previously discussed. From and after the enactment of Dodd-Frank through the present, OLS has regularly and systematically committed knowing violations of the Dodd-Frank Act in its servicing of borrowers' loan modifications.

### 1.    <u>Unfair</u>

---

[51] 15 U.S.C.A. § 45(a)(1) (2006).

[52] The Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203, 124 Stat., 1376-2223 (July 21, 2010).

[53] 12 U.S.C.A. § 5536(a)(1) (2010).
[54] 12 U.S.C.A. § 5481(6) (2010).
[55] 12 U.S.C.A. § 5481(5) and (15)(A)(1) (2010).

62.     Unfairness is defined as an act or practice that:

(A)     . . . causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers; and

(B)     such substantial injury is not outweighed by countervailing benefits to consumers or to competition."[56]

The unfairness provision further states that "in determining whether an act or practice is unfair, the Bureau may consider established public policies as evidence to be considered with all other evidence. Such public policy considerations may not serve as a primary basis for such determination."[57]

63.     Applying these elements to the OLS loan modifications, the likelihood that borrowers will lose their homes at the end of the maturity periods or when their interest rates go up is a **substantial injury**.

64.     In its Supervision and Examination Manual, the CFPB has put some flesh on the second element-- that consumers are not reasonably able to avoid the injury. The critical inquiry is whether "material information about a product, such as pricing . . . is withheld until after the consumer has committed to purchasing the product. . . . The question is whether an act or practice hinders a consumer's decision-making. For example, not having access to important information could prevent consumers from comparing available alternatives, choosing those that are most desirable to them, and avoiding those that are inadequate or unsatisfactory."[58]

65.     The OLS modifications obscured and excluded material information about the loan modifications by excluding the amount of the deferred principal from the payment

---

[56] 12 U.S.C.A. § § 5531(c)(1) (2010).

[57] 12 U.S.C.A. § § 5531(c)(2)(2010).

[58] CFPB Supervision and Examination Manual, version 2 (October 2012), p. UDAAP 2, citing the FTC Policy Statement on Deception (available at http://www.ftc.gov/bcp/policystmt/ad-decept.htm).

schedules, by not including the principal balance so the borrowers could meaningfully compare their options, by not providing borrowers with information from which they could assess the accuracy of OLS's figures, and by not making clear, in all instances, that OLS was under no obligation to refinance their balloon and deferred principal payments. These omissions impeded borrowers' ability to weigh their options with full information.

66.     Obscuring the terms of the modifications does not benefit competition or consumers. To the extent that public policy is a consideration, numerous laws and judicial decisions have established that informed consumer choice is a value that the law should support.

## 2.     **Deceptive**

67.     Although the Dodd-Frank Act does not define the term deceptive, the CFPB Supervision and Examination Manual states that a representation or omission is deceptive if:

(1) the representation, omission, act, or practice misleads or is likely to mislead the consumer;

(2) the consumer's interpretation of the representation, omission, act, or practice is reasonable under the circumstances; and

(3) the misleading representation, omission, act, or practice is material.[59]

68.     One feature of the loan modifications that falls under the deception prong is the omission of the deferred principal amounts from the payment schedules. Again, the CFPB Manual provides guidance: "Oral or fine print disclosures or contract disclosures may be insufficient to cure a misleading headline or a prominent written representation . . . . Acts or practices that may be deceptive include: making misleading cost or price claims."[60] The payment schedules are prominent in the loan modification agreements and give the impression that they

---

[59] *Id.* at p. UDAAP 5.
[60] *Id.*

reflect the true cost of the loan modifications even though the fine print indicates otherwise.

69.     The CFPB cites to the FTC's "four Ps" test for determining whether a statement is likely to be misleading. The test focuses on the prominence of the statement, whether the statement is presented in a format consumers can understand, whether the information is in a place consumers would look, and "whether the information is in close proximity to the claim it qualifies."[61] The critical language about the date for paying the deferred principle is not prominent, nor is it in close proximity to the payment schedule, which it, in effect, qualifies.

70.     The focus of the second element takes into account the target audience. The question is: how would reasonable people who are financially distressed interpret the payment schedule? If "a significant minority" of such people would find the schedule misleading, this element is satisfied.[62]

71.     Finally, the last element is satisfied because the ambiguous deferred principal payments of tens and even hundreds of thousands of dollars is material to every consumer's choice.

### 3.     <u>Abusive</u>

72.     An abusive act or practice is one that:

(1) materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service; or

(2) takes unreasonable advantage of--

> (A) a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service;

> (B) the inability of the consumer to protect the interests of the consumer in

---

[61] *Id.* at p. UDAAP 5-6.

[62] *Id* at 6.

selecting or using a consumer financial product or service; or

(C) the reasonable reliance by the consumer on a covered person to act in the interests of the consumer.[63]

73.     Abusive acts and practices are not well-defined because abusive is a new addition to the traditional UDAP coverage. The CFPB has not yet provided any explicit guidance on the parameters of the prohibition. With that in mind, the same provisions and omissions that would support an unfairness claim would satisfy the first of the two categories of abusive acts and practices.[64]

74.     Thus, the initial and annual SPA certifications/representations executed by Ocwen, that it was "in compliance with all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices…" were **knowingly false** for all of these additional reasons. These certifications were express conditions of payment and material to the government's decision to (1) execute the SPAs and (2) make HAMP incentive payments.

### C.      OLS's Unfair, Deceptive or Abusive Acts and Practices

### 1.      <u>Loss Mitigation – OLS's Modification Delays and Wrongful Denials</u>

75.     In addition to violations contained in the terms (and omitted terms) of the modification agreements, OLS's handling of the modification agreements, themselves, amounted to unfair, deceptive and abusive acts and practices. These practices, which resulted in the severe detriment of borrowers seeking loss mitigation assistance, routinely occurred from on or after from at least as early as 2011, and on information and belief from as early as April 16, 2009 , through the present.    All prior allegations herein and hereafter regarding unlawful violations of

---

[63] 12 U.S.C.A. § 5531(d) (2010).
[64] *Supra*, ¶¶ 61-64.

federal, state and local laws, regulations, rules and requirements are incorporated herein by reference.     All of such conduct was unfair, deceptive and abusive.

76.     According to Relators, it was a common practice of OLS, after borrowers sought loss mitigation assistance, to delay implementation of the borrower's modification agreement by causing the borrower (or their legal counsel) to repeatedly have to submit the same documentation several times. OLS, as one of the servicers with which Relator Fisher attempted to coordinate loan modification transactions, made redundant demands for loan documents already provided to Ocwen by knowingly and falsely claiming that documents were "missing" when they were not. Typically, OLS either claimed that the entire package was not received, that certain pages of the package were missing, or that the delay of a decision had now taken so long that it required all new financial records in order to render a final decision on the modification. It was not uncommon for this scenario to play out more than once in a single borrower's modification process (or attempted modification process), and each time OLS requested new documentation, the entire process had to begin anew. OLS recognized that handling files in this manner would drive down "modification pipeline numbers," creating the pretextual appearance that the files were being properly reviewed. Some borrowers suffered as many as five to six submissions over a period as long as nine to twelve months, and at times, longer. Relators directly witnessed evidence that borrowers were often lied to about the progress of their modification applications.

77.     Relator Bullock directly witnessed evidence of several loan modifications with all the documents necessary to complete a full HAMP review; however, OLS failed to do so and borrowers were denied a modification due to alleged "missing" documents. Borrowers, who might otherwise have qualified, were wrongfully denied a modification without first receiving a

full and fair review, as required, of their modification package. Had OLS been properly **staffed** and **properly trained** its staff, as the servicer **expressly covenanted** that it would be in the Financial Instrument of the SPA, OLS could have avoided virtually all of the pervasive violations attendant to the extreme loan modification pipeline processing problems.[65]

78.     Similarly, virtually every client Relator Fisher assisted in seeking a modification had experience with OLS's demands for **multiple submissions** of documents *previously provided* to the servicer. The indifference demonstrated by OLS could not have been the result of oversight, as Relator Fisher and the law firm he was assisting followed the document trail each time and often failed to receive a sensible or rational response from OLS as to the delay. The overwhelming majority of redundant document demands were not because of the borrowers' failures, but because of OLS's **failure to properly staff** with sufficient numbers of adequately educated and/or experienced employees and failure to properly train its staff personnel to avoid violations of federal and state laws.   Proper staffing and training would have enabled Ocwen to lawfully process loan modification packages as Fannie Mae and the borrowers reasonably believed Ocwen would do. Had OLS been properly staffed, as the servicer **expressly covenanted** that it would be in the Financial Instrument of the SPA, OLS could have avoided many of the pervasive violations attendant to the obvious loan modification pipeline processing problems.[66]

79.     For those borrowers that were **enrolled in a trial period plan** for HAMP or non-HAMP modifications, the process of making redundant demands for loan documentation already

---

[65] *See* Exhibit 1, Ocwen SPA at Financial Instrument, p. 3 ¶ 5(d); Exhibit 2, Ocwen Amended and Restated SPA at Financial Instrument, p. B-3 ¶ 5(d).

[66] *See* Exhibit 1, Ocwen SPA at Financial Instrument, p. 3 ¶ 5(d); Exhibit 2, Ocwen Amended and Restated SPA at Financial Instrument, p. B-3 ¶ 5(d).

submitted **was especially detrimental**. When the final decision on whether to offer a loan modification was eventually rendered, and the decision was a denial, where the process **had taken six to twelve months** and the borrower had sent each month the agreed-to, lesser trial payment, **once the denial was received OLS then demanded the immediate payment of *all amounts "past due"*** – meaning the difference between the modified trial payment amount and the full payment amount contained in the original contract. This amount, **often equaling many thousands of dollars**, was required by OLS to be made up **within thirty days** or the borrower was forced into **foreclosure**, which occurred with regularity, because the borrowers were usually under severe personal and financial distress and unable to pay the "denial penalty." Furthermore, OLS often reported the lesser, modified trial payment to the credit reporting bureaus as not being made in full and on time, thereby harming the borrower's credit rating and causing a situation wherein, after a denial of a modification, the borrower could not obtain additional refinancing because of their damaged credit score. This occurred, despite the fact that the borrowers were actually current on their loan serviced by OLS.

80.    Often when a loan modification package became improperly aged or outdated, OLS would knowingly deny the modification based on "missing or aged documents," when in fact that was untrue, because it was Ocwen which was untimely, not the borrowers. Further, borrowers' documents were regularly mislabeled at intake into the imaging system, making it difficult for employees to locate the correct document. Because of the mislabeled documents, employees believed documents to be missing, and consequently, borrowers' loans weren't further reviewed for eligibility. This occurred due to OLS's failure to properly **staff and train** sufficient numbers of qualified and experienced employees to perform the services. Inefficient communications amongst OLS employees handing the same file also resulted in processing

detriment to borrowers. For instance, comments, codes or notes entered by employees into the communication logs [RealServicing] on borrower files might have reflected "missing HAMP package," but on an earlier dated communication log the file reflected "complete HAMP package received." Because the later communication (improperly) reflected a missing package, the borrower was not further reviewed for eligibility. These issues were common and, as a result, borrowers' homes were foreclosed upon because a modification wasn't timely obtained and OLS unlawfully failed to suspend foreclosure sale dates during the borrowers' review period.

81.     In those situations where a borrower was in fact missing necessary documents, OLS employees often delayed the modification process further by requesting one document at a time, without first completing a full and thorough review of the entire modification package. Generally, OLS employees stopped the modification review outright for missing documents or additional information needed from the borrower. After the borrower sent in the requested documents and the review continued, employees often caught additional errors or missing documents. This required them to stop the review, once again, to request the (new) missing document from the borrower. This drawn out process continued until the file was (finally) complete and had ultimately been approved or denied, a process that typically took many months. This practice, of requesting missing documents without completing a full and thorough review of the modification package unfairly and unnecessarily extended the review process, and importantly, the time required for desperate borrowers to receive much-needed assistance.

82.     Often, OLS failed to timely send borrowers the required Incomplete Information Notices, required under HAMP, regarding missing information.[67] Many borrower modifications

---

[67] See MHA Handbook 4.4, at p. 97 ¶ 4.5.

would then be denied for incomplete/missing documents. Under HAMP guidelines, when a borrower submits a loss mitigation application the servicer is required to inform the borrower, within 5 business days following receipt of any component of an application, whether their modification application is complete or incomplete – listing the additional document(s) and information requested. The date the borrower must remit the requested information/documents to complete the modification application must be no less than 30 calendar days from the date of the notice.[68] OLS, when it actually sends the Incomplete Information Notice, provides borrowers 45 days to submit the requested documents. The first notice to borrowers is (intended to be) a 30 day letter, followed by a 15 day letter to give the borrower a chance to timely return documents. If the servicer has "exercised reasonable diligence" in obtaining documents and information to complete a modification application, and there is no effort on part of the borrower, the servicer may determine the borrower ineligible for HAMP.[69] However, with respect to many loans, the communication logs [RealServicing] did not that OLS timely sent notice(s) to borrowers requesting missing documents. OLS failed to timely inform borrowers that their applications were incomplete, and in some instances, borrowers didn't know for weeks of any documentation still needed to complete their modification, until the borrowers themselves called to inquire about their modification. Consequently, many borrowers were wrongfully denied modifications.

83. These knowing violations were common and, as a result, numerous borrowers' homes were foreclosed upon because a modification wasn't timely obtained and OLS had compounded the problem by unlawfully failing to suspend foreclosure sale dates. Further,

---

[68] *Id.*

[69] MHA Handbook 4.4, at p. 98 at ¶ 4.6.2

Relator Bullock observed that some borrowers had equity in their property at the time the borrowers lost their home to wrongful foreclosure. It was more beneficial to OLS to foreclose on a home in which the borrower had equity than to foreclose on a home in the more typical situation, where the borrower was "underwater," owing more on the home than the home was worth, i.e., having "negative equity." The benefit was that if the borrower owed less than the value of the home, Ocwen could sell the property for as much or more than was owed, recovering fully—or more close to fully—for the owner/investor and for itself. It thus appeared that Ocwen may have foreclosed on properties in which the owner had positive equity in a greater percentage of cases than upon properties in which the owner had negative equity, although the precise percentages are unknown. Homes with positive equity were also likely to have higher values overall, being in situations where the negative forces in the economy had not had as severe effects as in other markets or neighborhoods. In both situations, however, Ocwen failed miserably to fulfill its regulatory obligation to provide loss mitigation options, and may have failed more so in cases where it was likely to benefit more. The failure to provide loss mitigation options was a regulatory violation and was unfair, deceptive, and/or abusive in either case, but was perhaps more unfair in the case of the higher equity owners if they were disproportionately targeted for foreclosure.

### 2.    Incorrect Income Calculation Detrimental For HAMP Borrowers

84.    A main factor for determining borrower eligibility for a HAMP modification is DTI (debt to income ratio). This is the first phase in determining financial eligibility for a HAMP modification, and it is critical that this step is calculated accurately. Servicers are required to consider all income of the borrower(s), and if the mortgage debt to income ratio is higher than 31% of borrower net income, the borrower is determined to be likely to qualify for HAMP upon

further review. If DTI is calculated at less than 31%, the borrower is determined not to qualify

for HAMP. Relator Bullock has direct knowledge of  instances where unqualified, inexperienced

underwriters employed by OLS erred in applying the waterfall calculations and/or did not know

how to calculate income for borrowers. In some instances, income was improperly calculated as

being too high for HAMP modification eligibility approval, whereas in other instances the

calculation inaccurately showed income too low for an approval, thus denying borrowers who

were financially eligible. When income is improperly calculated by an underwriter it was often

detrimental to a borrower's modification request. According to Relator Bullock, some borrowers

were wrongfully denied eligibility for a HAMP modification due to improper calculation of

borrowers' income, which usually resulted in borrowers losing their homes to foreclosure. The

root cause was unqualified, inexperienced and **untrained** underwriters who did not properly

evaluate and calculate the different types of income, including but not limited to gross vs. net

income, self-employed income, bi-monthly income, income paid every two weeks, Schedule E

income and the improper reading and misunderstanding of a Profit & Loss Statement. Borrowers

were wrongfully denied eligibility for a HAMP modification when they otherwise should have

qualified for further review in the modification process, because Ocwen underwriters were

**inexperienced** and **untrained** to properly perform underwriting as required.

85.    Further, borrowers who were denied HAMP eligibility based on these

circumstances would then be evaluated by OLS for other options such as an in house

modification, short sale, or deed in lieu; however, these options were almost always less

beneficial to the borrower than a HAMP modification. For instance, the in-house modification

would virtually always have an interest rate higher than the borrower could actually afford

resulting in borrowers defaulting again and ultimately losing their homes to foreclosure.

**Relators' Fourth Amended Complaint**                                                   47

86.     For    these    additional    reasons,    the    initial    and    annual    SPA certifications/representations executed by Ocwen, that it was "in compliance with all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices…" were **knowingly false.** These certifications were **express conditions of payment** and material to the government's decision to make HAMP incentive payments.

### 3.    OLS's Violations of Loss Mitigation Requirements

87.     Aside from engaging in tactical delays designed to force delinquent borrowers into foreclosure, OLS from at least as early as 2011, and on information and belief from as early as April 16, 2009 regularly engaged  in the following harmful and unlawful behavior, violating loss mitigation standards:

  a) **Inadequate staffing** to accomplish goals of the loss mitigation programs; the association and hiring of inadequate staff was compounded by the **staff's lack of training, education, experience and skills** needed to perform the services for which the staff was hired. OLS's failure, after hiring such personnel, to adequately train and supervise them and facilitate the development of such skills and understanding was a major cause of pervasive unlawful underwriting;[70]

  b) Failure to evaluate delinquent loans for all loss mitigation options within 30 days;[71]

---

[70] *See* Exhibit 1, Ocwen SPA at Financial Instrument, p. 3 ¶ 5(d); Exhibit 2, Ocwen Amended SPA at Financial Instrument, p. B-3 ¶ 5(d).

