1

| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| | EASTERN DISTRICT OF TEXAS |
| 2 | SHERMAN DIVISION |

```
 3
    UNITED STATES OF AMERICA      :      DOCKET NO. 4:12CV543
 4  EX REL MICHAEL J. FISHER      :
                                  :
 5  VS.                           :      SHERMAN, TEXAS
                                  :      JUNE 4, 2015
 6  OCWEN LOAN SERVICING, LLC     :      1:30 P.M.

 7
                          MOTIONS HEARING
 8            BEFORE THE HONORABLE AMOS L. MAZZANT,
                  UNITED STATES DISTRICT JUDGE
 9

10  APPEARANCES:

11
    FOR THE PLAINTIFF:            MR. MICHAEL BRETT JOHNSON
12                                FISH & RICHARDSON
                                  1717 MAIN STREET, SUITE 5000
13                                DALLAS, TX  75201

14                                MR. SAMUEL L. BOYD
                                  MS. LAURA GALLARDO
15                                BOYD & ASSOCIATES
                                  6440 N. CENTRAL EXPRESSWAY
16                                SUITE 600
                                  DALLAS, TX  75206
17

18

19  FOR DEFENDANT OCWEN:          MR. GERARD E. WIMBERLY, JR.
                                  MR. GABRIEL A. CROWSON
20                                MCGLINCHEY STAFFORD
                                  601 POYDRAS STREET
21                                12TH FLOOR
                                  NEW ORLEANS, LA  70130
22
                                  MR. RICHARD DWAYNE DANNER
23                                MCGLINCHEY STAFFORD
                                  2711 N. HASKELL AVE.
24                                SUITE 2750
                                  DALLAS, TX  75204
25
```

2

1

2   FOR INTERVENOR NEW YORK        MR. PETER C. DEAN
    DEPARTMENT OF FINANCIAL        NY DEPT. OF FINANCIAL SERVICES
3   SERVICES:                      ONE STATE STREET
                                   NEW YORK, NY  10004
4

5

    COURT REPORTER:                MS. JAN MASON
6                                  OFFICIAL REPORTER
                                   101 E. PECAN #110
7                                  SHERMAN, TEXAS  75090

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   PROCEEDINGS REPORTED BY MECHANICAL STENOGRAPHY, TRANSCRIPT

25   PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.

3

1          THE COURT:  Please be seated.

2      Good afternoon.  We're here in 4:12CV543, the United

3  States of America, Relators Michael Fisher, et al versus

4  Ocwen Loan Servicing, LLC.

5      So who will be here for the Relators?

6          MS. GALLARDO:  Laura Gallardo as well as Sam Boyd and

7  Brett Johnson for U.S. ex rel Brian Fisher and Brian Bullock.

8          THE COURT:  Very good.  And for Ocwen?

9          MR. WIMBERLY:  Gerard Wimberly, Your Honor, on behalf

10  of Ocwen.

11          THE COURT:  Is your mic on?  That's the one general

12  rule in this courtroom, you always have to have your mic on

13  because the acoustics are not the best.

14          MR. WIMBERLY:  Is it on yet?

15          THE COURT:  Yes, it is.

16          MR. WIMBERLY:  Thank you, Your Honor.  My partner hit

17  the wrong button.

18      My partner, Dwayne Danner, is here also for Ocwen and

19  Gabe Crowson rounds out the Ocwen team.

20          THE COURT:  And for Boston, do we have

21  representatives here for both of the --

22          MR. BURD:  Gene Burd for Boston Portfolio Advisors,

23  together with Brian Clark.

24          MR. SIEBMAN:  Your Honor, Clyde Siebman and John

25  Buretta on behalf of StoneTurn Group, LLP.

4

1          THE COURT:  And then is that it?  Do we have

2     representatives from New York?

3          MR. DEAN:  Yes, Your Honor.

4          THE COURT:  Okay.

5          MR. DEAN:  Peter Dean.

6          THE COURT:  Very good.

7        Well, I spent yesterday reading all these materials and

8     so I'm ready to proceed.  I presume there's been no

9     resolution or agreement or I would have been notified, so

10    let's go ahead and proceed.

11       Here's the way I want to proceed is I would like to

12    start with the third parties or the non-parties, their

13    arguments first, and then we'll progress from there.  So I

14    don't know if one -- the arguments are basically the same

15    arguments.  I'll give both sides the opportunity to say

16    their piece on that before I see what the Relators want to

17    respond.  So who would like to speak first on behalf of the

18    non-parties?

19          MR. SIEBMAN:  Your Honor, Clyde Siebman on behalf of

20    StoneTurn Group, LLP.  With me I also have, as I mentioned,

21    John Buretta.

22       There are two components to our argument.  The first

23    argument is one of undue burden and the other has to do with

24    privilege.  I'm going to handle the undue burden argument

25    and then Mr. Buretta will handle the issue with respect to

5

1    the privilege argument.

2              THE COURT:  Very well.

3              MR. SIEBMAN:  If that's all right with Your Honor.

4              THE COURT:  That's fine.

5              MR. SIEBMAN:  As a preliminary matter, I think it

6    would be important for Your Honor to understand that

7    StoneTurn -- the testing was designed primarily to evaluate

8    compliance with certain paragraphs of a consent order and not

9    primarily with respect to the statutes alleged in the

10   complaint.  In addition -- and what I mean is in the

11   Plaintiff's complaint.  The statutes that they have alleged in

12   the complaint are not the focus of the monitoring that was

13   being done by Stone Group -- by StoneTurn Group.

14        It's also important for the Court to understand the way

15   that the documents made the basis of the subpoena were

16   received by StoneTurn.  There was an FT site process that

17   was used and there was a focal site, an FTP focal site on

18   the Ocwen side of the wall, if you will.  So the FTP site is

19   on the Ocwen side of the wall.  All the documents from Ocwen

20   are received there.

21        From there, there were kind of two branches that went

22   to StoneTurn.  The first branch was basically the loan

23   files.  The other branch had to do with documents that were

24   not the loan files.

25        Once the information was on the StoneTurn side of the

6

1   FTP, individuals from StoneTurn all over the country could

2   download that information to perform their monitoring work.

3   For example, in this case there were StoneTurn employees

4   from Houston, New York, San Francisco, Boston and

5   Washington, DC, as I understand it, involved in the project.

6   So in all of those offices you had individuals who were

7   accessing this information that was coming through the FTP

8   site.  When they would download that information into their

9   office, it could be stored on servers, reviewed and what

10  have you.

11      In addition to that information that's coming through

12  the FTP site, there was also an e-mail process where e-mails

13  were being received basically from -- to and from various

14  individuals.  Primarily what we're talking about I think is

15  from Ocwen.  The e-mails would be received and they could be

16  received in all of those offices, and then there were also

17  some hand delivery documents.

18      Searching for this information -- and the information I

19  believe is like 4.5 million pages of documents throughout

20  StoneTurn -- is a monumental undertaking, as Your Honor can

21  imagine.  And it's our position that it's a far simpler way

22  to access that information, to access it from Ocwen, on the

23  the Ocwen side of the FTP site, rather than to access it

24  from StoneTurn on our side of the site after it has been

25  disseminated all over the country and all over these

7

1    offices.

2        If StoneTurn was to have to comply with this subpoena,

3    they would in effect have to search servers and databases in

4    all of those offices that I -- that I discussed.

5        In addition, the e-mails, as you can imagine, go not

6    only from Ocwen to StoneTurn but there's also e-mails

7    between StoneTurn employees.  There's e-mails with the New

8    York regulators and back.  There's e-mails back and forth

9    between the Monitor.  To get into those e-mails to determine

10   which one of those might pertain to the subpoena would be a

11   process that would be -- that's almost unfathomable, and it

12   would certainly not be something that StoneTurn could

13   feasibly do with its manpower in even 60, 90, 120 days.  I

14   mean, this is the kind of thing that will take an enormous

15   amount of time on the part of StoneTurn to gather up all of

16   those documents from all of those offices from all of those

17   people.

18       In addition to that, Your Honor, the ease with which

19   the Plaintiff can obtain what they need from Ocwen is much

20   simpler, and it's also much more justified in that Ocwen is

21   a party to the case.

22       We have cited various law to Your Honor in the

23   briefing.  If you would like me to go through that, I will,

24   but I know Your Honor has that before you.

25       But the case authority is clear that the burden on a

8

1    third party, when the information is available from a party,

2    that burden typically prohibits or limits the amount of

3    information that can be obtained from that third party.  So

4    with respect to -- and we cited some case authority to Your

5    Honor both from Judge Schell and Judge Bush here in the

6    Eastern District as well as some other case authority.

7         But the proposition I think is well-settled that when

8    you're dealing with non-parties, the kind of burden that the

9    Plaintiff would have imposed on StoneTurn is simply

10   unjustified, particularly given that that information can be

11   obtained from Ocwen.

12            THE COURT:  But you concede that all the documents

13   would be relevant to what they're seeking?

14            MR. SIEBMAN:  Well, not as broad as their subpoena is

15   written.  I think the subpoena is written so broadly that it

16   certainly could encompass a lot of documents that are not

17   relevant.  It -- they use language like "relate to" and

18   "pertain to" with respect to two individuals.  It's any

19   document that relates or pertains to those two individuals.  So

20   certainly some of the documents, many of the documents would

21   probably be relevant, but given the scope of the subpoena and

22   the dragnet that they have thrown out, I don't think you could

23   make a determination until you saw the documents whether or not

24   all of the documents were relevant.

25            THE COURT:  And then let me ask, the issue of -- I

9

1    know you're only addressing the work product issue, but the

2    documents that would fall under work product, are those

3    documents -- are you saying those are too burdensome or are we

4    talking about to segregate those, to locate those documents, or

5    are you saying that just the documents from Ocwen that was

6    received by your client would be too difficult?

7              MR. SIEBMAN:  In order to comply with the subpoena,

8    you basically have to work through the subpoena and you have to

9    look at the documents to determine which documents comply with

10   each part of that subpoena.  And I think you would almost have

11   to go through that process before then you could take the next

12   step of the process of determining among that universe of

13   documents that have been captured by applying the language in

14   the subpoena to the universe of documents, you would then

15   narrow it down from there to the work product documents.

16             THE COURT:  Well, I guess what I'm -- maybe I'm being

17   too broad in terms of all work product issues, but clearly in

18   the briefing the Relators want the internal reports, which I

19   know that your client claims is work product.  Those reports,

20   my question is, are those that difficult to find?  I mean, is

21   that -- are you claiming an undue burden on being able to

22   locate those specific reports that's spread through the

23   briefing?

24             MR. SIEBMAN:  With respect to a particular report

25   that they identified, if they would identify a specific

10

1    report --

2            THE COURT:  I don't think they know exactly.  I don't

3    think they've seen those reports.  I get the impression that --

4    of course, we'll let them have the opportunity to speak on

5    that.  I'm just trying to separate -- let's say I find it's an

6    undue burden.  I don't know what I'm going to do on that yet,

7    but let's say I find that but say work product doesn't apply to

8    these internal reports.  The question I'm asking you is can

9    they find the reports they're referencing in the briefing that

10   talk about the various possible violations and whatever by

11   Ocwen?  Are those readily attainable in the system or are

12   those -- I'm just trying to say, those specific things they're

13   seeking, are those part of the undue burden as well?

14           MR. SIEBMAN:  Right.  The more specifically that they

15   can define a particular report that they're looking for -- I'm

16   not asking them to define it by -- you know, by its -- by the

17   name it's saved in the server under by any stretch of the

18   imagination.  But the greater extent they can define a

19   particular report they want by classification,

20   characterization, obviously the easier it is to access that

21   report rather than having to go through 4.5 million pages to

22   see what relates or might pertain to a particular topic.

23       I think Mr. Buretta would probably be better suited to

24   address that specific issue because he's the one that's

25   dealing directly with those work product documents, and that

11

1   would be more --

2        THE COURT:  On that discrete question, can you just

3   answer that?  And we'll come back.  I want to talk about undue

4   burden first before we go into work product, but the question

5   is can you answer that question, Mr. Buretta?

6        MR. BURETTA:  There were a finite group of formal

7   reports that were drafted and then finalized.  I think those

8   are limited in number.  And those particular reports, in terms

9   of undue burden, would not be difficult to identify.  It's all

10  the work in anticipation of those reports that is interspersed

11  throughout work papers, interspersed throughout electronic and

12  hard copy documents received from Ocwen, processed through work

13  streams at StoneTurn and BPA, analyzed by folks in the work

14  stream, and then at the end of the day after that entire

15  process, it gets whittled down to a finite series of formal

16  reports.

17       So the reports themselves, not difficult.  All the

18  other work product, very difficult to try to separate from

19  the materials that are in StoneTurn, both because they're in

20  different cities on different servers in different people's

21  offices and are intermingled with the underlying documents

22  received from Ocwen.

23       I hope that answers Your Honor's question.

24       THE COURT:  That does.  Mr. Siebman, I threw you off

25  maybe your argument.  I don't know if you stated everything you

12

1     wanted to state on that issue.

2            MR. SIEBMAN:  Yes, Your Honor, I think that probably

3     covers the undue burden.

4         I would direct your attention also to the language

5     that's used in the prongs of the subpoena and how broadly

6     the operative language of relate and pertain to is.  That

7     certainly requires a lot of subjective evaluation on the

8     part of StoneTurn as it looks through the millions and

9     millions of pages of documents to ascertain whether one

10    would fall within that subpoena or not.  And then after

11    that, obviously looking for attorney/client privileged

12    documents and work product documents and that kind of thing.

13        But without -- I would refer the Court to the papers

14    and our briefing and to the case authority that's contained

15    therein and respectfully suggest to the Court that the

16    subpoena certainly as it's drafted is far too burdensome on

17    a non-party to survive judicial scrutiny and that -- that to

18    the extent that they need those documents, they should go

19    first to Ocwen through whatever process.  This Court has

20    plenty of power and authority to demand Ocwen to produce

21    whatever Ocwen has that the Plaintiffs want produced, and I

22    think that would be the appropriate way for this Court to

23    proceed prior to forcing this kind of burden on a non-party.

24        And other than the privilege argument, which

25    Mr. Buretta will address -- and this is a different

13

1    privilege argument than the New York -- than the argument

2    with the New York --

3            THE COURT:  No, I'm aware of that.  But, Mr. Siebman,

4    before you give up the podium, just to make sure I understand,

5    the Relators are seeking all the documents that Ocwen provided

6    your client, and you're telling me that just even those

7    documents, that that is too burdensome to figure out based on

8    the way y'all have processed those documents, just to get

9    everything that Ocwen provided?

10           MR. SIEBMAN:  That's correct, because the FTP site is

11   on the Ocwen side of the wall, if you will, and it comes to

12   StoneTurn through two -- two avenues.  The first avenue

13   basically is the loan files.  The other avenue -- and this is a

14   little bit of an over-simplification, but the other avenue is

15   everything else.

16       When anything is downloaded by StoneTurn from that, it

17   becomes saved on local servers in those various offices that

18   we discussed.  So in order to gather that stuff up, you

19   would have to look in all the offices, potentially on the

20   desktops of everyone that worked in the project to see if

21   any documents were saved on those desktops.  And it just

22   becomes much much more complicated than it would if you were

23   simply obtaining those documents on the Ocwen side of the

24   FTP site.

25       They certainly would know what they sent, and gathering

14

1    it up before it gets, you know, strewn by the four winds, if

2    you will, as StoneTurn went about its work doing its

3    monitoring work would certainly be the most efficient way to

4    get those documents collected.