[71] *See* http://files.consumerfinance.gov/f/201301_cfpb_final-rule_servicing-respa.pdf at p. 9. ("For a complete loss mitigation application received more than 37 days before a foreclosure sale, the servicer is required to evaluate the borrower, within 30 days, for all loss mitigation options for which the borrower may be eligible in accordance with the investor's eligibility rules, including both options that enable the borrower to retain the home (such as a loan modification) and non-retention options (such as a short sale)… The servicer must provide the borrower with a written decision, including an explanation of the reasons for denying the borrower for any loan modification option offered by an owner or assignee of a mortgage loan with any inputs used to make a net present value calculation to the extent such inputs were the basis for the denial.").

   c) Failure to evaluate delinquent FHA loans for loss mitigation options prior to the loan becoming four monthly payments past due or within 90 days of delinquency;[72]

   d) Improper performance of modification underwriting;

   e) Inadequate establishment of loan modification procedures;

   f) Misplacing and failing to properly store loan modification documents;

   g) Wrongful, fraudulent denial of modification applications;

   h) Providing false/misleading information to borrowers;

   i) Not responding timely to borrower inquiries;

   j) Improper calculations of borrowers' eligibility for loan modifications;

   k) Continuing to assess late fees when borrowers were in review for loss mitigation options;

   l) Improper processing of modification applications, leading to denial; and

   m) Off-shore loan underwriting and reviews resulting in wrongful denials due to misunderstanding, confusion, lack of experience, education, training and cultural misunderstandings.

88.   These **knowing** violations of loss mitigation standards by OLS further rendered Ocwen's initial and annual SPA certifications/representations, that it was "in compliance with all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices . . ." **knowingly false**." These certifications were express conditions of payment and material to the government's decision to make HAMP incentive payments.

### 4.   <u>Unlawful Failure to Suspend Foreclosure</u>

---

[72] 24 CFR § 203.605

**Relators' Fourth Amended Complaint**        49

89.    OLS regularly and knowingly failed to suspend foreclosure proceedings when a delinquent borrower's modification package was under review, in direct violation of CFPB rules. Specifically,

> The rule restricts "dual tracking," where a servicer is simultaneously evaluating a consumer for loan modifications or other alternatives at the same time that it prepares to foreclose on the property. Specifically, the rule prohibits a servicer from making the first notice or filing required for a foreclosure process until a mortgage loan account is more than 120 days delinquent. Even if a borrower is more than 120 days delinquent, if a borrower submits a complete application for a loss mitigation option before a servicer has made the first notice or filing required for a foreclosure process, a servicer may not start the foreclosure process unless (1) the servicer informs the borrower that the borrower is not eligible for any loss mitigation option (and any appeal has been exhausted), (2) a borrower rejects all loss mitigation offers, or (3) a borrower fails to comply with the terms of a loss mitigation option such as a trial modification.[73]

The pervasive, knowing, unfair, abusive and deceptive violations under the Dodd-Frank Act and CFPB rules rendered Ocwen's [time relevant] certifications/representations, that it was "in compliance with all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices…" **knowingly false** for these additional reasons. These certifications were express conditions of payment and material to the government's decision to make HAMP incentive payments.

90.    Relator directly witnessed evidence showing that 70% of the foreclosure activity was not suspended and borrowers were wrongfully charged unauthorized charges and fees, including attorneys' fees, in connection with foreclosures which should have been suspended. This unfair and deceptive scenario occurred regularly with borrowers facing foreclosure.

---

[73] *See* http://files.consumerfinance.gov/f/201301_cfpb_final-rule_servicing-respa.pdf; 12 C.F.R. 1024.41 (f)–(g).

### 5.  Unlawful Capitalization of Unloaned Principal

91.     Furthermore, past due monthly payments that were capitalized by OLS at the closing of a modification included the entire past due payment amount, including the principal component of the payment, which was unlawfully, redundantly capitalized. While servicers are allowed to capitalize past due interest payments, there is no state or federal law which allows for the capitalization of *allegedly* past-due principal component that was **never loaned** to the borrower after the original loan, as each was already part of the unpaid principal balance.  As this unlawful practice was implemented through the servicer's computer system, it was universally applied to most, if not all, loan modifications. This pervasive practice amounted to a knowing and unlawful taking and an egregious violation of both state and federal UDAAP laws and Dodd- Frank, all of which rendered Ocwen's [time relevant] certifications/representations, that it was "in compliance with all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices…" **knowingly false** for all of these additional reasons. The knowing, unlawful practices, outlined in paragraphs 1-the preceding paragraphs hereinabove, were also material to the Government's decision to continue to make the incentive payments requested by OLS.

92.     OLS states, unfairly, deceptively and abusively, in the Modification Agreement, simply, that the borrower now owes a new principal balance amount **without disclosing** (1) any detail as to the amount of the previous unpaid principal balance, (2) **any detail** as to the total additional amount being added or capitalized to create the new, higher principal balance or (3) any detail as to the specific component amounts being added: *e.g.*, interest, taxes, late fees, HOA dues, etc. The knowing and purposeful omissions on the part of OLS denies the borrower any

means of determining whether the amount of the new principal balance is accurate or authentic. Borrowers, often under extreme duress and the stress of potentially losing their homes if the agreements are not returned in a timely manner, have no ability to negotiate and are forced to accept as accurate and true, without challenge, the dollar amount presented by OLS. Such conduct violated Dodd-Frank provisions against unfair, abusive and deceptive conduct towards consumers, as well as many State UDAP laws.

93.     This unlawful, unfair practice also violates express HUD guidelines regarding capitalized accounting. HUD Handbook 4330.1 Rev -5, specifically provides that "[m]ortgagees that capitalize **may not capitalize delinquent mortgage payments or late charges** (i.e., amounts due but not paid **may not be added** to unpaid principal **unless** advances are **actually made** by the mortgagee)" (emphasis added).[74] In fact, OLS's knowing, unlawful practice of capitalizing the entire delinquent payment amount, including **unloaned** principal, was the rule rather than the exception at OLS.

94.     OLS's unlawful taking of borrowers' funds, through the capitalization of **unloaned** principal from past due payments, has resulted in severe detriment to the borrowers, as these takings amount to an unlawful taking of money without the borrowers' consent or benefit. The extent of those takings may well rival the huge sum of the incentive payments wrongfully paid by the United States to Ocwen in the HAMP program. Given these additional violations of federal and state laws, Ocwen's knowing representations/certifications, that it was "in compliance with all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending

---

[74] HUD Handbook 4330.1 Rev-5, "HUD Escrow and Mortgage Insurance Premiums (MIP)" Ch. 2-2: Capitalized Accounting at pp. 1-2, available at
http://www.hud.gov/offices/adm/hudclips/handbooks/hsgh/4330.1/43301c2HSGH.pdf.

practices…" were **knowingly false** for all of these additional reasons. These certifications were express conditions of payment and material to the government's decision to make HAMP incentive payments.

### 6.     Unlawful, Forced Advance of Escrow

95.     According to Relator Bullock, , OLS regularly forced escrow advances, for property taxes and insurance, on borrowers who had already paid these obligations from their own pockets, a further example of OLS's unfair, deceptive and abusive acts and practices. Indeed, many borrowers provided OLS proof of payment; however, the servicer nonetheless forced the additional amount on the borrower, needlessly increasing the borrower's obligations and the amount of money on which the borrower was forced to pay interest. Relator Bullock reviewed some HAMP modifications wherein OLS employees noted in the communication log [RealServicing] that the borrowers sent notice of proof of payment of homeowners insurance; however, OLS continued to charge the borrowers for forced place insurance. Coincidently (or perhaps not), the forced placed insurance applied by OLS was through Altisource, which was owned and controlled, in large part, by William Erbey, who is aa substantial stakeholder in the Ocwen affiliated entities.

96.     This abusive practice also directly violates rules issued by the CFPB which require more transparency by the servicer in the insurance process, specifically. Servicers generally must ensure that borrowers maintain property insurance.[75] If the borrower does not maintain an insurance plan, the servicer typically has the right to purchase such insurance on the borrower's behalf; however, the CFPB has placed restrictions on the servicers' purchase of

---

[75] 12 C.F.R § 1024.37.

"force-placed" insurance, so as not to surprise borrowers. Specifically, servicers must (1) include advance notice and pricing information before charging consumers for "force-placed" insurance; (2) have a reasonable basis for concluding that a borrower lacks such insurance before purchasing a new policy on the borrower's property; and (3) terminate the new "force-placed" policy within fifteen days and refund the premiums if they receive evidence that the policy was, in fact, not needed; *i.e.* the borrower had already purchased insurance on the property.[76] Despite the CFPB policy, OLS regularly violated this consumer protection provision, by failing to acknowledge the borrower's own purchase of insurance and failing to refund premiums advanced on a force-placed plan.

97.    Forcing the advancement of escrow funds on unwitting borrowers resulted in a snowball effect. Specifically, when borrowers—who had already paid the escrow on their homes out of pocket—sent in the monthly payment amount specified in the executed documents, it was deemed "insufficient," because it did not include the amount for the escrow funds improperly advanced by the servicer. If the borrower was fortunate enough to have this "insufficient" payment returned, he or she might have discovered the payment discrepancy through a phone call to the servicer. However, if the "insufficient" payment was placed in a suspension account, as most insufficient payments were, the borrower had no idea that their payment had not been accepted and would likely not find out for several months. At that point, the borrower (1) was considered to be several months in default, (2) their monthly payments had been placed in a suspense account, (3) they were accruing late charges monthly and (4) their "default" had been reported to the relevant credit bureaus, resulting in a negative hit to their credit report. This

---

[76] *Id.*

unfair and abusive practice, of forcing unnecessary escrow advances on borrowers, literally *forced borrowers into delinquency*, and rendered Ocwen's [time relevant] certifications/representations, that it was "in compliance with all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices…" **knowingly false** for all of these additional reasons. These certifications were express conditions of payment and material to the government's decision to make HAMP incentive payments.

### 7.    "In-Flight" Modifications

98.    Commonly known in the industry as "In-Flight" modifications, these are loan modifications that are already in progress, and perhaps have even been approved, when the servicing rights of the loan are sold to another financial institution. **OFC** acquired several portfolios and the attendant servicing rights, including portfolios from Litton, Saxon, and ResCap.  Usually, OFC directed OLS to be the recipient of in-flight modifications. OLS would receive only a portion of a borrower's loan file (i.e. the transferee often failed to send some of the material loan modification documents to OLS) resulting in the transmittal of an incomplete modification package. Many OLS borrowers already had a final modification approved by the prior servicer at the time of transfer to **OFC**. When these borrowers, who rightfully believed they had been approved for a modification by the transferor bank, would begin making the adjusted payments to OLS the borrowers' payment would be short, because the transferred file was incomplete and OLS had no record of the modification. Despite identifying the issue, OLS knowingly failed to offer alternative modification options to these borrowers, resulting in many borrowers being wrongfully forced into foreclosure.

99.     Moreover, borrowers' in-flight modifications were regularly not being honored by OLS, and consequently, borrowers were required to start the modification completely over with OLS. OLS requested that borrowers submit an entirely new modification package, and go through the process all over again, despite being approved by the prior servicer. Relator is aware of numerous instances where borrowers' HAMP modifications, in particular, were denied by OLS, despite being approved by the prior servicer. This violation resulted in a number of homes being lost to wrongful foreclosure. OLS's knowing course of conduct has caused "substantial injury to consumers" and violated the Dodd-Frank Act and UDAAP/UDAP provisions. These federal violations are additional reasons that Ocwen's [time relevant] certifications/representations, that it was "in compliance with all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices…" were **knowingly false**. These certifications were express conditions of payment and material to the government's decision to make HAMP incentive payments.

### 8.      False, Unlawful Affidavits, Assignments and Attestations

100.    OLS employees, from at least as early as 2011, and on information and belief from as early as April 16, 2009 also executed false, unlawful affidavits, assignments and attestations that all loss mitigation options had been exhausted, which led to the unlawful and improper foreclosure of borrowers' homes that were otherwise qualified for a modification. OLS personnel, acting without lawful authority, regularly executed these affidavits, assignments and attestations at the instruction of management without the represented knowledge of whether or not all loss mitigation options had been exhausted or other pre-foreclosure obligations had been performed. This practice was often done in order to force aged loan files **to foreclosure**

**proceedings** and without regard to whether or not the homeowner was, in fact, qualified for or had been properly reviewed for a loan modification. The pressure exerted on employees by management, to get the loans to foreclosure as quickly as possible, resulted in many loan packages simply not being reviewed despite the employees' affidavits, assignments and attestations implying to the contrary. These false affidavits, assignments and attestations rendered Ocwen's [time relevant] certifications/representations, that it was "in compliance with all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices…" **knowingly false** for all of these additional reasons. These certifications were express conditions of payment and material to the government's decision to make HAMP incentive payments.

### 9.    Manipulation of Modification Process by OLS Employees

101.    Additionally, Relator Bullock directly witnessed evidence showing OLS employees often manipulated the loan modification process in order to achieve "completion codes" and receive employee incentives from the servicer, at great detriment to borrowers. OLS's operating procedure was to reward employees in the home retention department based upon the number of "completion codes" achieved, a system known as the HRD Incentive Plan. This system incentivized employees to work backwards in the modification process, in order to achieve completion codes that were not collected, so to speak, earlier in the process. This unfairly delayed the modification process for delinquent borrowers, many of whom had homes that were quickly proceeding to foreclosure, and further rendered Ocwen's [time relevant] certifications/representations, that it was "in compliance with all applicable Federal, state and

local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices…" **knowingly false.**

### 10.     Manipulation of Modification Documents

102.     Upon information and belief, OLS regularly engaged in the unlawful, unilateral and fraudulent manipulation of borrowers' modification documents. This manipulation of documents generally occurred as the result of one of two different scenarios.

1)     Often, "contingent" modification agreements were sent to borrowers. Although these agreements appeared to the borrower to be complete, their validity and effectiveness hinged upon some contingency occurring. If the contingency was not timely realized, OLS then reconfigured the modification and sent out a new modification agreement to the borrower. At times, borrowers received as many as three different modification packages in six months. OLS did not make clear to the borrower that these modification packages differed, and borrowers would often execute and return to OLS an earlier modification agreement which did not include the specific, updated modification terms contained in OLS's system. For example, a borrower may have received in March a modification package reflecting monthly payments of $1,200.00, the validity of which was contingent upon the borrower returning all documents to OLS within a certain number of days. When the borrower did not return the documents in a timely manner, OLS reissued a new modification agreement. By this time, the numbers contained in the initial modification package had changed significantly due to accrued interest, changes in escrow, etc. Therefore, the monthly amount due had increased to possibly $1,275.00. Despite the significant change in numbers contained in the reissued modification agreement, the borrower was not notified by the Servicer to explain the changes prior to

sending the agreement. Often, unaware that the reissued agreement contained new terms and amounts, a borrower would mistakenly execute and return to OLS the initial package sent months earlier reflecting the lower monthly payment amount, rather than the amount now reflected in OLS's system.

2) In other instances, where a modification package had taken three to six months to complete because of the need for all required documentation, the servicer's system could contain three to six proposed agreements that had not actually been issued because of the pending completion of the borrower's modification package. A third party, offshore company handled review of the borrower's completed modification package. This offshore company, in turn, would select whichever agreement appeared in imaging on the system to send to the borrower for execution, because the employees were untrained as to the distinction between the agreements in the system. As a result, the borrower often received a modification agreement that was not the current, actual agreement which the Servicer intended the borrower to receive. The borrower would execute and return the modification agreement with the belief he/she was executing the correct modification, when in fact that modification agreement did not include the specific, updated modification terms contained in OLS's system.

103.    This important information, regarding OLS's unilateral change of the terms and amounts contained in various modification agreements, was never truthfully disclosed to the borrower. Rather than rescinding the modification contract, explaining the error to the borrower and starting over, as the Servicer should have done, OLS would execute the (incorrect) agreement sent in by the borrower. Once the error was realized, employees were instructed to manipulate the terms and numbers in the system, which reflected the correct terms the borrower

should have received and executed, in order to reconfigure them in an effort to get the same terms and payment amount contained in the modification agreement executed by the borrower. Unfortunately, it was impossible to match the exact payment amount contained in the modification agreement executed by the borrower, meaning that the numbers reflected in the OLS system did not reflect what the borrower believed to be their payment amount, and the actual numbers were always higher.

104.    Upon information and belief, OLS knowingly and deliberately manipulated modification numbers which resulted in a snowball effect. Specifically, when the borrower sent in the monthly payment amount specified in the executed documents−for instance $1,200.00, but the actual (manipulated) payment in the system was $1,215−it was deemed "insufficient," because it did not match, exactly, the monthly payment contained in OLS's system. If the borrower was fortunate enough to have this "insufficient" payment returned, they might have discovered the payment discrepancy through a phone call to the servicer. However, if the "insufficient" payment was placed in a suspension account, as most insufficient payments are, the borrower had no idea that their payment had not been accepted and would likely not find out for several months. At that point, the borrower (1) was considered to be several months in default, (2) their monthly payments had been placed in a suspense account, (3) they were accruing late charges monthly and (4) their "default" had been reported to the credit bureau, resulting in a negative hit to their credit report. When the borrower finally discovered the discrepancy, between the amount provided for in the executed modification documents and the amount shown to be due in the system, OLS's practice was to blame the difference on a routine change in escrow or fees in transaction history rather than admitting its own error. This unlawful practice, of manipulating modification documents without notification to the borrower, is not

only fraudulent, but unfair, deceptive and abusive to borrowers. Thus, the initial and annual SPA certifications/representations executed by Ocwen, that it was "in compliance with all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices…" were **knowingly false** for all of these additional reasons. These certifications were express conditions of payment and material to the government's decision to make HAMP incentive payments.

## 11.   Violations of the CFPB's Continuity of Contact Requirement[77]

105.    Additionally, the Consumer Financial Protection Bureau ("CFPB") requires servicers to assign designated personnel to a delinquent borrower, in order to timely and accurately respond to borrower inquiries, not later than the 45th day of delinquency.[78] Under this directive, servicers must assign specific and identifiable personnel, often known as relationship managers or single points of contact (SPOC), to each borrower who is applying for assistance through HAMP or other foreclosure-prevention options. The relationship manager, who is required to be a full-time employee, is responsible for working with the individual borrower throughout the evaluation and modification process.