5              THE COURT:  I know, Mr. Siebman, your client is one

6    of the non-parties in this case and, of course, I know you

7    suggest that we should wait to see -- for the discovery to be

8    completed between the Relators and Ocwen, and then if there's a

9    need, to come back.  But the question I have for you is I don't

10   know if the Court's schedule -- the way this trial is set up,

11   how is there time for that?  And, of course, what the Relator's

12   argument is, and you can respond to this -- I assume he's going

13   to make the same argument, or whoever is going to make the

14   argument on behalf of the Relators, as in the briefing, that

15   essentially they don't trust Ocwen and they want to be able to

16   see everything they produced to the Monitors, is that the same

17   documentation they provided to the Relators.  So they want to

18   double check the work essentially.

19             MR. SIEBMAN:  And it would be our position that

20   that's an inappropriate burden to place on a non-party such as

21   StoneTurn, that this Court has all the power necessary to

22   ensure that any party to this case provides discovery that this

23   Court orders be discovered.  So to the extent that the

24   information is relevant and necessary, this Court has the power

25   to make the parties to this case exchange it.

1       And when I -- when I say first, what I really meant was

2  make them do it, because realistically if this Court wants

3  Ocwen to produce those documents, it has the authority and

4  the power justly to do that, and that's where this Court

5  should exercise its power, ordering a party that's before it

6  to incur that type of expense and that type of burden and

7  inconvenience.

8       As we've stated in our pleadings, StoneTurn is not a

9  massive organization.  It's small in comparison to Ocwen,

10  and to force its employees to leave the work that they're

11  working on currently and start working on this process would

12  be very disruptive to their business, very disruptive to

13  their clients that they're working for currently and would

14  be unjustified.

15       So I don't think it really impacts this Court's docket

16  because this Court has the power to force the parties before

17  it to engage in the discovery that the Court deems

18  appropriate and necessary without allowing this type of

19  burden to be placed on a non-party such as StoneTurn.

20            THE COURT:  Thank you, Mr. Siebman.

21       Let me ask, does anyone from Boston Portfolio, do you

22  want to add anything to this?  We'll segregate the arguments

23  and do this and then go to the issue of work product after

24  we hear from the other side.  Of course, I'm not forgetting

25  about Ocwen.  I'll let you --

16

1          MR. WIMBERLY:  Thank you, Your Honor.

2          MR. BURD:  Thank you, Your Honor.  This is Gene Burd

3     on behalf of Boston Portfolio Advisors.

4      The Boston Portfolio Advisors arguments with respect to

5     the undue burden are essentially the same and similar to

6     StoneTurn and they apply to Boston Portfolio.

7          THE COURT:  But you only have 12,000 documents

8     though.

9          MR. BURD:  Well, it's 12,000 documents but we are

10     unable to estimate how many pages.  Some of these documents are

11     substantial Excel files, multi page Excel files which contain

12     megabytes, tens of -- hundreds of megabytes of data in one

13     file, so there could be to the order of magnitude of two orders

14     or three orders of magnitude more pages to assemble the number

15     of documents.

16      But also for clarity, Boston Portfolio Advisors is a

17     small company.  It has only 18 employees.  They are located

18     in Florida.  These 12,000 documents are -- while they are

19     located in one location on the Boston Portfolio Advisors

20     servers, they still need to be separated.  They still need

21     to be reviewed and understood whether all of them are

22     responsive or not.  And that would impose an undue burden on

23     Boston Portfolio Advisors.

24          THE COURT:  Thank you, Mr. Burd.

25          MR. BURD:  You're welcome.

17

1          THE COURT:  Very good.  On behalf of the Relators,

2    Mr. Johnson, are you doing that?

3          MR. JOHNSON:  Yes, Your Honor.  May it please the

4    Court.  I have some general remarks about the burdensomeness

5    and then I'll address each of the two third parties

6    specifically.

7          The first thing I will say, Your Honor, is this is not

8    1990s discovery.  These are not 1990s hard copy documents.

9    We're in 2015 and this Court and the parties before it deal

10   every day with electronic documents, their recovery, their

11   location, their culling through electronic means on a scale

12   far greater than this.  And it is neither burdensome nor

13   overly costly to do so.

14         The third parties would have you believe that these

15   documents came in and were scattered by the winds.  That

16   strains the imagination, given that the whole point of these

17   Monitors was to carefully examine the specifics of these

18   documents, track them, write reports on them and provide

19   those reports to a governmental agency.

20         Clearly all of these documents, though they may have

21   electronic copies in various places, are all very well

22   organized, very locatable, because if the New York

23   Department of Financial Services comes calling, these people

24   will have to produce those lickety-split, organized and

25   exactly the way that they're supposed to have done in

18

1   keeping track of things.  So this idea that they have been

2   scattered to the winds is just not true.

3        In fact, if they exist on electronic servers, it is a

4   far simpler task to send an electronic discovery vendor to

5   just grab the Ocwen files off of servers throughout a system

6   than it is to go out and have to collect from each

7   individual person.  That doesn't happen today, and that's

8   not the reality of how these documents are kept.  These

9   people are in the business of keeping documents organized in

10  an appropriate fashion so that they can be used, they can be

11  relied upon later and that history can be recreated.

12       So that's the reality, and in fact, the evidence does

13  not match up with what has necessarily been stated here, so

14  that would be my general point.

15       The electronic documents can be collected easily.  The

16  hard copy documents, that's a very small portion of these, I

17  suspect, and those also can be carefully put in boxes,

18  collected and sent to an OCR site.  So I think there's an

19  overstatement as to the difficulty of this or that it is

20  somehow this big, disorganized process.  It's not.

21       The second thing I will say is that the volume, at

22  least in terms of StoneTurn, is overstated in the sense of

23  what is really at issue.  4.3 million pages may in fact be

24  true, but 90 percent of that are the loan files that Ocwen

25  provided.  And so the actual documents that are StoneTurn

19

1    documents are a far smaller group.  So we shouldn't let the

2    fact that the loan files, which are voluminous -- a lot of

3    pages have been provided electronically so all we've got to

4    do is go get an electronic copy.  Very easy, no privilege

5    review.  It's clearly responsive.

6         So that shouldn't mask the fact -- and I thought the

7    Court's questions were good ones -- that locating the

8    reports, locating correspondence, that's an easy task in

9    these cases.  For instance, e-mail is easy because you just

10   search on the Ocwen -- Ocwen.com e-mail addresses.

11        THE COURT:  Let me ask, you're not seeking every

12   single document Ocwen provided?  Which a lot of these would be

13   loan files.

14        MR. JOHNSON:  We are.  We're seeking all of the

15   documents provided, but I'm saying the vast volume or vast

16   amount of the volume here are the loan files.  That was clearly

17   the most voluminous information that was provided.  There were

18   e-mail correspondence.  There were I'm sure other documents

19   provided.  But in terms of when we're looking at the scale of

20   things, the bulk of these documents are the loan files.

21        We are, as Your Honor -- to answer the question about

22   why from these guys --

23        THE COURT:  Right.  Why don't you just get them from

24   Ocwen?

25        MR. JOHNSON:  Right.  Well, a couple of reasons, Your

1    Honor.  Number one, this document set specifically ties to

2    acknowledged and admitted violations by Ocwen.  So this

3    document set has special significance, and this document set

4    and those acknowledged wrong-doings form the basis of knowledge

5    that will be necessary to proving our case in part.

6         Now, we have alleged violations of various state laws,

7    various federal laws, but at least as to the New York

8    portion, that would be part and parcel of evidence that they

9    knew by virtue of this document set, they knew that they

10   were committing these wrong-doings.

11        Here's the other thing.  These documents -- this is not

12   just a New York problem.  This was a Texas problem, a

13   Massachusetts problem, a problem across Ocwen.  This

14   document set gives us a road map to the people, the

15   departments, the committees, the reports and other documents

16   that actually are discoverable in this action that relate to

17   this type of wrong-doing.  So because of their nature they

18   give a roadmap.

19        Another thing you've talked about, and I won't belabor

20   it, the fact that given Ocwen's history, we don't trust

21   them.  We think we are entitled to some --

22             THE COURT:  I asked -- I made that statement.  That

23   doesn't mean I --

24             MR. JOHNSON:  I don't mean you believe it, Your

25   Honor.  No, no, no.  I'm saying you were repeating our

21

1    argument.

2           THE COURT:  Right.

3           MR. JOHNSON:  I readily acknowledge that.  That is

4    part and parcel of this.

5        Another part of this is we took the CEO's deposition on

6    May 15th.  He said -- and I can have the transcript

7    provided.  He said that he doesn't believe there were any

8    material violations of law.  Well, if he says that, then we

9    are clearly entitled to the documents underlying this

10   consent judgment that he apparently claims was just signed

11   as a convenience and that the $150 million fine that was

12   paid and his resignation were just again a cost of

13   litigation type settlement.

14      But we're entitled to this set of documents because of

15   their import to undermining any allegation that there were

16   not material violations as to the --

17          THE COURT:  But what documents?  I guess make

18   clear -- I think Mr. Siebman makes the argument that the

19   subpoenas are over-broad, the requests.  I think you had eight

20   requests there and attached the subpoena.  So tell me, what

21   specifically are you seeking from them?

22          MR. JOHNSON:  So, Your Honor, here are the categories

23   on the screen.  The first are Ocwen's business records.  These

24   are Ocwen's loan files and Ocwen's business documents, policy

25   manuals, compliance manuals, compliance reports that they sent

22

1    over to these Monitors.  These are Ocwen originated documents.

2    I don't think there's any claim that they're privileged or not

3    relevant.

4           THE COURT:  Right.  But why can't you first obtain

5    all those from Ocwen themselves?

6           MR. JOHNSON:  Well, Your Honor, I think we can, but

7    they don't have the same -- for one thing, we're four months

8    after we've sent requests for production and we still have only

9    700 documents, despite the Monitors having millions.  So we can

10   obtain some of these, but that will not give us the set of

11   documents that actually underlies the admitted legal violations

12   that have been acknowledged and agreed to as to New York.

13       So while we may -- and we are I think allowed to check

14   and see, particularly if they're going to take the position

15   their CEO did that there was no material wrong-doing, what

16   the documents were underlying this consent judgment.

17          THE COURT:  What about if you get the reports, and

18   we're not addressing the issue of work product yet, but

19   assuming you got the reports, wouldn't that solve the problem,

20   without getting every single Ocwen document they received?

21          MR. JOHNSON:  I don't think so, Your Honor, because I

22   don't think that -- A, I'm not sure that the reports are

23   necessarily themselves going to give the detail that we would

24   need as to what the violations were.  They're also not going to

25   contain the people, the committees, the departments that would

23

1    lead us to actually the discovery of other evidence in addition

2    to the New York evidence that relates to the wrong-doing in the

3    case.  So I think just the reports alone won't get us there.

4    And, again, we need to be sure that we got what the New York

5    Department got before we rely on any of these reports.

6         The other thing -- and that's the reason in part

7    for the communications between Ocwen and the Monitors.  It's

8    not just what they gave them, it's what they told them.  The

9    only source of that is really the communications, whether

10   they're hard copy or e-mail.  And that's a unique set of

11   documents that we really can't get and know that we've got

12   everything, because we may not have everything on the --

13   Ocwen may not have every communication with the Monitors.

14   The Monitors may not have every communication from Ocwen.

15   We need both sides of that communication.

16        Then we get to the third category, which are the

17   monitoring reports and their communications about those

18   reports, their communications about Ocwen's positions.

19   That's really the third category.

20        The final category, Your Honor, and this was talked

21   about, about the individuals, is really do these Monitors

22   have anything related to this litigation.  I think that

23   category kind of goes by the way side.  I don't think they

24   do.  That was a catch-all in case they did have materials

25   related to our specific Relators.

24

1    So the main things we are seeking are the business

2    records, the communications and then the reports and

3    internal communications about those reports.

4    And, again, we believe that because of the significance

5    of New York, because of the admitted violations there, we're

6    entitled to that set of documents that we believe is very

7    easily obtained in terms of doing an electronic search,

8    doing an electronic cull, and at least pulling down what

9    Ocwen sent them.

10    THE COURT:  I guess, Mr. Johnson -- of course, I have

11    declarations from both of the non-parties and they claim it to

12    be an undue burden.  I mean, I know the Relator's argument is

13    this is easy, but they're saying it's not, that these are

14    relatively small companies.  Granted, I think the one is bigger

15    than the other, but -- so, I mean, even if I find it's

16    relevant, it seems a really hard burden to put on small

17    companies.  You're making the argument that it's easy to do.

18    They're saying no, it's not.  So how do I decide that?

19    MR. JOHNSON:  I think what's missing, Your Honor, is

20    I think there is a failure of proof.  They have given you proof

21    of how somebody would have done it in the 1990s.  They would

22    have done a hard copy, page by page review.  That's not how

23    litigation is done.

24    What's missing from the record is their affidavit from

25    their electronic discovery vendor that they contacted and

25

1    said this is how -- we know your system, this is how we

2    would do it, this is how many thousands of dollars it would

3    cost or how many hours.  They didn't do that because they

4    know if they provide you that kind of proof as opposed to

5    the attorney manual review proof that they provided, that it

6    comes out that in fact it's not that burdensome.

7        The other point I would make on burdensomeness, Your

8    Honor, and this is -- I am about to speak about evidence

9    that I'm so far not allowed to see.  It's been filed I guess

10   in camera.  But I would be surprised if in fact under their

11   agreements with Ocwen that they are not entitled to charge

12   back to Ocwen the costs of having to produce information.  I

13   haven't seen those engagement letters.  Ocwen has taken the

14   position that they're privileged.  I think they are Exhibit

15   B to their motion.

16          THE COURT:  Let me stop you.  I'm curious.  That's an

17   interesting question.  Mr. Siebman, what's the answer to that

18   question in terms of is your client able to -- if the Court

19   orders this production to go forward, do you get to charge that

20   back to Ocwen?

21          MR. SIEBMAN:  It would certainly be our position that

22   we would.  Whether or not it would be their position that they

23   would pay it is a whole different issue, and, you know, that

24   would be something that we would have to fight about.  But that

25   really takes us --

26

1          THE COURT:  We'll talk to them in a minute.

2          MR. SIEBMAN:  That really takes us to the crux of the

3  argument, and that is it's not just the money either.  It's the

4  fact that this small company -- StoneTurn is a small company,

5  when you're talking about this type of undertaking.

6          And the distraction of causing its employees to have to

7  quit working on what they're working on to start working on

8  this project, to bring -- to search the records on their

9  laptops, on their personal desktops and on the servers to

10  see if there could be some e-mail on there that was

11  exchanged between -- I mean, this document -- the overhead

12  here shows internal communications.  I mean, that's an

13  enormous undertaking to look at the various e-mails that

14  might have been exchanged between StoneTurn employees or

15  between the New York regulators and StoneTurn or between

16  Ocwen.  I mean, if that's what they're talking about, that's

17  enormous.

18          You know, I don't know what the cost is per custodian

19  in this case, but generally speaking, I mean, the cost of

20  this can often be in the tens of thousands of dollars per

21  person that you have to look through their stuff.

22          I mean, not only is it a money issue but it's also a

23  distraction issue.  You're taking people away from their

24  work and requiring them to go gather up documents that the

25  Plaintiffs could get from Ocwen.

27

1        And the fact that it's been four months and they

2    haven't filed a motion to compel -- I don't think they've

3    filed a motion to compel.  I mean that --

4             THE COURT:  I believe they did call the chambers but

5    I may have been busy in trial and I couldn't address it.

6             MR. SIEBMAN:  But these are competent lawyers on the

7    Plaintiff's side.  They know how to make parties that are not

8    compliant with their discovery obligations to comply with their

9    discovery obligations.

10        I'm afraid what's happening here is they have decided

11   to go out and try to find a cheap way to get this done, as

12   they see it, but it puts an enormous burden and it's not

13   cheap.  It's an enormous distraction and enormous cost on my

14   client to go through and look for internal communications.

15        One last point I would make is these bullet points look

16   nice and clean, but when you start looking at the way that

17   they --

18             THE COURT:  Well, I'll give you a chance to reply.  I

19   just asked that one question.