106.    OLS developed an appointment system whereby a borrower was assigned a relationship manager to contact, but by appointment only. The relationship manager was allotted only a restricted amount of time, approximately thirty minutes, for each appointment with a borrower regardless of the borrowers' individual circumstances. The restriction on time, and the

---

[77] 12 CFR § 1024.40. The Consumer Financial Protection Bureau adopted this regulation pursuant to its authority under the Real Estate Settlement Procedures Act and the Dodd-Frank Act. *See* https://www.federalregister.gov/articles/2013/02/14/2013-01248/mortgage-servicing-rules-under-the-real-estate-settlement-procedures-act-regulation-x#p-1928 at § 1024.40 (a)(1).

[78] *Id.*

appointment requirement, did not allow ample opportunity to address the borrowers' unique situations, as contemplated by the CFPB.

107.   What's more, employees serving as relationship managers were placed on dialers, meaning that if they were away from their desk or on another call when the customer called in for their appointment the customer was re-directed to another available customer service associate. This re-direct was done in order to "keep the appointment," so that OLS could show regulators that they were attempting to comply with the CFPB's mandate; however, the available associate was not the customer's appointed relationship manager, meaning they could not make substantive, material changes to the customer's account. The service associate that the borrower was re-directed to was not able to provide any information or assist the borrower beyond relaying to the borrower the new updates or notes that had been input into the system by the borrower's relationship manager. If there were no new updates or notes contained in the system, the system directed the service associate to tell the customer, simply, that "review is still in progress." The borrower was then asked to schedule a new appointment and told that their individual relationship manager would return their call at that later date.

108.   Despite rescheduling for the sole purpose of speaking with their individual relationship manager, many borrowers never received the opportunity to address their issues and concerns in a meaningful discussion. When the time came for the borrower's rescheduled appointment, if the individual relationship manager was busy, another service associate phoned the borrower in order to "keep the appointment." Once again, the borrower was unable to make any substantive, material changes to their account based upon their conversation with this individual. They were, again, asked to reschedule their appointment for some date in the future.

This runaround, inherent to the flawed appointment process, was one of the greatest frustrations expressed by OLS borrowers.

109.    Failure on the part of OLS SPOCs to communicate with borrowers in a timely manner resulted in tremendous detriment to borrowers. Often, borrower communication logs [RealServicing] evidenced that several calls had been made by borrower(s) to OLS asking for assistance, but the relevant SPOC would fail to contact borrower(s) for weeks and sometimes months. . These delays often caused the borrowers' financials to become unacceptably aged at no fault of the borrowers. Under HAMP, the borrowers' financials expire 90 days from date of receipt.[79] Often, despite starting the modification process over, valuable time was lost in resubmitting documentation and homes were foreclosed upon. The practice of failing to communicate with borrowers regarding their requested modifications was a common cause of many wrongful foreclosures.

110.    The failure by OLS relationship managers to respond to borrowers in a timely manner directly violated the mandate of the CFPB and harmed those borrowers seeking loss mitigation assistance.[80] The system established by OLS was not only ineffective and inefficient,

---

[79] **See MHA Handbook v4.3 at 4.3,** *Evidence of Income*.

[80] *See* 12 C.F.R. § 1024.40

> (a) *In general*. A servicer shall maintain policies and procedures that are reasonably designed to achieve the following objectives:
>
> …
>
> (2) **Make available to a delinquent borrower**, via telephone, personnel assigned to the borrower as described in paragraph (a)(1) of this section to respond to the borrower's inquiries, and as applicable, assist the borrower with available loss mitigation options until the borrower has made, without incurring a late charge, two consecutive mortgage payments in accordance with the terms of a permanent loss mitigation agreement.

(3) If a borrower contacts the personnel assigned to the borrower as described in paragraph (a)(1) of this section and **does not immediately receive a live response** from such personnel, **ensure that the servicer can provide a live response in a timely manner**. (emphasis added)

but was unfair to borrowers and greatly frustrated the modification process. Thus, the initial and annual SPA certifications/representations executed by OLS, that it was "in compliance with all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices…" **were knowingly false** for these additional reasons. These certifications were express conditions of payment and material to the government's decision to make HAMP incentive payments.

## 12.      Imparting False, Misleading Information to Borrowers

111.    OLS employees, from at least as early as 2011, and on information and belief from as early as April 16, 2009, often imparted false and misleading information to borrowers, resulting in wrongful denials of modification applications and borrowers' inability to receive loss mitigation assistance to which they were entitled. As previously mentioned, borrowers were regularly told that their modification application was denied due to missing documents. In fact, while employed at OLS, Relator Brian Bullock observed on numerous occasions that he and other employees were able to access documents in the servicer's imaging system for which the borrower's modification had been denied, because they were supposedly "missing." This was obviously an unfair, deceptive and pre-textual excuse for denial of the borrower's modification application and rendered the initial and annual SPA certifications/representations executed by Ocwen, that it was "in compliance with all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices…" **knowingly false**.

112.    Similarly, OLS employees regularly misinformed borrowers that they must be

delinquent on their home loans in order to qualify for assistance through the Home Affordable Modification Program (HAMP). In fact, a borrower does not have to be delinquent in order to qualify for HAMP, and this false and misleading information resulted in many borrowers abandoning the idea of using a HAMP modification in order to save their homes.[81] What's more, the information that a borrower "must be delinquent" in order to qualify for HAMP likely encouraged some borrowers to default on their loan payments in order to potentially qualify for the assistance program. Inaccurate information was also given to some borrowers by OLS regarding steps for borrowers to apply for HAMP and borrower qualifications.

113.    OLS additionally failed to properly inform some borrowers the relevant investor on their loan did not participate in HAMP, and therefore they weren't eligible for HAMP modifications. Nonetheless, OLS misled these borrowers by sending them a HAMP modification application and later approving their submitted HAMP package and trial payment plan. These borrowers, believing they were eligible for a HAMP modification would make one or all trial payments before OLS denied the modification on the basis that the investor didn't participate in

---

[81] *See* http://www.makinghomeaffordable.gov/programs/lower-payments/Pages/hamp.aspx

You may be eligible for HAMP if you meet the following criteria:

- Because of a financial hardship, you are struggling to make your mortgage payments.
- You are delinquent **or in danger of falling behind on your mortgage.**
- You obtained your mortgage on or before January 1, 2009.
- Your property has not been condemned.
- You owe up to $729,750 on your primary residence or one-to-four unit rental property (loan limits are higher for two-to-four unit properties).
- You have not been convicted within the last 10 years of a crime in connection with a mortgage or real estate transaction.

HAMP. The borrower was not notified initially by OLS that the investor didn't participate in the HAMP program.

114.    In some instances, OLS failed to communicate with the trustee to ensure proper financials and court documents were obtained in connection with borrowers' request for modification. Specifically, when borrowers are in active (open) chapter 7 or chapter 13 bankruptcy, they remain eligible for HAMP, but at the servicer's discretion in accordance with the investor guidelines. In addition, servicers must obtain, from the Trustee, verification of certain financials and the Bankruptcy Court's consent. **Experienced and trained** SPOCs would have noticed this at the initial review and had knowledge of the financial documents required to proceed with the modification review. .  OLS's conduct  caused these borrowers' modifications to be wrongfully denied and in some instances resulted in borrowers losing their homes to foreclose.

115.    For     these     additional     reasons     Ocwen's     [time     relevant] certifications/representations, that it was "in compliance with "all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices…" **were knowingly false**. These certifications were express conditions of payment and material to the government's decision to make HAMP incentive payments.

### 13.    Offshore loan review resulting in misunderstanding and confusion

116.    Finally, the routing of loan documents offshore to contractors in India, who were neither properly trained nor qualified, resulted in tremendous confusion and serious errors committed to the ultimate detriment of borrowers. Relator Bullock directly observed that approximately 95% of the loan modification process at OLS, including underwriting and the

determination of specific borrower terms, was handled offshore by third-party contractors. While the general review and underwriting of conventional loans offshore is not prohibited, it is undoubtedly a violation of federal and state UDAP laws for the review and modification to be completed improperly, resulting in not only confusion but increased delinquency for borrowers.

117.    As an OLS employee, Relator Bullock regularly and directly saw instances of offshore underwriters inputting the wrong numbers in the system. For instance, trial plan payments were sometimes set up slightly higher in the servicer's computer system than what the proposed modification agreement actually reflected. This resulted in borrowers remitting a payment amount that did not match that contained in OLS's internal system, and many times caused a payment shortage to be reflected on the borrower's account. In order to address and correct this type of error, a customer service representative would have to reach out to the individual underwriter overseas; however, these third party contractors are often unresponsive and a communication made to correct an error such as this may go unreturned for several weeks. Relator Bullock, himself, reached out to an underwriter in India by email in order to address an issue and did not receive a response for over six (6) weeks. By this time, a monthly payment had become due on the borrower's account, and they had likely accrued significant fees.

118.    Furthermore, offshore underwriters often miss "radical" red flags in the structuring of loan modifications, resulting in modifications with terms that are highly inappropriate for the individual borrower. *Several hundred times per year* Relator Bullock received phone calls from confused borrowers regarding loan terms which the borrower simply did not understand; however, after review, even Mr. Bullock—a seasoned professional in the loan modification industry—was also unable to explain the terms because of the offshore contractor's incompetence. Such practices by the offshore contractor violated the Dodd-Frank

prohibitions against unfair, abusive and deceptive practices.

119.    Finally, payments received by the Cashiering Department, which is also located off-shore, were often misapplied to suspense accounts by offshore employees instead of being properly applied to the unpaid principal balance. This, as well, resulted in the further delinquency of borrowers' accounts and amounts to an unfair, deceptive and abusive act or practice committed by OLS. For these additional reasons Ocwen's [time relevant] certifications/representations, that it was "in compliance with "all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices…" were **knowingly false.** These certifications were express conditions of payment and material to the government's decision to make HAMP incentive payments.

### 14.    Forced In-House Modifications

120.    OLS employees also forced borrowers into less attractive modification options and terms than they were otherwise qualified to receive. Often, borrowers who otherwise qualified for a HAMP modification, and had funds in a suspense account at the time of the HAMP modification review, would be wrongfully denied a HAMP modification and forced to accept an in-house modification instead. The receipt of a HAMP modification is subject to the borrower timely completing a trial payment plan. Here, the funds from the borrower's suspense account would be applied by OLS to the first or even second payment under the trial plan. OLS would, in turn, send a statement to the borrower that indicated a lesser amount would be due for the next payment. However, this statement was extremely misleading, and when the borrower would submit the lesser amount, reflected in OLS's statement, the lesser payment would be rejected or set in a suspense account, because it was not the full payment the borrower had

initially agreed to pay during the trial payment plan. This occurred, despite OLS's own statement, sent to the borrower, reflecting a lesser amount due. If the payment was not rejected and returned to the borrower as incomplete, which seldom occurred, the borrower had no knowledge the payment was not applied to the trial plan. The borrower was ultimately sent a letter denying the modification due to shortage on the trial plan payments. Borrowers would often call to complain about the misleading statement they received, but OLS refused to accept any payment and told borrowers their only options were (1) to accept an in-house modification or (2) proceed to foreclosure. OLS would then utilize the borrower's information, collected in connection with the HAMP modification process, to render a same day decision to the borrower for an in-house modification option. While an in-house modification was potentially better than nothing for the borrower, it was nevertheless unfair, deceptive and abusive for the servicer to force borrowers into less attractive modification terms.

121.    OLS employees complained to management about default process issues and on-going violations of loss mitigation standards, but management disregarded the warnings and did nothing to remediate pervasive violations. The Vice President of GSE loans, Robert Hamilton, expressly raised loss mitigation deficiency and default servicing violations to management; his warnings were disregarded, he was held in disfavor and nothing was done to even attempt to bring OLS into compliance. This made it clear to other OLS employees and management that known violations or deficiencies regarding loan laws and regulations were not on the table for discussion.

122.    For these additional reasons Ocwen's [time relevant] certifications/representations, that it was "in compliance with "all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent

unfair, discriminatory or predatory lending practices…" were **knowingly false.** These certifications were express conditions of payment and material to the government's decision to make HAMP incentive payments.

## IX.    REAL ESTATE SETTLEMENT PROCEDURES ACT (RESPA)

123    RESPA is a consumer protection statute that provides certain rights regarding the servicing of mortgage loans and escrow accounts.[82] Section 2605 states that, prior to a loan transfer, it is the responsibility of the transferor servicer to notify the borrower in writing, fifteen (15) days before the effective date of the transfer.[83] The transferee receiving servicing rights to a loan must notify the borrower within fifteen (15) days after the effective date of the transfer of the servicing of the mortgage loan. [84]

124.    In addition, RESPA requires that a servicer of a federally related mortgage may not:

    A.  obtain force-placed hazard insurance to maintain property insurance;

    B.  charge fees for responding to valid qualified written requests under this section;

    C.  <u>fail to take timely action to respond to a borrower's requests to correct errors relating to allocation of payments, final balances for purposes of paying off the loan, or avoiding foreclosure, or other standard servicer's duties;</u>

    D.  fail to respond within 10 business days to a request from a borrower to provide the identity, address, and other relevant contact information about the owner or assignee of the loan; or

---

[82] 12 U.S.C. §§ 2601-2617.

[83] 12 U.S.C. § 2605(a) and § 2605(b)(1)-(2)(A).

[84] 12 U.S.C. § 2605(c)(1)-(2)(A)

E.   fail to comply with any other obligation found by the Bureau of Consumer Financial Protection, by regulation, to be appropriate to carry out the consumer protection purposes of this chapter.[85]

125.   OLS obtained servicing rights in connection with certain mergers and/or acquisition  of a competitor's loan portfolio. In turn, OLS was responsible for the timely notification of these transfers to the respective borrowers. Additionally, OLS was required by RESPA to honor all modifications approved by the prior servicer but regularly failed to honor the modifications approved by transferor servicers. OLS violated the above legal requirements, and for these **additional reasons,** the representations/certifications provided to the United States, that it was "in compliance with all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices…" were **knowingly false.**   These  certifications were express conditions of payment and material to the government's decision to make HAMP incentive payments.

### A.   Untimely Transferee/Transferor Letters to Borrowers

126.   According to RESPA, borrowers must receive notice of the transfer of their loans to a new servicer within fifteen (15) days. Despite this requirement, OLS knowingly failed to timely transmit notices, commonly known as "hello" letters, to the borrowers within the statutorily required 15 days, in violation of RESPA,[86] from at least as early as 2011, and on information and belief from as early as April 16, 2009.  This confused the borrowers who then sent payment to the wrong servicer **and thereby became delinquent <u>at no fault of the borrowers.</u>**

---

[85] 12 U.S.C. § 2605(k)(1)(A)-(E).

[86] 12 U.S.C. § 2605(a).

> If the transferor (rather than the transferee servicer that should properly receive payment on the loan) receives payment on or before the applicable due date (including any grace period allowed under the loan documents), a late fee may not be imposed on the borrower with respect to that payment. Moreover, the payment may not be treated as late for any other purposes. 12 C.F.R. § 1024.21(d)(5)

127.    In these instances, the borrower would send payment to the wrong servicer, due to the untimely transferee letter, and OLS would improperly charge the unwitting borrower a late fee and send a negative report to the CRAs at a time when the borrowers were **current on their loan**. This all occurred within the first 60 days of the transfer.

128.    The transfers were also carried out in such a way that many incomplete files were sent to the transferee and were missing important documents, such as the original mortgage contract and often a recently approved modification. OLS failed to timely respond to complaints regarding the misappropriation of mortgage payment funds due to the failure to properly notify the borrower of a transfer in a timely manner and confirm the modified terms. For these additional reasons Ocwen's [time relevant] certifications/representations, that it was "in compliance with "all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices…" were **knowingly false.** These certifications were express conditions of payment and material to the government's decision to make HAMP incentive payments.

B.    **Additional Violations of RESPA**

129.    OLS's course of conduct with regard to (1) "In-Flight Modifications" as described at ¶¶ 88-89, is also a violation of RESPA.[87]

---

[87] 12 U.S.C. § 1024.38; 12 USC § 2605(k)(1)(C).

130.   A transferee servicer such as OLS] must have policies and procedures reasonably designed to ensure, in connection with a servicing transfer, that the transferee servicer receives information regarding any loss mitigation discussions with a borrower, including any copies of loss mitigation agreements. Further, the transferee servicer's policies and procedures must address obtaining any such missing information or documents from a transferor servicer before attempting to obtain such information from a borrower.[88] OLS knowingly failed to implement policies to assist borrowers in connection with a servicing transfer. This knowing and reckless conduct resulted to the detriment of the borrower as described above. For these additional reasons Ocwen's [time relevant] certifications/representations, that it was "in compliance with "all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices…" were **knowingly false.** These certifications were express conditions of payment and material to the government's decision to make HAMP incentive payments.

## X. TRUTH IN LENDING ACT AND REGULATION Z

131.   The federal Truth in Lending Act ("TILA") is contained in Title I of the Consumer Credit Protection Act, as amended, 15 U.S.C. § 1601 *et seq.* TILA was enacted "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit." 15 U.S.C. § 1601(a).

---

[88] 12 U.S.C. § 1024.38(b)(4). See also Official Bureau Interpretations ¶ 38(b)(4)(ii) Compliance with the commentary issued by the BCFP affords protection from liability under § 19(b) of RESPA, 12 U.S.C. 2617(b).

132.    15 U.S.C. § 1604 authorizes the Consumer Financial Protection Bureau ("CFPB" or "Bureau")[89] to promulgate regulations to carry out the purposes of TILA, which may contain "additional requirements, classifications, differentiations, or other provisions, and may provide for such adjustments and exceptions for all or any class of transactions, as in the judgment of the Bureau are necessary or proper to effectuate the purposes of [TILA], to prevent circumvention or evasion thereof, or to facilitate compliance therewith."[90] The Bureau's rulemaking and interpretive authority are thus expansive and entitled to substantial deference.