20             MR. SIEBMAN:  Okay.  Thank you, Your Honor.

21             THE COURT:  Go ahead.

22             MR. BURD:  Thank you, Your Honor.

23             THE COURT:  Just limit it to the question that I

24   asked about the payback in terms of whether you have the

25   ability to bill Ocwen for --

28

1          MR. BURD:  Well, let me just address this one

2   point -- two points that have been raised by Relators.  One is

3   regarding the veracity of the submission by Ocwen.  There are

4   other methods in the electronic discovery to figure out whether

5   these are a complete and truthful production or not.  You don't

6   need to bring third parties to this action in order to double

7   check what Ocwen produces or doesn't produce.  Especially in

8   the age of electronic discovery it's not that complicated to

9   do.

10      The other argument that BPA did not produce the

11  information, did not produce facts to support its burdensome

12  argument, on April 23rd BPA submitted affidavit to this

13  Court where there is an estimate that it would take 240 to

14  300 hours to review and determine whether the documents are

15  responsive to the subpoena or not.

16          THE COURT:  Okay.  I asked one question and you

17  haven't answered the question.  I didn't want to hear anything

18  else other than answer the question.  Are you going to answer

19  the question I asked?  The charge back.

20          MR. BURD:  Yes, and the answer is there is -- there

21  is indeed a provision in the agreement, relevant in our

22  agreement.  But, again, at this point it's unclear whether

23  Ocwen would reimburse this cost or not.

24          THE COURT:  That's fine.  I'll give you a chance to

25  respond to everything else later.

29

1          MR. BURD:  Thank you, Your Honor.

2          THE COURT:  Mr. Johnson, go ahead.

3          MR. JOHNSON:  Thank you, Your Honor.

4      Turning to -- again, with due respect to counsel,

5  there's a lot of conclusions about how difficult this would

6  be.  There's no evidence and no one has tried to -- this

7  isn't Bank of America.  We're not going out and searching

8  throughout the world.  There's 65 employees, as I understand

9  it, in Mr. Siebman's client.  And doing an electronic search

10  of those employees is neither difficult nor expensive, and

11  that's the reason you don't have the evidence on that.  It's

12  their burden to show burdensomeness, and not using or taking

13  advantage of technology that is readily available to them.

14      The other -- turning to the Boston group, Your Honor,

15  it strains the imagination that 12,000 documents,

16  particularly when many of them are Excel spreadsheets which

17  are not going to be reviewed, those are going to be -- they

18  don't contain attorney information.  They don't contain

19  privileged information, putting aside the banking privilege.

20  12,000 documents where most of them or many of them are

21  Excel spreadsheets is not a difficult review.

22      I understand.  I've represented third parties before.

23  Third parties never want to participate in discovery.  It's

24  not their fight.  But the reality is they are the keepers of

25  certain information that was used in proceedings in New York

30

1    where there was an admitted -- admitted violations by Ocwen

2    that relate directly to our case.  And we are entitled,

3    particularly as Ocwen's officers or former officers are

4    disputing whether it was a material violation, even though

5    they agreed to it, we're entitled to those documents.

6         They're readily ascertainable, particularly at Boston

7    where there's 12,000, and using anything other than old

8    technology producing these materials is not difficult.

9         Now, again, I firmly believe that every bit of the

10   costs can be billed right back under that letter, and I

11   think you've heard that from counsel.

12        THE COURT:  Maybe that's true, but when you're

13   dealing with a small company, you're taking -- even if they get

14   reimbursed for it at some point later, you're taking a number

15   of employees off of their regular duties.

16        MR. JOHNSON:  Your Honor, that has not been my

17   experience.  Employees -- because our employees at our client,

18   their employees, that's not their job, to go collect their

19   materials.  That's why electronic discovery vendors come in and

20   swoop the e-mail.  They search it for Ocwen.  They search it

21   for relevant terms and get the group, and then we agree upon

22   typically key terms to then search the larger group.  But we're

23   past the days of people segregating their own e-mail.

24        There may be some hard copy documents and I'm sure

25   those can be taken care of over time, but we're past the

31

1    days of employees having to do this themselves.  Vendors do

2    this because you can do it electronically now from outside

3    the system.

4         And I would stress, Your Honor, I think that the

5    relevance here is high.  We would be in a different position

6    if Ocwen was standing up saying, oh, yeah, you know what,

7    here are the documents we provided to New York.  We might be

8    in a different position.  We would still want to check them.

9    We would still want the underlying reports and conclusions

10   and communications.  But they're not doing that either.

11   They're trying to forestall discovery too.

12        So, Your Honor, I think the cost is minimal.  The

13   volume is manageable.  And using technology, this can be

14   accomplished very quickly and ultimately be at a cost of the

15   party litigant, in my opinion.

16             THE COURT:  And before I go to Ocwen, did either of

17   the non-parties want to respond to anything there?

18             MR. SIEBMAN:  Yes, Your Honor.  Clyde Siebman on

19   behalf of StoneTurn.

20        Your Honor, the oppressive costs and burden of this

21   E-Discovery that Mr. Johnson suggests is so easily done,

22   that it's just part of pushing a button, that -- the burden

23   and cost of that type E-Discovery is so oppressive, even

24   among parties, that it's the subject of much debate in this

25   type complex litigation.  It's even the subject of a

32

1    proposed Congressional action it's so burdensome.

2         The cost of this type discovery, even among parties --

3    I mean, we all know how oppressive it is because we see it

4    in every one of our cases and we hear about it from the

5    halls of Congress and we hear about it from actual parties.

6         And imposing that type of heavy burden of E-Discovery

7    of this level on a non-party is simply not justified,

8    particularly where virtually everything they talk about they

9    can obtain from a party to the case if they can justify

10   that.

11        For example, communications between Ocwen and the

12   Monitors, Ocwen has that.  If it's a communication between

13   the two, they're clearly going to have it.

14        The last thing I would say is these bullet points are

15   really nice and crisp, but you compare them to the subpoena

16   and you see something else.  Category six in the subpoena

17   says all documents and communications that refer or relate

18   to the instant litigation.  That literally requires

19   StoneTurn to comply with this subpoena to go through all of

20   its documents and look and see which documents refer or

21   relate to this litigation.

22        Now, they could guess that maybe a bunch of them don't,

23   but in order to comply with a Court order, with a subpoena,

24   you have to go through the documents and look.  You can't

25   just guess that I bet there's nothing in that box that

33

1    relates or refers.

2         Not only that, but somebody has to make a decision when

3    they find a document on whether or not it relates or refers.

4    You look at nearly all of these and they talk about things

5    that are relating or referring, so basically broad

6    categories.  All communications and other documents, whether

7    electronic, print or printed, which evidence or relate to

8    Ocwen's compliance with federal and state laws, including

9    but not limited to the 2014 consent order.

10        I mean, that requires -- each one of these is going to

11   require a review of virtually all the documents, and an

12   argument could be made of all the documents, but certainly a

13   lot of the documents to determine whether or not these broad

14   categories pertain.

15        And the last thing I would say is that the type of --

16   of burdensome, heavy E-Discovery that's even being

17   questioned in the courts now on whether or not it can be

18   justified between parties, that certainly can't be justified

19   when it comes to a non-party such as StoneTurn.

20        Thank you, Your Honor.

21             THE COURT:  Thank you.  Let me ask Boston Portfolio

22   if they want to make any additional comments.

23             MR. BURD:  Gene Burd for BPA.

24        Your Honor, in closing, I would like to address some of

25   the comments my colleague for Ocwen mentioned.  One is that

34

1    the requirements to involve employees of the company.  To

2    date there are hours and hours of employees' time from my

3    client has been spent to communicate with counsel, to

4    preliminarily review the documents and address -- how to

5    address the subpoena.

6         This is -- even assuming that there would be a

7    e-discovery vendor retained, you still need to have input

8    from the employees because the documents that BPA has, a lot

9    of them involve complicated accounting and complicated

10   mortgage servicing reports and spreadsheets that need to be

11   understood.  It would need to be understood whether they're

12   in fact responsive or not responsive, because in some sense

13   the subpoena is specific but in some sense it's rather

14   broad.

15        Moreover, the subpoena asks for all of the documents

16   relating to current litigation.  That could include the

17   documents, for example, internal e-mails, even after BPA

18   ceased its monitorship engagement in relation to monitoring

19   internal e-mails and e-mails between different parties, even

20   after the monitorship was completed.  So from that end there

21   is a very broad scope of the subpoena that we would like you

22   to address.

23        Thank you.

24            THE COURT:  Thank you.  Mr. Wimberly on behalf of

25   Ocwen.

35

1          MR. WIMBERLY:  Your Honor, it's unbelievable that

2    Relators rely on fundamentally not only a factually incorrect

3    premise for their relevancy argument but it's nothing but

4    rhetoric, and that is that we're looking at admissions.  And in

5    order to make this material relevant, they -- they have to get

6    there, that somehow Ocwen admitted wrong-doing in New York, and

7    that's absolutely false.  If you look at the consent decrees

8    themselves, Your Honor, there is no admission in there.

9          Now, we may argue about that on the merits down the

10   line.  I appreciate that.  But it's not self-evident that

11   there are admissions in there.  In fact, what it looks like

12   and what it should look like to the jury ultimately if we

13   get there is that Ocwen settled a dispute with its regulator

14   and paid some money to do so.  But consistently the

15   acknowledgments that -- instead of admissions, you have

16   acknowledgments that there were allegations and that there

17   was an investigation of allegations and that my client,

18   which is a regulated entity and intends to continue to do

19   business in the State of New York and elsewhere, ultimately

20   settled the matter with the regulator.

21          So then driving --

22          THE COURT:  So essentially it was settled prior to

23   any finding so you had allegations of misconduct or --

24          MR. WIMBERLY:  Right, Your Honor.

25          THE COURT:  Okay.

36

1          MR. WIMBERLY:  And to drive that into this -- and

2     we've heard this and you've read this in the briefs.  You would

3     have seen it yesterday, Your Honor, this notion of we're the

4     serial discovery abuser, quote, end quote.  While --

5          THE COURT:  You don't have to go there.  I mean, I

6     don't --

7          MR. WIMBERLY:  I appreciate that, Your Honor, but it

8     gets to their -- they're continuing to allege that we have bad

9     motives in connection with discovery, and it isn't the case.

10    The reason we're sensitive to that is that we are struggling

11    with a mountain of discovery requests.

12         And it is -- the second point I want to make, Your

13    Honor, in connection with the burden is it's absolutely

14    naive in 2015 -- I was around in the 1990s.  I understand

15    what counsel is saying.  It's absolutely naive to think you

16    can just lickety-split, quote end quote, produce electronic

17    records when you have a company and a project like this with

18    four million images, we understand.  But when you have a

19    company whose business it is to create electronic data with

20    respect to millions of consumer transactions regulated here,

21    there and everywhere, subject to all kinds of -- we keep a

22    lot of records.

23         Then on top of this, Relators in our case have refused

24    to limit the number of custodians.  As Your Honor would

25    know, the more custodians you get, the more mountains you

37

1    get in the mountain range of burden on electronic discovery.

2    And you're talking about, in particular, e-mail files.

3        Now, I would think as they do, if you don't know

4    anything about what's actually going on, well, why not just

5    download it, download it and search it.

6        We have one of the biggest ESI vendors working on our

7    side in this case, that's Epic.  It's taking them an

8    extraordinary amount of time to go through the process of

9    pulling the e-mails out of the system, putting it in a form

10   that's searchable and then employing the searches that would

11   pull out the relevant information.

12       In the cases, as other counsel -- as BPA and StoneTurn

13   counsel have explained, there's an intermingling of stuff.

14   So they are entitled to and will have to go through that

15   material and sift out what's not pertinent, and depending on

16   Your Honor's decision on the privilege, what's privileged

17   and so forth.

18       Let me move to something just so the Court understands

19   our position.  I think it's been obfuscated a bit in the

20   briefing by Relators.  We have never said that we won't

21   produce business records.  In fact, Your Honor, we've

22   started the process of collecting the business records that

23   were provided to the Monitor through the portal that counsel

24   alluded to earlier.  Our side of it -- very true, on our

25   side the stuff goes out.  Therefore, it ought to be the same

38

1    stuff that gets on the other side.  Take their burden

2    argument and say that's burdensome on their side.  On our

3    side we are looking at our part of the portal.  If it is a

4    business record, if it is a communication that would have

5    existed, notwithstanding the examination, we are not

6    asserting that that's blocked from discovery.  We are

7    pulling that information and we are processing it for

8    production.  That's going on right now, Your Honor.

9         So there is validity to the point -- and let me say, if

10   the Court ends up to accommodate burden, let's put it on

11   Ocwen, we don't need a court order, Your Honor.  We're doing

12   it, by the way.

13        Ocwen should be able to produce the materials that were

14   provided to the Monitor that are at the core of their demand

15   that are not subject to the privilege and so forth and we'll

16   move on.

17        They are not entitled to the analytical work product.

18   They continue to want to scavenge that kind of stuff to

19   prove their case.  As Justice Scalia said, it's smuggling.

20   And I understand that's rhetoric, Your Honor.

21        But the point I'm making is they'll get what they need.

22   They should get what they need from us.  We are in the

23   process of packaging it for production.  We can talk about

24   timing and that should alleviate these guys, because

25   ultimately we're talking about utter duplication of effort

39

1    and that should be prevented by the Court.

2              THE COURT:  So when are you going to be producing all

3    these business records?

4              MR. WIMBERLY:  I can't give -- Your Honor, I

5    apologize to the Court.  I can't give you a date certain.  I

6    can tell you right now we have located and we have started to

7    pull stuff out of the Share Point file, which was the

8    repository and the transfer point.  And we should have an

9    answer to that question very shortly and be happy to report to

10   the Court.

11        And, Your Honor, just so it is clear, it's my

12   understanding this stuff has been tracked, so it may be that

13   it is pretty quick and efficient to actually produce it.

14   Unlike the records in other parts of the discovery in this

15   case, which have never been screened and so forth,

16   presumably these records have been screened, they're Bates

17   numbered.  I mean, I can't speak to actually what's in

18   there, but for the most part, it should be a pretty quick

19   and efficient process, but I apologize to the Court, I don't

20   have a date certain.

21             THE COURT:  Thank you.  Mr. Johnson, do you want to

22   add anything?

23             MR. JOHNSON:  Just a brief response, Your Honor.

24             THE COURT:  Is your mic on?

25             MR. JOHNSON:  I think I do.  Am I?

40

1          THE COURT:  Yes, it is.  Go ahead.

2          MR. JOHNSON:  The one thing I would say in response

3   to Ocwen -- first of all, I think the Court should read the

4   consent order because the language is we stipulate and agree,

5   not just acknowledge, but that's sort of beside the point.

6          The question about the electronic records is -- it

7   comes down to this.  If New York's Department of Financial

8   Services walked into StoneTurn today and said show us what

9   they gave you, there is no way that they would say, well,

10  you know what, we need about four months.  That's not their

11  job.  Their job was to keep all this together, monitor it,

12  analyze it, and it's their liability if they don't do it.

13         These materials are a collected set of documents.

14  They're sitting there.  They're relevant.  They don't need

15  to review for relevance because they deal with the loan

16  servicing process that is at issue in this case.

17         So they don't need -- this is a complete red herring

18  that they don't know where they are, they're hard to collect

19  and that they somehow are incredibly burdensome,

20  particularly where -- I mean, in one case, I think it's

21  Boston's server.  There are only two servers or two

22  databases, one in Florida, one in Dallas.  And particularly

23  as to the Ocwen provided documents on Share Point, I believe

24  that was preserved on the Share Point site.

25         So really, I don't know -- our whole problem comes down

41

1    to what Mr. Wimberly just said, which is they're going to

2    get them to us but we don't know when.

3        And the third party documents we think we're entitled

4    to because those documents have special significance because

5    they are linked to admitted bad behavior.