133.    Regulation Z, 12 C.F.R. 1026.1 *et seq.* was promulgated by the Board of Governors of the Federal Reserve System ("Board") to implement TILA and other federal consumer protection statutes pursuant to authority granted in several sections, including, primarily, section 105 of TILA, 15 U.S.C. § 1604. *See* 12 C.F.R. 1026.1(a).[91] The provisions relevant to this action are contained in the first two of TILA's five sections, captioned "General Provisions," and "Credit Transactions."

134.    The scope of TILA is so broad that it does not contain a general statement of what transactions are covered but instead specifies what transactions are <u>excluded from coverage.</u>[92] Federal courts have held that "'exceptions' not mentioned in TILA should not lightly be read into it." *E.g., Thomas v. Myers-Dickson Furniture Co*., 479 F.2d 740, 745 (5th Cir. 1973). TILA

---

[89] This rulemaking authority was originally vested in the Board of Governors of the Federal Reserve System ("Board"). Effective July 21, 2011, the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank"), P.L. 111-203, 124 Stat. 1376, shifted the TILA rulemaking and interpretive authority from the Board to the new Consumer Financial Protection Bureau ("CFPB" or "Bureau"). Dodd-Frank § 1100A.

[90] 15 U.S.C. § 1604(a).

[91] Since Dodd-Frank, P.L. 111-203, 124 Stat. 1376, shifted the TILA rulemaking and interpretative authority from the Board to the new CFPB, effective July 21, 2011, Dodd-Frank § 1100A, Regulation Z, previously published at 12 C.F.R. 226, has been republished at 12 C.F.R 1026.

[92] See 15 U.S.C. § 1603, titled "Exempted transactions."

also affirmatively specifies coverage as to some transactions, including, *inter alia*, exceptions to exceptions from coverage. Although the original bill passed by the Senate did not cover mortgage lending, the final version of TILA passed by Congress included <u>all real property transactions</u>, unless specifically exempted. 4-37A Powell on Real Property § 37A.01[1][a].

135.   TILA delineates its broad scope by specifying *who* must comply with its provisions. Specifically, TILA provides that "creditors" are required to comply and provides that

**"Creditor"**

> refers only to **a person who both (1) regularly extends, whether in connection with loans,** sales of property or services, or otherwise, **consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge[93] is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness** or, if there is no such evidence of indebtedness, by agreement. . . . Any person who originates 2 or more mortgages referred to in subsection (aa) [current subsection (bb)][94] in any 12-month period or any person who originates 1 or more such mortgages through a mortgage broker shall be considered to be a creditor for purposes of this title . . . .

15 U.S.C. § 1602(g). Under TILA,

> (f) The term **"credit"** means **the right granted by a creditor to a debtor [1] to defer payment of debt or [2] to incur debt and defer its payment**.

15 U.S.C. § 1602(f) (emphasis added). Both events constitute an extension of credit.

136.   OLS satisfies both prongs of the statutory definition of "creditor," and therefore must adhere to all TILA requirements. Virtually 100% of the HAMP and non-HAMP

---

[93] Regulation Z defines "finance charge" at 12 C.F.R. § 1026.4.

[94] A "mortgage[ ] referred to in Subsection (aa) [current subsection (bb)]" refers to certain high-cost mortgages with high interest rates in comparison with the yield on Treasury securities, or high points and fees payable at or before closing, 15 U.S.C. §§ 1602(bb)(1), 1602(4), (2), (3), 1605(e), secured by the consumer's principal dwelling, other than purchase money or construction financing loans ("residential mortgage transactions," 15 U.S.C. § 1602(x), (w); 12 C.F.R § 1026.2(a)(19), (24); *cf.,* 15 U.S.C. § 1602[(dd)] (cc) (**"*Residential mortgage loan*" refers to credit transactions secured by mortgage on a dwelling other than purchase money or construction financing loans**.)).

modifications offered by OLS (1) deferred the payment of debt and most involved (2) the charging of additional debt, in the form of capitalized amounts (i) past due, (ii) not yet due, (iii) charges for principal advances never made; and (iv) amounts for expenses and costs related to the modification. Thus, OLS regularly extended credit as defined under TILA. OLS is also the "person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of the indebtedness." Specifically, loan modifications offered to borrowers expressly required that payment be remitted to OLS, which extended all of the modification advances and/or charges capitalized and added to the principal balance.[95]

137.    Section 1635 of TILA, 15 U.S.C. § 1635, requires notice of the borrower's right to rescind consumer credit transactions in which a <u>security interest is retained or acquired</u> in property that will be the borrower's principal dwelling, until midnight of the third business day after consummation of the transaction or delivery of the TILA rescission forms, whichever is later. 12 U.S.C. § 1635(a). This provision applies to the modifications extended to borrowers by OLS. In 100% of OLS's HAMP or proprietary modifications, a "security interest is retained." In

---

[95] *See* Exhibit 6 at p. 4.

**Payment Remittance Information**

    1. Make checks payable to OLS Loan Servicing, LLC.

…

**Loan Modification Agreement**

**…**

Pursuant to our mutual agreement to modify your Note and Mortgage and in consideration of the promises, conditions, and terms set forth below, the parties agree as follows:

1. In order for the terms of this modification to become effective, you promise to make an initial payment of $1,233.51 on or before 1/1/12 and one (1) equal monthly payment of principal and interest in the amount of $971.85 ***to OLS*** ("Trial Period") beginning on 2/1/12.

virtually 100% of the HAMP modifications, OLS advances to the borrower were expressly conditioned on the advance being covered by a first lien security interest that OLS acquired through the credit extension under the HAMP modification. Thus, a security interest was both (1) retained (Note Owner) and (2) acquired (Servicer). Written acknowledgement of *any* required TILA disclosure creates only a rebuttable presumption of delivery. 15 U.S.C. § 1635(c). <u>Refinancings</u> *with no new advances, by the <u>same</u> creditor and secured by the same property*, and certain other transactions are exempted from the rescission provisions. 15 U.S.C. § 1635(e). The actionable conduct alleged herein involves transactions which were <u>not refinancings and not otherwise exempted</u> from the rescission provisions.

138.     Knowing and willful violations of TILA are subject to criminal penalties including fines and imprisonment. 15 U.S.C. § 1611.

139.     Consistent with the Act, Regulation Z specifies that its scope extends in general:

> To each individual or business that offers or extends credit . . . when four conditions are met:
>
> (i)      The credit is offered or extended to consumers;
> (ii)     The offering or extension of credit is done regularly;
> (iii)    The credit is subject to a finance charge or is payable by a written agreement in more than four installments; and
> (iv)     The credit is primarily for personal, family, or household purposes.

12 C.F.R. 1026.1(c)(1).

140.     Regulation Z provides tests for determining whether one is a **"Creditor,"** including in relevant part:

> (17) Creditor means:
>
> (i) **A person who regularly extends consumer credit that is subject to a finance charge or is payable by written agreement in**

> **more than four installments (not including a down payment), and to whom the obligation is initially payable, either on the face of the note or contract,** or by agreement when there is no note or contract.
>
> . . .
>
> (v) **A person regularly extends consumer credit only if it extended credit** (other than credit subject to the requirements of § 1026.32) more than 25 times (or **more than 5 times for transactions secured by a dwelling) in the preceding calendar year.** If a person did not meet these numerical standards in the preceding calendar year, the numerical standards shall be applied to the current calendar year. A person regularly extends consumer credit if, in any 12-month period, the person originates more than one credit extension that is subject to the requirements of § 1026.32 or one or more such credit extensions through a mortgage broker.

12 C.F.R. 1026.2(a)(17). If the obligation is initially payable to one person, that person is the creditor. 12 C.F.R. § 1026, Supp. I, Comment 2(a)(17)(i)2.

141.    **Credit** means the right to defer payment of debt or to incur debt and defer its payment. 12 C.F.R. 1026.2(a)(14).

142.    **Consumer credit** means credit offered or extended to a consumer primarily for personal, family, or household purposes. 12 C.F.R. 1026.2(a)(12). The statute does not define "**transaction,**" "**credit transaction,**" or "**consumer credit transaction,**" although it defines "consumer" and "credit." In a fairly recent case of first impression, the Court of Appeals for the Fourth Circuit held that for purposes of the right to rescind under TILA, a course of dealing between parties must be a "consummated event" to constitute a transaction giving rise to the right to rescind. *Weintraub v. Quicken Loans, Inc.,* 594 F.3d 270 (4th Cir. 2010). Relying on cases regarding the definition of "credit transaction" in automobile sales, the definitions of "residential mortgage transaction," 15 U.S.C. § 1602(w), and "reverse mortgage transaction," 15 U.S.C. § 1602(bb), a *Black's Law Dictionary* definition of "transaction" in the business context,

and "a common sense reading of the text of § 1635(a)," the court of appeals concluded that a "credit transaction" occurs when "credit is in fact extended"—nothing more is required. 594 F.3d at 274-76. The court of appeals further pointed out that under the regulation implementing the right of rescission, a transaction arises when a security interest has been <u>retained</u>. *Id.* at 276. The court further concluded that the plaintiffs' **deposit agreement with the lender pursuant to which the plaintiff paid a $500 fee "<u>was undoubtedly a 'transaction,'</u>"** although not a *credit* transaction. *Id.*

143.   **Consummation** means the time that a consumer becomes contractually obligated on a credit transaction. 12 C.F.R. 1026.2(a)(13).

144.   Regulation Z specifies that a **"residential mortgage transaction"**

> means a transaction in which a mortgage, deed of trust, purchase money security interest arising under an installment sales contract, or equivalent consensual security interest is created or retained in the consumer's principal dwelling to finance *the acquisition* or *initial construction* of that dwelling.

12 C.F.R. § 1026.2(a)(24) (emphasis added). According to the Commentary to the § 1026.2(a)(24) definition of "Residential mortgage transaction," a transaction is *not "to finance the acquisition"* of the consumer's principal dwelling if the consumer has previously purchased and acquired some title to the dwelling, even if not full legal title. 12 C.F.R. § 1026, Supp. I, Comment 2(a)(24)5.

145.   In most credit transactions in which a security interest is acquired in a consumer's principal dwelling, each consumer whose ownership interest is or will be subject to a security interest has a **right to rescind the transaction**. 15 U.S.C. § 1635; 12 C.F.R. § 1026.23(a) (other than "residential mortgage transactions," defined at 12 C.F.R. § 1026.2(a)(24) as a transaction to finance the initial acquisition or construction of a dwelling, whether the dwelling is real or

personal property, 12 C.F.R. § 1026, Supp. I, Comment 1026.23(f)-1; *see also* 122 C.F.R. 1026, Supp. I, Comment 1026.23(a)). ***Refinancing* or *consolidation* by the same creditor of an extension of credit already secured by the consumer's principal dwelling is exempt from the right to rescind.** *See Arnold v. W.D.L. Investments, Inc.*, 703 F.2d 848 (5th Cir. 1983). A **refinancing** occurs when the original obligation is satisfied or extinguished and replaced. 12 C.F.R. § 1026.20, & Supp. I, Comment 1026.20(a)-1. ***This exemption, in Section 1026.23(f)(2), applies only to refinancings or a consolidation by the original creditor; if new money is advanced, however, the amount of the new money is rescindable.*** For purposes of rescission, a new advance does not include amounts attributed solely to the costs of refinancing. 12 C.F.R. § 1026, Supp. I, Comment 1026.23(f)-4. None of the HAMP modifications were refinancings or consolidations under Section 1026.23(f), which requires that the previous debt be paid and replaced by a new debt to constitute a refinancing.

146.     In any transaction subject to rescission, the creditor must give the consumer two copies of a notice of right to rescind, which must be a separate document clearly and conspicuously disclosing the rights and process of rescission. 12 C.F.R. § 1026.23(b). Unless the consumer waives the right to rescind, which is permitted only in limited circumstances, no money shall be disbursed, other than in escrow, no services shall be performed, and no materials shall be delivered unless and until the three-day period passes without the right of rescission being exercised. 12 C.F.R § 1026.23(c). Because OLS knowingly and systematically failed to provide borrowers with the required notice of right of rescission, the initial and annual SPA certifications/representations executed by OLS, that it was "in compliance with all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices…" were **knowingly**

**false**. These certifications were express conditions of payment and material to the government's decision to make HAMP incentive payments.

## XI. STATE LAWS AND REGULATIONS

147.    Since Ocwen certified that it was in compliance with "all applicable Federal, state and local laws, regulations, regulatory guidance, statutes, ordinances, codes and requirements, including, but not limited to, the Truth in Lending Act, . . . and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices," Exhibit 1, Ocwen *SPA*, the following state laws are relevant to the falsity of OFC's initial certification to sell the financial instrument to Fannie Mae and each anniversary thereafter when re-certification was required.

148.    OLS has modified Texas home equity loans and purchase money mortgages without, when required, complying with Tex. Const. Art. XVI, § 50(a)(6). OLS has sometimes added tens of thousands of dollars to the principal balance—**including the principal portions of past due payments, which amounts were already part of the principal and were not loaned to the borrower an additional time**—far in excess of the original notes and of constitutional reasonable closing costs.[96] Similarly, OLS imposed new obligations, charging the borrowers interest on interest through the modification process, a burden not imposed by the terms of the original note or deed of trust. OLS pervasively violated many Texas constitutional legal requirements that protect homesteads in Texas, thus making its certification of compliance with state [Texas] laws and regulations in the initial SPA, and each year thereafter, a false certification to the U.S. of a condition of payment and a fraudulent inducement of the United

---

[96] 7 Tex. Admin. Code § 153.14(2)(B).

States to approve the SPA.

149.    New York Regulation 3 NYCRR § 419.11 states that Servicers must make "reasonable and good faith" efforts when offering loan modifications to borrowers. Loan modifications should have payments that are "**affordable and sustainable**" for borrowers, and prevent foreclosure. Second, Servicers are required to provide borrowers with **written disclosures** that clearly state the "**material terms, costs and risks**."[97] Thus, OLS pervasively violated both New York provisions, thus making its certification of compliance with state [New York] laws and regulations in the initial SPA, and each year thereafter, a false certification to the U.S. of a condition of payment and a fraudulent inducement of the United States to approve the SPA.

150.    The state of Massachusetts also has stringent requirements for Servicers. The Code of Massachusetts' Regulations mandates that a third-party loan servicer may not use "**unfair or unconscionable means**" when servicing a loan.[98] The Code also prohibits "misrepresenting any material information [including] the amount, nature or terms of any fee or payment due…and conditions of the servicing contract." 209 CMR § 18.21(1)(i). Massachusetts' law and regulations also require that lenders provide borrowers with a Notice of the Right of Rescission which provides the "obligor" a right to rescind a consumer credit transaction that involves an added security interest in the principal dwelling of the person. Mass. Gen. Laws Ch. 140D § 10(b). Thus, OLS pervasively violated the duty under Massachusetts law to provide borrowers the Notice of the Right of Rescission at the time of loan modifications. For this additional reason the initial and annual Ocwen Certifications of Compliance with federal and

---

[97] 3 NYCRR 419.11(b) and (d).

[98] 209 CMR § 18.21(1).

state [Massachusetts] consumer lending laws under the SPA were false. Further, OLS pervasively violated these Massachusetts laws protecting consumers. Those violations make Ocwen's certification of compliance with state [Massachusetts] laws and regulations in the initial SPA, and each year thereafter, a false certification and false statement to the United States made or used to fraudulently induce the United States to approve the SPA.

151.   Pervasive violations by OLS make Ocwen's Certifications of Compliance to Fannie Mae false, thus fraudulently inducing Fannie Mae to approve the SPA with Ocwen and approve the payment of huge incentives, all while OLS stood in violation of, at least, the following provisions:

### A.   Texas Constitutional and Administrative Law

#### 1.   Constitutional Law

152.   OLS has modified Texas home equity loans and purchase money mortgage loans by making "an advancement of new funds, or by increasing the obligations beyond those created by the original note and deed of trust" without complying with Tex. Const. Art. XVI, § 50(a)(6). OLS has at times, "when making extensions of credit," added tens of thousands of dollars to the principal balance, including the unloaned principal sums contained in the past due monthly payments, far in excess of (i) of the sums due and (ii) the obligations arising out of the original note or deed of trust which abridged the limits of constitutionally reasonable closing costs. 7. Tex. Admin. Code § 153.14(2)(B).   According to well-established Texas law, if mortgage servicers increase the principal balance of existing loans (whether the original loan was for purchase money loan or a home equity loan) beyond an amount of reasonable and necessary closing costs, , the transaction constitutes a home equity loan under section 50(a)(6) as a matter of law, regardless of the parties' intent, and triggers a number of constitutional requirements and

disclosures that protect the borrower's homestead. OLS often failed to abide by its duties to provide the protections of Section 50(a)(6) for Texas modifications when making borrowers "new extensions of credit" as defined by the Texas Supreme Court in the recent *Sims* case.[99] Thus, Ocwen's initial and annual SPA certifications/representations, that it was "in compliance with all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices…" **were knowingly false** for these additional reasons. These certifications were express conditions of payment and material to the government's decision to make HAMP incentive payments.

153.    Loan modifications that increase the principal balance by collateralizing unloaned principal from past due monthly payments, accrued interest, property taxes, or insurance seek to secure additional home equity and are thus home equity loans under Texas law. Further, Tex. Const. Art. XVI, § 50(e) states that when a lender advances "additional sums" (any sum over and above "reasonable and necessary closing costs") to an existing purchase money loan, the lender has actually made a home equity loan, regardless of the lender's intentions. In addition, as outlined by the Texas Supreme Court in the *Sims* case in 2014, if there are "**new extensions of credit,**" Texas law unequivocally requires that when a lender advances additional sums to an existing home equity loan, it must satisfy **all the requirements** of Section 50(a)(6)(A) – (Q)— *i.e.*, all the requirements applicable to a home equity loan. If the "modification" does not comply with the long, demanding list of requirements at 50(a)(6)(A) – (Q), **no lien attaches** to the homestead. The lender has an unsecured, non-recourse loan unless and until it cures the loan within sixty (60) days of being notified by the borrower of the lender's failure to comply. *See*

---

[99] *Sims, et al. v. Carrington Mortgage Services, LLC*, No. 13-068 Tex. Sup. Ct., (Tex. May 16, 2014).