6        Thank you, Your Honor.

7            THE COURT:  Okay.

8            MR. WIMBERLY:  Your Honor, I won't bother to address

9    his suggestive that we're in this supreme breezy kind of we'll

10   get to it when we can.  We're working really hard, Your Honor.

11   It's costing my client a lot of money and I appreciate that

12   we -- we have obligations.  We have a nationally known ESI

13   vendor who's working on this very problem.  We have my team at

14   McGlinchey Stafford working on it.  We are not disregarding the

15   urgency of getting through this litigation, Your Honor.

16           THE COURT:  Very good.

17           MR. WIMBERLY:  And just one other thing.  Counsel

18   says we stipulated and agreed.  We stipulated and agreed that

19   it was an investigation and there were serious allegations.  We

20   didn't stipulate and agree to wrong-doing.

21           THE COURT:  I understand.  So on the work product

22   issue, are we ready to go onto that?  Mr. Siebman, did you have

23   something else you wanted to throw in?

24           MR. SIEBMAN:  Just one last thing, Your Honor.  We

25   obviously have a dispute about the burden.  We have submitted

42

1    our affidavits, our evidence to the Court, the declarations

2    showing how heavy the burden is on StoneTurn, and we would ask

3    the Court to look at that evidence as opposed to just rhetoric.

4         THE COURT:  Mr. Siebman, you got back to the podium,

5    so let me ask a question.  I may not have asked this question,

6    but since you came back up again.  Why is this any different

7    than, in a more simpler context, of like medical records, other

8    records that in litigation one side provides the other but yet

9    they want to still go get the original records to make sure

10   nothing's missing?  That happens all the time in other

11   litigation that I have.  It's a much simpler scale.  We're not

12   dealing with millions of documents.  But why is it any

13   different than that in terms of the need to go to non-parties

14   in seeking documents?

15        MR. SIEBMAN:  Well, I think it gets down to the

16   breadth of the subpoena and it gets down to the burden imposed

17   when you have this many documents.

18        What they are looking to require us to do would take an

19   enormous amount of time.  For example, Your Honor, as you

20   heard from Ocwen and as you heard from the Plaintiff, they

21   have been wrangling about how to go about doing this for

22   months.  And if Your Honor ordered us to do this, we would

23   start much earlier in the process.  You've got to start

24   figuring out what terms you're going to use to do searches

25   on search terms.  You've got to figure out how many

43

1   custodians and which custodians.  I mean, the process that

2   would be required if Your Honor ordered us to comply with

3   that subpoena would put us far back on the racetrack than

4   where Ocwen is right now.  You can't just order -- I mean,

5   you can, but it's not appropriate, it's not justified, and

6   there would be no way for StoneTurn to comply.  I mean, if

7   you ordered them to produce those documents today, there

8   would be no way.  It would just be impossible.

9           THE COURT:  Well, how long would it take?

10          MR. SIEBMAN:  You know, they've told me that they

11  can't do it any sooner than -- they don't think they can do it

12  in 60 days.  They're not sure they can do it in 90 days.  And

13  that I think itself reflects to Your Honor the enormity of the

14  task.

15      And you've heard from Ocwen what they're going through

16  to do this and that's the same thing that StoneTurn would

17  have to do except with a much smaller organization.  And

18  while they're doing that with their small organization,

19  they're totally distracted from the work that they're

20  supposed to be doing for their existing clients under their

21  existing contracts.

22      So in the context of this case, based on the evidence

23  that's before Your Honor, the burden that you would be

24  placing on a non-party is just astronomical in terms of

25  requiring them to do that.

44

1          So we would ask Your Honor to consider the evidence.

2     It seems to me that these two parties are the ones that

3     should be fighting about what should be produced, and then

4     the parties should produce that which Your Honor agrees or

5     they agree to be produced in the case.

6          Thank you, Your Honor.

7               THE COURT:  Thank you, Mr. Siebman.  Okay.  Work

8     product.

9               MR. BURETTA:  Thank you, Your Honor.  John Buretta on

10    behalf of StoneTurn.

11         I'll focus my brief remarks on the LTV decision by the

12    learned Judge Higginbotham.  Judge Higginbotham, well before

13    his time, before many Monitors had been imposed anywhere

14    around the country, recognized back in the early 1980s the

15    following situation:  If you had a regulated financial

16    institution or any kind of company that retained a

17    consultant to assist the company with respect to reviewing

18    whether something went wrong or didn't go wrong and what

19    happened and the company did that, that consultant's work

20    would be protected by the work product protection and would

21    be in anticipation of litigation.

22         What Judge Higginbotham realized in the LTV decision is

23    that when you have a little bit different situation where

24    you have a regulated company which has a regulator staring

25    it down, looking at it, and where you have a consent order

45

1    entered into that creates additional requirements for that

2    regulated company, and both the company and the regulator

3    agree that there should be a third party who will be

4    creating dramatic efficiencies for both sides but also

5    protecting and enabling efficient flow and open flow of

6    information between the regulator and the regulated entity,

7    that is protected by work product as well.

8        As we point out in particular in StoneTurn's reply

9    brief, LTV is really on all fours with the situation here.

10   There you have a consent order.  Here you have a consent

11   order.  There you had someone who was called a special

12   officer appointed that both the FCC and the regulated party

13   had some input into.  The person was appointed and the

14   person had duties both to the regulator and to the regulated

15   entity.  In that circumstance Judge Higginbotham said work

16   product applies.  And as we pointed out in our briefs, it

17   applies here as well.

18       Perhaps one of the most important points to really boil

19   this down is the argument that Relators are making to Your

20   Honor is that they should not just have to look through the

21   underlying broad data.  They shouldn't have to analyze it

22   themselves.  They shouldn't make their case themselves.

23   They shouldn't look at those materials and determine what as

24   to their specific allegations -- and here we're on the

25   fourth amended complaint.  There's been a maturation or a

46

1    change in what the allegations are that would even

2    specifically pertain to the work that was done by StoneTurn

3    and BPA.  But in any case --

4              THE COURT:  I think we're only on the third.  I don't

5    think I've granted leave for the fourth.  But go ahead.

6              MR. BURETTA:  I think I heard about a fourth possibly

7    coming.  I apologize.

8              THE COURT:  There's a motion pending but I haven't

9    granted it.

10             MR. BURETTA:  Okay.  Fair enough, Your Honor.  Third

11   Amended Complaint.  In LTV, Judge Higginbotham there again

12   addresses this precise point and says it is not -- it is not a

13   basis to bother a Special Officer or a Monitor with respect to

14   their own particular analysis of the issues that they were

15   looking at, to be taking that analysis from that because it is

16   protected by work product, and there's no injustice in that

17   because the party to the case that's making the allegations is

18   going, as they will here and are, they will get the loan files.

19   They will be able to assess how those loan files relate to the

20   allegations they're making.  And it's the same situation here.

21       The last point I would make, Your Honor, is that on

22   this relevance point that's been floating around, just to

23   echo but amplify for a moment as well what my colleague Mr.

24   Siebman provided to Your Honor, it is actually not clear

25   what of the material that StoneTurn and BPA has is relevant

1    to the allegations that are being made here.

2         Loan files actually have a lot of different dimensions

3    to them.  There's the loan itself.  There's the terms of the

4    mortgage.  There are the terms of foreclosure with respect

5    to a loan that's in default.  There are provisions that

6    could be in these files as well about refinance of the

7    mortgage, about providing to the customer who holds the

8    mortgage some better or additional terms.

9         So the consent order in New York looked at some very

10   narrow categories of issues, and at least when I read the

11   amended complaint -- I apologize, the third amended

12   complaint, it's not clear to me that these line up together.

13        What StoneTurn looked at and BPA was limited to New

14   York state loan files.  I don't understand the allegations

15   here to be limited to that.  I think Relator's counsel has

16   said it relates to a variety of different states.

17        And I'm not seeing congruity necessarily, at least

18   based on the allegations we're reading.  We're not a party

19   so we're not having -- you know, we're not at depositions

20   where people might be spelling out in any more detail what

21   exactly is at issue here.  But it's not clear, I would say

22   to Your Honor, what our client did lines up.

23        And it really feeds back to the point made in LTV that

24   a party to the case shouldn't have -- shouldn't impose on a

25   third party the burden of turning over analytical work.  And

48

1    I would say to Your Honor here all the more so when it's not

2    clear what's relevant.

3         And lastly, the subpoenas are incredibly broad, as Mr.

4    Siebman so ably pointed out to Your Honor, and they're not

5    at all doing the work for us to try and suggest what finite

6    area really, you know, is at issue here.

7         But in any case, as to our work product, our own

8    internal correspondence, our correspondence with DFS, with

9    BPA, with Ocwen, we think LTV is on all fours.

10        And I thank Your Honor for your time.

11             THE COURT:  Well, let me ask the question that --

12   where can I see the issue of the monitoring in this case, the

13   primary motivating purpose of that, that was the primary

14   motivating purpose, versus -- I mean, was it for future

15   litigation or what was the purpose for monitoring?

16        It doesn't seem to me to be exactly the same for

17   preparing for litigation.  And I don't have the LTV case in

18   front of me, but when I looked at it yesterday I don't know

19   if those facts and these facts are exactly alike.  At least

20   I didn't bring any notations out from that.

21        So are you telling me those factors are exactly

22   identical, that there was no issue regarding the monitoring

23   in that case involving some litigation?  Or am I confusing

24   it with another case?  It seems like it was a dual purpose.

25   Maybe I'm wrong.  Maybe that's not the LTV case, but correct

49

1    me or educate me on that.

2              MR. BURETTA:  Sure, Judge.  So at 89 FRD 614 in LTV,

3    the Court talks about how the Special Officer was retained by

4    LTV to implement a consent decree with the SEC.  So it's the

5    same situation as here.  Here StoneTurn and BPA are put in

6    place as a result of a consent order.  It's just with a

7    different regulator.  So it's not the SEC.  It's the New York

8    Department of Financial Services, which is also obviously a

9    regulator of financial entities.  So the factual difference is

10   simply SEC versus New York DFS.

11        Same thing in terms of a consent decree being

12   implemented and the purpose of the person appointed, in that

13   case called a Special Officer, here called a Monitor, the

14   same as well.

15        There are numerous cases we list, Your Honor.  At page

16   five, for example, of our reply brief we cite numerous cases

17   indicating that an investigation by an agency, a regulator,

18   the SEC, others, is in anticipation of litigation.  It

19   doesn't have to be about the prospect technically that a

20   civil lawsuit will be given a docket number in a federal or

21   state court.  An agency's investigation of a regulated

22   entity is —— where the object of what the person is doing is

23   in relation to that, that is anticipation of litigation.

24   And we cite several cases, including a Fifth Circuit case

25   going back to 1982, about this issue as well there in the

50

1    context of the SEC.

2          THE COURT:  Would you agree that the -- is the

3    correct analysis for the Court to look at is, was the primary

4    motivation purpose behind the creation of the document was, A,

5    for possible future litigation?

6          MR. BURETTA:  It was, Judge.  So obviously the

7    context and the facts here matter.  Here you have a consent

8    order put in place.  It has specific requirements that are

9    imposed on Ocwen.  The Monitor is there to assess and ensure

10   the compliance with respect to that consent order.

11       There is obviously the prospect -- and I think New York

12   DFS points this out in its brief as well.  There is the

13   clear prospect that there could be violations found with

14   respect to the first consent order, and indeed, what in fact

15   happened here was that a second consent order was imposed on

16   Ocwen with respect to further issues that were identified as

17   to its handling of loan servicing.

18       So the short answer is yes, this was absolutely the

19   primary purpose.

20          THE COURT:  Thank you.

21          MR. BURETTA:  Thank you.

22          MR. BURD:  I would completely -- Gene Burd for BPA.

23       I completely agree with my colleague for StoneTurn, but

24   I would also like to add that there are other cases that

25   have been cited by BPA in its brief, and in particular this

51

1    is 636 F.2d --

2              THE COURT:  Say that again.

3              MR. BURD:  U.S. V Davis, 636 F.2d 1028, page 1040.

4    And it directly addresses the issue that once the

5    investigation, the government investigation has begun, there is

6    a sufficient basis for work product privilege to attach.

7         And there are other cases, and I found a case which was

8    not cited in the brief, but that's the Julich case, Julich

9    versus State Street Bank and Trust Company in the 214th --

10   2014 Westlaw 394 2934, and it's a District of Massachusetts

11   case of 2013.  It specifically states once the government

12   investigation has begun, litigation is sufficiently likely

13   to satisfy the anticipation requirement.  And, of course, as

14   my colleague noted, once the investigation has been

15   conducted by New York Department of Financial Services and

16   that of the context in which my client BPA has been

17   retained.

18        Thank you, Your Honor.

19             THE COURT:  Thank you.  Mr. Johnson, are you doing

20   this argument as well?

21             MR. JOHNSON:  Yes, Your Honor.

22        Your Honor, briefly, I think Your Honor is correct

23   about LTV.  I don't believe those facts are on all fours

24   with this case.  I believe in that case there had been an

25   actual threat of litigation and I believe the evidence in

1    that case was different in terms of the threat of litigation

2    that we have here.

3        The evidence we have here is that they knew there was a

4    possibility of litigation but they didn't -- there's no

5    evidence that the primary motivating factor or primary

6    purpose in creation of these documents was in fact threat of

7    litigation.

8        And I would direct the Court to the I believe Fifth

9    Circuit case that finds similarly, the Guzzino case in the

10   Western District of Louisiana, which noted that the

11   investigation that is ongoing by even a federal agency

12   doesn't give rise to an anticipation of litigation.  In

13   fact, I think as Your Honor is recalling, if you look at

14   LTV, it is different in terms of what the evidence was and

15   the circumstances were.

16       It is not the case that just because there is a

17   monitoring -- there are not cases out there that say, well,

18   if there's a monitoring that's ongoing or there's a consent

19   decree that's ongoing and, therefore, everything that's done

20   is work product.  It is still, as I understand it, a

21   document by document circumstance by circumstance analysis,

22   and the evidence in this case does not match up to that.

23   There's just not an anticipation of litigation that was the

24   primary purpose behind what these people were doing or

25   behind the creation of these reports about their compliance

53

1    with the consent decree.

2         So, Your Honor, I believe that work product will not

3    apply generally and does not apply specifically in this

4    case, given the evidence and record before the Court.

5              THE COURT:  Thank you.  And does Ocwen want to

6    comment on the issue of work product?

7              MR. WIMBERLY:  Yes, Your Honor.

8              MR. JOHNSON:  Oh, could I say one other --

9              THE COURT:  Yes, go ahead.

10             MR. JOHNSON:  Sorry.  The other thing I would say,

11   Your Honor, is work product would protect a very limited amount

12   of material in this case.  Work product would not protect

13   anything that moved between Ocwen and the Monitors or Ocwen and

14   the State of New York.  So it's very limited in what it would

15   even apply to.  We don't think it applies, but the only thing

16   it could apply to is something that stayed within the four

17   walls of the agency, because otherwise it's waived.

18             THE COURT:  Mr. Wimberly.

19             MR. WIMBERLY:  Your Honor, just briefly.  It's

20   obviously the Monitor's work product we're talking about, but

21   since Ocwen is the regulator and was involved in the

22   discussions, we do have a position on that, that this entire

23   exercise of the monitoring was driven by anticipation of

24   litigation, which we think is obvious and is evident clearly in

25   the 2014 -- the terms of the 2014 consent decree, Your Honor,

54

1    just to add that to the Court's analysis.

2         If you look at the "whereas" section, again, there is

3    no acknowledgment of wrong-doing, but the parties

4    acknowledge that there are issues and that the regulator was

5    looking into violations of law.  Then it concludes, Your

6    Honor, that the Department and the Compliance Monitor

7    identified numerous significant additional violations of the

8    2011 agreement and this is now therefore to resolve this

9    matter, the parties agree to the following.