Tex. Const. Art. XVI, § 50(a)(6)(Q)(x). There is no other *safe harbor* for Texas home loan modifications which involve a *Sims* **"new extensions of credit,"** which is the only proper characterization for the capitalization of **unloaned principal** from past due monthly payments. Given the predicate **"new extension of credit" under *Sims*,** OLS has violated numerous provisions of the Texas constitution Section 50(a)(6)-(Q). Thus, Ocwen's initial and annual SPA certifications/representations, that it was "in compliance with all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices…" were **knowingly false** for all of these additional reasons. These certifications were express conditions of payment and material to the government's decision to make HAMP incentive payments.

154. OLS unlawfully *increased* the Texas borrowers' principal balances by making **new extensions of credi**t under *Sims*, including (1) the capitalization of **unloaned principal** from past due monthly payments and (2) the new financial burden of charging interest on interest (**not allowed** under the original note or deed of trust) while capitalizing new debt principal consisting of such items as (1) past due interest, which began accruing interest for the first time; (2) past due property taxes; (3) escrow prepayments; and (4) some undefined fees or costs. According to Texas constitutional law under *Sims*, the lender who has made new **"extensions of credit"** is restricted by Section 50(a)(6) and is allowed to add debt in the amount of reasonable closing costs only; each home equity loan refinance has a reasonable allowance of 3% for closing costs against the sums advanced. Adding new debt to the principal, by way of new extensions of credit, is strictly prohibited. A 2001 Interpretation Letter drafted by banking regulators lays the groundwork for 7 Tex. Admin. Code **§** 153.14(2)(B):

A modification to increase the principal amount advanced would be prohibited

because it would have the effect of turning the home equity loan into a line of credit, which is expressly prohibited.

Tex. Jt. Fin. Reg. Agencies, "Home Equity Modification Interpretation Letter," (Dec. 20, 2001). Subject to the *Sims* decision, the regulations state that "[t]he advance of additional funds to a borrower is not permitted by modification of an equity loan."[100] Equally important is the requirement that payments be an invariable monthly amount for the life of the loan. Principal was increased so much, however, that even with a lower interest rate, borrower payments increased and constituted an additional state law violation. To counteract this problem, OLS instituted modification terms involving interest-only payments and balloons, which created dramatic payment increases as the loan matured. Tex. Const. Art. XVI, § 50(a)(6)(L)(i). These laws clearly apply to the "**new extensions of credit,**" as clarified by *Sims*.

155.    Furthermore, OLS failed to conform to Texas state law requirements pertaining to the modification of mortgage loans involving "new extensions of credit." Specifically, although Texas law requires it, in its Purchase Money Mortgage ("PMM") modifications, OLS **did not**:

- Schedule loan modifications for repayment in substantially equal successive periodic installments, not more often than every 14 days and not less often than monthly, beginning no later than two months from the date the extension of credit is made, each of which equals or exceeds the amount of accrued interest as of the date of the scheduled installment. **Tex. Const. Art. XVI, § 50(a)(6)(L)(i).**

- Close loan modifications at the office of the lender, an attorney at law, or a title company. **Tex. Const. Art. XVI, § 50(a)(6)(N).**

---

[100] 7 Tex. Admin. Code § 153.14(2)(B).

- Provide a disclosure in the security instrument that the extension of credit is the type of credit defined by Section **50(a)(6). Tex. Const. Art. XVI, § 50(a)(6)(Q)(vi).**

- Provide the owner of the homestead with notice that he or she may, within three days after the extension of credit is made, rescind the extension of credit without penalty or charge. **Tex. Const. Art. XVI, § 50(a)(6)(Q)(viii).**

- Include a written acknowledgement as to the fair market value of the homestead property on the date the extension of credit is made, signed by the owner of the homestead and the lender. **Tex. Const. Art. XVI, § 50(a)(6)(Q)(ix).**

- Ensure that the maximum principal amount extended, when added to all other debts secured by the home, did not exceed 80 percent of the fair market value of the home on the date the line of credit is established. **Tex. Const. Art. XVI, § 50(a)(6)(R)(5).**

Thus, Ocwen's initial and annual SPA certifications/representations, that it was "in compliance with all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices…" were **knowingly false** for all of these additional reasons. These certifications were express conditions of payment and material to the government's decision to make HAMP incentive payments.

## 2. <u>Sims "Extensions of Credit" triggering Section 50(a)(6) applications</u>

156.   In a recent decision,[101] the Texas Supreme Court held that as long as there is no additional "extension of credit" in the modification of a home equity loan, the modification, or

---

[101] *Sims, et al. v. Carrington Mortgage Services, LLC*, No. 13-068 Tex. Sup. Ct., (Tex. May 16, 2014). There is no reason to believe that the Supreme Court would rule differently in regards to purchase money

"restructuring," is valid and need not comply with the requirements of Tex. Const. Art. XVI, § 50(a)(6). The Court identified three situations, however, which constitute an "**extension of credit**" and make the loan modifications subject to the home equity provisions in Section 50(a)(6) of the Texas Constitution. The *Sims* case defined an "extension of credit" as follows for purposes of home equity loan modifications:

1. A **re-financing** or "satisfaction or replacement" of the **original** note;"

2. An **advancement of new funds** which were not due and owing under the terms of the **original** note or deed of trust; and

3. The borrower has **new/increased obligations**, as a result of the modification, which were not created by the terms of the **original** note or deed of trust.

157.    The *Sims* opinion made evident that in a home equity loan modification, capitalizing any funds for obligations that grew out of the original mortgage contract/Deed of Trust, may be done without regard to Texas Section 50(a)(6) home equity provisions. However, if within the modification contract, any new funds are advanced for an obligation that <u>**did not arise</u> from rights granted to the lender/servicer under the **original** note/Deed of Trust, those advances of new funds [e.g., unloaned principal] implicate** Section 50(a)(6). Similarly, the same is true if the lender imposes **increased or new obligations** which do not arise out of (i) the original note or (ii) deed of trust. Both of the foregoing events are considered "extensions of credit" and are subject to the home equity provisions of Section 50(a)(6), which **includes** providing the borrower the notice of the right of rescission. OLS **never provided the notice of the right of rescission, although required** under TILA/Reg. Z, Texas law or Massachusetts laws, respectively, when appropriate. Because OLS never provided the required notice of the right of rescission, Ocwen's initial and annual SPA certifications/representations, that it was "in

mortgage modifications.

compliance with all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices…" were **knowingly false**. These certifications were express conditions of payment and material to the government's decision to make HAMP incentive payments.

158.    Upon information and belief, OLS has increased Texas borrower obligations by:

- Adding modification fees and costs including but not limited to ancillary costs (*e.g.,* charges for Broker Price Opinions, property inspections, appraisals, etc.) not arising out of the **original** note or deed of trust.

- Imposing interest on interest not allowed under the **original** note or deed of trust;

- Requiring the establishment of an escrow account that was not required by the terms of the **original** note/deed of trust;

- Extending the repayment period with only partial amortization creating large balloon payments due at the maturity of the modified note; and

- Capitalizing unloaned principal by capitalizing the entirety of the past due monthly payments, including the **unloaned principal.**

159.    The situation outlined below occurs in many modifications and was not restricted to Texas, but would violate both the TILA/Reg. Z Right of Rescission duties under Federal law, as well as the Right of Rescission duties which arise pursuant to state laws (Massachusetts and Texas).

### 3.        The Relevant Situation

160.    When a borrower enters into a Note/Deed of Trust for a residential mortgage loan there are two methods by which to pay their property taxes and insurance premiums. Insurance premiums are always paid in advance, monthly, quarterly or annually. The escrow provisions for insurance or taxes are fact specific to each particular note and/or deed of trust. There are no

generalizations that apply broadly to all mortgage contracts/security agreements. With this in mind, the following transactions would constitute a new obligation imposed by OLS on the borrower which would require OLS's compliance with Texas Constitution Section 50(a)(6) home equity provisions.

1.  Borrower enters into an original purchase money note/deed of trust and the contract often **does not** expressly require that the borrower must maintain an impound/escrow account with the lender, and the borrower may elect to pay their insurance premiums and/or property taxes directly to the county/insurance company; and

2.  Borrower then later enters into a modification contract wherein a condition of approval of the modification **requires the borrower to establish an escrow** account with the servicer/lender for the escrow of funds to pay annual taxes and insurance premiums.

Because the imposition by OLS of an escrow account was not required by the terms of the original note/deed of trust, the imposition of the escrow arrangement in the modification of the loan constituted a **new obligation,** thus triggering lender compliance with Texas' Section 50(a)(6) home equity provisions.

161.    Additionally, on some modifications, both HAMP and non-HAMP, the servicer is advancing/loaning new funds for Modification fees, expenses and costs that do not arise out of the original note or deed of trust. While *Sims* allows the capitalization of past due items arising from the original note and/or deed of trust, the prospective, post-modification imposition for the charging of interest on interest on any (i) capitalized, unloaned principal reflected in past due monthly payments, (ii) capitalized past due interest, (iii) capitalized property taxes and insurance premiums; (iv) prospective, not yet due escrow items and (v) reserve amount required by the servicer were new obligations that **would not have been allowed** without the borrower's

approval in writing of the loan modification agreement. In particular, **the borrowers never approved the capitalization of unloaned principal**. The HAMP agreements expressly provide:

> [Borrowers] understand that interest will now accrue on the unpaid interest that is added to the outstanding principal balance, which would not happen without this Agreement.

162.    It is only by the express wording of the <u>modification contract</u> that interest is charged by the lender on these newly capitalized amounts; the original note and/or deed of trust did not allow this on capitalized interest on interest charge. Therefore, the charging of interest against the new capital advanced **[e.g., unloaned principal],** is a **new obligation** imposed on the borrower by the modification, thus triggering Texas Section 50(a)(6) home equity requirements.

163.    Additionally, OLS in its modifications of Home Equity Loans and Purchase Money Mortgages, although required by Texas law, made new extensions of credit and **<u>did not</u>**:

- Schedule loan modifications for repayment in substantially equal successive periodic installments, not more often than every 14 days and not less often than monthly, beginning no later than two months from the date the extension of credit is made, each of which equals or exceeds the amount of accrued interest as of the date of the scheduled installment. **Tex. Const. Art. XVI, § 50(a)(6)(L)(i).**

- Close loan modifications at the office of the lender, an attorney at law, or a title company**. Tex. Const. Art. XVI, § 50(a)(6)(N).**

- Provide a disclosure in the security instrument that the extension of credit is the type of credit defined by Section **50(a)(6). Tex. Const. Art. XVI, § 50(a)(6)(Q)(vi).**

- Provide the owner of the homestead notice that he or she may, within three days after the extension of credit is made, rescind the extension of credit without penalty or charge. **Tex. Const. Art. XVI, § 50(a)(6)(Q)(viii).**

- Include a written acknowledgement as to the fair market value of the homestead property on the date the extension of credit is made, signed by the owner of the homestead and the lender. **Tex. Const. Art. XVI, § 50(a)(6)(Q)(ix).**

- Ensure that the maximum principal amount extended, when added to all other debts secured by the home, did not exceed 80 percent of the fair market value of the home on the date the line of credit is established. **Tex. Const. Art. XVI, § 50(a)(6)(R)(5).**

For these additional reasons, Ocwen's initial and annual SPA certifications/representations, that it was "in compliance with all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices…" were **knowingly false**. These certifications were express conditions of payment and material to the government's decision to make HAMP incentive payments.

### 4.    Pervasive Violations by Purchase Money Mortgage Modifications

164.    From and after OFC's execution of the SPA under the HAMP program, OLS's loan modifications of purchase money mortgages in the State of Texas virtually always involved adding the *Sims* **"new extensions of credit,"** **including the unloaned principal,** not arising from the **original** note or deed of trust. As such, the transactions constituted home equity loans as a matter of law. According to Texas law post-*Sims*, Texas permits modifications of purchase

money mortgages, except for those involving "new extensions of credit;" modified loans involving new extensions of credit are considered home equity loans invoking the protections of section 50(a)(6) of the Texas Constitution.

165.    Since virtually all purchase money mortgage modifications by OLS involved the *Sims* **"new extension of credit**," the modifications were home equity loans under Texas law, and OLS was required to comply with all of the provisions of Section 50(a)(6)A-Q, which OLS knowingly failed to do. OLS violated virtually all of the Texas Constitutional provisions as set out here and below on its purported purchase money mortgage modifications. Thus, Ocwen's initial and annual SPA certifications/representations that it was "in compliance with all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices…" **were knowingly false** for all of these additional reasons. These certifications were express conditions of payment and material to the government's decision to make HAMP incentive payments.

### 5.    Loan-to-value Ratio

166.    In addition, OLS violates the Texas Constitution by collateralizing the new extensions of credit in contravention of Tex. Const. Art. XVI, § 50(a)(6). To comply with Section 50(a)(6), a new loan/modification which involves a new extension of credit must be completed without violating the strict 80% loan-to-value restriction. Tex. Const. Art. XVI, § 50(a)(6)(B). Virtually all of OLS's Texas loan modifications violated Texas' 80% loan-to-value restriction as a result of the severe drop in Texas property values during the 2008 national financial crisis and the amounts advanced by OLS. This violation further renders Ocwen's initial and annual SPA certifications/representations, that it was "in compliance with all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws

designed to prevent unfair, discriminatory or predatory lending practices…" **knowingly false.** These certifications were express conditions of payment and material to the government's decision to make HAMP incentive payments.

### 6.      Closing Location

167.    In addition, the Texas constitution requires home equity loans involving **new extensions of credit** to close *in person* and **only at the office of a lender, attorney or title company**. Tex. Const. Article XVI § 50a(6)(N). All of OLS's mortgage modifications unlawfully **closed** by the borrower executing the documents and sending them to OLS by mail, Federal Express, or other carrier for finalization. The Texas Supreme Court has definitively ruled that the borrower, himself/herself, must attend all closing activities in one of the constitutionally permitted venues of an office of the lender, an attorney or title company, only. *The Financial Committee of Texas, et al. v. Valerie Norwood, et al.*, No. 10-0121, (Tex. Sup. Ct. Jan. 24, 2014). OLS did not comply with this Texas Constitutional requirement, nor many of the other Section 50 requirements. Therefore, Ocwen's initial and annual SPA certifications/representations, that it was "in compliance with all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices…" **were knowingly false**. These certifications were express conditions of payment and material to the government's decision to make HAMP incentive payments.

### 7.      Texas Notice of Right of Rescission

168.    One of the requirements for home equity loans involving new extensions of credit under the Texas Constitution, like Section 1026.23(a) of Regulation Z, is that the servicer/lender must provide the borrower(s) with the mandated **Notice of the three (3) day Right of**

**Rescission**.[102] As evident in **Exhibit 4**, the mandated Notices were not provided under either the federal or state laws. The owner of a homestead in Texas may, within three days after an extension of credit secured by his or her homestead is made, rescind the transaction without penalty or charge.[103] The Texas law is, therefore, similar to TILA's Regulation Z, which states that, in any transaction subject to rescission, the creditor must give the consumer the required written Notice of Right to Rescind. 12 C.F.R. § 1026.23(a)-(b). In Relator's experience and based on the documents they directly reviewed, virtually all of OLS's Texas modification contracts do not include either the required federal or Texas three day Notice of the Right of Rescission. The absence of these Notices of the Right of Rescission were additional violations of state law, rendering Ocwen's initial and annual SPA certifications/representations, that it was "in compliance with all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices…" **knowingly false**. These certifications were express conditions of payment and material to the government's decision to make HAMP incentive payments.

### 8.    Full Amortization

169.    The Texas Constitution, interpreted by *Sims*, states that home equity loans involving the *Sims* **"new extensions of credit"** must be fully amortizing at inception and must remain that way. Home equity loans must provide for equal payments over the course of the loan, must pay down principal with each installment, and must be fully amortizing (*i.e.*, a steadily downward sloping principal curve that is zero at maturity). Tex. Const. Art. XVI, § 50(a)(6)(L) and 7 Tex. Admin. Code § 153.11. As the evidence demonstrates, OLS loan

---

[102] Tex. Const. Art. XVI, § 50(a)(6)(Q)(viii).

[103] Tex. Const. Art. XVI, § 50(a)(6)(Q)(viii).

modifications violated these provisions. Thus, Ocwen's initial and annual SPA certifications/representations, that it was "in compliance with all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices…" were **knowingly false**. These certifications were express conditions of payment and material to the government's decision to make HAMP incentive payments.

170.    In short, § 50(a)(6)(L) requires that affected loans:

1.  Have a definite **non-balloon** pay-off date;

2.  Pay down principal with every installment (7 Tex. Admin. Code Sec. 153.11); and

3.   Be **fully** amortizing.

The Texas Department of Banking and other state regulatory agencies state that:

> Section 50(a)(6) does not specifically allow or even mention modifications of home equity loans. Elsewhere, the constitution provides that a refinance secured by the homestead, any portion of which is a home equity loan, may not be secured by a valid lien against the homestead **unless the refinance of the debt is a home equity loan.** (citing Tex. Const. art. XVI, §50(f)).

Tex. Jt. Fin. Reg. Agencies, "Home Equity Modification Interpretation Letter," (Dec. 20, 2001).