10        I think it's evident that the parties were in

11   anticipation of litigation throughout the monitoring

12   process, especially if you think about how it is mapped out.

13   It starts with an agreement on servicing in 2011 or 2012, I

14   believe.  It was a targeted examination that got hot and

15   that began to raise some serious issues.  So the parties

16   then entered into two consent decrees.  This is the second.

17   The other one set the Monitor up, which followed from the

18   earlier agreement that the regulator felt had not been

19   complied with.  But it sets up this monitoring process and

20   the very formal, very focused, there could be -- there could

21   be litigation context.  And, Your Honor, if that isn't

22   objectively anticipation of litigation, I -- I don't know

23   what it is, and I think certainly that's consistent with the

24   primary purpose test, which is the Fifth Circuit's standard.

25        Then subjectively, the -- I believe it's in one of the

55

1   affidavits that maybe StoneTurn –– pardon me if I can't

2   remember –– but it's stated there that at least the Monitor

3   thought it was in anticipation of litigation.

4          THE COURT:  Thank you.

5          MR. WIMBERLY:  Thank you, Your Honor.

6          THE COURT:  Let me just ask if the other non–parties

7   have anything else you want to add?  No?  That's fine.

8       Mr. Johnson, did you have something else you wanted to

9   add to this?

10          MR. JOHNSON:  Your Honor, the only thing I would say

11   is as you look at the evidence, the Monitor actually does not

12   say they anticipated litigation.  They say that they knew it

13   was a possibility.  The language they use is not as strong as

14   what the Fifth Circuit requires.

15       And I think the other thing I would point out is if you

16   look at the LTV case, I think the part that is being relied

17   upon by counsel really has to do with the Special Officer

18   privilege and not necessarily the analysis of work product.

19   I leave that to the Court.

20          MR. WIMBERLY:  Your Honor, if I may, just one thing.

21          THE COURT:  Is your mic on?

22          MR. WIMBERLY:  It is.

23          THE COURT:  It is?

24          MR. WIMBERLY:  It is, Your Honor.

25       Anticipation of litigation, the phrase in the Davis

56

 1    decision is to aid in possible future litigation in quotes.

 2    I think counsel is wrong to draw it out so much that I know

 3    I'm going to get in litigation kind of context.  It really

 4    is more anticipatory.  It's more vague than that.  To aid in

 5    possible future litigation is enough for the primary

 6    motivating purpose.

 7            MR. JOHNSON:  That was not, Your Honor, where I was

 8    focused.

 9            THE COURT:  Hold on a second.  Mr. Wimberly, so let

10    me ask you a question.  Is -- is it your position that every

11    time there's a monitoring situation, that an agency, some

12    government agency could end up ordering monitoring on a private

13    entity, that that's work product, and there's a consent decree?

14    That every situation -- I didn't think it was a bright line

15    rule that says, okay, if you have that situation, it's work

16    product, period.

17            MR. WIMBERLY:  Your Honor, fair point.  No, that's

18    not my position.  My reading of the case is it is case by case.

19    We've got our factors.  That's why I wanted to point out to the

20    Court the actual language of the consent decrees, and if you

21    look at them in their context, this is a -- this is its own set

22    of facts.  I would say -- I'm sorry, Your Honor.

23            THE COURT:  Go ahead.

24            MR. WIMBERLY:  I would say that one hand -- it's a

25    continuum.  On one side you've got a regulatory enforcement

57

1    investigation that could lead to the Justice Department says

2    there's a trip wire versus on the other side there is the

3    routine monitoring behavior in a jurisdiction by a regulator,

4    and so you have to look case by case.  And I think in our case

5    we do have anticipation of litigation.

6              THE COURT:  But do you believe that having a consent

7    decree coming out, which -- in that situation you're not saying

8    when there's a consent decree and there's monitoring because of

9    that consent decree that there's some bright line rule?  That's

10   not what you're saying to the Court?  I just want to make sure.

11             MR. WIMBERLY:  No, that's not what I'm saying.  What

12   we would say about the consent decree is it clearly marks a

13   settlement opportunity.  That's another argument, but --

14             THE COURT:  Isn't that going to be the situation?  I

15   mean, every consent decree by its very nature is some agreement

16   that has come up because -- either preceding any kind of

17   litigation, but it's in settlement.  I mean, it's an agreement

18   to do something on both sides or one side to do something.  So

19   how -- under what you're asserting, why wouldn't everything be

20   work product?

21             MR. WIMBERLY:  I think they -- I think the consent

22   decree is different from the language.  With due respect to

23   Pete, Mr. Dean, New York tends to be a little more aggressive

24   than lots of other jurisdictions, Your Honor.

25         I think when you're in that kind of environment,

58

1    especially in light of the problems that were surfacing with

2    respect to the economy in general at this time period,

3    people concerned about banks and mortgage lenders and so

4    forth, I think you have a super-charged atmosphere.

5         And I think all you have to do is find that as to this

6    particular case it was in anticipation of litigation.

7         THE COURT:  Thank you.  Go ahead, Mr. Smith, or Mr.

8    Johnson, you wanted to make some comment.

9         MR. JOHNSON:  Yes, Your Honor.  The part I was

10   focusing on is not the end of Davis but the beginning, which is

11   that the primary motivating purpose behind the creation of the

12   document must be the possibility of litigation.

13        And here, to use an analogy, Your Honor, the consent

14   decree is no different than any other contract.  That

15   contract may get breached.  You may have litigation about it

16   because the party under the contract doesn't perform as

17   they're supposed to.

18        So that's why there's no bright line rule in these

19   consent cases, because until you have something more than

20   just a contract or just a consent order, you're not giving

21   rise to that possibility of litigation that exists.  It

22   doesn't exist any more here than it does in most other

23   contexts, and that's why the test is what it is and there's

24   no bright line rule.

25        Thank you.

59

1           THE COURT:  Thank you.

2           MR. BURETTA:  Can I just add one thought, Your Honor?

3           THE COURT:  Go ahead.

4           MR. BURETTA:  The question you asked, I think the

5 answer really is in LTV Judge Higginbotham there says there are

6 criteria.  So if the consultant that's retained by the company

7 would have been acting in anticipation of litigation, that's

8 one important factor and you need to check yes to that.

9      If the company appearing directly before the regulator

10 would have also been subject to a state law protection

11 there -- in this case there would have been -- Your Honor,

12 in our view, doesn't need to decide that.  But it's

13 important because in LTV Judge Higginbotham says, look, if

14 we have a company sitting in the room with the regulator,

15 there would be a privilege that applied to that discussion

16 as well.

17      What LTV addresses is the in between the Special

18 Officer and the Monitor who's collecting and analyzing

19 information in the context of the consent decree where it

20 clearly is in anticipation of litigation.  So that is a

21 subset of all Monitors that exists in the country.

22      There are many monitorships.  I dealt when I was in

23 government with many monitorships and selecting Monitors.

24 Many monitorships involve companies that don't have that

25 regulated aspect to them where they're not going to be in

60

 1   front of a bank regulator routinely.  They don't really have

 2   a regulator, frankly, if they're in the electronics

 3   industry, for example, where there are foreign court

 4   practices and violations of that and Monitors were imposed

 5   there.

 6        It is possible that Your Honor doesn't need to decide

 7   it, and I'm not saying I'm landing on it either, but -- for

 8   my future clients, but it would not necessarily meet the LTV

 9   criteria.  And so the bottom line is it's not actually all

10   Monitors that LTV would cover.

11            THE COURT:  Thank you.

12            MR. BURETTA:  Thank you, Judge.

13            THE COURT:  Okay.  So let's move to -- I think we

14   should maybe start with the issue of the New York banking

15   privilege.  Now, I know, Ocwen, you filed a motion to quash and

16   you raised other alternative arguments on different and various

17   privileges or rules of evidence.  The question is who wants to

18   go first on that issue?  Does -- we have a representative, I

19   guess, from New York somewhere?

20            MR. DEAN:  Yes.

21            THE COURT:  Or does Ocwen want to lead off on just

22   the issue of Section 36 Subsection 3?

23            MR. WIMBERLY:  Your Honor, we would defer to Mr. Dean

24   for the regulator.

25            THE COURT:  Okay.  Mr. Dean, I'll let you, and then

61

1   we'll come back to the other issues to the extent that we want

2   to discuss the other issues.  I think they're adequately

3   briefed, but this is the one that piqued my interest in terms

4   of addressing, if I have to get there.

5        MR. DEAN:  Thank you, Your Honor.

6        THE COURT:  And I wish I could say -- I typically

7   like to make decisions here so I don't have to write an opinion

8   about it, because I'm extremely busy.  I had thoughts coming

9   into the hearing and I'm not so sure where I'm coming down on

10  it.  So in terms of the issues we've already discussed, I will

11  be candid, I mean, coming into it, I was inclined to deny the

12  motions to quash, which I'm sure -- but I'm not sure of the

13  answer there now.  So for me I'm going to have to write an

14  opinion to figure out how I want to come down on that.

15       So that's the reason why I want to go to that next,

16  just in case.  That was my inclination going in.  Maybe it

17  will be finally when I'm done, but we'll come back.  I'll

18  deal with that later.  So to give you just kind of my

19  thoughts off the top of my head.

20       MR. DEAN:  Thank you, Your Honor.  Peter Dean on

21  behalf of the Department of Financial Services, and I say that

22  I hope you don't have to reach the privilege issue here either.

23       I just want to be clear about what we are arguing for

24  here in terms of asking for the Court to recognize New York

25  state's Banking Law privilege.  We're not, as Relator

62

1    suggests, seeking to protect Ocwen's day-to-day business

2    records, the loan files, their analyses.

3        What we're really concerned with here is kind of core

4    bank exam material, the communications between the

5    Department, its Monitor and its regulated entity, the work

6    papers that were submitted by -- the work papers prepared by

7    the Monitor and the reports that Relators seek.

8        We've briefed Finch extensively as to -- ACLU v Finch

9    as to whether under that test the Court should recognize New

10   York state's privilege.

11       THE COURT:  You concede that that's the analysis the

12   Court has to do?  I know that Ocwen makes the argument that

13   under the Federal Rules of Evidence that tries to fit this into

14   a state issue, but --

15       MR. DEAN:  Your Honor, I --

16       THE COURT:  Are you contesting really this is a Finch

17   analysis, that Federal Rules of Evidence 501 does not -- it

18   would be federal common law in this case.  Would you concede

19   that?  I'm not sure Ocwen would, but would you concede that,

20   that we have to do the Finch analysis?

21       MR. DEAN:  I --

22       THE COURT:  I mean, I'll tell you that's where I'm

23   at, so unless you can convince me otherwise.  But I don't

24   see -- the way I look at it is of course it's a federal claims

25   act or False Claims Act claim, which is a federal cause of

63

1    action.   There's nothing in the complaint -- the cause of

2    action in the complaint, they aren't independent state claims.

3    They're federal causes of action.

4         Now, are there allegations of facts that are including

5    various state issues?  Yes.  But that's where I look at.

6    And I understand that you can have a mixed question, but

7    there aren't any state claims and I'm not sure that there's

8    any -- well, I'm giving you a heads-up of what I think, but

9    I'll give you an opportunity if you want to rebut this

10   later, but that's my view, that the state rule isn't going

11   to decide the case in essence.  So in the Court's view, I

12   have to reach Finch, if I get to this point.

13             MR. DEAN:  Your Honor --

14             THE COURT:  So I made that long -- I gave you an

15   advanced view of what I think and it sounds to me like you

16   agree with me, at least in a general sense.

17             MR. DEAN:  I do agree with Your Honor.  I really

18   don't want to take much of a position contrary to Ocwen's

19   position or to Relator's on any matter.  You know, I should say

20   that the Department is a reluctant Intervenor here.

21        The concern that we had is when the argument starts to

22   focus on there can't be any state law banking examination

23   privilege in a federal question case, there's a lot of

24   troubling implications there for us, and that's what our

25   interest is.

64

1        So I don't want to say Ocwen is wrong, but I agree with

2   Your Honor that we have to do the Finch analysis here.  So I

3   think we've briefed the Finch case extensively in the

4   papers.  I think for the purpose of the oral argument I

5   would like to simplify the analysis.

6        Finch, as you pointed out, recognizes that there may be

7   exceptions to the general rule under 501 that a federal

8   privilege -- federal common law does cover privilege in a

9   federal question case.  Finch says basically, in my view,

10  that a state law claim can be recognized if it's meritorious

11  and if its recognition won't pose an undue burden on the

12  general federal interests in there being full discovery and

13  fact finding.

14       I think as to the first question, the meritorious

15  nature of the privilege, I think it's very clear.  There's

16  75 plus years of case law in federal courts recognizing the

17  importance of some level of -- of privacy and facilitating

18  candor in the communication between the regulator and its

19  regulated entity.

20       I think the same kind of public policy considerations

21  that underlie the federal recognition of a bank exam

22  privilege apply with equal force to the New York state exam

23  privilege, and indeed to the exam privilege of any other

24  state.

25       I think the question here then is does the recognition

65

1    of New York state law impose more of a burden than the

2    federal bank exam privilege would, and in that regard I will

3    acknowledge there's a difference between New York state's

4    bank examination privilege and the federal common law.

5        New York protects absolutely from subpoena all

6    correspondence, memoranda, and reports relating to or

7    arising out of the examination of a regulated institution.

8    The federal privilege only protects kind of non-factual.

9    It's very much like a deliberative process privilege.   In

10   fact, we cite some cases that identify it as a derivative of

11   the deliberative process privilege.

12       Non-factual material is protected and it's a qualified

13   privilege, meaning that it can be overcome or it can be

14   ignored if there's a substantial need for the evidence.

15       I think in this case on the facts of this case,

16   applying New York state's privilege does not unduly

17   interfere with the federal interests in getting to the truth

18   in this case.

19       As Finch recognized, there's a number of instances in

20   which the federal interests may be reduced.   One is where

21   there's substantially the same information can be obtained

22   from a non-privileged source, and as we've discussed at

23   length here today, all of the records that Ocwen -- that the

24   Monitor reviewed from Ocwen, the loan files, all the things

25   that are the factual information contained in the

66

1   examination material is available to Plaintiffs, to

2   Relators.

3           THE COURT:  Of course, they haven't received them

4   yet.

5           MR. DEAN:  I -- I have no control over that.

6           THE COURT:  I understand.  I understand.

7           MR. DEAN:  I think the Department had its own issues

8   with Ocwen.  So substantially the same --

9           THE COURT:  Let me ask you this.

10          MR. DEAN:  Sure.

11          THE COURT:  The idea is you want to get to the truth,

12   so what better way to get at the truth than to have in this

13   case the Plaintiff and Relators have access to these reports

14   which ultimately led to an agreement later, but showing your

15   allegation of wrong-doing, which they're saying they never

16   admitted to, which happens probably in any settlement.  But you

17   certainly thought there were violations, so what better way to

18   get to the truth than having to cull through, you know,

19   millions of documents trying to piece it together, whereas

20   you've already done that?

21          MR. DEAN:  We've done that to a different set of

22   facts than are alleged in the complaint here.  As I think both

23   StoneTurn and BPA have stated, the analysis that was done by

24   the Monitor is different than what's alleged in the complaint

25   here.

67

1        There was -- the complaint generally alleges -- the

2   claim is very similar.  The claim is Ocwen falsely certified

3   its compliance with state law, but the generally --

4   particularly as it applies to New York state law, what they

5   allege is that Ocwen did not modify loans in a way that were

6   affordable and sustainable.

7        The Monitor looked at different issues and different

8   violations of New York laws.  It looked at foreclosure.  Did

9   they check to see if they had the right to foreclose before

10  they foreclosed on a property.  They looked at conflicts of

11  interest in that Ocwen has some related companies that do

12  business with each other and whether that impacted their

13  operations.