### 9.    Examples of OLS Texas Modification Contracts

171.    Attached hereto as **Exhibit 4 is** a Texas contract example. The following example is included:

**Exhibit 4**        **Servicer: -** OLS

**Loan No.:** 71871321
**City, State:** Dallas, TX 75248
**New Advance of funds:** Not disclosed
**New Principal Balance AFTER modification:** $222,497.13
**Start Date of Modification:** March 2011

> **New Interest on Interest Charges:** Interest charged on capitalized, past due interest, **unloaned principal**, any reserve amounts for property taxes and insurance premiums not allowed under the original note or deed of trust, nor by State and Federal banking rules, regulations, and/or laws.
>
> **Violates 80%LTV:**   A) Property Value on Modification Date - $249,000
> B) 80% LTV on Modification date - $199,200
> C) $ amount over 80% LTV - $23,297.13

This contract fails to provide the borrower with the termination date, the amount of the previous loan balance, or the specific amount being added to create the new principal balance. In addition, the servicer advanced new sums to the borrower by adding to the principal balance, amounts not due or allowed under the original Note/Deed of Trust. These amounts included; 1) fees/costs associated with the modification, 2) obligating the borrower for interest over the next some 25 to 40 years on the (i) delinquent interest and (ii) unloaned principal added to the principal balance, 3) new interest on the past due property taxes/escrow, 4) and the now accruing interest on the advanced amount not yet due of funds to be placed in the escrow account for future escrow expenses and paid over the next some 25 to 40 years. The Servicer increased the borrowers' obligation by causing interest to now be required to be paid on the **unloaned principal,** the delinquent interest, the past due property taxes/escrow, the advanced but not yet due funds to be placed in the escrow account for future expenses, and any fees/costs associated with the modification and the interest now accruing on those fees/costs advanced. These new advanced amounts/obligations carried the duty to meet the requirement of Texas Constitution Section 50.

**New obligations**, triggering the duties under Texas Constitution Section 50(a)(6), are created for the borrower if the **original** Note/Deed of Trust did **not require** the establishment of an escrow account, but the establishment of an escrow account was a condition of approval for the modification, as was required for every modification reviewed by Relators. It would also be a **new obligation** to the borrower when the original amortization schedule in the original Note/Deed of Trust was extended by the modification contract. This is a **new, additional obligation** causing the borrower an increased amount of interest to be paid, greater than that called for in the original Note/Deed of Trust over the term of the loan.

Further, where the modified loan is not fully amortizing as set forth in the **original** Note/Deed of Trust and thus results in a Balloon Payment at the end of the loan term that was not part of the original Note/Deed of Trust, the modification constitutes a new credit transaction under Texas Constitution Section 50(a)(6) and requires that the servicer/lender comply with the requirements of Texas Constitution Section 50(a)(6).

**Texas State Violations under Section 50(a)(6), Article XVI, Texas Constitution and Tex. Admin Code 153 on this contract:**

1. Section 50(a)(6)(B) & Tex. Admin. Code 153.3 – Involves an advance of funds that creates a home equity loan exceeding 80% LTV.

2. Section 50(a)(6)(Q)(vi) – Appropriate language not provided in contract; required disclosures not made to borrower.

3. Section 50(a)(6)(Q)(viii) – No notice of right of rescission form provided with contract.

4. Section 50(a)(6)(Q)(ix) – No written acknowledgement as to fair market value of homestead on date extension of credit is provided.

5. Section 50(a)(R)(5) – Principal amount exceeds 80% LTV.

6. Section 50(a)(6)(N) -- Was not closed at the office of a lender, attorney or title company.

### 10.     Homesteaders, In Effect, Become "Renters"

172.    When servicers add tens to hundreds of thousands of dollars of principal balance to the original note, making new extensions of credit, they make it virtually impossible for most borrowers to ever have any hope of paying the loan off. As a result of the monetary increase in the principal balance, the new loan principal begins accruing its own interest.

173.    To make the payments affordable, many loans have stepped interest rates, deferred principal, partial amortization, and balloon payments, which result in a mortgage note that is not paid down in accordance with the **mandatory**, fully-amortizing requirement of § 50(a)(6)(L). For this additional reason, Ocwen's initial and annual SPA certifications/representations, that it was "in compliance with all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices…" were **knowingly false**. These certifications were express conditions of payment and material to the government's decision to make HAMP incentive payments.

### B.     New York State Law

174.    New York Regulation 3 NYCRR § 419.11 states that servicers must make "reasonable and good faith" efforts when offering loan modifications to borrowers. Loan modifications should have payments that are "**affordable and sustainable**" for borrowers, and

prevent foreclosure. Second, servicers are required to provide borrowers with written disclosures that clearly state the "**material terms, costs and risks**." 3 NYCRR 419.11(b) and (d). OLS pervasively violated both New York provisions, thus making Ocwen's certification of compliance [a condition of payment] with state [New York] laws in the initial SPA a fraudulent inducement of the United States to approve the SPA and purchase the Financial Instrument, and each year thereafter, a material false statement to the United States as a condition of payment.

175.    According to 3 NYCRR § 419.11, Servicers must take steps to ensure that borrowers are treated fairly in accordance with HAMP guidelines and rules established by the United States Department of Treasury. The Servicer is required to inform the borrower of the details of the loan, including the status of the default and all "loss mitigation" procedures and services that can be considered. 3 NYCRR § 419.11(a)(1). If requested, it is also required to "negotiate with the borrower in good faith, subject to the Servicer's duties and obligations under the mortgage servicing contract, if any, to attempt a resolution or workout of the delinquency or to prevent the borrower's default, including a loan modification." 3 NYCRR § 419.11(a)(2).

176.    In addition, § 419.11(b) of the regulation requires that:

> Loan modifications should be structured to result in payments that are ***affordable* and *sustainable*** for the borrower. Servicers that are participating in HAMP shall offer loan modifications in compliance with the HAMP guidelines or directives, including using reasonable efforts to remove prohibitions or impediments to their authority and to obtain third party consents and waivers that are required, by contract or law, in order to effectuate a loan modification under HAMP. (*emphasis added*).

177.    Based on the evidence directly witnessed by Relators, the Servicer did not adhere to these guidelines and, instead, provided modifications that were <u>not</u> affordable or sustainable, resulting in many borrower failures to perform the terms and conditions of the modified note.

Thus, Ocwen's initial and annual SPA certifications/representations, that it was "in compliance with all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices…" were **knowingly false**. These certifications were express conditions of payment and material to the government's decision to make HAMP incentive payments.

178.    Moreover, OLS did not provide borrowers with required written disclosures that clearly state the "material terms, costs and risks." 3 NYCRR 419.11(d) specifically requires that:

> Within 30 days of receiving all required documentation from the borrower and third parties, unless a shorter time is required under regulations or guidelines implementing HAMP, a Servicer shall complete its evaluation of the borrower's eligibility for a loan modification or other loss mitigation option requested by the borrower and advise the borrower, and if applicable, the borrower's authorized representative, in writing of its determination. Where the Servicer approves the borrower for a loan modification, <u>including</u> a trial modification, or other loss mitigation option, the written notice <u>must provide</u> the borrower with ***clear and understandable written information explaining the material terms, costs and risks*** of the option offered. (emphasis added).

OLS's failure to provide these required disclosures was pervasive throughout New York.

179.    Finally, there is a presumption of good faith "if the Servicer offers loan modifications and other loss mitigation options in accordance with the HAMP guidelines . . . ." 3 NYCRR § 419.11(i). OLS did not act in good faith, however, when it provided terms that were not conducive to the borrower avoiding foreclosure and saving the home on a long term basis. Similarly, the Servicer's pervasive **failures**, upon information and belief, to provide the mandated, written disclosures clearly disclosing the "**material terms, costs and risks**," constituted the second major prong for New York modification violations. *See* 3 NYCRR § 419.11(d). These New York state law violations, again, **rendered knowingly false** Ocwen's

initial and annual SPA certifications/representations that it was "in compliance with all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices…." **These false certifications/representations** fraudulently induced the U.S. to approve the SPA and purchase the Financial Instrument, and each was a false statement or record which OLS used to obtain huge incentive payments each year thereafter, when OLS falsely re-certified legal compliance with federal and state laws to Fannie Mae.

## 1.   OLS Examples of NY Modification Contracts

180.   Attached hereto as **Exhibit 5-6** are New York contract examples. The following examples are included:

**Exhibit 5**        **Servicer:** OLS
**Loan No.:** 7100435291
**City/State/Zip:** Mount Vernon, NY 10553
**Start Date of Modification:** September 2013; Term: 268 months

**New Advance of Funds:** Not Disclosed
**New Principal Balance after Modification:** $577,983.85
**Deferred Principal:** $344,833.85
**Deferred Principal Eligible for Forgiveness:** $305,333.85
**Interest Bearing Principal Amount:** $233,150
**Balloon Payment on Deferred Payment:** $39,500
**Monthly Principal & Interest:** $706.04
**Monthly Payment if Fully Amortized over 268 Months:** $1,079.38
- Amortization schedule extended 212 extra months (monthly payment amount calculated on the basis of an amortization schedule 212 months longer than the term of the loan),
**Monthly Shortage on Payment over Fully Amortized:** $373.34
**Contract <u>Not</u> Fully Amortized creating a Balloon Payment:** YES
**Balloon Payment due to not full amortization:** $126,006.75
**Total Balloon Payment due:** $165,505.75
**New Interest on Interest Charges:** Interest charged on capitalized, past due interest, **unloaned principal**, any reserve amounts for property taxes and insurance premiums not allowed under the original note or deed of trust, nor by State and Federal banking rules, regulations, and/or laws.

**New York State violations within 3 NYCRR § 419.11 on this contract**:

1. Section 419.11(b) – Requires that modifications be affordable and sustainable.
   - The minimum total Balloon Payment due at the end of the loan term is $165,505.75. This amount, due after 22 years of borrower's payments, is 71% of the initial Interest Bearing Principal the borrower started with.
   - The monthly payment is short by $357.66 per month of paying the full principal if fully amortized in 268 months.

2. Section 419.11(d) – Requires that borrowers receiving a modification must receive clear and understandable written information explaining the material terms, costs and risks of the option offered. The contract does not ever use the term "Balloon Payment" in any language throughout the contract.

   - The contract does not provide the previous principal balance before any advanced funds are added.
   - The contract does not disclose to the borrower the amount of new funds being advanced and added to create the new principal balance after the modification.
   - The contract does not explain that the borrower will pay a monthly Principal & Interest payment wherein the principal is short by $373.34 per month for 268 payments. The contract does not disclose that this monthly shortage will result in a balloon payment of $126,006.75, due at the end of the loan term.
   - Additionally, while the contract reflects a loan terms of 268 months, the payment amount is based on a 480-month amortization schedule (nearly 18 additional years beyond the loan term), creating the monthly shortage amount on principal and a balloon payment – a clear and understandable explanation of this is not reflected in the contract for the borrower.
   - The contract does not have any language that informs the borrower that a balloon payment in the amount of $165,505.75 will be due at the end of the loan term.
   - The contract fails to provide a line item in the "Payment Schedule" section informing the borrower of a final payment date and amount due, as required by TILA.
   - The contract fails to list the balloon payment as a final payment due in the "Payment Schedule," with an exact amount and date due, as required by TILA.
   - The contract does not have the proper federal and New York State required notice to borrowers that the balloon payment might not be refinanced by the lender

3. Section 419.11(i) – There is the presumption of good faith "if the servicers offer borrowers a modification."

   - The violations above demonstrate that there was a lack of "good faith" in the modification offered to the borrower.
   - This contract fails to provide the borrower the federally mandated, and any New York State required, TILA, Regulation Z, Right of Rescission form on the newly

advanced funds added to the original principal balance creating a new increased principal balance.

**Exhibit 6**          **Servicer:** OLS
                       **Loan No.** 706108818
                       **City, State, Zip Code:** Brooklyn, New York 11236
                       **Start Date of Modification:** February 2012; Term: 301 Months
                       **New Advance of Funds:** Not Disclosed
                       **New Principal Balance after Modification**: $277,513.82
                       **Deferred Principal:** None
                       **Interest Bearing Principal Amount:** $277,513.82
                       **Monthly Principal & Interest:** $971.85
                       **Monthly Payment if Fully Amortized over 301 Months:** $1,270.15
                       ▪ Monthly payment is calculated on the basis of an amortization schedule extended 157 extra months, 13 years longer than the term of the loan
                       **Monthly Shortage on Payment over Fully Amortized:** $298.30
                       **Contract <u>Not</u> Fully Amortized creating a Balloon Payment**: Yes
                       **New Interest on Interest Charges:** Interest charged on capitalized, past due interest**, unloaned principal**, any reserve amounts for property taxes and insurance premiums not allowed under the original note or deed of trust, nor by State and Federal banking rules, regulations, and/or laws.

**New York State violations under 3 NYCRR § 419.11 on this contract:**

1. Section 419.11(b) – Requires that modifications be affordable and sustainable.

- The modification contract is not amortized over the term of the loan. The monthly payment is short of paying the full principal if fully amortized of $298.30 per month for 301 months. This monthly shortage creates a balloon payment due at the end of the loan term of $128,784.16. This amount, due after 25 years of the borrower's payments, is 46.41% of the interest bearing principal that the borrower owed at the start.

2. Section 419.11(d) – Requires that borrowers receiving a modification must receive clear and understandable written information explaining the material terms, costs and risks of the option offered.

- The contract does not provide the previous principal balance before any advanced funds are added.
- The contract does not disclose to the borrower the amount of new funds being advanced and added to create the new principal balance after the modification.
- The contract does not explain that the borrower will pay a monthly Principal & Interest payment that is short of the amount necessary to fully amortize the loan by $298.30 per month for 301 payments. Nowhere in the contract does it provide

to the borrower that this monthly shortage shall result in a Balloon Payment of $128,174.16 due at the end of the loan term by the borrower.

- Additionally, while the contractual term of the loan is 301 months, the monthly payment is calculated on the basis of an amortization schedules extended to 458 months (an additional 13 years beyond the loan term), creating the monthly shortage amount on principal and a balloon payment – a clear and understandable explanation of this is not reflected in the contract to the borrower.

- The contract does not ever provide the exact dollar amount of the balloon payment due on January 1, 2037. Because this amount is unclear, it requires the average borrower to know the undisclosed monthly payment shortage and use a compound interest calculator in order to determine on his or her own the amount of the balloon payment.

- The contracts fails to provide a line item in the "Payment Schedule" section informing the borrower of the amount due, as required by TILA.

- The contract does not have the proper federal and New York State required notice to borrowers that the balloon payment may not be refinanced by the Lender.

3. Section 419.11(i) – There is the presumption of good faith "if the servicers offer borrowers a modification."

- The violations above demonstrate that there was a lack of "good faith" in the modification offered to the borrower.

- This contract fails to provide the borrower the federally mandated, and any New York State required, TILA, Regulation Z, Right of Rescission form on the newly advanced funds added to the original principal balance creating a new increased principal balance

## C.    Massachusetts Law

181.    Massachusetts also has stringent requirements for servicers. In its discussion of

mortgage loan servicing practice, the Code of Massachusetts' Regulations mandates that a third-

party loan servicer may not use **"unfair or unconscionable means"** when servicing a loan. 209

CMR § 18.21(1). The Code also prohibits "misrepresenting any material information [including]

the amount, nature or terms of any fee or payment due…and conditions of the servicing

contract." 209 CMR § 18.21(1)(i). Massachusetts' law and regulations also require that lenders

provide borrowers with Notice of the Right of Rescission which provides the obligor a right to

rescind a consumer credit transaction that involves an added security interest in the principal

dwelling of the person. Mass. Gen. Laws Ch. 140D § 10(b). OLS pervasively violated the duty under Massachusetts law to provide borrowers the Notice of the Right of Rescission at the time of loan modifications. For this additional reason, OLS's initial and annual SPA certifications/representations that it was "in compliance with all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices…" were **knowingly false** statements, certifications and records used to obtain huge incentive payments from the United States. These certifications were express conditions of payment and material to the government's decision to make HAMP incentive payments.

182.    In its discussion of mortgage loan servicing practices, the Code of Massachusetts Regulations mandates that a third-party loan servicer may not use **"unfair or unconscionable means"** when servicing a loan. 209 CMR § 18.21(1).

183.    The following conduct is specifically prohibited:

(a) Knowingly misapplying or recklessly applying loan payments to the outstanding balance of a loan.
…
(i) **Misrepresenting any material information** in connection with the servicing of the loan, including, but not limited to, **misrepresenting the amount, nature or terms of any fee or payment due or claimed to be due on a loan, the terms and conditions of the servicing contract or the borrower's obligations under the loan**.

Upon information and belief, OLS violated this law as outlined by the Massachusetts' high court below.

184.   Under Massachusetts' UDAP law,[104] loans that are "doomed to foreclosure" are unfair. In *Commonwealth of Massachusetts v. Fremont Investment & Loan*, the highest court in Massachusetts affirmed a lower court's ruling that loans with a specific set of features were presumptively unfair, because the only way borrowers could avoid foreclosure was if housing values rose indefinitely. 897 N.E.2d 548 (Mass. 2008) ("General Laws c. 93A, § 2(a), makes unlawful any "unfair or deceptive acts or practices in the **conduct of any trade or commerce**."):

> More to the point, at the core of the judge's decision is a determination that when Fremont chose to combine in a subprime loan the four characteristics the judge identified, Fremont knew or should have known that they would operate in concert essentially to guarantee that the borrower would be unable to pay and default would follow unless residential real estate values continued to rise indefinitely -an assumption that, in the judge's view, logic and experience had already shown as of January, 2004, to be unreasonable.
>
> ***
>
> Fremont correctly points out that as a bank in the business of mortgage lending, it is subject to State and Federal regulation by a variety of agencies. Well before 2004, State and Federal regulatory guidance **explicitly warned** lending institutions making subprime loans that, even if they were in compliance with banking-specific laws and regulations and were "underwrit[ing] loans on a safe and sound basis, [their] policies could still be considered unfair and deceptive practices" under G.L. c. 93A. Consumer Affairs and Business Regulation, Massachusetts Division of Banks, Subprime Lending (Dec. 10, 1997). More particularly, the principle had been clearly stated before 2004 that loans made to borrowers on terms that showed they **would be unable to pay and therefore were likely to lead to default were unsafe and unsound, and probably unfair**. Thus, an interagency Federal guidance published January 31, 2001, jointly by the Office of the Comptroller of the Currency (OCC), the Board of Governors of the Federal Reserve System, the FDIC, and the Office of Thrift Supervision, stated: "Loans to borrowers who do not demonstrate the capacity to repay

---

[104] Mass. G.L. c. 93A, § 2.

the loan, as structured, from sources other than the collateral pledged are generally **considered unsafe and unsound**" (emphasis supplied).   Expanded Guidance for Subprime Lending Programs at 11 (Jan. 31, 2001). On February 21, 2003, one year before the first of Fremont's loans at issue, the OCC warned that certain loans could be unfair to consumers:

When a loan has been made based on the foreclosure value of the collateral, rather than on a determination that the borrower has the capacity to make the scheduled payments under the terms of the loan, based on the borrower's current and expected income, current obligations, employment status, and other relevant financial resources, the lender is effectively counting on its ability to seize the borrower's equity in the collateral to satisfy the obligation and to recover the typically high fees associated with such credit. Not surprisingly, such credits experience foreclosure rates higher than the norm. "[S]uch disregard of basic principles of loan underwriting lies at the **heart of predatory lending** ."OCC Advisory Letter, Guidelines for National Banks to Guard Against Predatory and Abusive Lending Practices, AL 2003-2 at 2 (Feb. 21, 2003).