14       So there's a different scope of issues that were looked

15  at by the Monitor than were looked at here, and that's part

16  of the reason why I don't see a burden to the Relators for

17  not getting this information.  I don't see that this

18  information supports the claims, the information that

19  support the claims that they're alleging in this case.

20       And I know this is something of -- it's a subject I'm

21  reluctant to get into, but I do question whether they can be

22  an original source of the material that's alleged in the

23  consent orders that were published by the Department.

24       So the material -- the Relators can get substantially

25  the same material from other sources.

68

1     The other point is I don't know that -- I wouldn't say

2   that this is a case that Finch doesn't apply, but Finch does

3   recognize that a claim may be nominally federal where state

4   law issues predominate or where state law issues are

5   incorporated by reference.

6     And as the Monitor's work is relevant here, it's a

7   review of New York state regulation.  In fact, it's a

8   regulation that was promulgated by the Department.  So the

9   substantive issue, the substantive violation is a question

10  of New York law here.  And it's not only a question of New

11  York law but it's a question of how our regulated

12  institutions should behave.

13    I think in that situation there's a clear kind of New

14  York concern in the interpretation of the law and

15  correspondingly the New York privilege should be applied.

16    I will say there are -- in fairness, there's three

17  categories of analysis that the Monitor did do, as I

18  understand, that are kind of arguably relatable to what the

19  allegations are in the complaint, but it's a very small

20  subset of the Monitor's work papers and reports.

21    Generally they looked at -- for example, they looked at

22  a substantial part of the allegations in the complaint.  And

23  I apologize.  I looked at the fourth amended complaint.  I

24  didn't realize that that wasn't the operative complaint

25  here.  But from what I've seen, the substantial allegations

69

1    in the complaint involve whether Ocwen offered affordable

2    modifications.

3          I understand the Monitor looked at the model, kind of

4    the electronic model that Ocwen used to prepare those kinds

5    of modifications, but it didn't look to see whether it

6    prepared -- whether it was designed to generate affordable

7    modifications, whether the inputs were intended or played

8    with to not get affordable modifications or whether it

9    produced affordable modifications, more to look at whether

10   the model performed as Ocwen expected it to.

11         So there are areas where there are arguably relatable

12   material that the Monitors examined in the work papers and

13   the core examination material, but by and large, it's a

14   different issue than the Monitors were alleging here.

15              THE COURT:  Thank you.

16              MR. DEAN:  Thank you.

17              THE COURT:  Did Ocwen want to add anything to that?

18              MR. WIMBERLY:  Sure.  Your Honor, I think first it's

19   just in terms of the recognition of the privilege we're asking

20   the Court to provide.

21         As to the state law privilege 36.10, the question of

22   whether the Court ought to -- ought to employ a state law

23   privilege in a federal question case is on the table.  We

24   think, because this is a False Claims Act case and

25   specifically the way it's pled, that there are good reasons

1   to do so in the context of what's not completely clear under

2   501.  How this happens -- what happens when you have -- you

3   don't have a diversity case.  I mean, everybody agrees 501

4   is a federal question.  It will be federal privilege except

5   where you have -- and it would be state privilege if it's a

6   diversity case, and if you have a state claim in a federal

7   case, 501 teaches that you are to employ state privilege

8   law.

9        We're in a gap here and I don't know whether there's --

10  we haven't found any precedent that would -- that would tell

11  the Court you can't employ the state law privilege where

12  there is this kind of state law claim as it were.

13       The -- the False Claims Act and the petition and the

14  complaint here is based on the predicate that my client

15  violated state law, and in fact there are over 40 pages of

16  state law allegations and they -- they live or die based on

17  their ability to prove that we violated Massachusetts, New

18  York and now -- and Texas.  That we violated New York,

19  that's what we're talking about today.  They want to prove

20  that and they want to get facts and then they're going to

21  apply New York law, in fact a lot of it, no doubt, or

22  they'll try anyway, governing servicing of loans in New

23  York.  So it's the whole bundle.  It's a New York -- it's a

24  New York theater completely.

25       Now, for us not to be able to use -- to employ a New

71

1    York privilege as part of the defense to deal with the

2    evidence, it would seem not to be consistent with due

3    process frankly, Your Honor.

4         And let me say, that moves to the Finch analysis, in my

5    mind anyway.  Judge Wisdom in Finch says -- or in effect I

6    think this is the way the Courts have interpreted Finch,

7    it's a balancing test and Your Honor is going to look at the

8    interests on both sides of the issue, the interest in

9    getting the truth out.  Although I would question whether

10   there's any truth to it, what the regulator thought about

11   violations ends up completely irrelevant because there's no

12   finding of violation.  There's just a consent decree we

13   talked about, but put that aside.

14        The -- the process of dealing with this kind of

15   examination requires, for it to be effective, requires that

16   there be frankness in the exchanges of communication,

17   particularly in the context of discussing potential

18   violations.  So bank examiners -- as the Courts teach, bank

19   examiners really can't effectively function -- examinations

20   can't effectively function without a cloak of privilege

21   protection, and that's the basis for the New York rule and

22   that's the basis for the common law banking privilege.

23        No reason to question the application notes policy

24   principles here.  In fact, we're talking about four million

25   pieces of paper exchanged and a lot of analysis that went

72

1    into it.

2         We would have been chilled –– and I'll tell you how

3    that is evidenced.   In the –– in the engagement letter

4    that's under seal, Exhibit B that was discussed earlier,

5    that's the agreement between Ocwen and the Monitors, and in

6    it there is a specific provision that I invite the Court to

7    look at with respect to confidentiality.   And the parties

8    agree that the –– that New York law, Banking Law 36.10, is

9    applicable to communications in connection with the

10   monitoring.

11        So my client, Ocwen, and the Monitors certainly went

12   into the process –– into the process with the expectation

13   that their communications would be privileged.   And the

14   regulator is –– under the law the regulator may have the

15   power to waive that.   The regulator is not waiving that, so

16   the regulator is prepared to assert the coverage of the

17   privilege.

18        So in terms of the Finch analysis, we think it would ––

19   those factors balance in favor of application of the

20   privilege and ––

21             THE COURT:  But let me ask, I mean, if I extend the

22   privilege, I would be the first court to do so in this nature

23   of a case.   That privilege has never been extended in –– I

24   think by any court.

25             MR. WIMBERLY:   The ––

73

1          THE COURT:  I couldn't find anything either, so --

2          MR. WIMBERLY:  I think it's a small step from, for

3   example, the Garza versus Scott & White decision 234 FRD 617 we

4   cite in our brief, extending, in other words, the steps out

5   from diversity cases to appendant state claims, this is a small

6   step.

7          THE COURT:  But is it a small step?  I mean, I think

8   in every one of those cases there were some state claims, and

9   so now we're looking at basically is the allegation an

10  essential element of their cause of action, which is a federal

11  claim.

12         MR. WIMBERLY:  Your Honor, I -- I submit that the FCA

13  makes this a very unique situation with respect to the

14  interplay of state and federal claims, that you don't -- maybe

15  there are other contexts but I can't think of one offhand where

16  you literally package a state claim as the predicate, the sole

17  predicate for a violation of the federal statute, the False

18  Claims Act.  That's the formula here.

19      If we're stripped of the privilege and the evidence

20  comes in, I think we've been denied -- in the way that the

21  Courts like Garza move the privilege or the state law

22  privilege to appendant claims and beyond just the rigid it's

23  gotta be diversity or you're under federal privilege.

24  Otherwise, you are disregarding the state privilege that the

25  parties have relied on and that's -- that's the rule of

74

1    decision, which is what the cases tell us.  If state law is

2    the rule of decision, then the state privilege ought to

3    apply.

4         And, Your Honor, lastly I would say this isn't an out

5    there kind of privilege.  You know, lots of states have lots

6    of different kinds of privileges and that's the basis for

7    501's formula, because obviously a federal court should not

8    have to accept some crazy privilege in my state of

9    Louisiana, for example.  But this is not.  This is a bank

10   examination privilege recognized at the federal common law

11   level.

12        So again, in terms of the small step, that -- the model

13   of it is already there.  This happens to be just the New

14   York state version of the federal common law bank

15   examination privilege.  We would submit it would apply to

16   whatever your decision is on the state law.

17             THE COURT:  Thank you.  Mr. Johnson, are you making

18   this argument as well?

19             MR. JOHNSON:  At the risk of talking you out of being

20   predisposed in my favor, I think I am.

21             THE COURT:  I didn't necessarily mean it like that,

22   but go ahead.

23             MR. JOHNSON:  Your Honor, we agree --

24             THE COURT:  I think everyone is doing a very good

25   job, so --

75

1        MR. JOHNSON:  Oh, no, I'm -- I'm being facetious.

2        THE COURT:  I meant only that coming in I -- you

3   know, you form opinions about things coming in.  But I always,

4   going back to my appellate days, keep an open mind and look at

5   things in different ways.

6        MR. JOHNSON:  Certainly, Your Honor.  I didn't mean

7   to imply otherwise.

8        THE COURT:  I'm not ruling against you yet.  Now

9   I'm -- now I don't know what I'm going to do, so you haven't

10  lost, you haven't won.  But go ahead.

11       MR. JOHNSON:   Thank you, Your Honor.

12      The Court is correct and we agree with the New York

13  Department of Financial Services, this is a Finch case, and

14  it is a Finch case because at best, proof of a violation of

15  New York law, Texas law, Massachusetts law is a step within

16  the analysis that has to be done in a federal False Claims

17  Act.  It is not an essential element.  It is not an element.

18  We've got the elements of the FCA laid out there.  So

19  because of that, this is a Finch case.

20      So this is not a -- the fact that New York or New

21  York's allegations are a part of this case does not mean

22  that New York privilege law should govern any more than the

23  fact that Texas -- violations of Texas law are also at issue

24  and the Texas law would govern.  In fact, that would lead us

25  to a morass of problems with privileges going different

76

1    ways, and that's why federal law controls under 501.

2         In the Finch balancing test, as the Court knows from

3    Magistrate Hine's opinion, that first question of is

4    there --

5              THE COURT:  To confess, I didn't know of Finch until

6    this sole issue.  I never had dealt with Finch before so I

7    didn't know there was such analysis until I read all the

8    briefing and got into this issue.  But go ahead.

9              MR. JOHNSON:  Does the fact that the courts in the

10   state recognize the privilege itself create good reason?  As

11   Magistrate Hines said, that question is almost always answered

12   no, and the reason is because the existence of the state

13   privilege alone and the fact that a state will recognize it

14   doesn't give rise to the overriding or doesn't override the

15   federal concern in a federal question case.

16        I would say, Your Honor, you're in a very limited,

17   narrow circumstance of an FCA case.  We're not talking

18   about -- and the New York -- I don't think the Department of

19   Financial Services argues this, but we're not asking you in

20   this decision to rule that the New York state banking

21   privilege can never apply in private litigation in federal

22   court.

23        We are in the unique circumstance of a False Claims Act

24   case, which is unique because the real party in interest is

25   the United States of America.  The United States of America

77

1    controls the resolution of the case and is ultimately the

2    beneficiary of the case.

3        So there is an overriding and unique federal policy

4    that is present in this case, that comes to bear in this

5    particular decision that is not present in other cases.

6    And, frankly, Your Honor, we think that's why this privilege

7    has never been recognized in the FCA context.

8        If we talk about --

9            THE COURT:  Let me make sure.  Not only has it been

10    not recognized in that context, we don't have a case where -- I

11    don't have an opinion that I could find in an FCA context

12    that -- that it was rejected either.

13            MR. JOHNSON:  Correct.

14            THE COURT:  I mean, we don't have any cases.

15            MR. JOHNSON:  You're correct.  You would be the

16    first.

17        The second part of the Finch analysis -- and I disagree

18    with my counsel, my fellow counsel from Louisiana, that

19    Finch is not a balancing test, because Finch -- in question

20    two all of the factors in Finch must be answered in favor of

21    the privilege.  If any one of them is not answered in favor

22    of the privilege, doesn't weigh in favor of the privilege,

23    then the privilege isn't recognized.

24        Here we believe that really none of these substantially

25    weigh in favor.  In fact, most of them go against the

78

1    recognition of the privilege.

2        The briefing has that, and I won't go through all the

3    details because the briefing has that, but I will note the

4    Fairchild decision is informative.  And I think this is

5    really applicable to what happened here is that I believe

6    the parties do have an expectation that everything is not

7    going to necessarily be publicly aired, but not that it will

8    always be shielded from discovery.  Certainly governmental

9    entities share information all the time, and in particular

10   in this case, which I think makes New York a little unique,

11   is the statute specifically allows the Superintendent to

12   waive any or all parts of his investigation at his

13   discretion, if the public needs to know or if justice

14   requires it.

15       And that happened in this case.  Four of the

16   correspondence, four of the letters that the Department of

17   Financial Services sent to Ocwen were published to the

18   public.  The consent order itself was published.  These

19   weren't kept confidential.  And in fact, the CEO testified

20   that this whole matter -- they were having discussions with

21   Fannie and Freddie Mac because this whole matter had become

22   so public.  And I'm happy to provide that testimony to you.

23   I think it was taken after the briefing.

24       So in this case in particular, the idea that

25   confidentiality is necessary, I agree confidentiality is

79

1    necessary, but that doesn't necessarily mean it shields

2    things from complete view when the United States Government

3    wants to come see if it has been defrauded.  I think

4    particularly in this case where there has been, we would

5    argue, a complete waiver as to subject matter by the

6    Superintendent of the New York Department of Financial

7    Services publishing his letters.  Ocwen also published a

8    letter to its clients about some of the backdating issues

9    that formed a part of this case.

10       There has been a substantial amount of publicity around

11   this, and it seems that the only person who can't know the

12   details of that is the Relator who is seeking to find out

13   the truth about whether the United States has been

14   defrauded.

15       And that truth, Your Honor -- I would say I would

16   disagree with counsel for New York a little bit, is that the

17   crux of the claim in this case is that there were false

18   certifications made to the Federal Government that Ocwen was

19   in compliance with all state and all federal laws.  So to

20   the extent there are other violations, they are encompassed

21   within that certification, whether that was Texas law or New

22   York law.  So the claim is broader than that.

23       I will also say that the truth is at the end of the day

24   the New York allegations did result in a substantial fine,

25   the CEO resigning, and so this wasn't some small,

80

1    insignificant matter.  This was a major ordeal that the

2    Superintendent, in his discretion, decided the public needed

3    to know about.  So we believe that the United States'

4    interest in a False Claims Act is equally as strong in terms

5    of its ability to know.

6         I don't know -- I was unclear, Your Honor.  You

7    discussed a little bit about the federal common law

8    privilege, whether you actually wanted to have argument on

9    that.  It sort of got mish-mashed in some of this.  I'm

10   happy to forego it.  I think it is a qualified privilege and

11   is subject to be overridden, and I think in this instance

12   can and should be.

13        I think the candor requirement, the need for

14   confidentiality has really been exploded in this case

15   because of the public nature of the investigation.

16             THE COURT:  Thank you.  I don't necessarily need that

17   addressed unless the parties want to.  I know Ocwen raised that

18   issue, but for purposes of the Department, if you would like to

19   respond.

20             MR. DEAN:  Yes, Your Honor.

21        I want to apologize.  I think I sat down prematurely

22   before.  I guess this is what happens when you get up at two

23   in the morning to fly down to an argument.

24             THE COURT:  You're doing fine.

25             MR. DEAN:  The -- I did want to say that we do think

81

1    that there is ample reason to apply the New York privilege

2    here, but should for any reason Your Honor decide not to, I see

3    no reason that the federal privilege shouldn't apply.

4         Unfortunately, the process would have to involve a

5    review of the documents, logging, redacting, production that

6    would have to be done here.

7         I want to say a couple things in response.  As to the

8    idea that there is no expectation of privacy here, one, I

9    think Fairchild -- the reliance on Fairchild is misplaced.