*Id.* at 556-557;

## 1.     **Mass. Right of Rescission**

185     The Massachusetts Consumer Credit Cost Disclosure Act (MCCCDA) determines the rights and liabilities of "consumer credit transactions." **Mass. Gen. Laws Ch. 140D § 10**. The Massachusetts legislature closely modeled the MCCCDA after TILA, making them materially the same.

186.     Massachusetts' **right of rescission** gives an obligor a right to rescind a consumer credit transaction that involves an added security interest in the principal dwelling of the person. Once an obligor rescinds the transaction, he is not liable for finance or other charge, and any security interest given by the obligor becomes void upon such rescission. **Mass. Gen. Laws Ch. 140D § 10(b).** OLS did not provide Massachusetts borrowers the required Notice, thus rendering false for this additional reason the initial and annual SPA certifications/representations executed

by Ocwen that it was "in compliance with all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices…."

### 2. OLS Examples of Massachusetts Modification Contracts

187.    Attached hereto as **Exhibits 7-8** are Massachusetts contract examples. The following examples are included:

**Exhibit 7**        **Servicer:** OLS
                          **Loan No.** 7143874753 – HAMP Modification
                          **City, State:** Attleboro, MA 02703
                          **Start Date of Modification:** May 2013; Term: 283 months

                          **New Advance of Funds**: Not Disclosed
                          **New Principal Balance after Modification:** $372,429.82
                          **Deferred Principal:** $23,422.17
                          **Interest Bearing Principal Amount:** $349,007.65
                          **Monthly Principal & Interest:** $1,064.15
                          **Monthly Payment if Fully Amortized over 283 Months:** $1,547.87
                                  ▪ Payment is calculated on the basis of an amortization schedule extended by 192 months – 16 years longer than the term of the loan
                          **Monthly Shortage on Payment over Fully Amortized:** $483.72
                          **Contract Not Fully Amortized Creating a Balloon Payment:** YES
                          **Balloon Payment due to not Full Amortization:** $179,800.00
                          **Balloon Payment from Deferred Principal:** $23,422.17
                          **Total Balloon Payment Due at Term of Loan:** $203,222.17
                          **New Interest on Interest Charges:** Interest charged on capitalized, past due interest, **unloaned principal**, any reserve amounts for property taxes and insurance premiums not allowed under the original note or deed of trust, nor by State and Federal banking rules, regulations, and/or laws.

                          **Massachusetts State Violations within 209 CMR § 18.21 and Mass. Gen. Laws Ch. 140D § 10(b) on this contract:**

                          1. Mass. Gen. Laws Ch. 140D § 10(b) -
                                  • OLS fails to provide the borrower the federally mandated, and the Massachusetts required Right of Rescission form on the newly advanced funds added to the original principal balance.
                          2. 209 CMR § 18.21(1)(i) -

- The contract includes a monthly shortage of $483.72 per month and the borrower is not informed that this shortage accrues compound interest for the next 283 months.
- As a result of the only partial amortization, the contract creates a balloon payment. At loan maturity, $179,800.00 will be due after nearly 24 years of payments.
- Additionally, there is a separate balloon payment due of $23,422.17 on the deferred principal. This creates a total <u>balloon payment due of $203,222.</u>17 after nearly 24 years of payments. The servicer fails to provide this correct balloon payment amount in the payment schedule box as a last line of payment due as required by federal TILA and Massachusetts law

3. 209 CMR § 18.21(1) -

- The failure to inform the borrower of the calculation of monthly payments on the basis of an amortization schedule extended beyond the actual term of the loan, and that it will cause an increased amount of interest to be paid over the term of the loan, coupled with the omission of the exact amount of funds added to the principal balance, misrepresents "material information" and represents "unfair or deceptive acts or practices in the conduct of any trade or commerce" pursuant to Massachusetts law.

**Exhibit 8**      **Servicer: OLS**
**Loan No. 77091605456**
**City, State: Dorchester, MA 02124**
**Start Date of Modification**: November 2013; Term: 273 Months

**New Advance of Funds:** Contract does not disclose
**New Principal Balance after Modification:** $337,549.30
**Deferred Principal:** None
**Interest Bearing Principal Amount:** $337,549.30
**Monthly Principal & Interest**: $1,049.32
**Monthly Payment if Fully Amortized over 283 Months:** $1,543.89

  ▪ Monthly payments calculated, however, on the basis of an amortization schedule extended by 276 months – 23 years beyond the actual term of the loan

**Monthly Shortage on Payment over Fully Amortized:** $494.57
**Contract <u>Not</u> Fully Amortized creating a Balloon Payment:** YES
**Balloon Payment due to not Full Amortization:** $176,600.00
(52.32% of Principal Balance at start of modification)
**New Interest on Interest Charges**: Interest charged on capitalized, past due interest, **unloaned principal**, any reserve amounts for property taxes and insurance premiums not allowed under the original note or deed of trust, nor by State and Federal banking rules, regulations, and/or laws.

**Massachusetts State Violations within 209 CMR § 18.21 and Mass. Gen. Laws Ch. 140D § 10(b) on this contract:**

1. Mass. Gen. Laws Ch. 140D § 10(b) -
   - OLS fails to provide the borrower the federally mandated, and the Massachusetts required Right of Rescission form on the newly advanced funds added to the original principal balance.
2. 209 CMR § 18.21(1)(i) -
   - OLS fails to provide the borrower the exact, itemized amount of funds being added to create the new principal balance.
   - The contract includes a monthly shortage of $494.57 per month not disclosed to the borrower, nor is the borrower informed that this shortage accrues compound interest for the next 276 months.
   - As a result of the only partial amortization, the contract creates a balloon payment. At loan maturity, $176,600.00 will be due after nearly 23 years of payments. The servicer fails to use the term balloon payment to identify the total amount due by the borrower at loan maturity.
3. 209 CMR § 18.21(1) -
   - The failure to inform the borrower of the calculation of monthly payments on the basis of an amortization schedule extended beyond the actual term of the loan, and that it will cause an increased amount of interest to be paid over the term of the loan, coupled with the omission of the exact amount of funds added to the principal balance, misrepresents "material information" and represents "unfair or deceptive acts or practices in the conduct of any trade or commerce" pursuant to Massachusetts law.

## XII. FAILURE BY OLS TO SELF-REPORT

188.    As a participant in the government's Home Affordable Modification Program, OLS had the express, affirmative duty to notify Fannie Mae and Freddie Mac **immediately** in the event that any of the representations, warranties, or covenants made by Ocwen in the SPA ceased to be "true and correct."[105] Despite this directive, OLS has knowingly failed to notify the

---

[105] *See* Exhibits 1 and 2, Ocwen's Original and Amended and Restated SPA at Financial Instrument ¶ 5 "In the event that any of the representations, warranties, or covenants made herein ceases to be true and correct, Servicer agrees to notify Fannie Mae and Freddie Mac immediately."

government of all violations committed by OLS and its third party contractors of which it was aware. OLS has knowingly violated this obligation to the United States, many thousands of times, when OLS knew of violations that had occurred.

189.    Specifically, OLS did not (1) operate in compliance with all applicable Federal, state and local laws, regulations, regulatory guidance, statutes, ordinances, codes and requirements;[106] (2) perform its services in accordance with high professional standards of care, using qualified individuals with suitable training, education, experience and skills;[107] or (3) responsibly supervise and manage third-party contractors to ensure that services were being performed in accordance with HAMP program requirements.[108] These latter, knowing failures and the knowing failure by OLS to properly report violations to Fannie Mae and Freddie Mac, as required by the SPA, render Ocwen's [time relevant] certifications/representations, that it was "in compliance with "all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices…" **knowingly false.**

## XIII. FALSE CLAIMS ACT

190.    This is an action alleging violations of the federal False Claims Act, 31 U.S.C. §§ 3729-32 ("FCA") and seeking damages, civil penalties and other statutory relief on behalf of the United States and the Relators as a result of the Defendants' false records, statements, and claims.

---

[106] *Id*. at Financial Instrument ¶ 5(b).

[107] *Id*. at Financial Instrument ¶ 5(d).

[108] *Id*. at Financial Instrument ¶ 6.

191.   The FCA generally provides, *inter alia*, that any person who (i) knowingly presents or causes to be presented to the United States for payment or approval a false or fraudulent claim, *(ii) knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim,* **and (iii)** is liable to the Government for a civil penalty of not less than $5,500 and not more than $11,000 for each such claim, plus three (3) times the amount of damages sustained by the Government because of the false claim. 31 U.S.C. §§ 3729(a)(1)(G).

192.   The FCA allows any person having knowledge of a false or fraudulent claim against the Government to bring an action in Federal District Court for himself and for the United States Government and to share in any recovery as authorized by 31 U.S.C. § 3730(d). Relators claim entitlement to a portion of any recovery obtained by the United States as they are, on information and belief, the first to file, and are (to the extent OLS proffers any qualifying public disclosures) original sources for the information on which the allegations or transactions in the claims herein are based. In this vein, all the allegations are based on Relators' direct and independent knowledge.

193.   Based on these provisions, Relators, on behalf of the United States Government, seek, through this action, to recover damages, civil penalties and other statutory relief arising from the Defendants' submission of false and/or fraudulent claims for approval and/or payment and Ocwen's use of false records or statements that would be material to a decision of the United States to pay OLS's requests for payment. The United States has suffered significant actual damages as a result of the Defendants' false and fraudulent claims and its use of false records or statements material to false or fraudulent claims.

194.     As required under the FCA, Relators have provided the Attorney General of the United States and the United States Attorney for the Eastern District of Texas a disclosure statement of material evidence and information related to and supporting the allegations in this complaint before the filing of the Complaint.

195.     OFC falsely certified/represented in its original, standard form SPA on or around April 16, 2009, Exhibit1 at p. 1**,** that it was in full compliance with all relevant laws, including but not limited to TILA, at the time of its execution of the SPA and Financial Instruments. OLS *falsely certified, again,* on or about September 9, 2010, **and annually thereafter**, that they were in full compliance with all relevant laws, including but not limited to TILA, at the time of their execution of the Amended and Restated Commitment to Purchase Financial Instrument and SPAs. Exhibit 1, Ocwen *SPA*. By these individual material false certifications and false statements, OFC **fraudulently induced** the United States, through its Financial Agent, to enter the SPA Agreement with OLS and **to purchase** the overarching Financial Instrument. OLS made false Subsequent Certifications to the United States annually, on or about June 1, 2010, June 1, 2011, June 1, 2012, and June 1, 2013 in the form set forth in the SPA, that it **[past]** and would [future] comply with all relevant laws, including but not limited to TILA and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices, when it had not done so. OLS has however, knowingly failed to provide required TILA/Regulation Z notices of right of rescission to borrowers for the secured additional advances, both in and out of the HAMP program, and failed to comply with the state laws set forth above.

196.     OLS also knowingly and falsely certified/represented to the FHA that they were in compliance with all FHA and HUD regulations. By these individual material false certifications and false statements, OLS **fraudulently induced** the United States to authorize

insurance claim payments from the FHA insurance fund, based upon the belief that OLS's certifications/representations of compliance with all FHA and HUD regulations were true when they were, in fact, not true.

197.    In addition to the HAMP incentive payments which were fraudulently induced by Ocwen, the United States is entitled to recover under the FCA similar relief for the fraudulently induced FHA and VA insurance payments requested by OLS. Similarly, OLS violated the FCA by making false statements about its compliance with applicable federal laws which were material to the decision of the United States to pay FHA and VA insurance payments requested by OLS.

## XIV. ADMISSIONS: 2014 CONSENT ORDER UNDER NEW YORK BANKING LAW AND JUDICIAL ESTOPPEL AGAINST DEFENDANTS

198.    On December 19, 2014, OFC and OLS officers executed a Consent Order Pursuant to New York Banking Law § 44 ("2014 NYDFS Consent Order"), entered between these two Ocwen entities and the New York State Department of Financial Services ("NYDFS"). OFC and OLS *stipulated* that:

- in 2010 and 2011, the multistate examinations of Ocwen,[109] Litton, and Homeward[110] identified numerous and significant violations of New York State laws and regulations;[111]

---

[109] "Ocwen" defined as OFC and OLS together. 2014 NYDFS Consent Decree at 1.
[110] Litton was purchased by Ocwen in 2011; Homeward was purchased by Ocwen in 2012.
[111] 2014 NYDFS Consent Order at 1.

- on September 1, 2011, in connection with Ocwen's acquisition of Litton and amid concerns regarding Ocwen's rapid growth and capacity to properly acquire and service a significant portfolio of distressed home loans, Ocwen and the Department entered into an Agreement on Mortgage Servicing Practices (the "2011 Agreement"), which required Ocwen to adhere to certain servicing practices in the best interest of borrowers and investors;[112]

- a June 2012 targeted examination of Ocwen revealed that <u>Ocwen violated the 2011 Agreement;</u> [113]

- as a result of Ocwen's violation of the 2011 Agreement, Ocwen entered into a Consent Order with the Department on December 5, 2012 [("2012 Consent Order")], which required Ocwen to retain an independent compliance monitor (the "Compliance Monitor") for two years to conduct a comprehensive review of Ocwen's servicing operations; [114]

- <u>the Department and the Compliance Monitor identified numerous and significant additional violations of the 2011 Agreement, as well as New York State laws and regulations;</u> [115]

199.    In the 2012 NYDFS Consent Order, OFC and OLS further ***agreed*** to the

following ***facts***:

2.      In 2010 and 2011, the Department participated in a multistate examination of Ocwen, as well as examinations of Litton and Homeward, the entities ultimately acquired by Ocwen. <u>The examination of Ocwen identified, among other things, deficiencies in Ocwen's servicing platform and loss mitigation infrastructure,</u> including (a) <u>robo-signing,</u> (b) <u>inaccurate affidavits</u> and <u>failure to properly validate document execution processes,</u> (c) <u>missing documentation,</u> (d) <u>wrongful foreclosure,</u> (e) <u>failure to properly maintain books and records,</u> and (f) <u>initiation of foreclosure actions without proper legal standing.</u>[116]

3.      The examinations of Litton and Homeward identified substantial deficiencies, weaknesses, and violations of laws and regulations relating to, among other things, foreclosure governance, implementation of modification

---

112 2014 NYDFS Consent Order at 2.
113 2014 NYDFS Consent Order at 2.
114 2014 NYDFS Consent Order at 2.
115 2014 NYDFS Consent Order at 2.
116 2014 NYDFS Consent Order at 3.

programs, record keeping, required notifications, and the charging of unallowable fees.[117]

4.      The examination of Litton also revealed that, prior to Ocwen's acquisition of Litton, members of Litton's information technology staff falsified documents provided to the Department during the review of Litton's information technology infrastructure.[118]

5.      In connection with Ocwen's acquisition of Litton in 2011 and in light of the examination findings for both Ocwen and Litton, the Department sought to ensure that Ocwen had sufficient capacity to properly acquire and manage a significant portfolio of distressed loans, including the ability to effectively manage the increased volume and comply with requirements under the federal Home Affordable Modification Program, internal loss mitigation policies and procedures, and laws and regulations governing mortgage loan servicing and foreclosure activities.[119]

6.      To that end, Ocwen and the Department entered into an Agreement on Mortgage Servicing Practices on September 1, 2011, which required Ocwen to: (a) establish and maintain sufficient capacity to properly acquire and manage its significant portfolio of distressed loans to ensure a smooth borrower transition; (b) engage in sound document execution and retention practices to ensure that mortgage files are accurate, complete, and reliable; and (c) implement a system of robust internal controls and oversight with respect to mortgage servicing practices performed by its staff and third party vendors to prevent improper foreclosures and maximize struggling borrowers' opportunities to keep their homes.[120]

7.      In June 2012, the Department conducted a targeted examination of Ocwen to assess its compliance with the 2011 Agreement and Part 419 of the Superintendent's Regulations, which governs business conduct rules for servicers. The examination identified gaps in the servicing records of certain loans that indicated **repeated non-compliance** by Ocwen, including: (a) failing to send borrowers a 90-day notice prior to commencing a foreclosure action as required under New York Real Property Actions and Proceedings Law ("RPAPL") § 1304, (b) commencing foreclosure actions on subprime loans without affirmatively alleging in the complaint that Ocwen had standing to bring the foreclosure action as required by RPAPL § 1302, and (c) commencing foreclosure actions without sufficient documentation of its standing to do so.[121]

---

[117] 2014 NYDFS Consent Order at 3.
[118] 2014 NYDFS Consent Order at 3.
[119] 2014 NYDFS Consent Order at 3.
[120] 2014 NYDFS Consent Order at 3-4.
[121] 2014 NYDFS Consent Order at 4.