10   I think they're relying on a line of dicta there.  The key

11   factor in Fairchild appears to be that the person who's

12   seeking the discovery was actually at the meeting.  They

13   were there, they heard exactly what was going on.  So to say

14   that they weren't entitled to the transcript of the meeting,

15   to the recording of the meeting, was somewhat silly in that

16   situation.

17        Two, and this kind of goes back to why I tried to

18   simplify this argument, the Federal Government, the OCC, the

19   fed, all have the same ability to waive the bank examination

20   privilege.  Nobody says that there's any less of an interest

21   in maintaining that privilege or that the privilege is

22   invalid because of that possibility.

23        Moreover, in terms of the expectation, there is an

24   engagement letter.  There's language in the engagement

25   letter that says that we expect -- and this is language the

82

1    Department asks the Monitor to put into the engagement

2    letter with the regulated entity -- stating that we expect

3    that they're going to be accessing banking examination

4    material, material protected by Banking Law 36.10 and that

5    they won't disclose it.

6        Then I just want to briefly address the subject matter

7    waiver argument.  There isn't, from what I can find, a lot

8    of case law on the question of subject matter of a waiver of

9    a bank examination privilege.  The closest that I can find

10   is deliberative process, and the split is -- I think what

11   Relators are arguing is an attorney-client privilege waiver.

12   That is generally where you see waiver of a subject matter.

13       There's a whole world of cases that say on the

14   executive privilege cite, deliberative process, executive

15   privilege, there is no subject matter waiver.  Whatever is

16   publicized is waived.  Whatever isn't is not waived.  I

17   think that's -- that's the better rule to follow here.  It's

18   more applicable to what's alleged in this case and what's

19   involved in this case.

20       One other thing.  You know, in terms of the

21   publication, there are competing interests that the

22   Department serves.  Generally examination material is held

23   absolutely confidential.  There is -- when you do have

24   issues of wrong-doing, there is some interest in disclosure,

25   but not full disclosure.  And this is no -- again, no

83

1    different than the federal regulators.  The OCC, for

2    example, you can go onto their Website.  There's an

3    enforcement action page and you can look at their

4    enforcement orders, and it depends on the order.  Some of

5    them are more descriptive than the others, but again,

6    there's -- when there is an issue of wrong-doing, there is a

7    government interest in providing some disclosure of what the

8    nature of that wrong-doing is.  It provides a warning to

9    other regulated entities and it provides some notice to the

10   consumer.

11        But the interest here and the concern particularly as

12   it relates to the Monitor is this detailed analysis that

13   they do, kind of the review that -- the conclusions that

14   they reach.  If that's available, you know, we're concerned

15   that no one is going to want to cooperate with the Monitor

16   in the future.

17        Thank you.

18             THE COURT:  Thank you.  Are you sufficient with the

19   argument he made?

20             MR. WIMBERLY:  Yes, Your Honor, just a very few

21   comments.  The -- and especially with respect to the notion of

22   a subject matter waiver.  It is true the letters were

23   publicized and the consent decree, but nothing else.  And

24   importantly, the Regulator has not waived the privilege with

25   respect to the underlying information that we're arguing about

84

1    today.

2        Also, Your Honor, we're not arguing about business

3    records as we have established, but the -- the rest of the

4    subject matter subject to the privilege has not been waived.

5        The second point, there's an empty chair over there,

6    Your Honor.  The Government is not here and it's a

7    non-intervention case.  Not only is it a non-intervention

8    case, the Government has not issued any -- made any

9    statements to the Court, and typically they will if they

10   have an interest in the issue.  So there's a complete

11   silence as to the Government.  I think you can -- it's

12   probative what their interest is.  We don't know.

13          THE COURT:  Well, that's true, but of course, if the

14   Relators win, the Government takes a share.  The case can't be

15   dismissed by agreement of the parties without the Government

16   agreeing to it as well.  So I understand they didn't intervene

17   but ultimately they're representing the Government in a sense.

18          MR. WIMBERLY:  They have an interest.  They're not a

19   party and they haven't intervened, and they investigated it for

20   several years and made their decision, and I submit that to the

21   Court, that there is a silence there.  So we are looking at

22   just what the Relators want.

23       The problem for us as a putative Defendant in this kind

24   of case, Your Honor, and it's typical of False Claims Act

25   cases, typically they get thrown out, and we hope Your Honor

85

 1    throws this one out too.  But they come in and they're

 2    bounty hunter things.  And they come in and that's fine.  I

 3    understand the public policy and it's the Lincoln Law and

 4    all that.  We respect all that.

 5        But, look, these guys don't have any evidence.  They're

 6    going to get their evidence from us.  We just took the

 7    deposition of the Relators and they admitted under oath,

 8    they don't have any independent evidence.  It's all from us.

 9    And they're desperate to get at all these records to find

10    something.

11        What the Fourth Circuit would say is they're out here

12    because they didn't come with a claim in hand.  The Fifth

13    Circuit is somewhere around there too.

14        And the frustrating thing, Your Honor, is the burden on

15    a Defendant in our situation, especially in this age of

16    e-mail and with respect to discovery where it is a hugely

17    expensive problem before we can even see what it is somebody

18    thinks we did wrong.

19            THE COURT:  I'm not sure how that relates to the

20    argument we're --

21            MR. WIMBERLY:  Your Honor, I just wanted to make that

22    point.

23            THE COURT:  Thank you for that general statement.

24            MR. JOHNSON:  Your Honor, I did want to just remind

25    Your Honor that the sealing hearing in this matter, the

86

1    Government did request a continued seal be maintained on the

2    amended complaint and wanted to continue to investigate.  And I

3    believe the Government continues to have a right to intervene

4    and is monitoring the case.  So it is not -- the Government is

5    not a disinterested bystander at this point by any stretch.

6    Thank you.

7              THE COURT:  Okay.

8              MR. JOHNSON:  I'll -- I won't respond to the other

9    stuff about the evidence.  I have a response but I know we're

10   pressed for time.

11             THE COURT:  Thank you.  So I think that concludes

12   those arguments.  Now, Ocwen had a motion to quash.  Do you

13   want to argue any of those other kind of alternative issues you

14   raised or do you want to just rest on the briefing on that?

15             MR. WIMBERLY:  Your Honor, I recognize it's getting

16   late.  We would submit that our position on the settlement

17   privilege is not collateral or secondary.  In fact, it's its

18   own --

19             THE COURT:  No, I understand.  I mean, I'll let you

20   argue that.  It seems to me you're conflating that

21   significantly to apply to the situation that I'm not sure

22   applies, but --

23             MR. WIMBERLY:  It may not apply specifically to the

24   contract -- the compliance monitor records, Your Honor.  We

25   would submit to the Court that that issue can wait for another

87

1    day and really should be teed up with the privilege log, and we

2    would be -- we'll provide that.

3        Under Goodyear and then there's several Eastern

4    District of Texas cases, it is recognized -- it's 408 as a

5    privilege.  It's recognized in this jurisdiction and then I

6    think you just deal with does it apply or not with respect

7    to the particular documents.  And we've been basically

8    talking about something else.  So to that extent, we can

9    defer that issue to another -- to a later date with the

10   Court.

11           THE COURT:  So in terms of the motions that I

12   actually set for today, I think -- is there anything else that

13   I have omitted that we need to address related to these

14   discovery -- really, the non-party motions?

15           MR. JOHNSON:  Not from the Plaintiffs, Your Honor, or

16   Relators, Your Honor.

17           MR. WIMBERLY:  Not from Ocwen, Your Honor.

18           THE COURT:  And then have I taken care of everything

19   you wanted to say from the non-parties and also the Intervenor?

20           MR. SIEBMAN:  I think that's all, Your Honor.

21           MR. BURD:  That is all, Your Honor.  Thank you.

22           THE COURT:  Very good.

23           MR. DEAN:  Thank you, Your Honor.

24           THE COURT:  Okay.  So of course the non-parties, the

25   Intervenor, you're welcome to leave.  There are still some

88

```
1    issues and I need to have a status conference on the other

2    issues.  Of course, you're welcome to stay or not.  It's

3    totally up to you.

4        My court reporter, I have to think of her and give her

5    a little bit of a break here.  I do have a contempt matter

6    in a civil matter that's set for 3:30.  I don't know if

7    they're even here yet.  What I'm going to do is take a short

8    break and we'll come back.  If that matter -- they may have

9    resolved it.  I don't know what the status of it is.  If I

10   have to proceed with that hearing, if it's going to be

11   quick, I may just take that up first before coming back into

12   this matter.

13              MR. JOHNSON:  Your Honor, I have hard copies of our

14   slides I was going to give the Court.

15              THE COURT:  Yes, that would be nice.  Did you provide

16   a copy to the other side as well?

17              MR. JOHNSON:  Sure will.  If I can approach.

18              THE COURT:  Okay.  We'll take a ten minute break and

19   come back.

20                    (Recess.

21              THE COURT:  Please be seated.  We'll go ahead and

22   continue with y'all just because my other matter, I think they

23   have resolved some of it but it's not -- it may take more than

24   just a few minutes, so we'll continue on.

25        This is more of a status conference.  This is to see
```

1    what else -- where we are.  First, let me confess -- I know

2    Ocwen raised the issue of hoping I would dismiss the case

3    and resolve those issues in the case, and I know those

4    motions have been pending for awhile.  I have to confess

5    that last week I finished my seventh jury trial since

6    becoming a District Judge.  As a Magistrate Judge I only had

7    one law clerk.  I didn't get that second law clerk until

8    January and then I'm still without a Magistrate Judge so I'm

9    still doing double duty on things.  That should be resolved

10   and hopefully I'll have a Magistrate Judge here before the

11   end of the month.

12       But with that confluence of events and being in trial

13   so much, I just haven't resolved that.  And, of course, I

14   just happen to have three qui tam cases on my docket that

15   all have similar motions pending.

16       So I can't give you an estimate.  I wish I could, but

17   we hope -- my hope is to get those done hopefully in the

18   next 30 days, so that's kind of where we're at on that.

19   That's why I have not done anything on the amended complaint

20   or request for leave to resolve those issues.  I didn't want

21   to cause an issue of mooting anything out unless it's

22   resolved and then I'll look at it and see if the amended

23   complaint should be done or not.  So that's where that's at.

24       What else can I help you all with since we're here?

25   Clearly it sounds like there's some discovery issues, maybe

90

1    more than we should take up today.  Of course, Mr. Wimberly

2    has said that they're thick in the process of getting it

3    done and getting things started.  I know that in the

4    response the Relators indicated that a motion to compel was

5    forthcoming.

6         I don't know exactly the issue.  My chambers was

7    called, which is a requirement that I have.  I like in any

8    case for me to be called first to see if I can resolve it

9    informally.  I was too busy to take it up, so I guess the

10   Relators couldn't -- I don't think you've filed anything, I

11   don't believe, so --

12        MR. JOHNSON:  We have not, Your Honor.  We actually

13   called last Thursday to see when Your Honor would be available

14   on Friday for a potential call and that's when we got the

15   message that you said the schedule would not allow for it and

16   we should file our motion.

17        THE COURT:  I was in Tyler at the federal court

18   there, so, yes, I wasn't here Friday.

19        MR. JOHNSON:  So that is underway.  We are continuing

20   to work with Ocwen's counsel to try to get documents and then

21   to thereafter take depositions.  I think there will likely be

22   motions on both because we are so near all of the deadlines.

23   And quite literally, Your Honor, this is probably, given the

24   scope, a million plus document case, and this isn't the first

25   time these kinds of allegations have been a part of Ocwen's

91

1    life.  Certainly very experienced counsel.

2              THE COURT:  Well, and I understand.  Mr. Wimberly --

3              MR. WIMBERLY:  Don't worry about it.  I don't take --

4              MR. JOHNSON:  My point is, Your Honor, they know how

5    to do this.  Their counsel regularly -- you know, this is his

6    business is white collar defense and corporate investigations.

7    They know how to do this, and by all means, counsel has been

8    the utmost professional, courteous, and we're trying to work

9    with them and we've tried to stay out of this Court's hair,

10   knowing how busy your docket is, but at some point we've got to

11   get documents.  We've got to be able to analyze those.  We've

12   got to be able to actually take depositions and work with

13   experts.

14       Right now our sense is that it is not counsel's fault

15   but that their client needs a fire under them to get things

16   going, because four months and we've got 700 documents.  At

17   this rate, the Supreme Court will be denying the cert on the

18   case before we get the last of the documents in a case of

19   this scope.

20             THE COURT:  Okay.  Mr. Wimberly.

21             MR. WIMBERLY:  Your Honor, we filed yesterday a short

22   memo to respond to the several contentions here, but one

23   correction.  It's not 700.  It's 15,000, I believe, 10 to

24   15,000.

25             MR. BOYD:  Pages.

92

1          MR. JOHNSON:  There's 700 documents.

2          MR. WIMBERLY:  Well, we can quarrel with metrics, but

3    in fact, we've been producing.  We've had six, seven rounds of

4    production.  We have a rolling production.

5          THE COURT:  The difference is I think they're saying

6    700 documents versus how many pages, but --

7          MR. WIMBERLY:  Oh, well --

8          THE COURT:  That's what he's saying is 700 documents.

9          MR. WIMBERLY:  But we are looking at a mound of

10   discovery requests, and that's -- that's identified for Your

11   Honor, in the scope of -- well, it's been five months.

12       I'm going to give you an example, Your Honor, of what

13   we're dealing with as to the 30(b)(6)s.  We had one -- the

14   first 30(b)(6) deposition notice comes in and it's for ESI,

15   so we find a representative who can speak to the ESI issues

16   and then we're talking to Relator's counsel and had a

17   telephone conference and I think mooted out the need for a

18   formal.  But we have been ready for a formal 30(b)(6) on ESI

19   for over a month, but we're trying to work it out.  That's

20   the spirit of the rules.  As to ESI.

21       Then in March I got not one, not two, but five -- is it

22   four or five?

23          MR. JOHNSON:  I believe it was five.

24          MR. WIMBERLY:  Five new Rule 30(b)(6) notices, and

25   I'm thinking why five, how do they relate to the -- you look at

93

1    them and they ask for a corporate -- they ask for party

2    depositions on April 29 but only if there's been substantial

3    document production, so there is no date certain for these

4    things.  Who knows?  Then the list of topics, consistent with

5    the number of interrogatories we've gotten, we got over a

6    hundred requests for admissions.  There's 70 plus topics.  Now,

7    how -- we'll have to have 30 30(b)(6) representatives.  It's

8    unwieldy.

9         So I spoke with Mr. Boyd and we had this conversation

10   followed up with e-mails and letters.  Look, this is a

11   nonstarter.  We're ready to give you a 30(b)(6)

12   representative or however many we need.  Give me a

13   manageable list of topics and let's talk about a time, a

14   date certain, not when you decide that we've had substantial

15   document production or I've decided it.  So let's talk about

16   timing.  We are going to do that.

17        But the discovery request is just a pile-on.  It's just

18   a mess.

19             THE COURT:  So you've already answered all your

20   requests for admissions, interrogatories --

21             MR. WIMBERLY:  All and we've answered them on time.

22   Your Honor, we've submitted answers and objections.  And let's

23   get to what we're dealing with, Your Honor.

24        The discovery process throughout this we have built to

25   correspond to their requests that we have not objected to

94

1   and we've told them how we're going to respond, policies and

2   procedures.  They wanted all the e-mails of our CEO -- I

3   mean our chairman, Mr. Erbey, before his deposition.  We

4   diverted our resources to go through his tens of thousands

5   of e-mails, produced that before the deposition.

6       Now they prioritized Mr. Bullock's e-mails.  There are

7   90, right?  90,000 e-mails in the population.  To the

8   question, can we limit this according to subject matter, no,

9   we want all of his e-mails.  Well, that's got to be

10  processed.  We have a vendor, we've downloaded and we are in

11  the middle of reviewing those, and sooner rather than later

12  they're going to get a deluge of e-mails.