8.     The <u>targeted examination</u> also <u>identified instances that indicated widespread noncompliance with the 2011 Agreement</u> including: (a) <u>failing to provide borrowers with the direct contact information for their designated single point of contact</u>, a customer care representative whose role is to understand each assigned borrower's circumstances and history to ensure that the borrower receives efficient and consistent customer care; (b) <u>dual-tracking</u>; (c) <u>failing to conduct an independent review of loan modification denials</u>; (d) <u>failing to demonstrate adoption of policies and procedures to effectively track sanctioned third-party vendors</u>, including local foreclosure counsel; (e) <u>failing to demonstrate implementation of policies and procedures to verify borrower information on newly boarded accounts to accurately reflect the status and current balance of the borrower's account</u>; and (f) <u>failing to ensure that trial or permanent modifications granted to borrowers by a prior servicer are honored upon transfer to Ocwen</u>.[122]

9.     Consequently, on <u>December 5, 2012</u>, <u>Ocwen entered into a Consent Order with the Department</u>, which required Ocwen to retain an independent compliance monitor for two years. The Consent Order mandated that the Compliance Monitor, which would report directly to the Department, would "conduct a comprehensive review . . . of Ocwen's servicing operations, including its compliance program and operational policies and procedures." The review would, at a minimum, consider (a) the adequacy of Ocwen's staffing levels, (b) the robustness of Ocwen's established policies and procedures, (c) the fairness of servicing fees and foreclosure charges, (d) the accuracy of borrower account information, (e) Ocwen's compliance with federal and state law, (f) borrower complaints and recordings of customer service, and (g) Ocwen's compliance with the Agreement.[123]

10.     The Compliance Monitor began work in July 2013.[124]

11.     <u>In the course of the Compliance Monitor's review, it identified numerous and significant violations of the 2011 Agreement, as well as New York State laws and regulations.</u>[125]

12.     For example, <u>a limited review by the Compliance Monitor of 478 New York loans that Ocwen had foreclosed upon revealed 1,358 violations of Ocwen's legal obligations</u>, or about three violations per foreclosed loan. These violations included:

•     <u>failing to confirm that it had the right to foreclose before initiating foreclosure proceedings</u>;

---

122 2014 NYDFS Consent Order at 4-5.
123 2014 NYDFS Consent Order at 5.
124 2014 NYDFS Consent Order at 5.
125 2014 NYDFS Consent Order at 5.

- failing to ensure that its statements to the court in foreclosure proceedings were correct;

- pursuing foreclosure even while modification applications were pending ("dual tracking");

- failing to maintain records confirming that it is not pursuing foreclosure of service members on active duty; and

- failing to assign a designated customer care representative.[126]

13.     The Department and the Compliance Monitor also identified, among other things, (a) inadequate and ineffective information technology systems and personnel, and (b) widespread conflicts of interest with related parties.[127]

**Inadequate and Ineffective Information Technology Systems and Personnel**

14.     In the course of its review, the Compliance Monitor determined that Ocwen's information technology systems are a patchwork of legacy systems and systems inherited from acquired companies, many of which are incompatible. A frequent occurrence is that a fix to one system creates unintended consequences in other systems. As a result, Ocwen regularly gives borrowers incorrect or outdated information, sends borrowers backdated letters, unreliably tracks data for investors, and maintains inaccurate records. There are insufficient controls in place— either manual or automated—to catch all of these errors and resolve them.[128]

15.     For example, Ocwen's systems have been backdating letters for years. In many cases, borrowers received a letter denying a mortgage loan modification, and the letter was dated more than 30 days prior to the date that Ocwen mailed the letter. These borrowers were given 30 days from the date of the denial letter to appeal that denial, but those 30 days had already elapsed by the time they received the backdated letter. In other cases, Ocwen's systems show that borrowers facing foreclosure received letters with a date by which to cure their default and avoid foreclosure—and the cure date was months prior to receipt of the letter. Ocwen's processes failed to identify and remedy these errors.[129]

---

[126] 2014 NYDFS Consent Order at 5-6.
[127] 2014 NYDFS Consent Order at 6.
[128] 2014 NYDFS Consent Order at 6.
[129] 2014 NYDFS Consent Order at 6.

**Relators' Fourth Amended Complaint**                                          118

16.     Moreover, <u>Ocwen failed to fully investigate and appropriately address the backdating issue</u> when <u>an employee questioned the accuracy of Ocwen's letter dating processes and alerted the company's Vice President of Compliance</u>. <u>Ocwen ignored the issue for five months</u> until the same employee raised it again. While Ocwen then began efforts to address the backdating issue, <u>its investigation was incomplete and Ocwen has not fully resolved the issue to date, more than a year after its initial discovery</u>.[130]

17.     <u>Ocwen's core servicing functions rely on its inadequate systems</u>. Specifically, <u>Ocwen uses comment codes entered either manually or automatically to service its portfolio</u>; each code initiates a process, such as sending a delinquency letter to a borrower, or referring a loan to foreclosure counsel. <u>With Ocwen's rapid growth and acquisitions of other servicers, the number of Ocwen's comment codes has ballooned to more than 8,400 such codes</u>. Often, <u>due to insufficient integration following acquisitions of other servicers, there are duplicate codes that perform the same function</u>. <u>The result is an unnecessarily complex system of comment codes, including, for example, 50 different codes for the single function of assigning a struggling borrower a designated customer care representative</u>.[131]

18.     Despite these issues, <u>Ocwen continues to rely on those systems</u> to service its portfolio of distressed loans. <u>Ocwen's reliance on technology has led it to employ fewer trained personnel than its competitors</u>. For example, <u>Ocwen's Chief Financial Officer recently acknowledged, in reference to its offshore customer care personnel, that Ocwen is simply "training people to read the scripts and the dialogue engines with feeling." Ocwen's policy is to require customer support staff to follow the scripts closely, and Ocwen penalizes and has terminated customer support staff who fail to follow the scripts that appear on their computer screens</u>. In some cases, <u>this policy has frustrated struggling borrowers who have complex issues</u> that exceed the bounds of a script and <u>have issues speaking with representatives at Ocwen capable of addressing their concerns</u>. Moreover, <u>Ocwen's customer care representatives</u> in many cases <u>provide conflicting responses to a borrower's question. Representatives have also failed in many cases to record in Ocwen's servicing system the nature of the concerns that a borrower has expressed</u>, leading to <u>inaccurate records of the issues raised by the borrower</u>.[132]

19.     <u>Ocwen's</u> <u>inadequate infrastructure and ineffective personnel</u> have resulted in Ocwen's <u>failure to fulfill its legal obligations</u>. Prior to the Department's and the Compliance Monitor's review, <u>Ocwen did not take</u>

---

[130] 2014 NYDFS Consent Order at 7.
[131] 2014 NYDFS Consent Order at 7.
[132] 2014 NYDFS Consent Order at 7-8.

adequate steps to implement reforms that it was legally obligated to implement pursuant to the 2011 Agreement.[133]

**Widespread Conflicts of Interest with Related Parties**

20.    The Department's review of Ocwen's mortgage servicing practices also uncovered a number of conflicts of interest between Ocwen and four other public companies (the "related parties"),[1] all of which are chaired by Mr. Erbey, who is also the largest individual shareholder of each and the Executive Chairman of Ocwen. In addition to serving as chairman of the board for Ocwen and each related company, Mr. Erbey's holdings in these companies total more than $1 billion. Other Ocwen executives and directors also own significant investments in both Ocwen and the related parties. Yet, Ocwen does not have a written policy that explicitly requires potentially conflicted employees, officers, or directors to recuse themselves from involvement in transactions with the related companies.

> [1].    The related parties are, as of the date of this Consent Order, Altisource Portfolio Solutions, S.A. ("Altisource Portfolio"), Altisource Residential Corporation, Altisource Asset Management Corporation, and Home Loan Servicing Solutions Ltd., and any of their affiliates, predecessors and successors in interest, both past and present, and any of their officers, directors, partners, employees, consultants, representatives, and agents or other persons and entities acting under their control or on their behalf.[134]

21. Despite Mr. Erbey's holdings in these companies, Mr. Erbey has not in fact recused himself from approvals of several transactions with the related parties. Mr. Erbey, who owns approximately 15% of Ocwen's stock, and nearly double that percentage of the stock of Altisource Portfolio, has participated in the approval of a number of transactions between the two companies or from which Altisource received some benefit, including the renewal of **Ocwen's forced placed insurance** program in early 2014.[135]

22.    Ocwen's close business relationship with related companies is particularly evident in its relationship with Altisource Portfolio, which has **dozens of subsidiaries that perform fee based services for Ocwen**. In one example, Altisource Portfolio subsidiary Hubzu, an online auction site, hosts nearly all Ocwen auctions. In certain circumstances, Hubzu has charged more for its

---

[133] 2014 NYDFS Consent Order at 8.
[134] 2014 NYDFS Consent Order at 8.
[135] 2014 NYDFS Consent Order at 9.

services to Ocwen than to other customers—charges which are then passed on to borrowers and investors. Moreover, Ocwen engages Altisource Portfolio subsidiary REALHome Services and Solutions, Inc. as its default real estate agency for short sales and investor-owned properties, even though this agency principally employs out-of-state agents who do not perform the onsite work that local agents perform, at the same cost to borrowers and investors.[136]

     23.    Conflicts of interest are evident at other levels of the Ocwen organization. For example, during its review, the Monitor discovered that Ocwen's Chief Risk Officer concurrently served as the Chief Risk Officer of Altisource Portfolio. The Chief Risk Officer reported directly to Mr. Erbey in both capacities. This individual seemed not to appreciate the potential conflicts of interest posed by this dual role, which was of particular concern given his role as Chief Risk Officer.[137]

200.    Based on the stipulations and agreed facts, Ocwen agreed, *inter alia,* to pay $150 million in penalties and restitution to borrowers, to be overseen by an Operations Monitor to be selected by NYDFS and who will review and assess the adequacy and effectiveness of Ocwen's operations with respect to the violations found by NYDFS and the Compliance Monitor appointed pursuant to the 2012 NYDFS Consent Order. The Operations Monitor is also authorized to assess and consult with OFC's Board and its committees regarding numerous issues. Finally, the 2014 NYDFS Consent Agreement required William Erbey to resign from his positions as Chairman of Ocwen and four related entities.[138]

201.    Relator Bullock witnessed virtually all of the violations described in the 2014 NYDFS Consent Agreement before it was made public, and are original sources of the allegations regarding those violations. Ocwen should be judicially estopped from claiming that it has not been in material non-compliance with applicable federal, state and local laws, regulations, rules and requirements, all of which are outlined hereinabove and incorporated

---

[136] 2014 NYDFS Consent Order at 9.
[137] 2014 NYDFS Consent Order at 9.
[138] 2014 NYDFS Consent Order at 10-17.

herein. Ocwen may not stipulate and agreement to pervasive mortgage servicing violations in the New York State matter and turn around and deny its admitted conduct herein. If it attempts to do so, Relators will move to strike the improper pleadings.

## XV. CAUSES OF ACTION

### A.    First Cause of Action -False Claims 31 U.S.C. § 3729(a)(1)(A)

202.    Relators re-allege and hereby incorporate by reference each and every allegation contained in the preceding paragraphs numbered 1 through 201 of this complaint. Therefore, OFC and OLS have knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval in violation of **31 U.S.C. 3729(a)(1)(A).**

### B.    Second Cause of Action - False Claims 31 U.S.C. § 3729(a)(1)(B)

203.    Relators re-allege and hereby incorporate by reference each and every allegation contained in the preceding paragraphs numbered 1 through 202 of this complaint. Therefore, OFC and OLS have knowingly made, used or caused to be made or used a false record or statement material to a false or fraudulent claim in violation of **31 U.S.C. § 3729(a)(1)(B). The false statements also included false statements and certifications made to <u>fraudulently induce</u> the U.S. to approve Ocwen's SPA, to induce the U.S. to purchase Ocwen's Financial Instrument and to induce the United States to pay FHA and VA insurance payments to which OLS was not entitled.**

## XVI. PRAYER AND REQUEST FOR RELIEF

204.    On behalf of the United States, Relators seek to recover all relief available under the FCA, as amended. Relators seek monetary damages equal to three (3) times the damages suffered by the United States. In addition, Relators seeks to recover all civil penalties and other relief on behalf of the United States Government and the Relators in accordance with the FCA.

205.    Relators should, for their contribution to the Government's investigation and recovery, be awarded a fair and reasonable Relator's share pursuant to 31 U.S.C. § 3730(d) of the FCA;

206.    Relators seek to be awarded all costs and expenses for this action, including statutory attorneys' fees, expenses, court costs and any available pre-judgment or post-judgment interest at the highest rate allowed by law.

WHEREFORE, premises considered, Relators pray that this District Court enter judgment on behalf of the United States and against the Defendants for the following:

a.    damages in the amount of three (3) times the actual damages suffered by the United States and all statutory penalties arising from the Defendants' unlawful conduct which violated the FCA;

b.    a Relator's Share from the recoveries in a statutory amount which is fair and reasonable under the circumstances;

c.    Relator's statutory attorneys' fees, expenses, and costs of court;

d.    pre-judgment and post-judgment interest, at the highest rate allowed by law; and

e.    all other relief to which Relators and/or the United States may be justly entitled, whether at law or inequity, and which the District Court deems just and proper.

Dated: April 17, 2015

**UNITED STATES OF AMERICA, ex rel. Michael J. Fisher and Brian Bullock**

Respectfully submitted:

By*: /s/Samuel L. Boyd*
Samuel L. Boyd
Texas SBN: 02777500
Catherine C. Jobe
Texas SBN: 10668280
**BOYD & ASSOCIATES**
6440 North Central Expressway, Suite 600
Dallas, Texas 75206-4101
Tel (214) 696-2300
Fax (214) 363-6856
sboyd@boydfirm.com


By: */s/ Thomas M. Melsheimer*
Thomas M. Melsheimer
txm@fr.com
Texas Bar No. 13922550
Chad B. Walker
cbwalker@fr.com
Texas Bar No. 24056484
**FISH & RICHARDSON P.C.**
1717 Main Street, Suite 5000
Dallas, TX 75201
(214) 747-5070 (Telephone)
(214) 747-2091 (Facsimile*)*

William T. "Tommy" Jacks
jacks@fr.com
Texas Bar No. 10452000
**FISH & RICHARDSON P.C.**
One Congress Plaza, Suite 810
111 Congress Avenue
Austin, TX 78701
(512) 472-5070 (Telephone)
(512) 320-8935 (Facsimile)

*Counsel for Qui Tam Plaintiffs/Relators*

By: */s/Roger D. Sanders*
Roger D. Sanders
TX SBN 17604700
J. Michael Young
TX SBN 00786465
Sanders, O'Hanlon, Motley & Young, PLLC
III South Travis
Sherman, TX 75090
(903) 892-9133 (Tel.)
(903 892-4300 (Fax)
**Local Counsel for Relators**

**Relators' Fourth Amended Complaint**                                124

## CERTIFICATE OF SERVICE AND DISCLOSURE

The undersigned certifies that the forgoing Third Amended Complaint was filed in accordance with the Local Rules of the United States District Court for the Eastern District of Texas and the Federal Rules of Civil procedure.

On August 9, 2012, Relator served a copy of his Disclosure Statement to US Attorneys Shamoil Shipchandler and Kevin McClendon for the United States District Court for the Eastern District of Texas, Sherman Division, and to United States Attorney General Eric Holder.

On August 20, 2012, Relator served a copy of his Disclosure Statement and proposed Original Complaint to US Attorney Kevin McClendon for USDC for the Eastern District of Texas, Scott Hogan, U.S. Attorney for the Northern District of Texas, Dallas Division and to US. Attorney William Edgar, Senior Trial Counsel, Department of Justice, Washington D.C.

On August 20, 2012, a copy of Relator's Complaint filed under seal was formally served pursuant to FRCP 4(i)(1)(b), via Certified Mail, Return Receipt Requested, upon: Eric Holder Attorney General of the United States, U.S. Department of Justice, 950 Pennsylvania Avenue NW, Washington, DC 20530-0001

On August 11, 2014, a copy of the First Amended Complaint filed under seal was formally served pursuant to FRCP 4(i)(1)(b), via Certified Mail, Return Receipt Requested, upon: Eric Holder, Attorney General of the United States, U.S. Department of Justice, 950 Pennsylvania Avenue NW, Washington, DC 20530-0001

On August 20, 2014 a copy of Relator's Second Amended Complaint filed under seal was served upon AUSA Kevin McClendon for the United States District Court for the Eastern District of Texas, Sherman Division and to US Attorney William Edgar, Senior Trial Counsel, Department of Justice, Washington D.C. and formally served pursuant to FRCP 4(i)(1)(b), via Certified Mail, Return Receipt Requested, upon: Eric Holder, Attorney General of the United States, U.S. Department of Justice, 950 Pennsylvania Avenue NW, Washington, DC 20530-0001

On October 29, 2014 a copy of Relator's proposed Third Amended Complaint filed under seal was served upon AUSA Kevin McClendon for the United States District Court for the Eastern District of Texas, Sherman Division and to US Attorney William Edgar, Senior Trial Counsel, Department of Justice, Washington D.C. and formally served pursuant to FRCP 4(i)(1)(b), via Certified Mail, Return Receipt Requested, upon: Eric Holder, Attorney General of the United States, U.S. Department of Justice, 950 Pennsylvania Avenue NW, Washington, DC 20530-0001.

On November 13, 2014, a copy of Relator's proposed Third Amended Complaint (filed without seal) was served upon AUSA Kevin McClendon for the United States District Court for the Eastern District of Texas, Sherman Division and to US Attorney William Edgar, Senior Trial Counsel, Department of Justice, Washington D.C. and formally served pursuant to FRCP 4(i)(1)(b), via Certified Mail, Return Receipt Requested, upon: Eric Holder, Attorney General of

the United States, U.S. Department of Justice, 950 Pennsylvania Avenue NW, Washington, DC 20530-0001.

On April 16 and April 17, 2015 a copy of Relators' Motion for Leave and Relator's Fourth Amended Complaint was served upon AUSA Kevin McClendon for the United States District Court for the Eastern District of Texas, Sherman Division and to US Attorney John Black, Senior Trial Counsel, Department of Justice, Washington D.C. and formally served on April 17, 2015 pursuant to FRCP 4(i)(1)(b), via Certified Mail, Return Receipt Requested, upon: Eric Holder, Attorney General of the United States, U.S. Department of Justice, 950 Pennsylvania Avenue NW, Washington, DC 20530-0001.

/s/Samuel Boyd
Samuel L. Boyd