13      But that's not all of it.  In 2015, as opposed to 1992,

14  the magnitude of this stuff is driven by a direct proportion

15  to number of custodians, Your Honor, and we have a five year

16  period of time.  They won't limit the list of custodians

17  they want us to search for their categories of evidence,

18  which means we've got -- how many custodians?  40?  40.  We

19  have loaded up.  That's a million plus documents.

20      Now, this is what's going on.  They think and they have

21  demanded that they just be allowed to take a look at all

22  that, that they can go in and do a search because we have a

23  clawback agreement.  Well, that doesn't suspend our right

24  to -- we can't just not look for privilege, period, as a

25  result.  That's an inadvertent disclosure.

95

1        But we have a process to screen for privilege.  We've

2   got a process to screen for irrelevant material that might

3   be highly provocative in the marketplace.  It's a publicly

4   traded company.

5        And let me stop there.  They don't trust us.  We don't

6   trust them.  The Relator has -- he's on record as having

7   admitted having stolen records from prior law firm

8   employment for this case.  This is what he does.  Now,

9   that's not a merits issue, but that does give us a little

10  pause before we would just give them all of our e-mails.  So

11  we have a screen.

12        THE COURT:  So we'll -- we'll accept as a fact you

13  both distrust each other on certain obligations, so where --

14  the bottom line is where are we and how can I assist?  At this

15  point is there anything I can do and I'll try to work it out?

16        MR. WIMBERLY:  Yes, Your Honor.  If I may, just in

17  terms of assisting, and I don't think they're going to

18  disagree, if we could have a plan that would limit custodians,

19  if we could have a plan that would restrict -- I think they

20  really want loan files and I think they really want certain

21  e-mail files.  They've already told us Mr. Bullock.  We're

22  going to get them that.  Mr. Erbey, we got them those.  And Mr.

23  Farris, our CEO, we're uploading and searching those.  So there

24  are targeted searches that are still voluminous, but that's not

25  this whole universe.

96

1        If the Court could facilitate a discovery plan that

2   would make some of those limitations, we'll get done a lot

3   sooner.

4           MR. JOHNSON:  Your Honor, our problem is we're

5   sitting here with no visibility into their company.  We don't

6   know who the person was responsible for, you know, enforcement

7   of this policy, that policy, so we're having to stay at a very

8   high level.  If they will begin to give us documents, more than

9   700 over the course of four months, then that's what -- I hear

10  how hard they're working but you can't look at this as we're

11  going to do one person, then we're going to do one person.

12  This case is too broad for that.

13       I mean, we need to have the people that were

14  responsible for the foreclosures.  We need those people.  We

15  need specific, germane areas of the company.  Are they

16  custodians we need?  We don't know who they are.  They do,

17  and they need to identify them and they need to tell us who

18  does what and then we maybe can select.  But right now we're

19  blind.

20          THE COURT:  So how do you perceive that the Court can

21  assist?

22          MR. JOHNSON:  My perception is the Court can assist

23  by giving us dates certain by which to complete document

24  production, by asking -- by ordering them to give us by

25  category who the custodians are in certain areas of

97

 1   responsibility relative to the case and they can -- I don't

 2   know how to segregate those categories because I don't know

 3   what their departments are, but starting at the CEO and CFO.  I

 4   mean, they aren't the people that are on the ground.  I

 5   understand there were reasons to do that.  I'm not being

 6   critical about it.  But it's the lower and mid level people

 7   that actually have the information that we're needing.  And

 8   most of all, we need loan files.  We're going to need that.

 9       And so a good production would have been everything

10   they gave New York as a starting point, because then at

11   least we can start to see the policies and how things break

12   down and who has supervisory -- maybe that would be helpful,

13   if you would order them to produce everything they gave to

14   New York.

15           MR. WIMBERLY:  On the loan files -- and he's right,

16   that's the core of their stuff -- we have agreed to a process.

17   So in a way what you're saying is a little bit behind what --

18   where Chad Walker is with my team.  We are sending them 14

19   sample files from Texas jurisdiction side of the complaint.

20   That's the starting point.  Beyond that they will tell us what

21   they --

22       Loan files, they're tough to put together, but we're in

23   the process where they at least will identify what they

24   want.  Consistent with my suggestion to the Court as to how

25   the Court might help, with loan files I think we're okay.  I

98

1    think we have a process.  They'll talk to us about what they

2    want beyond the 14 sample.  So that's not the problem.

3         In terms of custodians, they have work charts.  They've

4    got interrogatories they can ask.  I don't know if they want

5    us to interpret their points with respect to our custodians

6    over time.  We can't do that.

7         THE COURT:  Of course, you understand the Eastern

8    District, the way we view document production, disclosure is a

9    wide berth.  So, I mean, some judges don't even require a

10   request for production.  It's simply a matter of saying you

11   produce everything that goes to any claim or defense.

12        MR. WIMBERLY:  Right.

13        MR. JOHNSON:  And I think that would be helpful in

14   this case, Your Honor.

15        MR. WIMBERLY:  Your Honor, I suggested limiting

16   custodians to limit the time.  We are actually proceeding on

17   the basis of the large population of custodians.  We have in

18   fact jumped ahead of the Court on that.  Not ahead of the

19   Court, but we are consistent with where the Court is.  We

20   recognize our obligation.

21        We have now 60 people or so and we're uploading their

22   e-mails.  That's five years of e-mails.  You think of the

23   normal employee, if Bullock is an example, that may be

24   90,000 e-mails.  Let's say it's 60,000.  There are going to

25   be 60 sets of 60,000 e-mails in this database.

1        We have a search protocol that we worked out with them.

2   We have search terms.  We're ready to pull and review, but

3   that's a time problem.  That's not a substance problem.

4   That's what we're doing right now.

5        But these wheels, they're going but it will take a long

6   time.  With that universe of searchable material, our vendor

7   has made it searchable and now we're putting our search

8   terms to pull out the relevant material and we're going to

9   screen and produce.  But it's a time problem.

10           MR. JOHNSON:  I think, Your Honor, obviously e-mail

11  has its own unique problem but there's also the issue of just

12  the corporate documents, policy manuals.  I believe we have

13  some org charts and the procedure manuals, check lists, the

14  training materials that these employees would have received.

15  Those are things that we ought to be able to get and that I

16  know within the 700 we may have some sampling of some of those

17  documents, but I don't believe we have all of them.

18           MR. WIMBERLY:  Well, you went after all of them.

19  That's the big chunk of the first roll of the production.

20  Maybe we need to meet and confer on that.  I'm surprised.  We

21  have pulled out as many policies and procedures as we can.

22  We're still looking for them.

23           THE COURT:  The only statement I would have is it

24  doesn't seem like in a four month period of time, if they have

25  only received 700 documents in this kind of case, that seems

100

1    odd to the Court.

2              MR. WIMBERLY:  We have chunks in the queue.

3              THE COURT:  Right.  But my question is when are they

4    going to get these chunks?

5              MR. WIMBERLY:  The picture will look very different

6    two weeks from now, Your Honor.  I can't though commit to the

7    Court in -- to be candid -- well, I'll be candid anyway.  Don't

8    worry about that, Your Honor.

9              THE COURT:  I assume you would be.

10             MR. WIMBERLY:  I don't know what's beyond that, but I

11   do know they're going to start getting chunks of information

12   that we are -- we are at a very positive point.

13             THE COURT:  And what about -- Mr. Johnson raises the

14   issue of -- the issue that took the first hour or so or more of

15   our hearing on going after the non-parties and getting the

16   documents, the documents that of course they don't want to

17   produce -- spend the time to produce because they say they can

18   get them from you or your client.  So where are you on just

19   producing all the documents you produced to them?

20             MR. WIMBERLY:  We have now got -- we've got

21   electronic access to the Share Point that was alluded to.

22             THE COURT:  That should be a separate production

23   of --

24             MR. WIMBERLY:  Yes.

25             THE COURT:  -- different from what was provided --

101

1           MR. WIMBERLY:  It is.

2           THE COURT:  -- to the Department.

3           MR. WIMBERLY:  You are of course absolutely right.

4    It is.

5           THE COURT:  So where are we at on that?

6           MR. WIMBERLY:  We have now -- we've got the database,

7    we've got the documents, and we're confirming that these are

8    the materials actually provided and making sure that we

9    understand the percentage of all the materials that represent.

10   But it ought to be almost all, and theoretically, we should be

11   able next to download.

12       We still need to review but it's going to be a lot

13   quicker process because of the nature of the history of

14   those things.

15       But they are segregated.  We have them electronically

16   available and I've got a separate team bird-dogging that.

17           MR. BOYD:  May it please the Court, Sam Boyd.

18           THE COURT:  Mr. Boyd, you haven't spoken at all.

19           MR. BOYD:  Yes.  The Court has hit on really the key

20   sensitive point, and that is I've been in cases with Lockheed

21   Martin over building all kinds of military devices and boats,

22   eight million, ten million documents, and it did take them

23   three months to comb their entire files.  We got everything in

24   three months.

25       We haven't gotten a smattering of e-mail.  I mean,

102

1    somebody could have just gone to somebody's monitor and to

2    their CPU and run off some e-mails for us.

3        We haven't gotten any loans.  And I can tell the Court

4    why that's so critical, because the way they do their loan

5    processes, we understand through our Relator, is unlawful in

6    many regards.

7        All we need -- and I suggested to counsel, I said

8    look -- he said, oh, we've got half a million loan

9    modifications.  I said no, look, let's do it the easy way.

10   The low hanging fruit is the Boston Portfolio, because we

11   have a witness, potential co-relator that we will join who

12   has already given disclosure to the Government.  He said,

13   look, we reviewed -- my committee reviewed about 7500 loans,

14   a committee of 19.  7500?  That's nothing in this day and

15   age.  It really is nothing.  If we had a thousand of those,

16   if we had -- those are the ones, as Brett said, led to --

17            THE COURT:  Mr. Johnson.

18            MR. BOYD:  -- the stipulations.  Mr. Johnson.  Excuse

19   me, you're correct.

20       If we had those, now we're getting into the fertile

21   fields.  And of course they have the documents.  Our people

22   were not authorized to take the documents out of Ocwen.

23       So if the Court said look, your Boston Portfolio, if

24   you have 7500 loans, turn them over, that would at least get

25   us started.  But truly, we can't do anything.  We're just

1    spinning.

2          THE COURT:  Well, I understand.  Thank you.  I think

3    Mr. Wimberly understands the Court's view of the discovery in

4    our district and what should and shouldn't be happening, and

5    I'll accept at this point that you're going through that

6    process, but that process needs to speed up a little bit, okay?

7         Mr. Johnson, he says life will look a lot different in

8    two weeks.  If it's not, let's talk again.

9          MR. JOHNSON:  That -- I was actually going to suggest

10   that maybe we get this production, we see if things speed up in

11   accordance with your wishes, and maybe have another status

12   conference even by telephone maybe in 30 days.

13         THE COURT:  Yeah, and I'm available to do it by

14   telephone.  Of course, today's hearing would be too long.  My

15   only issue about doing it by telephone is I can't have too many

16   speakers.  The court reporter will have difficulty trying to

17   discern that, especially when people use cell phones these

18   days.

19         MR. WIMBERLY:  Your Honor, if the Court please, so

20   that I haven't put everybody out on a limb in terms of the

21   production effort, I'm confident there will be substantial

22   progress in two weeks.  What that means --

23         THE COURT:  I understand.

24         MR. WIMBERLY:  And I'll present to the Court whatever

25   it is and we can deal with it, but I don't want the Court to

104

1    misunderstand.

2           THE COURT:  Oh, I understand and I'm not holding you

3    to that, but I'm instructing you --

4           MR. WIMBERLY:  We --

5           THE COURT:  -- life should look a lot different in

6    two weeks.  It needs to pick up the pace.

7           MR. WIMBERLY:  Well, we'll --

8           THE COURT:  If not -- y'all confer and if it hasn't

9    picked up the pace, then come back to me and I'll make sure it

10   picks up.

11          MR. WIMBERLY:  We'll do our best, Your Honor.

12          THE COURT:  Okay.  What else?  Anything from Ocwen,

13   just miscellaneous issues?

14          MR. WIMBERLY:  No, Your Honor.  That -- that was it

15   on ours.

16          THE COURT:  Anything from the Relators?

17          MR. BOYD:  One other thing, Your Honor.

18          THE COURT:  Yes, Mr. Boyd.

19          MR. BOYD:  I took the deposition of Mr. Erbey, the

20   former executive chairman of Ocwen, and counsel inserted his

21   privilege objections to a number of things like what facts do

22   you know that support that position and so on.  It became an

23   impossibility.  So all I want to say is I hope the Court

24   appreciates our difficulty, not just with documents, but

25   somehow we have to get past this privilege thing.  And I'm

105

 1    worried about your suspense dates.

 2              THE COURT:  I'm sorry, I didn't hear the last.

 3              MR. BOYD:  Your suspense dates in your Scheduling

 4    Order, because until -- I can't get much substantive deposition

 5    testimony as long as we have these instructions not to answer

 6    questions.

 7              MR. WIMBERLY:  Your Honor, let me --

 8              THE COURT:  Well --

 9              MR. WIMBERLY:  I do want to address that, because

10    that's not fair.

11              MR. BOYD:  What?

12              MR. WIMBERLY:  The instructions not to answer.

13    Erbey's were specifically, and you knew they were coming, with

14    respect to what we argued today and that was to preserve the

15    record, and we did.  We asked you specifically can we postpone

16    this pending getting some rulings on the privileges and you

17    wanted to go forward with your deposition.  And as you will

18    agree, I facilitated having the deposition.

19       We fought the good fight and we put him up for the

20    deposition and it went down.  But it was before the

21    decisions on -- and so I don't -- I know, Mr. Boyd, you

22    don't --

23              THE COURT:  Okay.  Let me --

24              MR. WIMBERLY:  -- intend to do this, and we did

25    instruct him not to answer on --

106

1          THE COURT:  Mr. Wimberly.

2          MR. JOHNSON:  Your Honor, this is --

3          THE COURT:  Okay.  First, let me just tell -- let me

4     say, of course, privilege is an objection allowed to be made in

5     the Eastern District in depositions, if it truly is a privilege

6     issue.

7          If you perceive that it's not a privilege issue, then

8     bring that to the Court and I can address that.  And we can

9     do that informally in the sense of it doesn't have to be a

10    motion to compel.  If you can't -- after a good faith

11    attempt to work it out, if you can't, then submit it to the

12    Court and we'll have a telephone conference to try to

13    resolve that.

14         If it truly is a privilege issue or if it depends on

15    decisions the Court has to make on these other issues, if

16    that impacts it, I'm not sure exactly.  But based on the

17    reference that you made, then certainly after the Court's

18    decision on the discovery issues, if that changes that

19    result, then we'll address it at that point.

20         MR. JOHNSON:  I was going to say, I suspect that the

21    Court's decisions on the issues of the day will give guidance

22    as to how that issue ought to be resolved regarding Mr. Erbey.

23         MR. WIMBERLY:  Thank you, Your Honor.

24         THE COURT:  Okay.  Anything else from Relators?

25         MR. JOHNSON:  No, Your Honor.

107

1          THE COURT:  Okay.  Very good.  Thank you very much

2     for a spirited debate.

3          MR. JOHNSON:  Thank you, Your Honor, for so much

4     time.

5          MR. WIMBERLY:  Thank you, Your Honor.

6          MR. DANNER:  Thank you, Judge.

7

8

9

10

11

12

13

14

15

16

17

18     I certify that the foregoing is a correct transcript from

19     the record of proceedings in the above-entitled matter.

20

21     _____          _____

22     Jan Mason                             Date

23

24

25